FILED UNDER SEAL 31 U.S.C. §3730(b)(2)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
OCT 1 4 2005
Oct. 14 , 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
NF

| | |
|---|---|
| UNITED STATES OF AMERICA ex. rel. GREG HUDALLA, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| WALSH CONSTRUCTION COMPANY, an Illinois Corporation | ) ) ) |
| Defendant. | ) ) |

No. **05C 5930**

JURY TRIAL DEMANDED

**JUDGE KOCORAS**

**MAGISTRATE JUDGE KEYS**

COMPLAINT

Plaintiffs, the United States of America *ex. rel.* Greg Hudalla, individually, by and through their attorneys, Shelly B. Kulwin and Jeffrey R. Kulwin, KULWIN & ASSOCIATES, L.L.C., complains of the defendant, WALSH CONSTRUCTION COMPANY, an Illinois corporation, as follows:

COUNT I
(Violation of 31 U.S.C. § 3729(a)(1)

JURISDICTION AND VENUE

1.      As required under the False Claims Act, 31 U.S.C. § 3730 (b)(2), on October 11, 2005, Greg Hudalla, the relator, has provided the Attorney General of the United States and the United States Attorney for the Northern District of Illinois with a statement of all material evidence and information related to the complaint.

2

2.      This Court has jurisdiction over this matter pursuant to 31 U.S.C. § 3730 (b) (in that the claims for relief in this action are brought in the name of the United States Government) and pursuant to 31 U.S.C. § 3730 (e)(4) (in that Hudalla is an "original source" of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this action based on this information).

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b), (c) in that the defendant resides in this district.

## PARTIES

4.      Defendant, Walsh Construction Company (Walsh) is an Illinois corporation and employs over 500 employees. Walsh's principal place of business is located in Chicago, Illinois. Walsh is engaged in the construction business and provides, among other things, general contracting services to both private and government developers. Walsh is one of the largest construction companies in the City of Chicago. Walsh serves as general contractor for many federally financed construction projects including, but not limited to, Westhaven, Park Boulevard, Park Crescent and Altgeld Gardens. The construction value of these other federally funded construction projects exceeds $150,000,000.

5.      Plaintiff, Greg Hudalla (Hudalla), the relator, resides in Downers Grove, Illinois. Hudalla has been in the construction industry for over twenty-five (25) years.

## FACTS

6.     Woodlawn Community Development Corporation (WCDC) is an Illinois corporation with its principal place of business located in Chicago, Illinois. WCDC is, and has been, a not-for-profit social services community organization for over 41 years.

7.     In recent years, the City of Chicago (City) has promoted public policies in which it has demolished and re-developed pre-existing public housing structures.

8.     In or around 2000, the City decided to demolish the Prairie Shores public housing project located at or near 26th Street and Calumet Avenue in Chicago, Illinois, and re-locate its tenants. The re-development project was named South Park Plaza (SPP).

9.     SPP was to be built in two phases: Phase I was comprised of four cluster town homes and two mid-rise buildings containing approximately 134 rental units intended for City residents who qualify for City rent assistance programs. Phase II was comprised of over 90 town homes intended for general sale to the public at fair market value.

10.     The SPP project was funded by local, state and federal funds. Specifically, the National Equity Fund guaranteed the SPP equity funding and is an ownership partner with WCDC in SPP with WCDC. The United States Department of Housing and Urban Development (HUD) provided 51% of the SPP funding and guaranteed 100% of the SPP mortgage dollars. The City provided 49% of the SPP funding through its home funds program.   Cole Taylor Bank provided an interim bridge loan of $5,600,000.

4

11. Beginning in 2000, the City and WCDC contracted to allow WCDC to act as developer for SPP, to manage the forthcoming SPP rental properties and to assist the City in relocating the former Prairie Shores tenants. WCDC was entitled to a fixed developer's fee of $2,250,000 at the time it contracted with the City and HUD.

12. Given the size and scope of the SPP project, WCDC met with and solicited bids from general contractors in an effort to hire a general contractor for the SPP project including, among others, Hunter Alliance Corporation, Walsh, UBM General Contractors and Pepper Construction Co. The City advised WCDC that Walsh was the "right company" for the SPP project and that the City would prefer if it contracted with Walsh for the SPP project

13. In the fall of 2002, WCDC hired Hudalla to, among other things, oversee the SPP construction project.

14. Hudalla's WCDC responsibilities included serving as WCDC's construction site representative, interfacing with the SPP general contractor throughout the project, reviewing construction change orders requested and/or required on the project.

15. WCDC incorporated South Park Plaza, L.L.C. to perform its SSP work. In December, 2002, WCDC selected Walsh as the SSP general contractor. In September 2003, South Park Plaza, L.L.C. and Walsh executed a HUD Construction Contract Cost Plus on HUD form HUD-92442-A (WCDC/Walsh Contract) attached hereto and incorporated herein as Exhibit A.

5

16.     The *WCDC/Walsh Contract* provided, among other things, that: (1) WCDC would pay the actual SPP construction costs; (2) it would pay Walsh $1,171,692 to serve as general contractor; (3) the total maximum SPP payments were not to exceed $22,501,843; and (4) any excess amounts and/or payments shall be returned to WCDC. *See WCDC/Walsh Contract,* Exhibit A. Cost savings for the project were to be returned to the developer which reduced the mortgage amount on the property reducing WCDC's monthly SPP burden which, in turn, allowed it to offer lower rents to SPP tenants. *Id.*

17.     In its capacity as general contractor, Walsh was required to, among other things, negotiate with and select subcontractors for the SPP project. Walsh executed subcontractor contracts with each subcontractor performing work on the SPP project. Each subcontract contains an exhibit outlining the scope of work and responsibilities for that particular subcontract.

18.     Pursuant to the *WCDC/Walsh Contract,* once Walsh began the SPP construction project, Walsh would collect its contract fee, and the value of construction work completed and materials utilized, on a monthly basis by submitting monthly applications for payment and draw requests on HUD form HUD-92448. On this form, Walsh was required to itemize, and account for the costs and fees constituting each draw request. A Walsh representative is further required to attest to the accuracy of the application for payment.

6

19.    Pursuant to the *WCDC/Walsh Contract* and the HUD, Illinois Housing Department Authority and the City Department of Housing regulations, Walsh's general contractor fee cannot exceed six percent (6%) of the total construction costs, its overhead cannot exceed two percent (2%) of the total construction costs and the general conditions for the project cannot exceed six percent (6%) of the total construction costs of the project. *See* Walsh/WCDC Contract, Exhibit A.

20.    The "general conditions" of a construction project refers to the general costs incurred in the day-to-day operation of the construction site including salary for a project manager and site superintendent, certain safety issues and other miscellaneous labor. Walsh utilizes an internal list of expenses which constitute its general conditions. *See Walsh SPP General Conditions List*, attached hereto and incorporated herein as Exhibit B. "Builder's overhead" refers to expenses such as upper management salary and fees and insurance.

21. The SPP project is now completed and awaiting final audit and review by HUD. During course of the project, Walsh presented 21 total applications for payment and draw requests. In each and every one of the applications for payment and draw requests, Walsh manipulated the line items on those applications for payment and draw requests to allow it collect funds as profit which it either was already paid pursuant to its general conditions/contractors' fee and overhead budget or which were already paid to subcontractors as a legitimate payments pursuant to their subcontracts. As a result, Walsh collected amounts to which it was not entitled under federal law or pursuant to the *WCDC/Walsh Contract* and thus caused the federal government to make to Walsh fraudulent and unlawful payments on the SPP project.

22. For example, on or about June 24, 2004, Walsh presented an application for payment which constituted draw request no. 10. *See Walsh June 24, 2004 Application for Payment and Draw Request*, attached hereto and incorporated herein as Exhibit C. In that draw request:

A. Walsh sought payment of approximately $35,500 for "electrical consumption." Electrical consumption, however, is a "general condition" as indicated on Walsh's own internal documents. *See Walsh June 24, 2004 Application for Payment and Draw Request*, Exhibit C and *Walsh SPP General Conditions List*, Exhibit B

B. Walsh sought payment of approximately $99,847 for "trenching." "Trenching" is an expense otherwise accounted for in the electrical subcontractor contract scope of work. *See Walsh June 24, 2004 Application for Payment and Draw Request*, Exhibit C and *SPP Electrical Subcontract*, attached hereto and incorporated herein as Exhibit D.

8

C.  Walsh sought payment of approximately $101,247 for masonry protection safety and taping which is already accounted for in the masonry subcontract scope of work and/or otherwise accounted for as WCDC's responsibility. *See Walsh June 24, 2004 Application for Payment and Draw Request*, Exhibit C and *SPP Masonry Subcontract*, attached hereto and incorporated herein as Exhibit E.

D.  Walsh sought payment of approximately $11,103 for structural steel/miscellaneous metals protection and safety which is already accounted for in the structural steel subcontract scope of work and/or otherwise accounted for as WCDC's responsibility. *See Walsh June 24, 2004 Application for Payment and Draw Request*, Exhibit C and *SPP Structural Steel Subcontract*, attached hereto and incorporated herein as Exhibit L.

E.  Walsh sought payment of approximately $33.339 for roofing and fireproofing coordination protection and safety which is already accounted for in the roofing subcontract scope of work, otherwise accounted for as WCDC's responsibility (site protection) and/or already accounted for in Walsh's contractor's fee (subcontractor coordination). *See WCDC/Walsh Contract*, Exhibit A; *Walsh June 24, 2004 Application for Payment and Draw Request*, Exhibit C and *SPP Roofing Subcontract*, attached hereto and incorporated herein as Exhibit H.

23.  Walsh attempted to hide these fraudulent payments in the manner in which it executed and reported the values of the SPP subcontractor contracts.

24.  For example, Walsh was required by HUD to report on HUD form HUD-2328 the contractor's cost breakdown and schedule of values. *See Walsh Cost Breakdown and Schedule of Values* attached hereto as Exhibit F. On HUD form HUD-2328, Walsh falsely inflated the value of the SPP subcontractor contracts. For example:

9

A.    Walsh advised HUD that the plumbing subcontract contract
was valued at $1,819,310 when, in fact, Hudalla and WCDC
later learned that the actual plumbing subcontract was
valued at $1,562,100. This discrepancy allowed Walsh to
collect the difference fraudulently as profit by creating false
line items on draw requests. *See Walsh Cost Breakdown
and Schedule of Values*, Exhibit F and *SPP Plumbing
Subcontract*, attached hereto and incorporated herein as
Exhibit G.

B.    Walsh advised HUD that the roofing subcontract contract
was valued at $562,386 when, in fact, Hudalla and WCDC
later learned that the actual roofing subcontract was valued
at $542,875. This discrepancy allowed Walsh to collect the
difference fraudulently as profit by creating false line items
on draw requests. *See Walsh Cost Breakdown and Schedule
of Values*, Exhibit F and *SPP Roofing Subcontract*, attached
hereto and incorporated herein as Exhibit H.

C.    Walsh advised HUD that the hydraulic elevator subcontract
contract was valued at $218,566 when, in fact, Hudalla and
WCDC later learned that the actual hydraulic elevator
subcontract was valued at $203,600. This discrepancy
allowed Walsh to collect the difference fraudulently as profit
by creating false line items on draw requests. *See Walsh
Cost Breakdown and Schedule of Values*, Exhibit F and *SPP
Hydraulic Elevator Subcontract*, attached hereto and
incorporated herein as Exhibit I.

D.    Walsh advised HUD that the electrical subcontractor
contract was valued at $2,472,511 when, in fact, Hudalla
and WCDC later learned that the actual electrical
subcontract was valued at $2,180,298. This discrepancy
allowed Walsh to collect the difference fraudulently as profit
by creating false electrical related line items on draw
requests such as "consumption" and "trenching." *See Walsh
Cost Breakdown and Schedule of Values*, Exhibit F and *SPP
Electrical Subcontract*, Exhibit D.

10

E.   Walsh advised HUD that the heating and ventilation subcontractor contract was valued at $1,690,589 when, in fact, Hudalla and WCDC later learned that the actual heating and ventilation subcontract was valued at $1,591,220. This allowed Walsh to collect the difference fraudulently as profit by creating false heating and ventilation related line items. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Heating and Ventilation Subcontract*, attached hereto and incorporated herein as Exhibit J.

F.   Walsh advised HUD that the earth excavation subcontract contract was valued at $ 592,021 when, in fact, Hudalla and WCDC later learned that the actual earth excavation subcontract was valued at $480,746. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false line items on draw requests. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Earth Excavation Subcontract*, attached hereto and incorporated herein as Exhibit K.

G.   Walsh advised HUD that the structural metals subcontract contract was valued at $680,249 when, in fact, Hudalla and WCDC later learned that the actual structural metals subcontract was valued at $581,996. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false line items on draw requests. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Structural Metals Subcontract*, attached hereto and incorporated herein as Exhibit L.

H.   Walsh advised HUD that the windows subcontract contract was valued at $629,543 when, in fact, Hudalla and WCDC later learned that the actual windows subcontract was valued at $556,040. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false line items on draw requests. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Windows Subcontract*, attached hereto and incorporated herein as Exhibit M.

11

25.     WCDC, Walsh, and others, including Hudalla, attended monthly meetings where each of Walsh's applications for payment and draw requests were discussed. Hudalla, on numerous occasions, advised both Walsh and WCDC that it appeared as if Walsh was seeking payment for expenses which were either not permitted pursuant to federal law or the contract, or otherwise were already accounted for under the "general conditions" portion of the draw request.

26.     Craig Kane, Walsh's SPP project manager, repeatedly advised Hudalla that this is how Walsh regularly does business and accounts for its expenses, costs and fees, *i.e.*, the suspicious line items were caused by "internal change orders" or were "deficits" related to subcontractor contracts.    Notwithstanding these responses, Hudalla later learned that these line items were either clearly allocated as a general condition or directly accounted for pursuant to a subcontractor contract.

27.     Hudalla on numerous occasions bought these apparent discrepancies in his WCDC supervisors.    Hudalla was told repeatedly that, given both the City's preference that Walsh act as the SPP general contractor and the timing of the project itself, that WCDC should accept Walsh's documents as they were presented.

12

28.     On October 5, 2005, Walsh submitted to WCDC an executed Contractor's Certificate of Actual Cost on HUD form HUD-92330-A. *See Walsh SPP Contractor's Certificate of Actual Cost* attached hereto and incorporated herein as Exhibit N. On the *Contractor's Certificate of Actual Cost*, Walsh under reported by approximately $1,300,000 the amounts of funds it received for the SPP construction costs. *Compare Walsh SPP Contractor's Certificate of Actual Cost*, Exhibit N with *WCDC Draw 21 Draft Sworn Statement*, attached hereto and incorporated herein as Exhibit O.

29.     Walsh under reported the SPP construction costs on the *SPP Contractor's Certificate of Actual Cost* to ensure it would receive amounts it was currently owed while not exceeding the maximum SPP construction costs pursuant to *the WCDC/Walsh Contract*. In reality, Walsh collected fraudulently in excess of $1,300,000 in profit from the SPP project in the manner outlined above.

30.     As a result of the conduct detailed in Paragraphs 1 through 29 of this Count I, Walsh caused to be filed with the United States Government claims for construction payments with knowledge of their falsity or with grossly negligent or reckless disregard to facts and conditions that would indicate that said claims were inaccurate or inappropriate and false and caused payments for said claims to be made by the United States Government.

31.     By reason of the violation of 31 U.S.C. 3729(a)(1), Walsh has knowingly or recklessly damaged the United States Government on the SPP project in an as yet undetermined amount, but in any event, in excess of $1,300,000.

13

32. By reason of the violation of 31 U.S.C. 3729(a)(1), and given the sheer number of other government financed construction projects for which Walsh serves as general contractor, including, but not limited to, the federally financed construction projects known as Westhaven, Park Boulevard, Park Crescent and Altgeld Gardens, and the manner in which Walsh "accounts" for its costs, expenses and fees, Walsh has, on information and belief, knowingly or recklessly damaged the United States Government in an as yet undetermined amount but, in any event, in excess of $5,000,000.

## COUNT II

### (Violation of 31 U.S.C. § 3729(a)(2)

1-32. The Plaintiffs repeat and re-allege the allegations of Paragraphs 1 through 32 of Count I as paragraphs 1 through 32 of this Count II.

33. As a result of the conduct detailed in Paragraphs 1 through 29 of this Count II, Walsh caused to be filed with the United States Government claims for construction payments with knowledge of their falsity or with grossly negligent or reckless disregard to facts and conditions that would indicate that said claims were inaccurate or inappropriate and false and caused payments for said claims to be made by the United States Government.

34. By reason of the violation of 31 U.S.C. § 3729(a)(2), Walsh has knowingly or recklessly damaged the United States Government in an as yet undetermined amount but, in any event, in excess of $6,300,000.

14

## COUNT III

### (Violation of 31 U.S.C. § 3729(a)(7)

1·34. The Plaintiffs repeat and re·allege the allegations of Paragraphs 1 through 34 of Counts I and II as paragraphs 1 through 34 of this Count III.

35. As a result of the conduct detailed in Paragraphs 1 through 29 of this Count III, Walsh knowingly used or caused to be used a false statement to conceal, avoid and decrease its obligation to pay or transmit money to the Government funds which were not utilized for construction costs on the SPP project and, on information and belief, other federally funded construction projects.

36. By reason of the violation of 31 U.S.C. § 3729(a)(7), Walsh has knowingly or recklessly damaged the United States Government in an as yet undetermined amount but, in any event, in excess of $6,300,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, United States ex. rel. Greg Hudalla, and Greg Hudalla individually, pray that judgment be entered against the defendant, Walsh Construction Company:

A.     In an amount, presently undeterminable, upon Counts I -III for violation of 31 U.S.C. § 3729 (a)(1), (2) and (7) duly trebled in addition to a fine of not less than $5,000 and not more than $10,000, together with attorney's fees and costs and any other relief provided pursuant to 31 U.S.C. § 3729; and

B.     In addition, plaintiffs pray for such further and additional relief at law or in equity that this Court may deem appropriate or proper.

PLAINTIFFS, UNITED STATES EX. REL. GREG HUDALLA AND GREG HUDALLA INDIVIDUALLY, DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

One of the attorneys for
Plaintiffs

Shelly B. Kulwin
Jeffrey R. Kulwin
KULWIN & ASSOCIATES
161 North Clark St., Suite 2500
Chicago, IL 60601
312/641-0300

FILED UNDER SEAL 31 U.S.C. §3730(b)(2)

<u>FILED UNDER SEAL 31 U.S.C. §3730(b)(2)</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex. rel. GREG HUDALLA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| WALSH CONSTRUCTION | ) | **JURY TRIAL DEMANDED** |
| COMPANY, an Illinois Corporation | ) | |
| | ) | |
| Defendant. | ) | |

# GREG HUDALLA'S COMPLAINT
# APPENDIX OF EXHIBITS

Shelly B. Kulwin
Jeffrey R. Kulwin
KULWIN & ASSOCIATES, L.L.C.
161 North Clark St., Suite 2500
Chicago, IL 60601
312/641-0300
*Attorneys for Greg Hudalla*

**Exhibit A**



# Construction Contract
## Cost Plus

**U.S. Department of Housing
and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0011 (exp. 1/31/2004)

Public Reporting Burden for this collection is estimated to average 16 hours per response, including the time for reviewing, searching existing data sources, gathering and maintaining the data needed, and compiling and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Officer, 451 7th Street SW, Washington, DC 20410-3600.

The Department of Housing and Urban Development (HUD) is authorized to collect this information by provisions set forth in Article 1, E of the National Housing Act (Public Law 479, 48 Stat. 1246, 12 U.S.C., 1701 et. seq.). This information is necessary for contractors and mortgagors to obtain approval from the FHA Commissioner's to document the terms of any Contract Document, or order for extra work, or changes by altering or adding to the work, or which will change the design concept. The information is used by HUD to ensure that viable projects are being developed. Furnishing of this information is mandatory, and failure to provide it may result in your not receiving your benefits. This agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless that collection displays a valid OMB number.

Privacy Act Notice. The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses the data only in response to a Freedom of Information request. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

This Agreement, made the _____ day of **September** 20 **03** , between **Walsh Construction Company**

**of Illinois, an Illinois corporation** (hereinafter called the "Contractor") and

**South Park Plaza, L.P. an Illinois limited partnership** (hereinafter called the "Owner").

Witnesseth, that the Contractor and the Owner, for the consideration hereinafter set out, agree as follows:

### Article 1: Scope of Contract

A. The Contract between the parties is set forth in the "Contract Documents," which consist of this Agreement, the Drawings and Specifications, which include the current edition of AIA Document A201, "General Conditions of the Contract for Construction," and Form HUD-2554, "Supplementary Conditions of the Contract for Construction." The provisions of this instrument and the said HUD Supplementary Conditions take precedence over all inconsistent provisions in the said AIA General Conditions. This Contract constitutes the entire agreement between the parties, and any previously existing contract concerning the work contemplated by the Contract Documents is hereby revoked.

B. The Contractor shall furnish all of the materials and all of the work (within the property lines) shown on, and in accordance with, the Drawings and Specifications entitled **See Item (6)**

**attached hereto and made a part hereof.**

HUD Project No. **071-35693** , dated **See Item (6)**
**attached hereto and made a part hereof.**
C. The Drawings, which are numbered **as set forth in Item (6)** and the Specifications, the pages of which are numbered _____

**as set forth in Item (6)**

have been prepared by **Lowenberg & Associates, Inc.** ("Design Architect").

The Architect administering the Construction Contract (hereinafter, and elsewhere in the Contract Documents, referred to as the "Architect") is **Lowenberg & Associates, Inc.,**
**One West Superior St., Ste. 200**
**Chicago, IL 60610**

D. A master set of said Drawings and Specifications, identified by the parties hereto and by the Design Architect, the Architect, and the Contractor's Surety or Guarantor have been placed on file with the Federal Housing Commissioner (hereinafter referred to as the "Commissioner"), and shall govern in all matters which arise with respect to such Drawings and Specifications.

E. Changes in the Drawings and Specifications or any terms of the Contract Documents, or orders for extra work, or changes by altering or adding to the work, or which will change the design concept, may be effected only with the prior written approval of the Owner's Lender (more particularly identified below and hereinafter referred to as the "Lender") and the Commissioner and under such conditions as either the Lender or the Commissioner may establish.

### Article 2: Time

A. The work to be performed under this Contract shall be commenced within **10** days of this Agreement, and shall be completed by **February** , 20 **05** . The time by which the work shall be completed may be extended in accordance with the terms of the said AIA General Conditions only with the prior written approval of the Commissioner.

B. The Contractor shall correct any defects due to faulty materials or workmanship which appear within one year from the date of final completion.

C. If the work is not brought to final completion in accordance with the Drawings and Specifications, including any authorized changes, by the date specified above, or by such date to which the contract time may be extended, the maximum sum stated in Article 3A(1) below shall be reduced by $ **2,024.18** , as liquidated damages, for each day of delay until the date of final completion. When the Owner cost certifies to HUD, the actual cost of interest, taxes, insurance, mortgage insurance premiums, and construction and permanent loan extension fees, as approved by the Commissioner, for the period from the scheduled date of completion through the date construction was actually completed, shall be determined. The lesser of the liquidated or actual damages shall be applied. The applicable amount shall be reduced by the project's net operating income (as determined by the Commissioner) for the damage period.

D. The Owner and Contractor may amend this contract prior to initial endorsement (insurance of advances projects) or upon execution of the construction contract (insurance upon completion projects), in a form prescribed by the Commissioner, to provide for an incentive payment to the Contractor, which will result in an increase in the contract sums stated in Article 3A below, if the work is completed before the date specified in this contract. The Contractor will not be entitled to any incentive payment resulting from early completion if HUD determines that the Contractor's cost certification, required by Article 10, is fraudulent or materially misrepresents the Contractor's actual cost of construction.

E. The date of final completion shall be the date the HUD representative signs the final HUD Representative's Trip Report provided that the trip report is subsequently endorsed by the Chief Architect.

### Article 3: Contract Sum and Payments

A. (1) Subject to the provisions hereinafter set out, the Owner shall pay to the Contractor for the performance of this Contract the following items in cash:

  (a) The actual cost of construction as defined in Article 10 below; plus

  (b) A fee of $ 1,171,692 .

  In no event, however, shall the total cash payable pursuant to this paragraph (1) exceed $ 22,501,843 .

(2) In addition to any cash fee provided for in paragraph (1), the Owner shall pay to the Contractor by means other than cash, the following:

  (a) A note in the form prescribed by the Commissioner in the amount of $ N/A .

  (b)

(3) If, upon completion, the Contractor shall have received cash payments in excess of (a) the actual cost of construction, plus (b) the cash fee specified in paragraph (1), plus the additional amount to be paid under the provisions of paragraph (2), all such excess shall be refunded to the Owner.

B. Each month after the commencement of work hereunder, the Contractor shall make a monthly request on Form HUD-92448 for payment by the Owner for work done during the preceding month. Each request for payment shall be filed at least __30__ days before the date payment is desired. Subject to the approval of the Lender and the Commissioner, the Contractor shall be entitled to payment thereon in an amount equal to (1) the total value of classes of the work acceptably completed; plus (2) the value of materials and equipment not incorporated in the work, but delivered to and suitably stored at the site; plus (3) the value of components stored off-site in compliance with applicable HUD requirements; less (4) 10 percent holdback and less prior payments. The "values" of (1), (2) and (3) shall be computed in accordance with the amounts assigned to classes of work in the "Contractor's and/or Mortgagor's Cost Breakdown," attached hereto as Exhibit "A". The Contractor agrees that no materials or equipment required by the Specifications will be purchased under a conditional sale contract or with the use of any security agreement or other vendor's title or lien retention instrument.

C. The balance due the Contractor hereunder shall be payable upon the expiration of 30 days after the work hereunder is fully completed, provided the following have occurred.

  (1) All work hereunder requiring inspection by municipal or other governmental authorities having jurisdiction has been inspected and approved by such authorities and by the rating or inspection organization, bureau, association or office having jurisdiction;

  (2) All certificates of occupancy, or other approvals, with respect to all units of the project have been issued by State or local governmental authorities having jurisdiction; and

  (3) Permission(s) To Occupy (Form HUD-92485) for all units of the project have been issued by the Commissioner.

D. With its final application for payment by the Owner, the Contractor shall disclose, on a form prescribed by the Commissioner, all unpaid obligations contracted in connection with the work performed under this Contract. The Contractor agrees that within 15 days following receipt of final payment, it will pay such obligations in cash and furnish satisfactory evidence of such payment to the Owner.

### Article 4—Receipts & Releases of Liens

The Owner may require the Contractor to attach to each request for payment its acknowledgement of payment and all subcontractors' and material supplier's acknowledgements of payment for work done and materials, equipment and fixtures furnished through the date covered by the previous payment. Concurrently with the final payment, the Owner may require the Contractor to execute a waiver or release of lien for all work performed and materials furnished hereunder, and may require the Contractor to obtain similar waivers or releases from all subcontractors and material suppliers.

### Article 5—Requirements of Contractor

A. The Contractor shall furnish, at its own expense, all building and other permits, licenses, tools, equipment and temporary structures necessary for the construction of the project. The Contractor shall give all required notices and shall comply with all applicable codes, laws, ordinances, rules and regulations, and protective covenants, and with the current regulations of the National Board of Fire Underwriters, wherever applicable. The Contractor further shall comply with the provisions of the Occupational Safety and Health Act of 1970. The Contractor shall immediately notify the Commissioner of the delivery of all permits, licenses, certificates of inspection, certificates of occupancy, and any other such certificates and instruments required by law, regardless of to whom issued, and shall cause them to be displayed to the Commissioner upon his request.

B. If the Contractor observes that the Drawings and Specifications are at variance with any applicable codes, laws, ordinances, rules or regulations, or protective covenants, it shall promptly notify the Architect in writing, and any necessary changes shall be made as provided in this Contract for changes in the Drawings and Specifications. If the Contractor performs any work knowing it to be contrary to such codes, laws, ordinances, rules or regulations, or protective covenants, without giving such notice to the Architect, it shall bear all costs arising therefrom.

Replaces forms FHA-2442A, which is obsolete
Previous editions are obsolete                    Page 2 of 4                    form HUD-92442-A (11/00)
                                                                               ref Handbook 4430.1

C. Upon completion of construction, the Contractor shall furnish to the Owner a survey showing the location on the site of all improvements constructed thereon, and showing the location of all water, sewer, gas and electric lines and mains, and of all existing utility easements. Such survey shall be prepared by a licensed surveyor who shall certify that the work is installed and erected entirely upon the land covered by the mortgage and within any building restriction lines on said land, and does not overhang or otherwise encroach upon any easement or right-of-way of others. In addition, the Contractor shall furnish additional surveys when required by the Owner for any improvements, including structures and utilities, not theretofore located on a survey. The Contractor shall furnish copies of such survey required hereunder for the Lender and the Commissioner.

D. The Contractor shall assume full responsibility for the maintenance of all landscaping which may be required by the Drawings and Specifications until such time as both parties to this Contract shall receive written notice from the Commissioner that such landscaping has been finally completed. The Owner hereby agrees to make available to the Contractor, for such purpose, without cost to the latter, such facilities as water, hose and sprinkler.

### Article 6—Assurance of Completion

The Contractor shall furnish to the Owner assurance of completion of the work in the form of (specify) _____

**100% Payment and Performance Bonds each**

**in the penal sum of $22,501,843**

Such assurance of completion shall run to the Owner and the Lender as obligees and shall contain a provision whereby the surety agrees that any claim or right of action that either the Owner or the Lender might have thereunder may be assigned to the Commissioner.

### Article 7—Waiver of Lien or Claim

The Contractor shall not file a mechanic's or materialman's lien or maintain any claim against the Owner's real estate or improvements for or on account of any work done, labor performed or materials furnished under this Contract, and shall include in each subcontract a clause which shall impose this requirement on the subcontractor.

### Article 8—Right of Entry and Interpretation

A. The Lender and its agents or assigns and the Commissioner and his agents shall, at all times during construction, have the right of entry and free access to the project and the right to inspect all work done and materials, equipment and fixtures furnished, installed or stored in and about the project. For such purpose, the Contractor shall furnish such enclosed working space as the Lender or Commissioner may require and find acceptable as to location, size, accommodations and furnishings.

B. The Commissioner shall also have the right to interpret the Contract Documents and to determine compliance therewith.

### Article 9—Assignments, Subcontracts and Termination

A. This Contract shall not be assignable by either party without the prior written consent of the other party, the Lender and the Commissioner, except that the Owner may assign the Contract, or any rights hereunder, to the Lender or the Commissioner.

B. The Contractor shall not subcontract all of the work to be performed hereunder without the prior written consent of the Owner, the Lender and the Commissioner.

C. Upon request by the Owner, the Lender or the Commissioner, the Contractor shall disclose the names of all persons with whom it has contracted or will contract with respect to work to be done and materials and equipment to be furnished hereunder.

D. The Contractor understands that the work under this contract is to be financed by a building loan to be secured by a mortgage and insured by the Commissioner, and that the terms of said loan are set forth in a Building Loan Agreement between the Owner as Borrower

and _____

**Midland Loan Services, Inc.**

**a Delaware corporation** _____ as Lender.

The Contractor further understands that said Building Loan Agreement provides that, in the event of the failure of the Owner to perform its obligations to the Lender thereunder, the Lender may, as attorney-in-fact for the Owner, undertake the completion of the project in accordance with this Contract. ~~In the event the Lender elects not to undertake such completion, the Contractor's obligations under this contract shall terminate.~~

**E. See Rider 9E, attached hereto and made a**

### Article 10—Certification of Actual Cost **part hereof.**

A. The "actual cost of construction," as used in Article 3 above, shall include all items of cost and expense incurred by the Contractor in the performance of this Contract, including costs and expenses of labor, materials for construction, equipment and fixtures, field engineering, sales taxes, workmen's compensation insurance, social security, public liability insurance, job overhead and all other expenses directly connected with construction, and including general overhead expenses, but excluding kick-backs, rebates or discounts received or receivable in connection with the construction of the project; and excluding any return on or cost of the Contractor's working capital, such return on or cost of working capital being a part of or to be paid from the Contractor's fee or profit.

B. The Contractor shall keep accurate records of account of the said actual cost of construction, and shall, upon demand, make such records and invoices, receipts, subcontracts and other information pertaining to the construction of the project available for inspection by the Owner and the Commissioner.

C. With its final application for payment, the Contractor shall furnish to the Owner a completed "Contractor's Certificate of Actual Cost," which shall be accompanied and supported by an independent public accountant's certificate as to actual cost (in form acceptable to the Commissioner).

D. The Contractor shall include in all subcontracts, equipment leases and purchase orders a provision requiring the subcontractor, equipment lessor or supplier to certify its costs incurred in connection with the project, in the event the Commissioner determines there is an identity of interest between either the Owner or the Contractor and any such subcontractor, equipment lessor or supplier.

### Article 11 – Incorporation By Reference

**Each of the Exhibits identified as A-M attached hereto are expressly incorporated herein by this reference.**

In Witness Whereof, the parties to these presents have executed this contract in six (6) counterparts, each of which shall be deemed an original, in the year and day first above mentioned.

| (Seal) Attest: | Owner |
|---|---|
| Rosa Scott, Secretary | South Park Plaza, L.P. |
| Witness | By South Park Plaza, Inc. an Illinois not-for-profit corporation, it General Partner |
| Witness | Title |
| | Carole Millison, President |

| (Seal) | Contractor |
|---|---|
| Larry J. Kibbon, Secretary | Walsh Construction Company of Illinois an Illinois corporation |
| Witness | By |
| | Daniel J. Walsh |
| Witness | Title |
| | President |

Note: If Contractor or owner is a corporation, Secretary should attest.

**Rider 9E To Construction Contract –**
**Cost Plus (HUD Form 92442 – A)**
**By And Between South Park Plaza, L.P. and**
**Walsh Construction Company of Illinois**
**Respecting South Park Plaza Apartments.**
**FHA Project No. 071-35693**

The Contractor understands and acknowledges that the Utility Work (as defined in Exhibit A herein referred) is being financed by the City of Chicago (the "Utilities Funds"), and pursuant to that certain Grant Agreement between the City and the Chicago Housing Authority (the "CHA"), dated as of August ___, 2003. The Utilities Funds are being granted by the CHA to the Woodlawn Community Development Corporation, an Illinois not-for-profit corporation, which is providing the Utilities Funds as a capital contribution to the Owner. The Contractor further understands that the Lender (as defined in the Building Loan Agreement, HUD-92441), as attorney-in-fact for the Owner may undertake the completion of the project, including but not limited to Utility Work, in accordance with this Contract. The Contractor further understands and acknowledges that in the event the Lender or the Commissioner elects not to undertake such completion of the Utility Work, the City of Chicago shall have the right to enforce any of the Contractor's obligations with respect to the Utility Work, and only the Utility Work, in accordance with this Contract. Notwithstanding the termination provisions in paragraph 9(d) above of this Contract, in the event the City of Chicago elects to enforce any of the Contractor's obligations with respect to the Utility Work as aforesaid, then, in that event, this Contract shall not terminate with respect to such Contractor's obligations as to such Utility Work.





**Contractor's and/or Mortgagor's Cost Breakdown**
Schedules of Values
**Site Utilities Work** *

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp 8-31-2003)

Public reporting burden for the collection of information is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing.

| Date: June 30, 2003 | Sponsor: The Woodlawn Community Development Corporation |
|---|---|

| Project No: 071-35693 | Building Identification: Mixed Income Mid-Rise & Low-Rise |
|---|---|

| Name of Project: South Park Plaza | Location: 26th Street & Calumet Ave., Chicago IL |
|---|---|

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div. | Trade Item | Cost | Trade Description |
|---|---|---|---|---|
| 1 | 3 -16 | General Building | $ - | N/A |
| 2 | 4 | Masonry * | $ - | w/Rebar and Flashing |
| 3 | 5 | Metals | $ - | Structural, Lintels, Stairs, Railings, and Misc. Metals |
| 4 | 6 | Rough Carpentry * | $ - | Blocking, Caulking, Townhome Framing |
| 5 | 6 | Finish Carpentry * | $ - | Window Sills, Misc. Trim |
| 6 | 7 | Waterproofing | $ - | Waterproofing and sealants |
| 7 | 7 | Insulation * | $ - | Foundation, Spray and Attic Insulation |
| 8 | 7 | Roofing | $ - | Roofing, Sheet Metal and Waterproofing |
| 9 | 7 | Sheet Metal | $ - | Included in Line 8 |
| 10 | 8 | Doors | $ - | HM Doors and Frames, Wood Doors, Finish Hardware |
| 11 | 8 | Windows | $ - | Windows, Storefront |
| 12 | 8 | Glass | $ - | Misc. Glazing |
| 13 | 9 | Lath and Plaster | $ - | N/A |
| 14 | 9 | Drywall | $ - | Studs, Gyp Board, Finishing, Acoustical Ceilings |
| 15 | 9 | Tile Work | $ - | In Line 25 |
| 16 | 9 | Acoustical | $ - | In Drywall |
| 17 | 9 | Wood Flooring | $ - | N/A |
| 18 | 9 | Resilient Flooring | $ - | In Line 25 |
| 19 | 9 | Painting and Decorating | $ - | Painting and Wall Covering |
| 20 | 10 | Specialties | $ - | Toilet Access, Louvers, Signage, Postal Specialties, Closet Shelves |
| 21 | 11 | Special Equipment | $ - | Trash Chute and Compactor |
| 22 | 11 | Cabinets * | $ - | Kitchen and Bath Cabinets |
| 23 | 11 | Appliances * | $ - | Range, Hood, Refrigerator, Microwave |
| 24 | 12 | Blinds and Shades, Artwork | $ - | None |
| 25 | 12 | Carpets | $ - | Vinyl Tile, Carpet, Base and Ceramic Tile |
| 26 | 13 | Special Construction | $ - | N/A |
| 27 | 14 | Elevators | $ - | Four (4) Hydraulic |
| 28 | 15 | Plumbing and Hot Water | $ - | Plumbing and Fire Protection |
| 29 | 15 | Heat and Ventilation | $ - | Heating, Air Conditioning, Ventilation, Temperature Control |
| 30 | 15 | Air Conditioning | $ - | Included in Line 29 |
| 31 | 16 | Electrical | $ - | Power, Light, Phone |
| 32 | | Subtotal (Structures) | $ - | |
| 33 | | Accessory Structures | $ - | N/A |
| 34 | | Total (Lines 32 and 33) | $ - | |
| 35 | 2 | Earth Work * | $ - | |
| 36 | 2 | Site Utilities * | $ 692,400.00 | Site Plumbing |
| 37 | 2 | Roads and Walks * | $ 21,100 | Site Pavements |
| 38 | 2 | Site Improvements * | $ 19,617 | Safety, Protection |
| 39 | 2 | Lawns and Planting * | $ - | Landscaping, Fencing, Clearing and Grubbing |

Previous edition is obsolete

form HUD-2328 (5-99)

| Line | Div. | Trade Item * | | Cost | Trade Description | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Nonresidential and Special Exterior Land Improvement Costs (costs not included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | |
| | | | | | Description | Est. Cost | Description | Est. Cost |
| 40 | 2 | Unusual Site Condition | $ | - | | $ | | $ |
| 41 | | Total Land Improvements | $ | 733,117 | | | | |
| 42 | | Total Struct. & Land Imprvts. | $ | 733,117 | Description | Est. Cost | Description | Est. Cost |
| 43 | 1 | General Requirements (6%) | $ | 43,987 | | $ | | $ |
| 44 | | Subtotal (Lines 42 thru 43) | $ | 777,104 | | $ | | $ |
| 45 | | Builder's Overhead (2%) | $ | 14,662 | | $ | | $ |
| 46 | | Builder's Profit (6%) | $ | 43,987 | Total $ | | Total $ | |
| 47 | | Subtotal (Lines 44 thru 46) | $ | 835,753 | Other Fees | | | |
| 48 | | | | | | $ | Demolition (costs not included in trade item breakdowns) | |
| 49 | | Other Fees (Preconstruction) | | | | $ | | |
| 50 | | Bond Premium | $ | 8,655 | | $ | Description | Est. Cost |
| 51 | | Total for All Improvements | $ | 844,408 | | $ | | |
| 52 | | Builder's Profit Paid by Means Other Than Cash | | | | $ | | |
| 53 | | Total for All Improvements Less Line 52 | $ | 844,408 | Total $ | | Total $ | |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate *Warning:* HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penal

| Mortgagor: | | By: | | Date: |
|---|---|---|---|---|
| Contractor: Walsh Construction Company of Illinois | | By: | | Date: |
| FHA: (Processing Analyst) | Date: | FHA: (Chief, Cost Branch or Cost Analyst) | | Date: |
| FHA: (Chief Underwriter) | | | | Date: |

**Instructions for Completing Form HUD-2328**

Date--Date form was prepared.

Sponsor--Name of sponsor or sponsoring organization.

Project No.--Eight digit assigned project number.

Building Identification--Number(s) or Letter(s) of each building as designated on plans.

Name of Project--Sponsors designated name of project.

Location--Street address, city and state.

Division--Division numbers and trade items have been developed from the cost accounting section of the uniform system.

Accessory Structures--This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings.

When the amount shown on line 33 is $30,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

Unusual Site Conditions--This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on -site conditions considered unusual.

Cost--Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

Trade Description--Enter a brief description of the work included in each trade item.

Other Fees--Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

Total For All Improvements--This is the sum of lines 1 through 50 and is to include the total builder's profit (line +6).

Line 51--When applicable, enter that portion of the builder's profit (line 46) to be paid by means other than cash and/or any part of the builder's profit to be waived during construction.

Non-Residential and Special Exterior Land Improvement Costs--Describe and enter the cost of each improvement, i.e.,on-site parking facilities including individual garages and carports, commercial facilities, swimming pools with related facilities and on-site features provided to enhance the environment and livability of the project and the neighborhood. The Design Representative and Cost Analyst shall collaborate with the mortgagor or his representative in designating the items to be included.

Off-Site Costs--Enter description and dollar amount including fees and bond premium for off-site improvements.

Demolition--Enter description and dollar amount of demolition work necessary to condition site for building improvements including the removal of existing structures, foundations, utilities, etc.

Other Fees--Enter a brief description of item involved and cost estimate for each item.

Signatures--Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the form was completed.

Previous edition is obsolete

Page 1 of 1

form HUD-2328 (3-93)
ref. Handbook 4450.1 &4460.1

**\*"Scope of work for Site Utility Work includes all site storm and sanitary sewers, and domestic water pipes and facilities as shown on the construction plans on sheets C-016 through C-028 and in accordance with the specification sections 02220, 02667, 02700, 02720, and 02730, dated November 7, 2000 and modified August 6, 2003 (see Schedule A attached hereto and incorporated herein)."**

**SECTION 00030**
**TABLE OF CONTENTS**

DIVISION 0 BIDDING AND CONTRACT REQUIREMENTS
    RESERVED

DIVISION 1 GENERAL REQUIREMENTS

| | | | | |
|---|---|---|---|---|
| 01000 | A.I.A. General Conditions - A-201 | 01000-01 | | |
| 01001 | Special Conditions | 01001-01 | thru | 01001-08 |
| 01010 | Summary of Work | 01010-01 | thru | 01010-02 |
| 01020 | Drawing & Specifications Listings | 01020-01 | | |
| 01035 | Work to be Performed by Others | 01035-01 | | |
| 01040 | Construction Scheduling Requirements | 01040-01 | thru | 01040-02 |
| 01045 | Cutting & Patching | 01045-01 | | |
| 01050 | Contract Value Engineering Alternates | 01050-01 | | |
| 01060 | Listing of Proposed Subcontractors | 01060-01 | | |
| 01070 | Site Logistic Plan | 01070-01 | | |
| 01080 | Project Organization & Key Personnel | 01080-01 | | |
| 01085 | Applicable Standards | 01085-01 | thru | 01085-02 |
| 01090 | Contract Qualifications | 01090-01 | | |
| 01330 | Submittals | 01330-01 | thru | 01330-04 |
| 01400 | Quality Control Procedures & Product Standards | 01400-01 | thru | 01400-08 |
| 01410 | Testing and Inspection | 01410-01 | thru | 01410-02 |
| 01420 | Definitions and Standards | 01420-01 | thru | 01420-08 |
| 01450 | Quality Control | 01450-01 | thru | 01450-02 |
| 01451 | Testing Laboratory Services | 01451-01 | thru | 01451-05 |
| 01500 | Temporary Facilities & Services | 01500-01 | thru | 01500-04 |
| 01600 | Material and Equipment | 01600-01 | thru | 01600-03 |
| 01720 | Site Documentation Requirements | 01720-01 | thru | 01720-02 |
| 01730 | Operating & Maintenance Data | 01730-01 | thru | 01730-02 |
| 01740 | Warranties | 01740-01 | | |
| 01780 | Closeout Submittals | 01780-01 | thru | 01780-04 |
| 01800 | Project Record Documents | 01800-01 | thru | 01800-03 |

DIVISION 2 SITEWORK

| | | | | |
|---|---|---|---|---|
| 02000 | Site Demolition | 02000-01 | thru | 02000-02 |
| 02100 | Clearing and Site Preparation | 02100-01 | thru | 02100-03 |
| 02200 | Earthwork | 02200-01 | thru | 02200-05 |
| 02205 | Aggregate Base Course | 02205-01 | | |
| 02206 | Geotechnical Fabric | 02206-01 | | |
| 02207 | Bituminous Concrete Surface Course & Bituminous Concrete Binder Course | 02207-01 | thru | 02207-02 |
| 02220 | Excavation, Backfilling, and Compacting For Pavements and Structures | 02220-01 | thru | 02200-06 |
| 02667 | Site Water Lines | 02667-01 | thru | 02657-02 |
| 02700 | Storm Drainage Piping | 02700-01 | thru | 02700-02 |
| 02720 | Manholes, Frames and Lids | 02720-01 | thru | 02720-02 |
| 02730 | Site Sanitary Sewerage Piping | 02730-01 | thru | 02730-02 |
| 02936 | Seeding | 02936-01 | thru | 02936-02 |

EXHIBIT
—B—

**SECTION 02220**
**EXCAVATION, BACKFILLING, AND COMPACTING**
**FOR PAVEMENTS AND STRUCTURES**

1.     **GENERAL**

    1.01     **WORK INCLUDES**

        A.     Base Bid:

           1.     General Contractor:

              a.     Excavate for pavements and structures.
              b.     Remove excess subsoil from site.
              c.     Place and compact fills to final grade elevations.
              d.     Dewater excavations as required.

        B.     Related Documents:

           1.     The General Conditions of the Contract shall apply to work specified in this Section.

    1.02     **RELATED WORK**

        A.     Specified Elsewhere:

           1.     02100 - Clearing and Site Preparation
           2.     02205 – Aggregate Base Course
           3.     02831 – Chain Link Fences and Gates
           4.     03300 – Cast-in Place Concrete

    1.03     **REFERENCES.** Specified references or cited portions thereof, current at date of bidding documents unless otherwise specified, govern the work.

        A.     Illinois Department of Transportation (IDOT): Standard Specifications for Road and Bridge Construction, adopted January 1, 1997.

        B.     American Society for Testing and Materials (ASTM):

           1.     ASTM D2487: Classification of soils for engineering purposes.
           2.     ASTM D698: Test methods for moisture – density relations of soils and soil aggregate mixtures using a 5 lb. hammer and 12 in. drop.

    1.04     **SPECIFICATIONS**

        A.     Conform to Section 202 of the 1997 Edition "Standard Specifications for Road and Bridge Construction" of the Illinois Department of Transportation and to the requirements hereinafter specified.

        B.     Exceptions: All reference in the Illinois Department of Transportation Specifications to methods of compensation shall not apply.

    1.05     **QUALITY ASSURANCE**

        A.     Perform excavation work in compliance with applicable requirements of Federal and State authorities, codes, and standards.

B.   Soil Testing:

1.   Testing of compacted fill materials will be performed by an independent testing laboratory employed and paid for by the Architect/Engineer. Testing will be performed in a manner to least encumber performance of work.

2.   Architect/Engineer will pay for one series of tests only, on area being evaluated. Contractor pays for all additional tests when initial tests show nonconforming work. A "series" of tests is defined as the initial tests performed on each lift and totally on the area being evaluated.

3.   When work, or portions of work, are completed, notify testing laboratory to perform density tests. Proceeding with additional portions of work prior to receipt of written satisfactory results shall be at contractor's own risk.

4.   When, during progress of work, tests indicate that compacted materials do not meet specifications, remove defective work, replace and retest, as directed in writing by Architect/Engineer.

5.   Ensure that all compacted fills are tested before proceeding with placement of surface materials.

6.   The exact location of tests will be determined by Testing Laboratory personnel. Copies of each test report will be furnished to the owner and the Contractor. The Laboratory will perform the following tests:
a.   Proctor test of proposed fill materials to be used for fill.
b.   Field density tests of each lift of fill material within the limits of any earthwork.

7.   The foregoing will not relieve the Contractor from his obligation to perform testing as may be required to verify the satisfactory performance of the compaction. Any areas exhibiting inadequate compaction shall be compacted to the requirements of these specifications and be retested at the expense of the Contractor.

### 1.06   JOB CONDITION

A.   Existing Utilities:

1.   The Contractors will be responsible for contracting the utility companies and locating existing underground utilities in the area of work. Where utilities are to remain in place, provide adequate means of protection during earthwork operations.

2.   Should uncharted or incorrectly charted piping or other utilities be encountered during excavation, consult the owner immediately for directions as to procedure. Cooperate with the owner and utility companies in keeping respective services and facilities in operation. Repair damaged utilities to satisfaction of utility owner.

3.   Do not interrupt existing utilities service facilities occupied and used by the Owner or others except where permitted in writing by the owner and then only after acceptable temporary utility services have been provided.

4.   Cooperate with the utility companies engaged in direct burial of existing facilities.

B.   Protection of Persons and Property: Barricade open excavations occurring as part of this work and post with warning lights. Operate warning lights.

## 2.   PRODUCTS

### 2.01   SOIL MATERIALS

A. Definitions:

1. Satisfactory soil materials are defined as those complying with American Society for Testing and Materials (ASTM) D2487, soil classification Groups GW, GP, GM, GC, SW, SP, SM, SC, JL, and CL.

2. Unsatisfactory soil materials are those defined in ASTM D2487 soil classification Groups OL, MH, CH, OH, and PT; also any materials containing peat and other highly organic soil, broken pavement, trash fill, cinders, or other deleterious substance.

3. Backfill material: Backfill around footing excavations beneath pavement and other excavations shall be satisfactory solid materials free of rock or gravel larger than two inches (2 in.) in any dimension, debris, waste, frozen materials, vegetable organic and other deleterious material.

3. EXECUTION

3.01 INSPECTION

A. Examine the areas and conditions under which excavating, filling, and grading are to be performed and notify the owner in writing of conditions detrimental to the proper and timely completion of the work. Don not proceed with the work until unsatisfactory conditions have been corrected in any acceptable manner.

3.02 EXCAVATION

A. General

1. Excavation consists of removal and disposal of material encountered when establishing required grade elevations.
   a. Earth excavation consists of removal and disposal of existing concrete and asphalt pavements and other obstructions visible on ground surface, underground structures and utilities indicated to be demolished and removed, material of any classification indicated in data on subsurface conditions, and other materials encountered that are not classified as unauthorized excavation.

2. Unauthorized excavations consist of removal of materials beyond indicated subgrade elevations or dimensions without specific direction of the A/E. Under footings, foundations bases, or retaining walls, fill unauthorized excavation by extending the indicated bottom elevation of the footing or base to the excavation bottom without altering required top elevation. concrete fill shall be used to bring elevations to proper position, only when acceptable to owner and at no extra charge. Elsewhere, backfill and compact unauthorized excavations as specified for authorized excavations of same classification, unless otherwise directed by owner.

3. Stripping: The existing organic topsoils shall be stripped from under all proposed pavement and structure areas in accordance with Section 02100, clearing and Site Preparation. After removing all organic, loose or obviously compressive materials; the subgrade should be proof-rolled until the grade offers a relatively unyielding surface.

B. Additional Excavation

1. When excavation has reached required subgrade elevations, notify the A/E who will make an inspection of conditions, before placement of any fill materials.

2. If unsuitable bearing materials are encountered at the required subgrade elevations, carry excavations deeper and replace the excavated materials as directed by the A/E.

3. Removal of unsuitable material and its replacement as directed will be paid on the basis of contract conditions relative to changes in work.

C. Stability of Excavations:

1. Slope sides of excavations to comply with local codes and ordinances having jurisdiction.

3. Maintain sides and slopes of excavations in a safe condition until completion of backfilling.

D. Material Storage:

1. Stockpile satisfactory excavated materials where directed, until required for backfill. Place, grade, and shape stockpiles for proper drainage.

2. Dispose of excess soil material and waste materials.

E. Removal of Unsuitable Soil Materials:

1. If dry suitable bearing for pavements and sidewalks is not encountered at the depth indicated on drawings, the Contractor shall immediately notify the A/E and shall not proceed further until written instructions are given.

2. No frozen material is to be used as fill nor shall the fill or foundations be placed on frozen ground.

3.03 COMPACTION

A. General:

1. Control soil compaction during construction providing minimum percentage of density specified for each area classification.

2. Maximum density shall be in accordance with ASTM D-698, Standard Proctor test.

B. Percentage of Maximum Density Requirements:

1. Compact soil to not less than the following percentages of maximum dry density as per ASTM D-698, Standard Proctor test.
   a. 95% - Spread Footings, Foundations, and Floor Slabs.
   b. 95% - Pavements and Parking Lots.
   c. 90% - Grading adjacent to Fence.

C. Compaction Equipment and Methods:

1. The equipment and methods employed to obtain the specified degree of compaction are the responsibility of the Contractor. However, ponding will not be permitted or used to obtain compaction. If the specified degree of compaction is not obtained, the owner may require the contractor to use the type of equipment and methods of compaction required for each kind, type, and grading of fill used to obtain not less than the specified density.

2. In general, tractor-drawn or self-propelled compacting will be required where such equipment can be utilized. Tamping or sheepsfoot are normally the most suitable equipment for the compaction of cohesive materials. Pneumatic tire rollers are not permitted. Granular materials are more readily compacted by vibratory rollers or surface vibrators. Where space is limited, hand operated mechanical tampers and small surface vibrators are the most suitable for cohesive soils and the granular materials respectively.

3. To insure proper compaction with a minimum of compactive effort, all materials should be at or near their optimum moisture content, as determined by ASTM D-698. If required to obtain compaction of the various materials, the Contractor shall add moisture or dry the materials as required by the owner.

3.04    BACKFILL AND FILL

A.    Place acceptable soil material in layers to required subgrade elevations for each area classification listed below:
    1.    In all areas of excavation, use satisfactory excavated or borrow materials. See Section 2.01 – Soil Materials.

B.    Backfill excavations as promptly as work permits, but not until completion of the following:
    1.    Observation by A/E of construction below finish grade.
    2.    Inspection, testing, approval, and recording locations of underground utilities.
    3.    Backfilling of voids with satisfactory materials.
    4.    Removal of trash and debris.

C.    Ground Surface Preparation:
    1.    Remove vegetation, debris, unsatisfactory soil materials, obstructions, and deleterious materials from ground surface prior to placement of fills.

D.    Placement and Compaction:
    1.    Place backfill and fill materials in layers not more than 9 in. in loose depth for material compacted by heavy compaction equipment, and not more than 6 in. in loose depth for material compacted by hand-operated tampers.
    2.    Each lift of fill materials shall be compacted as required and verified by the testing laboratory's data prior to placement of the next lift of fill.

E.    Moisture Control:
    1.    Before compaction, moisten or aerate each layer as necessary to provide the optimum moisture content. Compact each layer to required percentage of maximum dry density or relative dry density for each area classification. Do not place backfill or fill material on surfaces that are muddy, frozen, or contain frost or ice.

3.05    GRADING

A.    General: Uniformly grade areas within limits of grading under this section, including adjacent transition areas. Smooth finished surface within specified tolerances, compact with uniform levels or slopes between points where elevations are shown, or between such points and existing grades.
B.    Finish areas to receive topsoil to within not more than 0.10 ft. (1-1/4 in.) above or below the required subgrade elevations.

3.06    MAINTENANCE

A.    Protection of Graded Areas: Protect newly graded areas from traffic and erosion. Keep free of trash and debris.

3.07    DISPOSAL OF EXCESS AND WASTE MATERIALS

A.    Remove waste materials, including unacceptable excavated material, trash, and debris, and dispose of it legally off the Owner's property.

3.08    TOPSOIL

A.    Topsoil Application: Over all areas designed to be established and/or restored as lawn by seeding, topsoil shall be spread to such depth that when properly settled and compacted, it be reasonably uniform and not less than 4 in. deep. CONTRACTOR SHALL REMOVE

EXISTING SITE MATERIALS, OTHER THAN EXISTING TOPSOIL MORE THAN 4 IN. THICK, TO ACCOMMODATE THIS REQUIREMENT. The topsoil shall not be spread when in wet or frozen condition. The Contractor shall furnish any additional topsoil from approved off-site locations required for the development of lawn and planting areas. Graded areas shall be feathered into any adjacent lawn areas. The cost of furnishing topsoil from an off-site location, if required, shall be included in the base bid.

**END OF 02220**

**SECTION 02667**
**SITE WATER LINES**

1.    GENERAL

    1.01   WORK INCLUDES

        A.   Base Bid:

            1.   Plumbing Contractor:

                a.   This section includes the labor and furnishing of pipes, fittings, accessories, and connection to the local water supply system, as hereinafter specified, or as required to properly complete the work.

        B.   Related Documents:

            1.   The General Conditions of the Contract shall apply to the work specified in this Section.

    1.02   RELATED WORK

        A.   Specified elsewhere:

            1.   02200 - Earthwork
            2.   02936 - Seeding
            3.   15410 - Plumbing Piping

    1.03   REFERENCES.  Specified references or cited portions thereof, current at date of bidding documents unless otherwise specified, govern the work.

        A.   All work of this section shall conform to the applicable requirements of the Standard Specifications for Water and Sewer Main Construction in Illinois and to the requirements hereinafter specified.
        B.   All work of this section shall meet or exceed the City of Chicago Department of Water Requirements.
        C.   Exception: All reference in the Standard Specifications to methods of compensation shall not apply.

2.    PRODUCTS

    2.01   MATERIALS

        A.   Water pipe and accessories shall conform to Section 40 of the Standard Specifications for Water & Sewer Main Construction in Illinois.

        B.   Submit for review by the Architect/Engineer the type of water pipe the Contractor elects to use.  The submittal shall include all technical data supplies by the manufacturer and listings of any special provisions required to install the pipe.

3.    EXECUTION

    3.01   GENERAL

        A.   Contact the local water service utility to determine specific requirements for water service.

B.     The Contractor shall pay all charges assessed by the water service utility in relation to the water service.

3.02    INSTALLATION

A.     Install pipe in accordance with Section 41 of the Standard Specifications. The pipe diameter shall be as specified on the plans. Install pipe with a minimum 4 ft. - 6 inch cover.

B.     Connection to local water main and installation of the valve will be done by Contractor.

C.     Remove all excess dirt, etc. from pipe ends before joining pipe. Keep dirt and foreign material from joint space.

D.     When pipe laying is interrupted, close open ends with test plugs.

E.     Testing and disinfecting shall be in accordance with Section 41 of the Standard Specifications.

**END OF 02667**

<u>SECTION 02700</u>
<u>STORM DRAINAGE PIPING</u>

1.     GENERAL

    1.01    WORK INCLUDES

        A.    Base Bid:

            1.    This section of the Specification includes furnishing and installing Storm Drainage Piping, as indicated on the drawings, as hereinafter specified or as required to properly complete the work.

        B.    Related Documents:

            1.    The General Conditions of the Contract and Supplementary Conditions shall apply to the work specified in this Section.

    1.02    RELATED WORK

        A.    Specified elsewhere:

            1.    02100 - Clearing and Site Preparation
            2.    02200 - Earthwork
             3.    02720 - Manholes, Inlets, Frames and Grates

    1.03    REFERENCES: Specified references or cited portions thereof, current at date of bidding documents unless otherwise specified, govern the work.

        A.    Illinois Department of Transportation (IDOT): Standard Specifications for Road and Bridge Construction, adopted January 1, 1997.
        B.    City of Chicago Department of Sewers Permit Requirements.

    1.04    SPECIFICATIONS

        A.    Conform to Section 550 of the 1997 Edition of "Standard Specification for Road and Bridge Construction" of the Illinois Department of Transportation and to the requirements hereinafter specified.
        B.    Exceptions: All reference in the Illinois Department of Transportation Specifications to methods of compensation shall not apply.

2.     PRODUCTS

    2.01    MATERIALS

        A.    A.    Sewers constructed in sizes 21 inches in diameter and smaller must be Extra Strength Clay Pipe, ASTM Designation C-700 with C-425 joints; Ductile Iron Pipe, class 52 or equivalent, with push on or mechanical joints, or Cast Iron Pipe, with hot poured pure lead firmly packed with oakum or hemp. (See Section 13-168-1510 of the Municipal Code of Chicago).

            Cast iron pipe cannot be used in the public way.

            Cast iron pipe is allowed on private property.

Reinforced Concrete Pipe (R.C.P.) may be used for sewers 24 inches in diameter and larger. ASTM Designation C-76, Class-III, Wall-B with O-ring joints is the minimum requirement for this type of pipe.

No plastic pipe may be used for any underground sewer or drain inside or outside the property.

R.C.P. may not be used for pipe 21 inches in diameter and smaller inside or outside the private property.

B.    Submit for review by the A/E, the type of sanitary sewer pipe the Contractor elects to use. The submittal shall include all technical data supplied by the manufacturer and listing of any special procedures required to install the pipe.

3.    **EXECUTION**

    3.01    **CONSTRUCTION**

        A.    Trenches in surfaces areas, such as roadways, parking lots, entrances and walkways, shall be backfilled with fine aggregate for the entire depth below the existing or proposed base course. The fine aggregate shall meet the requirements of Articles 1003.01 and 1003.04 of the IDOT Standard Specifications.

        B.    All trenches in areas to be surfaces for roadway, parking, or walkways use shall be compacted in accordance with Article 550.07 of the IDOT Standard Specifications.

        C.    All trenches in unpaved areas shall be backfilled above the pipe to the ground surface with local soil. Backfilling shall be in accordance with Article 550.07 of the IDOT Standard Specifications.

        D.    Where trenches are cut across existing surfaced areas and the existing base and surface courses are removed, the base and surface shall be replaced in like kind of material or reconstructed to the minimum thickness indicated for new parking lot construction.

**END OF 02700**

<u>**SECTION 02720**</u>
<u>**MANHOLES, FRAMES AND LIDS**</u>

1.    GENERAL

    1.01    WORK INCLUDES

        A.    Base Bid:

            1.    General Contractor:

                a.    This section of the Specification includes labor, materials, and equipment as required to furnish, install, and construct manholes, frames, grates, and end sections as indicated on the drawings, as hereinafter specified or as require to properly complete the work.

        B.    Related Documents:

            1.    The General Conditions of the Contract and Supplementary Conditions shall apply to the work specified in this Section.

    1.02    RELATED WORK

        A.    Specified Elsewhere:

            1.    02100 - Clearing and Site Preparation
            2.    02200 - Earthwork
            3.    02700 - Storm Drainage Piping
            4.    02730 - Site Sanitary Sewage Piping

    1.03    REFERENCES

Specified references or cited portions thereof, current at date of bidding documents unless otherwise specified, govern the work.

        A.    Illinois Department of Transportation (IDOT): Standard Specifications for Road and Bridge Construction, adopted January 1, 1997.

        B.    Standard Specifications for Water and Sewer Main Construction in Illinois.

        C.    2000 Permit Requirement in Appendix.

    1.04    SPECIFICATIONS

        A.    Conform to Section 602 of the 1997 Edition "Standard Specifications for Road and Bridge Construction" of the Illinois Department of Transportation and to the requirements hereinafter specified and the City of Chicago Department of Sewers Details.

        B.    Exceptions:    All reference in the Illinois Department of Transportation Specifications to methods of compensation shall not apply.

2.    PRODUCTS

2.01    MATERIALS

A.    All material and construction shall conform to the applicable portions of the City of Chicago Department of Sewers Details.

B.    The concrete shall conform to and shall be proportioned and tested in accordance with "Concrete for Site Structures and Incidental Construction" Section 03000

C.    All castings and mortar shall conform to the requirements of Article 602.2 of the IDOT Specifications.

D.    Gray iron, structural steel, or Ductile iron frames and grates may be furnished at the Contractor's options.

3.    EXECUTION

A.    Frames must be set in accordance with Article 602.10 of the IDOT Specifications.

B.    Grates must be set accurately and to finished elevations and must be free of rattle when traversed by any vehicle.

**END OF 02720**

<u>**SECTION 02730**</u>
<u>**SITE SANITARY SEWERAGE PIPING**</u>

1.    GENERAL

    1.01    WORK INCLUDES

        A.    Base Bid:

            1.    General Contractor to provide:

                a.    Labor and furnishings of sanitary sewerage drainage piping, fittings, accessories, bedding, backfilling, compaction, and connection to municipal sewers.

    1.02    RELATED WORK

        A.    Specified elsewhere:

            1.  02100 - Clearing and Site Preparation
            2.  02200 - Earthwork

    1.03    REFERENCES.  Specified references or cited portions thereof, current at date of bidding documents unless otherwise specified, govern the work.

    1.04    SPECIFICATIONS

        A.    All work of this section shall conform to the applicable requirements of the "Standard Specification for Water and Sewer Main Construction in Illinois" and the City of Chicago Department of Sewers Permit Requirements.

        B.    Exceptions:  All references in the Illinois Department of Transportation specifications to methods of compensation shall not apply.

2.    PRODUCTS

    2.01    MATERIALS

        A.    Sewers constructed in sizes 21 inches in diameter and smaller must be Extra Strength Clay Pipe, ASTM Designation C-700 with C-425 joints; Ductile Iron Pipe, class 52 or equivalent, with push on or mechanical joints, or Cast Iron Pipe, with hot poured pure lead firmly packed with oakum or hemp.  (See Section 13-168-1510 of the Municipal Code of Chicago).

            Cast iron pipe cannot be used in the public way.

            Cast iron pipe is allowed on private property.

            Reinforced Concrete Pipe (R.C.P.) may be used for sewers 24 inches in diameter and larger.  ASTM Designation C-76, Class-III, Wall-B with O-ring joints is the minimum requirement for this type of pipe.



**Contractor's and/or Mortgagor's Cost Breakdown**
Schedules of Values

**Main Contract**

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 8.31.2003)

Public reporting burden for this collection of information is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewin

| Date: July 18, 2003 | Sponsor: The Woodlawn Community Development Corporation | |
|---|---|---|
| Project No: WCCI Job# 200119 | Building Identification: Mixed Income Mid-Rise & Low-Rise | |
| Name of Project: South Park Plaza | Location: 26th Street & Calumet Ave., Chicago IL | |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div. | Trade Item | Cost | Trade Description |
|---|---|---|---|---|
| 1 | 3 | Concrete * | $ 1,582,897 | w/Rebar, Precast Planks and Topping |
| 2 | 4 | Masonry * | $ 2,308,223 | w/Rebar and Flashing |
| 3 | 5 | Metals | $ 680,249 | Structural, Lintels, Stairs, Railings, and Misc. Metals |
| 4 | 6 | Rough Carpentry * | $ 1,446,638 | Blocking, Caulking, Townhome Framing |
| 5 | 6 | Finish Carpentry * | $ 423,682 | Window Sills, Misc. Trim |
| 6 | 7 | Waterproofing | $ 90,135 | Waterproofing and sealants |
| 7 | 7 | Insulation * | $ 221,005 | Foundation, Spray and Attic Insulation |
| 8 | 7 | Roofing | $ 562,386 | Roofing, Sheet Metal and Waterproofing |
| 9 | 7 | Sheet Metal | $ - | Included in Line 8 |
| 10 | 8 | Doors | $ 280,699 | HM Doors and Frames, Wood Doors, Finish Hardware |
| 11 | 8 | Windows | $ 629,543 | Windows, Storefront |
| 12 | 8 | Glass | $ 15,000 | Misc. Glazing |
| 13 | 9 | Lath and Plaster | $ - | N/A |
| 14 | 9 | Drywall | $ 1,506,354 | Studs, Gyp Board, Finishing, Acoustical Ceilings |
| 15 | 9 | Tile Work | $ - | In Line 25 |
| 16 | 9 | Acoustical | $ - | In Drywall |
| 17 | 9 | Wood Flooring | $ - | N/A |
| 18 | 9 | Resilient Flooring | $ - | In Line 25 |
| 19 | 9 | Painting and Decorating | $ 390,630 | Painting and Wall Covering |
| 20 | 10 | Specialties | $ 82,629 | Toilet Access, Louvers, Signage, Postal Specialties, Closet Shelves |
| 21 | 11 | Special Equipment | $ 83,543 | Trash Chute and Compactor |
| 22 | 11 | Cabinets * | $ 163,773 | Kitchen and Bath Cabinets |
| 23 | 11 | Appliances * | $ 186,533 | Range, Hood, Refrigerator, Microwave |
| 24 | 12 | Blinds and Shades, Artwork | $ - | None |
| 25 | 12 | Carpets | $ 431,389 | Vinyl Tile, Carpet, Base and Ceramic Tile |
| 26 | 13 | Special Construction | $ - | N/A |
| 27 | 14 | Elevators | $ 218,566 | Four (4) Hydraulic |
| 28 | 15 | Plumbing and Hot Water | $ 1,819,310 | Plumbing and Fire Protection |
| 29 | 15 | Heat and Ventilation | $ 1,690,589 | Heating, Air Conditioning, Ventilation, Temperature Control |
| 30 | 15 | Air Conditioning | $ - | Included in Line 29 |
| 31 | 16 | Electrical | $ 2,472,511 | Power, Light, Phone |
| 32 | | Subtotal (Structures) | $ 17,286,284 | |
| 33 | | Accessory Structures | $ - | N/A |
| 34 | | Total (Lines 32 and 33) | $ 17,286,284 | |
| 35 | 2 | Earth Work * | $ 592,021 | Excavation, Grading, Site Paving |
| 36 | 2 | Site Utilities * | | Under Sitework Portion |
| 37 | 2 | Roads and Walks * | $ 307,785 | Site Pavements |
| 38 | 2 | Site Improvements * | $ 133,346 | Demolition |
| 39 | 2 | Lawns and Planting * | $ 475,645 | Landscaping, Fencing, Clearing and Grubbing |

| Line | Div. | Trade Item | Cost | Trade Description | | | |
|------|------|-----------|------|------------------|---|---|---|
| | | | | Nonresidential and Special Exterior Land Improvement (costs included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | |
| 40 | 2 | Unusual Site Condition | $ | Description | Est. Cost | Description | Est. Cost |
| 41 | | Total Land Improvements | $ 1,508,797 | | | | |
| 42 | | Total Struct. & Land Imprvts. | $ 18,795,081 | Description | $ | Description | $ |
| 43 | 1 | General Requirements (6%) | $ 1,127,705 | | $ | | $ |
| 44 | | Subtotal (Lines 42 thru 43) | $ 19,922,786 | | $ | | $ |
| 45 | | Builder's Overhead (2%) | $ 375,902 | | $ | | $ |
| 46 | | Builder's Profit (6%) | $ 1,127,705 | Total $ | | | |
| 47 | | Subtotal (Lines 44 thru 46) | $ 21,426,393 | Other Fees | | Total $ | |
| 48 | | | | | $ | Demolition (costs not included in trade item breakdown) | |
| 49 | | Other Fees (Preconstruction) | | | $ | | |
| 50 | | Bond Premium | $ 231,042 | | $ | Description | Est. Cost |
| 51 | | Total for All Improvements | $ 21,657,435 | | $ | | |
| 52 | | Builder's Profit Paid by Means Other Than Cash | | | $ | | |
| 53 | | Total for All Improvements Less Line 52 | $ 21,657,435 | Total $ | | Total $ | |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate. *Warning* : HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penal

| Mortgagor: | | By: | | Date: |
|---|---|---|---|---|
| Contractor: Walsh Construction Company of Illinois | | | | Date: |
| FHA: (Processing Analyst) | Date: | FHA: (Chief, Cost Branch or Cost Analyst) | | Date: |
| FHA: (Chief Underwriter) | | | | Date: |

**Instructions for Completing Form HUD-2328**

This form is prepared by the contractor an/or mortgagor as a requirement for the issuance of a firm commitment. The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed breakdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each *structure type* . A summation of these structure costs are entered on line 32 of a master form. Land improvements, General Requirements and Fees are completed through line 53 on the master 2328 *only*.

**Date**--Date form was prepared.

**Sponsor**--Name of sponsor or sponsoring organization.

**Project No.**--Eight digit assigned project number.

**Building Identification**--Number(s) or Letter(s) of each building as designated on plans.

**Name of Project**--Sponsors designated name of project.

**Location**--Street address, city and state.

**Division**--Division numbers and trade items have been developed from the cost accounting section of the uniform system.

**Accessory Structures**--This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings.

When the amount shown on line 33 is $20,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

**Unusual Site Conditions**--This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on - site conditions considered unusual.

**Cost**--Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

**Trade Description**--Enter a brief description of the work included in each trade item.

**Other Fees**--Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

**Total For All Improvements**--This is the sum of lines 1 through 50 and is to include the toal builder's profit (line 46).

**Line 52**--When applicable, enter that portion of the builder's profit (line 46) to be paid by means other than cash and/or any part of the builder's profit to be waived during construction. .

**Non-Residential and Special Exterior Land Improvement Costs**--Describe and enter the cost of each improvement, i.e.on-site parking facilities including individual garages and carports, commercial facilities, swimming pools with related facilities and on-site features provided to enhance the environment and livability of the project and the neighborhood. The Design Representative and Cost Analyst shall collaborate with the mortgagor or his representative in designating the items to be included

**Off-Site Costs**--Enter description and dollar amount including fees and bond premium for off-site improvements.

**Demolition**--Enter description and dollar amount of demolition work necessary to condition site for building improvements including the removal of existing structures, foundations, utilities, etc.

**Other Fees**--Enter a brief description of item involved and cost estimate for each item.

**Signatures**--Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the form was completed.

Previous edition is obsolete

form HUD-2328 (5-95)
ref. Handbook 4450.1 & 4460.1

08/06/2003 09:38 312421 51 WALSH CONSTRUCTION PAGE 02/03

## Contractor's and/or Mortgagor's Cost Breakdown
### Schedules of Values

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 8/31/2003)

Public reporting burden for this collection of information is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewin

| Date: July 25, 2003 | Sponsor: The Woodlawn Community Development Corporation |
| Project No: 071-35693 | Building Identification: Mixed Income Mid-Rise & Low-Rise |
| Name of Project: South Park Plaza | Location: 26th Street & Calumet Ave., Chicago IL |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div. | Trade Item | | Cost | Trade Description |
|------|------|-----------|---|------|-------------------|
| 1 | 3 | Concrete * | $ | 1,582,897 | w/Rebar, Precast Planks and Topping |
| 2 | 4 | Masonry * | $ | 2,308,223 | w/Rebar and Flashing |
| 3 | 5 | Metals | $ | 680,249 | Structural, Lintels, Stairs, Railings, and Misc. Metals |
| 4 | 6 | Rough Carpentry * | $ | 1,446,638 | Blocking, Caulking, Townhome Framing |
| 5 | 6 | Finish Carpentry * | $ | 423,682 | Window Sills, Misc. Trim |
| 6 | 7 | Waterproofing | $ | 90,135 | Waterproofing and sealants |
| 7 | 7 | Insulation * | $ | 221,005 | Foundation, Spray and Attic Insulation |
| 8 | 7 | Roofing | $ | 562,386 | Roofing, Sheet Metal and Waterproofing |
| 9 | 7 | Sheet Metal | $ | - | Included in Line 8 |
| 10 | 8 | Doors | $ | 280,699 | HM Doors and Frames, Wood Doors, Finish Hardware |
| 11 | 8 | Windows | $ | 629,543 | Windows, Storefront |
| 12 | 8 | Glass | $ | 15,000 | Misc. Glazing |
| 13 | 9 | Lath and Plaster | $ | - | N/A |
| 14 | 9 | Drywall | $ | 1,506,354 | Studs, Gyp Board, Finishing, Acoustical Ceilings |
| 15 | 9 | Tile Work | $ | - | In Line 25 |
| 16 | 9 | Acoustical | $ | - | In Drywall |
| 17 | 9 | Wood Flooring | $ | - | N/A |
| 18 | 9 | Resilient Flooring | $ | - | In Line 25 |
| 19 | 9 | Painting and Decorating | $ | 390,630 | Painting |
| 20 | 10 | Specialties | $ | 82,629 | Toilet Access, Louvers, Signage, Postal Specialties, Closet Shelves |
| 21 | 11 | Special Equipment | $ | 83,543 | Trash Chute and Compactor |
| 22 | 11 | Cabinets * | $ | 163,773 | Kitchen and Bath Cabinets |
| 23 | 11 | Appliances * | $ | 186,533 | Range, Hood, Refrigerator, Microwave |
| 24 | 12 | Blinds and Shades, Artwork | $ | - | None |
| 25 | 12 | Carpets | $ | 431,389 | Vinyl Tile, Carpet, Base and Ceramic Tile |
| 26 | 13 | Special Construction | $ | - | N/A |
| 27 | 14 | Elevators | $ | 218,566 | Four (4) Hydraulic |
| 28 | 15 | Plumbing and Hot Water | $ | 1,819,310 | Plumbing and Fire Protection |
| 29 | 15 | Heat and Ventilation | $ | 1,690,589 | Heating, Air Conditioning, Ventilation, Temperature Control |
| 30 | 15 | Air Conditioning | $ | - | Included in Line 29 |
| 31 | 16 | Electrical | $ | 2,472,511 | Power, Light, Phone |
| 32 | | Subtotal (Structures) | $ | 17,286,284 | |
| 33 | | Accessory Structures | $ | - | N/A |
| 34 | | Total (Lines 32 and 33) | $ | 17,286,284 | |
| 35 | 2 | Earth Work * | $ | 592,021 | Excavation, Grading, Site Paving |
| 36 | 2 | Site Utilities * | $ | 692,400 | Site Plumbing |
| 37 | 2 | Roads and Walks * | $ | 328,885 | Site Pavements |
| 38 | 2 | Site Improvements * | $ | 152,963 | Demolition |
| 39 | 2 | Lawns and Planting * | $ | 475,645 | Landscaping, Fencing, Clearing and Grubbing |

form HUD-2328 (5/95)
ref Handbook 4450.1 4440.1

08/06/2003  09:38   3124210061           WALSH CONSTRUCTION              PAGE  03/03

| Line | Div. | Trade Item | Cost | | Trade Description | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Nonresidential and Special Exterior Land Improvement (costs not included in trade item breakdown) | | Offsite Costs (costs not included in trade form breakdown) | | |
| | | | | | Description | Est. Cost | Description | | Est. Cost |
| 40 | 2 | Unusual Site Condition | $ | . | | $ | | | $ |
| 41 | | Total Land Improvements | $ | 2,241,914 | | $ | | | $ |
| 42 | | Total Struct. & Land Imprvts. | $ | 19,528,198 | | $ | | | $ |
| 43 | 1 | General Requirements (6%) | $ | 1,171,692 | | $ | | | $ |
| 44 | | Subtotal (Lines 42 thru 43) | $ | 20,699,890 | | $ | | | $ |
| 45 | | Builder's Overhead (2%) | $ | 390,564 | | $ | | | $ |
| 46 | | Builder's Profit (6%) | $ | 1,171,692 | | Total $ | | Total $ | | |
| 47 | | Subtotal (Lines 44 thru 46) | $ | 22,262,146 | | Other Fees | | | | |
| 48 | | | | | | $ | | Demolition (costs not included in trade item breakdown) | | |
| 49 | | Other Fees (Preconstruction) | | | | $ | | Description | | Est. Cost |
| 50 | | Bond Premium | $ | 239,697 | | $ | | | | |
| 51 | | Total for All Improvements | $ | 22,501,843 | | $ | | | | |
| 52 | | Builder's Profit Paid by Means Other Than Cash | | | | $ | | | | |
| 53 | | Total for All Improvements Less Line 52 | $ | 22,501,843 | | Total $ | | Total $ | | |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment erewith, is true and accurate. *Warning*: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penal

| Mortgagor: | | By: | | Date: |
|---|---|---|---|---|
| Contractor: Walsh Construction Company of Illinois | | By: *[signature]* | | Date: 8·05·03 |
| FHA: (Processing Analyst) | Date: | FHA: (Chief, Cost Branch or Cost An   yst) | | Date: |
| FHA: (Chief Underwriter) | | | | Date: |

Instructions for Completing Form HUD-2328

This form is prepared by the contractor and/or mortgagor as a requirement for the issuance of a firm commitment  The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed br  akdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each *structure type*. A summation of these structure costs are er  ered on line 32 of a master form. Land Improvements, General Requirements and Fees are completed through line 53 on the master 2328 *only*.

Date—Date form was prepared.

Sponsor—Name of sponsor or sponsoring organization.

Project No.—Eight digit assigned project number.

Building Identification—Number(s) or Letter(s) of each building as designated on plans.

Name of Project—Sponsors designated name of project.

Location—Street address, city and state.

Division—Division numbers and trade items have been developed from the cost accounting section of the uniform system.

Accessory Structures—This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings.

When the amount shown on line 33 is $30,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

Unusual Site Conditions—This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on - site conditions considered unusual.

Cost—Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

Trade Description—Enter a brief description of the work included in each trade item.

Other Fees—Includable are fees  o be paid by the Contractor, such as sewer tap fees not included in the plumbing  contract. Fees paid or to be paid by the Mortgagor are not to be included  on this form.

Total For All Improvements—I  is is the sum of lines 1 through 50 and is to include the total builder's profit (l  ie 46).

Line 52—When applicable, enter  hat portion of the builder's profit (line 46) to be paid by means other than cash an  Vor any part of the builder's profit to be waived during construction.

Non-Residential and Special Ex  terior Land Improvement Costs—Describe and enter the cost of each improve  nt, i.e.on-site parking facilities including individual garages and carports, c  mmercial facilities, swimming pools with related facilities and on-site featu  es provided to enhance the environment and livability of the project and the re  ghborhood. The Design Representative and Cost Analyst shall collaborate wi  the mortgagor or his representative in designating the items to be includ  d

Off-Site Costs—Enter descriptio  and dollar amount including fees and bond premium for off-site improvemen  .

Demolition—Enter description an  i dollar amount of demolition work necessary to condition site for building improv  ments including the removal of existing structures, foundations, utilities, (  b.

Other Fees—Enter a brief descrip  ion of item involved and cost estimate for each item.

Signatures—Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the for  n was completed.

form HUD-2328 (3/95)
ref. Handbook 4450.1 4e4460.1

Exhibit B

704 11:00AM    19123263952                              NU. 940    F. 2/2

**WALSH**
Walsh Construction

## GENERAL CONDITIONS
## South Park Plaza #200119

7/8/05

The following is the budget for Supervision and General Conditions expenses anticipated for the projects Construction.

| | Pre Construction | Construction | Total Cost Budget for Construction Period |
|---|---|---|---|
| **1  Supervision** | | | |
| Project Executive | 10% | Part Time as required | |
| Project Director | 25% | Part Time as required | |
| Project Manager | 25% | Full Time | |
| Asst. Project Manager | As Required | Full Time | |
| Project Engineer | N/A | Full Time as Required | |
| Superintendent | As Required | Full Time | |
| Field Engineer | N/A | As Required | |
| Project Accountant | N/A | As Required | |
| Project Secretary | N/A | Full Time | |
| Safety Engineer | N/A | As Required | |
| Project Estimator | 33% | As Required | |
| | | **Subtotal** | $  852,202.00 |
| **2  Mobilization:** | | | |
| Office Setup | N/A | Included | |
| Demobilization | N/A | Included | |
| Site Preparation | N/A | Included | |
| | | **Subtotal** | $  10,000.00 |
| **3  Temporary Construction & Utilities** | | | |
| Field Offices | N/A | Included | |
| Drinking Water | N/A | Included | |
| Telephone | N/A | Included | |
| Rubbish Boxes | N/A | Included | |
| Temporary Job Sign | N/A | Included | |
| Temporary Toilets | N/A | Included | |
| Temporary Protection | N/A | Included | |
| Temporary Electric | N/A | In Trade Line Items | |
| Temporary Ladders | N/A | Included | |
| Temporary Permits | N/A | Included | |
| Winter Protection / Utility Bills | N/A | Not Included | |
| | | **Subtotal** | $  141,067.00 |
| **4  Office Expenses** | | | |
| Job Photos | N/A | Included | |
| Office Supplies | N/A | Included | |
| Postage / Courier Services | N/A | Included | |
| Copier / Fax Machine | N/A | Included | |
| Computer Equipment & Software | N/A | Included | |
| Blue Printing - Bid Documents | Included | Not Included | |
| Blue Printing - Shop Drawings | Not Included | Included | |
| Blue Printing - Change Order Documents | Not Included | Not Included | |
| | | **Subtotal** | $  48,250.00 |
| **5  Job Maintenance:** | | | |
| Project Safety | N/A | Included | |
| Safety Maintenance | N/A | Included in Trade Categories as a Cost of the Work | |
| Periodic Clean Up | N/A | Included in Trade Categories as a Cost of the Work | |
| Street Cleaning | N/A | Included | |
| Job Site Security | N/A | Not Included | |
| Hoisting | N/A | Included in Trade Categories as a Cost of the Work | |
| Punch List | N/A | Included | |
| | | **Subtotal** | $  119,463.00 |
| | | **Total Budget** | $  1,171,882.00 |



Exhibit C

# Application For Payment

Detailed, Grouped by Each Number

South Park Plaza
2601 S. Calumet
Chicago, IL 60616

Project # 200119
Tel: (312)326-3957    Fax: (312)326-3952

Walsh Construction Company of Illinois

**Application Date:** 6/9/2004    **Contract No:** 071-35693    **Application No:** 010

To Owner:   Woodlawn Community
Development Corporation
1500 East 63rd Street
Chicago, IL 60637

From Contractor:   Walsh Construction
Company of Illinois
929 W. Adams
Chicago, IL 60607

Via Architect: Loewenberg & Associates,
Inc.
1 W. Superior Street, Ste.
200
Chicago, IL 60610

Contract For:

Period Number:   32

Period To:   6/16/2004

## Application For Payment Summary

| | |
|---|---:|
| 1. Original Contract Value | 22,501,843 |
| 2. Net Change by Change Orders | 288,209 |
| 3. Contract Value To Date | 22,790,052 |
| 4. Total Completed Stored To Date | 11,593,956 |
| 5. Completed Work Retainage | 1,134,140 |
| 6. Stored Material Retainage | 0 |
| 7. Total Retainage | 1,134,140 |
| 8. Total Earned Less Retainage | 10,459,816 |
| 9. Less Previous Certificates For Payment | 8,214,854 |
| 10. Current Payment Due | 2,244,962 |
| 11. Balance To Finish, Including Retainage | 12,330,236 |

| Change Order Summary | Additions | Deductions |
|---|---|---|
| Total changes in previous months | 175,562 | 0 |
| Total approved this month | 112,647 | 0 |
| Totals | 288,209 | 0 |
| Net Changes by Change Order | 288,209 | |

Contractor Signature:

By: _____    Date: _____

Amount Certified: _____

Architect Signature:

By: _____    Date: _____

Owner Signature:

By: _____    Date: _____

Notary Signature:

By: _____    Date: _____

# Application For Payment

Detailed Sheet

Walsh Construction Company of Illinois

South Park Plaza
2601 S. Calumet
Chicago, IL 60616

Project # 200119
Tel: (312)326-3957  Fax: (312)326-3952

Contract No: **071-35693**
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

Application No: **010**
Application Date: 6/9/2004
Period To: 6/16/2004
Architect's Project No: 200119

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | | Site Security - WCCI | 50,000 | 20,381 | 2,228 | 0 | 0 | 22,609 | 45 | 27,391 | 2,261 |
| 002 | | Clearing - Angel's | 73,950 | 0 | 0 | 0 | 0 | 0 | 0 | 73,950 | 0 |
| 003 | | Surveying - Ways Engineering | 35,000 | 26,057 | 3,375 | 0 | 0 | 29,432 | 84 | 5,568 | 2,943 |
| 004 | | Earthwork/Site Clearing – Dynamic Wrecking (Dynamic SCCO #1 ($9,495)) | 471,251 | 400,159 | 0 | 0 | 0 | 400,159 | 85 | 71,092 | 40,016 |
| 005 | | Site Clearing, Dewatering, Protection, Safety, & Unsuitable Material Allowance ($10,017) / Dynamic SCCO #1 $3,455 - WCCI | 212,007 | 157,220 | 20,156 | 0 | 0 | 177,376 | 84 | 34,631 | 17,738 |
| 006 | | Two-rail Townhome Fencing and Tree Grates - SAS Fence | 237,487 | 0 | 0 | 0 | 0 | 0 | 0 | 237,487 | 0 |
| 007 | | Site Fencing - WCCI | 31,460 | 5,914 | 1,918 | 0 | 0 | 7,832 | 25 | 23,628 | 763 |
| 008 | | Asphalt Concrete Paving - Illinois Paving | 105,000 | 0 | 0 | 0 | 0 | 0 | 0 | 105,000 | 0 |
| 009 | | Site Utilities ($707,000) | 795,983 | 562,448 | 45,000 | 0 | 0 | 607,448 | 76 | 189,535 | 60,745 |

Prolog Manager    Printed on: 6/24/2004    KowortiSouthPark

Page 1

Application For Payment
Detailed Sheet

| Contract No: | 071-35693 |
| To Company: | Woodlawn Community Development Corporation |
| From Company: | Walsh Construction Company of Illinois |

| Application No: | 010 |
| Application Date: | 6/9/2004 |
| Period To: | 6/16/2004 |
| Architect's Project No: | 260119 |

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | and Unsurable Materials Allowance ($69,983) (See also Line 54): Builder's Trucking | | | | | | | | | |
| 010 | | Landscaping - Salt Creek | 230,571 | 0 | 0 | 0 | 0 | 0 | 0 | 230,571 | 0 |
| 011 | | Foundation / Slab Concrete – II in One (PCO 7009 ($14,622)) | 977,230 | 835,778 | 0 | 0 | 0 | 835,778 | 86 | 141,452 | 83,576 |
| 012 | | Concrete Bulkheads, Precast/Concrete Protection, Safety & Equipment Parts - WCCI | 130,356 | 83,043 | 16,606 | 0 | 0 | 99,649 | 76 | 30,707 | 9,965 |
| 013 | | Building Floor Topping - Barrier Corp. (PCO 6009 $34,900) | 219,460 | 117,712 | 62,357 | 0 | 0 | 180,069 | 82 | 39,391 | 18,007 |
| 014 | | Architectural Precast - ATM Dynacore | 513,468 | 416,575 | 84,305 | 0 | 0 | 500,880 | 98 | 12,588 | 50,088 |
| 015 | | Masonry - McNutt | 2,338,000 | 1,487,136 | 370,704 | 0 | 0 | 1,857,840 | 79 | 480,160 | 185,784 |
| 016 | | Masonry Protection, Safety, & Tarping - WCCI | 101,247 | 55,901 | 18,866 | 0 | 0 | 74,667 | 74 | 26,580 | 7,467 |
| 017 | | Structural Steel / Miscellaneous Metals - K&K Ironworks (PCO 6012 $15,494; PCO 6006 $188) | 597,668 | 268,143 | 104,110 | 0 | 0 | 372,253 | 62 | 225,415 | 37,225 |
| 018 | | Structural Steel / Miscellaneous Metals Protection & Safety - WCCI | 11,103 | 6,354 | 0 | 0 | 0 | 6,354 | 75 | 2,749 | 835 |

Printed on: 6/24/2004.    KonoverSouthPark

Prolog Manager

Page 2

Application For Payment.
Detailed Sheet

Contract No: 071-35653
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

Application No: 010
Application Date: 6/9/2004
Period To: 6/16/2004
Architect's Project No: 200119

| A | B / C | D | E | F | G | H | I | J | K | L |
|---|-------|---|---|---|---|---|---|---|---|---|
| 019 | Rough Carpentry, Finish Carpentry, Insulation, & Drywall - Salamone & Swift (PCO 6005 - $5,516) | 2,563,468 | 910,018 | 451,014 | 0 | 0 | 1,361,032 | 53 | 1,222,436 | 136,103. |
| 020 | Rough Carpentry, Rough Opening Support & Enclosure - WCCI | 175,895 | 63,636 | 29,984 | 0 | 0 | 93,620 | 53 | 82,075 | 9,362 |
| 021 | Firestopping - WCCI | 25,000 | 0 | 0 | 0 | 0 | 0 | 0 | 25,000 | 0 |
| 022 | Sprayed-On Fireproofing - Chicago Ceilings | 53,200 | 0 | 0 | 0 | 0 | 0 | 0 | 53,200 | 0 |
| 023 | Roofing - A-1 Roofing | 542,875 | 0 | 208,000 | 0 | 0 | 208,000 | 38 | 334,875 | 20,800 |
| 024 | Joint Sealants - Architectural Sealants (PCO 6021 - $50,284) | 105,284 | 0 | 15,142 | 0 | 0 | 15,142 | 14 | 90,142 | 1,514 |
| 025 | Roofing and Fireproofing - Coordination, Protection & Safety - WCCI | 33,338 | 0 | 9,396 | 0 | 0 | 9,396 | 28 | 23,943 | 940 |
| 026 | Steel Doors and Frames, Wood Doors & Finish Hardware - Star Contractors (PCO 6014 $31,920) | 300,320 | 0 | 0 | 0 | 0 | 0 | 0 | 300,320 | 0 |
| 027 | Doors, Hardware, Windows and Glazing Coordination, Protection, Safety - WCCI | 41,122 | 880 | 0 | 0 | 0 | 880 | 2 | 40,242 | 88 |
| 028 | Aluminum Entrances, Storefronts & Aluminum | 556,040 | 0 | 97,322 | 0 | 0 | 97,322 | 18 | 458,718 | 9,732 |

KenwoodSouthPark

Protog Manager    Printed on: 6/24/2004

Page 3.

**Application For Payment**
**Detailed Sheet**

Contract No: 071-35683
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

Application No: 010
Application Date: 6/9/2004
Period To: 6/16/2004
Architect's Project No: 200119

| Item | Description | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|
| | Windows - Monda Windows | | | | | | | | | |
| 029 | Gypsum Drywall, Flooring and Painting Coordination, Protection & Safety - WCCI | 114,806 | 0 | 11,288 | 0 | 0 | 11,288 | 10 | 103,518 | 1,129 |
| 030 | Tile, Resilient Tile & Carpeting - Office Environments (PCO 6011 - $49,956) | 462,472 | 0 | 0 | 0 | 0 | 0 | 0 | 462,472 | 0 |
| 031 | Painting - Continental | 360,225 | 10,965 | 28,971 | 0 | 39,956 | 11 | 320,269 | 3,996 |
| 032 | Signage - TBD | 6,700 | 0 | 0 | 0 | 0 | 0 | 6,700 | 0 |
| 033 | Postal Specialties - TBD | 10,553 | 0 | 0 | 0 | 0 | 0 | 10,553 | 0 |
| 034 | Toilet and Bath Accessories / Closet Specialties - Window Treatments | 137,416 | 0 | 0 | 0 | 0 | 0 | 137,416 | 0 |
| 035 | Residential Equipment - TBD | 219,686 | 0 | 0 | 0 | 0 | 0 | 219,686 | 0 |
| 036 | Kitchen & Bath Cabinets - Republic | 147,004 | 0 | 0 | 0 | 0 | 0 | 147,004 | 0 |
| 037 | Cabinet and Equipment Coordination, Protection, and Safety - WCCI | 16,769 | 0 | 0 | 0 | 0 | 0 | 16,769 | 0 |
| 038 | Window Treatments - TBD | 105,162 | 0 | 0 | 0 | 0 | 0 | 105,162 | 0 |
| 039 | Elevators - Thyssen Krupp | 203,600 | 20,832 | 24,432 | 0 | 45,264 | 22 | 158,336 | 4,526 |
| 040 | Chutes & Compactors - Wilkinson | 37,159 | 0 | 6,750 | 0 | 6,750 | 18 | 30,409 | 675 |

Prolog Manager          Printed on: 6/24/2004          KawestSouthPark

**Application For Payment**
Detailed Sheet

Contract No: 071-35693
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

Application No: 010
Application Date: 6/9/2004
Period To: 6/16/2004
Architect's Project No: 200119

| No | Description | D | E | F | G | H | I | J | K | L |
|----|-------------|---|---|---|---|---|---|---|---|---|
| 041 | Plumbing - Maxwell Plumbing (PCO 7008 $11,880) | 1,607,120 | 856,800 | 146,700 | 0 | 0 | 1,043,500 | 65 | 563,620 | 104,350 |
| 042 | HVAC - HVAC Consultants | 1,591,720 | 407,925 | 327,750 | | 0 | 735,675 | 46 | 856,045 | 73,568 |
| 043 | Fire Protection - Northstar Fire Protection | 246,800 | 161,350 | 34,450 | | 0 | 195,800 | 79 | 51,000 | 19,580 |
| 044 | MEP Engineering, Reproduction, Protection and Safety (PCO 6002 ($25,708); PCO 6009 ($34,960); PCO ($5,616); PCO (31,920); PCO 60; Roof Drainge - (33,140)) - WCCI | 223,923 | 52,068 | 10,013 | | 0 | 62,081 | 28 | 161,842 | 6,208 |
| 045 | Electrical - Faster (PCO 6002 $25,708; PCO 7009 $2,742) | 2,208,748 | 486,087 | 138,317 | | 0 | 624,404 | 28 | 1,584,344 | 62,440 |
| 046 | Electrical Consumption - WCCI | 35,500 | 6,123 | 3,545 | | 0 | 9,668 | 27 | 25,832 | 967 |
| 047 | Service Loop Trenching - WCCI | 99,847 | 0 | 0 | | 0 | 0 | 0 | 99,847 | 0 |
| 048 | Unpurchased Scope - WCCI (PCO 6012 ($15,484); PCO 6011 ...; PCO 5006 ...; ($188); PCO 6021 - ($30,284)) | 102,528 | 0 | 0 | | 0 | 0 | 0 | 102,528 | 0 |
| 049 | General Conditions - WCCI | 1,037,118 | 491,169 | 37,761 | | 0 | 528,930 | 51 | 508,188 | 52,893 |
| 050 | Contract Bond - WCCI | 134,511 | 134,511 | 0 | | 0 | 134,511 | 100 | 0 | 0 |

Prolog Manager          Printed on: 6/24/2004          Konwel\SouthPark

Page 5

Application For Payment
Detailed Sheet

Contract No: 071-35693
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

Application No: 010
Application Date: 6/9/2004
Period To: 6/16/2004
Architect's Project No: 200119

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 051 | | General Liability - WCCI | 281,547 | 281,547 | 0 | 0 | 0 | 281,547 | 100 | 0 | 28,155 |
| 052 | | Builder's Overhead - WCCI | 390,716 | 156,286 | 42,979 | 0 | 0 | 199,265 | 51 | 191,451 | 19,927 |
| 053 | | Fee - WCCI | 1,171,629 | 468,652 | 128,879 | 0 | 0 | 597,531 | 51 | 574,098 | 59,753 |
| 054 | | Unsuitable Soil Removal (PCCO 001, PCO 5004) | 80,022 | 80,022 | 0 | 0 | 0 | 80,022 | 100 | 0 | 0 |
| 055 | | Rear-Flush Toilets in Mid-Rises (PCCO 002, PCO 5001) | 16,416 | 7,200 | 0 | 0 | 0 | 7,200 | 44 | 9,216 | 0 |
| 056 | | Window Color Customization - Revised (PCCO 002, PCO 5006) | 59,174 | 0 | 10,876 | 0 | 0 | 10,876 | 18 | 48,298 | 0 |
| 057 | | Masonry Charges on 1st Floor - Rev. 9 & 10 (PCCO 002, PCO 5007) | 19,950 | 19,950 | 0 | 0 | 0 | 19,950 | 100 | 0 | 0 |
| 058 | | Revision of Precast Headers To Accommodate Lintel (PCCO 005, Rev.1, PCO 5015) | 18,162 | 0 | 0 | 0 | 0 | 0 | 0 | 18,162 | 0 |
| 059 | | Steel Lintels at Exterior of Mid-rises (PCCO 005, Rev.1, PCO 5026) | 14,942 | 0 | 0 | 0 | 0 | 0 | 0 | 14,942 | 0 |
| 060 | | Steel Lintel Re-Sizing in Mid-rise Bldgs - 1st Floor (PCCO 005, Rev.1, PCO 5032) | 2,232 | 0 | 0 | 0 | 0 | 0 | 0 | 2,232 | 0 |
| 061 | | Added Masonry Reinforcement at Balcony Wing Walls | 8,066 | 0 | 0 | 0 | 0 | 0 | 0 | 8,066 | 0 |

Prolog Manager    Printed on: 6/24/2004    KeverSouthPark

Application For Payment
Detailed Sheet

Contract No: 071-35693
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

Application No: 010
Application Date: 6/9/2004
Period To: 6/16/2004
Architect's Project No: 200119

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | (PCCO 005, Rev. 1, PCO 5033) | | | | | | | | | |
| 062 | | Sawcutting of Balcony Edges (PCCO 005, Rev. 1, PCO 5030) | 8,598 | 0 | 0 | 0 | 0 | 0 | 0 | 8,598 | 0 |
| 063 | | Obstruction in Elevator Piston Drilling (PCCO 007, PCO 5021) | 1,231 | 0 | 0 | 0 | 0 | 0 | 0 | 1,231 | 0 |
| 064 | | McNutt Construction Winter Protection (PCCO 008, Rev. 1, PCO 5042) | 30,636 | 0 | 0 | 0 | 0 | 0 | 0 | 30,636 | 0 |
| 065 | | Elevator Machine Room Change (PCCO 009 Rev. 1, PCO 5041) | 903 | 0 | 0 | 0 | 0 | 0 | 0 | 903 | 0 |

Project Manager

Printed on: 6/24/2004    Kowert South Park

Page 7

SWORN STATEMENT FOR CONTRACTOR AND SUBCONTRACTOR TO OWNER

State of { Illinois }
County of { Cook }

Contract # 071-55093

The officer        Dale M. Katz

being duly sworn, on oath

The Owner whose pay for Welsh Construction Company of Illinois

who has a contract with

South Park Plaza L.P. owner for

3600 S. Dr. Martin Luther King Jr. Drive, Chicago, IL 60616

| Line | NAME AND ADDRESS (Company Name, Address) | CONTRACT FOR (Scope of Work) | AMOUNT OF CONTRACT | CHANGE ORDERS TO DATE | ADJUSTED CONTRACT TOTAL | Work Completed % | Work Completed $ Value | Retention (Incl. Current) | Net Previously Paid | Net Amount This Payment | BALANCE TO COMPLETE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Woyle Engineering Survey, Inc. 2116 W. Roosevelt Road, 2N, Broadview, IL 60155 | Surveying | $ | $ | $ | | $ | $ | $ | $ | $ |
| 2 | Angel's Cleaning | Cleaning | $ 35,000 | $ | 35,000 | 84% | $ 29,432 | $ 2,943 | $ 23,452 | $ 3,038 | 3,511 |
| 3 | Dynamic Wrecking & Excavation, Inc. P.O. Box 1347, South Holland, IL 60473 | Excavation for Structures & Site | $ 73,950 | $ | 73,950 | 0% | $ | $ | $ | $ | 73,950 |
| 4 | Builder's Trucking 4344 W. 63rd Street, Chicago IL 606 | Site Plumbing | $ 480,766 | $ (9,695) | 471,151 | 15% | $ 400,159 | $ 40,016 | $ 360,143 | $ | 111,108 |
| 5 | Builder's Trucking - Off-site Spoil Removal 4344 W. 63rd Street, Chicago IL 606 | Off-Site Spoil Removal, Builder | $ 707,000 | $ | 707,000 | 73% | $ 517,465 | $ 51,747 | $ 425,218 | $ 40,500 | 241,282 |
| 6 | Star Creek Design Associates 4313 Central Avenue, Western Springs IL 60558 | Landscaping | $ 89,343 | $ 70,195 | 160,178 | 100% | $ 160,178 | $ 8,598 | $ 151,180 | $ | 8,598 |
| 7 | Illinois Paving Company 1800 West Armitage Ave, Chicago IL 60622 | Asphalt Paving | $ 224,571 | $ | 224,571 | 0% | $ | $ | $ | $ | 224,571 |
| 8 | S&S Fence, Inc. 3331 S. Harwood Rd., Lake Station IN 46405 | Site Fencing | $ 185,000 | $ | 185,000 | 0% | $ | $ | $ | $ | 185,000 |
| 9 | H to One 4344 West 45th Street, Chicago IL 60632 | | $ 227,487 | $ | 227,487 | 0% | $ | $ | $ | $ | 227,487 |
| 10 | Barrier Corporation 7621 North Nagle Ave, Morton Grove IL 60053 | Site Concrete & Sitework (Concrete | $ 991,582 | $ (14,022) | 977,210 | 86% | $ 835,278 | $ 83,578 | $ 752,200 | $ | 725,930 |
| 11 | T.D.M Drywarex P.O. Box 160, 533 S. Independence Blvd, Lockport | Concrete Topping | $ 184,500 | $ 34,968 | 219,468 | 82% | $ 180,069 | $ 18,907 | $ 105,941 | $ 56,121 | 57,398 |
| 12 | McGritt Construction Company 5071 W. Monroe St., Chicago IL 60644 | Precast Concrete | $ 513,468 | $ | 513,468 | 98% | $ 500,880 | $ 50,088 | $ 374,938 | $ 75,875 | 62,676 |
| 13 | KAX Iron Works Inc. 5100 S. Lawndale, McCook IL 60525 | Masonry | $ 2,338,000 | $ 66,437 | 2,404,437 | 78% | $ 1,875,349 | $ 185,784 | $ 1,355,972 | $ 333,614 | 714,881 |
| 14 | Sommers Builders Inc. 2028 N. Kildeen, Chicago IL 60623 | Miscellaneous Metals | $ 541,996 | $ 30,737 | 672,733 | 61% | $ 372,255 | $ 37,225 | $ 241,329 | $ 93,699 | 177,785 |
| 15 | TDM | Carpentry | $ 2,577,957 | $ 5,676 | 2,583,468 | 53% | $ 1,331,952 | $ 134,103 | $ 219,010 | $ 695,915 | 1,358,539 |
| 16 | Architectural Sealants 6535 W. Staypt Road, Morse, IL 60449 | Window Treatments | $ 60,852 | $ | 60,852 | 0% | $ | $ | $ | $ | 60,852 |
| 17 | A1 Roofing 1905 Factory Ave, Elk Grove Village IL 60007 | Sealants | $ 75,800 | $ 34,284 | 105,334 | 14% | $ 15,142 | $ 1,514 | $ | $ 13,628 | 91,656 |
| 18 | Chicago Lathing & Partitions Co., LLC 7864 Elmhurst Road, Mt. Prospect IL 60616-5711 | Roofing - All Buildings | $ 543,875 | $ | 543,875 | 38% | $ 208,000 | $ 20,800 | $ | $ 187,200 | 355,075 |
|    | Spray Fireproofing | | $ 53,200 | $ | 53,200 | 0% | $ | $ | $ | $ | 53,200 |

Sworn Statement for Contractor and Subcontractor to Owner Page 1 of 2

| Line # | NAME AND ADDRESS | CONTRACT FOR | AMOUNT OF CONTRACT | CHANGE ORDERS TO DATE | ADJUSTED CONTRACT TOTAL | Work Completed % | $ Value | Retention (Incl. Current) | Net Previously Paid | Net Amount This Payment | BALANCE TO COMPLETE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | Ace Contractors Supply, Inc. 9999 Virginia Ave, Chicago Ridge IL 60415 | Doors, Frames & Hardware | $ 368,400 | $ 31,920 | $ 340,320 | 0% | $ | $ | $ | $ | $ 340,320 |
| 20 | Manda Windows & Doors Mfg. 3901 W. 46th Street, Chicago IL 60632 | Windows, Sliding doors & Stors | $ 556,048 | $ 54,388 | $ 610,420 | 18% | $ 108,198 | $ 9,732 | $ | $ 98,466 | $ 511,954 |
| 21 | Continental Painting & Decorating 2255 S. Wabash Ave, Chicago IL 60616 | Painting | $ 360,225 | $ | $ 360,225 | 11% | $ 39,956 | $ 3,996 | $ 9,287 | $ 26,674 | $ 324,265 |
| 22 | Office Environments 202 May Street, Elmhurst IL 60126 | Flooring | $ 412,515 | $ 49,956 | $ 462,472 | 0% | $ | $ | $ | $ | $ 462,472 |
| 23 | TBD – Toilet Accessories | Toilet Accessories / Closet Spec | $ 137,416 | $ | $ 137,416 | 0% | $ | $ | $ | $ | $ 137,416 |
| 24 | TBD – Appliances | Appliances | $ 219,686 | $ | $ 219,686 | 0% | $ | $ | $ | $ | $ 219,686 |
| 25 | Wilkinson-Hi-Rise, LLC 2255 N. Elston Ave, Chicago IL 60647 | Trash Chutes & Compactors | $ 37,159 | $ | $ 37,159 | 18% | $ 6,750 | $ 675 | $ | $ 6,075 | $ 31,084 |
| 26 | Republic Industries, Inc 1400 Warren Dr, PO Box 1776, Marshall Texas 75671 | Cabinetry | $ 147,004 | $ | $ 147,004 | 0% | $ | $ | $ | $ | $ 147,004 |
| 27 | Thyssen Krupp Elevator 2345 Enterprise Drive, Westchester IL 60154 | Elevators | $ 203,600 | $ 1,080 | $ 204,680 | 22% | $ 45,364 | $ 4,536 | $ 19,749 | $ 21,980 | $ 163,942 |
| 28 | Northwest Fire Protection 875 Blue Grainm Rd, Eagan MN 55121 | Fire Protection | $ 246,800 | $ 24,436 | $ 271,236 | 12% | $ 195,600 | $ 19,580 | $ 145,215 | $ 31,005 | $ 95,636 |
| 29 | HVAC Consultants 1900 S. Highland Ave, Suite 206, Lombard IL 60148 | Mechanical Work | $ 1,591,720 | $ | $ 1,591,720 | 46% | $ 735,675 | $ 73,568 | $ 367,133 | $ 295,975 | $ 929,683 |
| 30 | Maxwell Plumbing PO Box 875, Tinley Park IL 60477 | Plumbing | $ 1,562,100 | $ 26,280 | $ 1,588,380 | 66% | $ 1,039,700 | $ 104,350 | $ 814,390 | $ 132,850 | $ 648,030 |
| 31 | Kaster Electric 125 W. 79th Street, Chicago IL 60620 | Electrical | $ 2,180,398 | $ 28,450 | $ 2,108,748 | 28% | $ 624,404 | $ 62,440 | $ 437,478 | $ 124,485 | $ 1,646,784 |
| 32 | Wala Construction 929 West Adam, Chicago IL 60607 | Coordination, Dewatering, Fireot | $ 1,427,883 | $ (134,665) | $ 1,293,418 | 45% | $ 577,430 | $ 57,742 | $ 408,078 | $ 111,600 | $ 772,240 |
| 33 | TBD – HERV/Permit Charges | Plumbing Drains, Carpet Spec, A/V Station, Security, Soffits | $ 216,943 | $ (69,956) | $ 206,987 | 0% | $ | $ | $ | $ | $ 206,987 |
| 34 | Travelers Casualty and Surety Company 215 Shuman Blvd, Naperville, IL 60563 | Bond Cost | $ 134,511 | $ | $ 134,511 | 100% | $ 134,511 | $ | $ 134,511 | $ | $ |
| 35 | Wala Construction 929 West Adam, Chicago IL 60607 | Project Supervision, General Lia | $ 1,931,010 | $ 42,216 | $ 1,932,226 | 55% | $ 1,639,550 | $ 160,728 | $ 1,270,165 | $ 188,657 | $ 1,695,484 |
| | TOTALS | | $ 22,501,143.00 | $ 288,209.00 | $ 22,789,052.00 | 51% | $ 11,593,956 | $ 1,134,140 | $ 8,214,854 | $ 2,244,962 | $ 12,380,235 |

| | |
|---|---|
| AMOUNT OF ORIGINAL CONTRACT | $ 22,501,143.00 |
| EXTRAS TO CONTRACT | $ 283,209.00 |
| TOTAL CONTRACT AND EXTRAS | $ 22,789,052.00 |
| CREDITS TO CONTRACT | $ |
| NET AMOUNT OF CONTRACT | $ 22,789,052.00 |

TOTAL AMOUNT REQUESTED $ 11,593,956
LESS: 10% RETAINED $ 1,134,140
NET AMOUNT EARNED $ 10,459,816
AMOUNT OF PREVIOUS PAYMENTS $ 8,214,854
AMOUNT DUE THIS PAYMENT $ 2,244,962
GROSS BALANCE TO COMPLETE $ 11,196,096

Not including Retainage

Approved

Signed

Sworn Statement for Contractor and Subcontractor to Owner Page 2 of 2

# WAIVER OF LIEN TO DATE

STATE OF
COUNTY OF

Gly # _____

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by     WOODLAWN COMMUNITY DEVELOPMENT CORPORATION

to furnish  GENERAL CONSTRUCTION

for the premises known as  SOUTH PARK PLAZA

of which  WOODLAWN COMMUNITY DEVELOPMENT CORPORATION

is the owner

The undersigned, for and in consideration of ██████████████████████████████████████████████
$2,244,962 Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es)
hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, relating to mechanics' liens, with respect to
and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the
moneys, funds or other considerations due or to become due from the owner, on account of labor services, material, fixtures, apparatus or machinery
furnished to this date by the undersigned for the above-described premises.

Given under _____ hand _____ and seal _____ this

_____ 28th of June _____ , 2004

Signature and Seal: _____

NOTE: All waivers must be for the full amount paid.  If waiver is for a corporation, corporate name should be used, corporate seal affixed and title of
officer signing waiver should be set forth; if waiver is for a partnership, the partnership name should be used, partner should sign and designate himself
as partner.

## CONTRACTOR'S AFFIDAVIT

STATE OF

COUNTY OF

TO WHOM IT MAY CONCERN:

THE undersigned, being duly sworn, deposes and says that he is     Craig M. Kane
PROJECT MANAGER                                    of the  WALSH CONSTRUCTION COMPANY
who is the contractor for the         GENERAL CONSTRUCTION
buildings located at   2600 S. Dr. Martin Luther King Dr. - 2601 S. Prairie Ave, Chicago, IL 60616                           work on the
owned by Woodlawn Community Development Corporation
That the total amount of the contract including extra is        $22,790,962.00
$          8,214,854  prior to this payment. That all waivers are true, correct and genuine and delivered unconditionally and that
there is no claim either legal or equitable to defeat the validity of said waivers. That the following are the names of all parties who have furnished material
or labor, or both, for said work and all parties having contracts or sub contracts for specific portions of said work or for material entering into the
construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said
work according to plans and specifications:

| NAMES | WHAT FOR | CONTRACT PRICE | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
| SEE SWORN STATEMENT ATTACHED | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL LABOR AND MATERIAL TO COMPLETE | | $  22,790,962 | $  8,214,854 | $  2,244,962 | $  12,330,237 |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work
of any kind done or to be done upon or in connection with said work other than above stated.

Signed this  28 th _____ day of  June _____ , 2004

Signature: _____

Subscribed and sworn to before me this     28 th _____ day of June _____ , 2004

# Contractor's Requisition
## Project Mortgages
To be submitted to mortgagee in quadruplicate

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0028 (exp. 12/31/2005)

This information is used to verify program benefits consisting of distribution of insured mortgage proceeds when construction costs are involved. The information regarding completed work items is used by HUD to ensure that payments from mortgage proceeds are made for work actually completed in a satisfactory manner. This information is a requirement under Section 207(b) of the National Housing Act (Public Law 479, 48 Stat. 1246, 12 U.S.C. 1701 et. seq) authorizing the Secretary of HUD to insure mortgages. The information collection does not contain information of a sensitive nature.

Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

| To (owner) Woodlawn Community Development Corp. | Requisition Number | Combined Pay App #10 |
|---|---|---|

| Project South Park Plaza | Project Number FHA #071-35693 | Location 26th Street & Calumet Ave, |
|---|---|---|

In accordance with the provision of the Construction Contract dated _____9/22/03_____ and Contractor's and/or Mortgagor's Cost Breakdown (Schedule of Values) attached thereto, this requisition is submitted for the amount of $ _____2,234,086_____ due for work performed up to the ___28th___ day of ___June___ and as itemized below by the trades listed in the Schedule of Values.

| DIV | Trade Item | Cost as per Cost Breakdown (A) | Amounts Complete (B) | For HUD-FHA Use (C) |
|---|---|---|---|---|
| 3 | Concrete | $ 1,582,897 | $ 1,582,897 | $ |
| 4 | Masonry | 2,308,223 | 1,932,507 | |
| 5 | Metals | 680,249 | 380,607 | |
| 6 | Rough Carpentry | 1,446,638 | 1,442,296 | |
| 7 | Finish Carpentry | 423,682 | | |
| 7 | Waterproofing | 90,135 | 880 | |
| 7 | Insulation | 221,005 | 15,142 | |
| 7 | Roofing | 562,386 | | |
| 8 | Sheet Metal | 0 | 217,395 | |
| 8 | Doors | 280,699 | | |
| 8 | Windows | 629,543 | | |
| 8 | Glass | 15,000 | 97,322 | |
| 9 | Lath and Plaster | 0 | | |
| 9 | Drywall | 1,506,354 | | |
| 9 | Tile Work | 0 | 186,052 | |
| 9 | Acoustical | 0 | | |
| 9 | Wood Flooring | 0 | | |
| 9 | Resilient Flooring | 0 | | |
| 9 | Painting and Decorating | 390,630 | | |
| 10 | Specialties | 82,629 | 39,955 | |
| 11 | Special Equipment | 83,543 | | |
| 11 | Cabinets | 163,773 | 6,750 | |
| 11 | Appliances | 186,533 | | |
| 12 | Blinds and Shades, Artwork | 0 | | |
| 12 | Carpets | 431,389 | | |
| 13 | Special Construction | 0 | | |
| 14 | Elevators | 218,566 | | |
| 15 | Plumbing and Hot Water | 1,819,310 | 45,264 | |
| 15 | Heat and Ventilation | 1,690,589 | 1,245,741 | |
| 15 | Air Conditioning | 0 | 735,675 | |
| 16 | Electrical | 2,472,511 | | |
| | Accessory Buildings | 0 | 695,153 | |
| 2 | Earth Work | 592,021 | | |
| 2 | Site Utilities | 692,400 | 592,021 | |
| 2 | Roads and Walks | 328,885 | 517,465 | |
| 2 | Site Improvement | 152,963 | | |
| 2 | Lawns and Planting | 475,645 | | |
| 2 | Unusual Site Conditions | 0 | 281,547 | |
| 1 | General Requirements | 1,171,692 | | |
| 1 | Bond Premium ($ 239,697 ) | | 528,930 | |

Previous editions are obsolete.

form HUD-92448 (1/91)

| DIV. | Trade Item | Cost as per Cost Breakdown (A) | Enter Amounts to Nearest Even Dollar | |
|---|---|---|---|---|
| | | | Amounts Complete (B) | For HUD-FHA Use (C) |
| 1. | Other Fees ($ | | | |
| (1) | Subtotal of Breakdown Items | $ 20,699,890 | $ 10,544,601 | ** % $ |
| (2) | Builder's Overhead | $ 390,564 | 51 % $ 199,265 | % $ |
| (3) | Builder's Profit | $ 1,171,692 | 51 % $ 597,531 | % $ |
| (4) | Total of Cost Breakdown Items | $ 22,262,146 | $ | $ |
| (5) | Inventory of Materials Stored On-site (See Note Below) | | $ 11,341,397 | $ |
| (6) | Inventory of Materials Stored Off-Site (See Note Below) | | $ 0 | $ |
| (7) | Sum of Cost Breakdown Items Plus Inventories of Materials | | $ 11,341,397 | $ |
| (8) | Less Net Decrease in Cost as a Result of Approved Changes | | $ 0 | $ |
| (9) | Total After Adjusting for Net Decrease to Approved Changes | | $ 11,341,397 | $ |
| (10) | Less Retained 10% | | $ 1,134,139 | $ |
| (11) | Bal.: Total Amount Due to Date on Account of Construction Contract | | $ 10,207,257 | $ |
| (12) | Less Previous Payments | | $ 7,973,171 | $ |
| (13) | Net Amount of This Requisition | | $ 2,234,086 | $ |

I certify that the Work covered by this requisition has been completed in accordance with the Contract Documents, and that I have actually received
$ 7,973,171 for Work performed and materials purchased up to the 17th day of May (date of previous requisition).

Date June 28, 2004          Contractor

* Percentage derived from subtotal of Breakdown Items (col. B divided by col. A)    Note: Attached Inventory of materials itemized as to quantities and costs.
** (col. C divided by col. A) Exclusive of Bond Premium

For Use of HUD-Federal Housing Commissioner

Date

Reviewed and Approved by (Chief Mortgage Credit)

Net Amount Approved for Payment

Column C Completed by (Mortgage Credit Examiner).

Director, Housing Development

Architect's Certificate  I certify, based on my on-site observations (or those of my authorized representative) and the data comprising this requisition, that the Work has progressed to the point indicated; that to the best of my knowledge, information and belief the Work is in accordance with the Contract Documents; and that the Contractor is entitled to payment of the amount certified.

Date  6/28/04          Architect

Inspector's Certificate      ☐ Amount Modified          ☐ No Modification
I certify that I have visited the site on this date
Architect (if an architect is administering the Construction Contract); that to the best of my knowledge, information and belief the amount certified represents acceptable Work; and that I have no personal interest, present or prospective, in the property, applicant or proceeds of the mortgage.

Date          Inspector

Contractor's Prevailing Wage Certificate  (For use under all sections of the National Housing Act requiring certification as to payment of prevailing wages. To be completed with each request for insurance of advance of mortgage proceeds which includes a payment on account of construction cost, or at the time the mortgage is presented for insurance pursuant to a commitment to insure upon completion.)

To

| Manager | Date 6/28/04 | Advance No. |
|---|---|---|
| Field Office | Project Name | |
| | Project Number | |

The undersigned, as principal contractor in connection with the construction of the above project, states that he/she is fully familiar with applicable wage determination decision of the Secretary of Labor and certifies that:
a. A copy of the applicable wage determination decision is posted in a conspicuous place at the site of the work and he/she has required each subcontractor as a part of his/her contract, to agree to pay wages at rates not less than those contained in the decision.
b. All laborers and mechanics employed in the construction of the project have been, to the date hereof, paid for such employment at wage rates not less than those contained in the applicable wage determination decision of the Secretary of Labor and no deductions or rebates have been made, either directly or indirectly, from the full weekly wages earned by any person, other than permissible deductions as defined in Regulations of the Secretary of Labor, Part 3 (29 CFR Part 3).
c. He/She has fulfilled his/her obligations, to the date hereof, under The Labor Standards Provisions of the Supplementary Conditions of the Contract for Construction and has included said conditions in all subcontracts.
This certificate is executed by the undersigned for the purpose of inducing the Commissioner to approve for insurance that certain mortgage loan, or an advance thereof, made or to be made by the mortgagee in connection with the construction of the project, and with the intent that the Commissioner rely upon this certification to establish compliance with the provisions of Section 212 of the National Housing Act, which provides in part: The Commissioner shall not insure ... unless the principal contractor files a certificate ... certifying that the laborers and mechanics ... have not been paid not less than the wages prevailing ... as determined by the Secretary of Labor..."
I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.
Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802).

| Contractor | By | |
|---|---|---|
| Walsh Construction | | Date: |
| Previous editions are obsolete. | X | 6/28/04 |

form HUD-92448 (1/91)

# Contractor's Requisition
## Project Mortgages
To be submitted to mortgagee in quadruplicate

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0028 (exp. 12/31/2006)

This information is used to verify program benefits consisting of distribution of insured mortgage proceeds when construction costs are involved. The information regarding completed work items is used by HUD to ensure that payments from mortgage proceeds are made for work actually completed in a satisfactory manner. This information is a requirement under Section 207(b) of the National Housing Act (Public Law 479, 48 Stat. 1246, 12 U.S.C. 1701 et. seq) authorizing the Secretary of HUD to insure mortgages. The information collection does not contain information of a sensitive nature. Public reporting burden for this collection of information is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

To (owner) Woodlawn Community Development Corp. | Requisition Number Site Pay App #10

Project South Park Plaza | Project Number FHA #071-35693 | Location 26th Street & Calumet Ave,

In accordance with the provision of the Construction Contract dated 9/22/03 and Contractor's and/or Mortgagor's Cost Breakdown (Schedule of Values) attached thereto, this requisition is submitted for the amount of $ 40,500 due for work performed up to the 18th day of May and as itemized below by the trades listed in the Schedule of Values.

| DIV | Trade Item | Cost as per Cost Breakdown (A) | Amounts Complete (B) | For HUD-FHA Use (C) |
|---|---|---|---|---|
| 3 | Concrete | $ | $ | $ |
| 4 | Masonry | | | |
| 5 | Metals | | | |
| 6 | Rough Carpentry | | | |
| 6 | Finish Carpentry | | | |
| 7 | Waterproofing | | | |
| 7 | Insulation | | | |
| 7 | Roofing | | | |
| 7 | Sheet Metal | | | |
| 8 | Doors | | | |
| 8 | Windows | | | |
| 8 | Glass | | | |
| 9 | Lath and Plaster | | | |
| 9 | Drywall | | | |
| 9 | Tile Work | | | |
| 9 | Acoustical | | | |
| 9 | Wood Flooring | | | |
| 9 | Resilient Flooring | | | |
| 9 | Painting and Decorating | | | |
| 10 | Specialties | | | |
| 11 | Special Equipment | | | |
| 11 | Cabinets | | | |
| 11 | Appliances | | | |
| 12 | Blinds and Shades, Artwork | | | |
| 12 | Carpets | | | |
| 13 | Special Construction | | | |
| 14 | Elevators | | | |
| 15 | Plumbing and Hot Water | | | |
| 15 | Heat and Ventilation | | | |
| 15 | Air Conditioning | | | |
| 16 | Electrical | | | |
| | Accessory Buildings | | | |
| 2 | Earth Work | | | |
| 2 | Site Utilities | | | |
| 2 | Roads and Walks | 692,400 | 517,465 | |
| 2 | Site Improvement | 21,100 | | |
| 2 | Lawns and Planting | 19,617 | | |
| 2 | Unusual Site Conditions | | | |
| 1 | General Requirements | 0 | | |
| 1 | Bond Premium ($ 8,655 ) | 43,987 | 32,802 | |

Previous editions are obsolete.

Page 1 of 2

form HUD-92448 (1/91)

| DIV | Trade Item | Cost as per Cost Breakdown (A) | Enter Amounts to Nearest Even Dollar | | |
|---|---|---|---|---|---|
| | | | Amounts Complete (B) | | For HUD-FHA Use (C) |
| 1 | Other Fees ($ | | | | |
| (1) | Subtotal of Breakdown Items | $ 777,104 | 71% $ 550,267 | ** | % $ |
| (2) | Builder's Overhead | $ 14,662 | 79 % $ 11,548 | | % $ |
| (3) | Builder's Profit | $ 43,987 | 79 % $ 34,631 | | % $ |
| (4) | Total of Cost Breakdown Items | $ 835,753 | | | |
| (5) | Inventory of Materials Stored On-site (See Note Below) | | $ 596,446 | | $ |
| (6) | Inventory of Materials Stored Off-Site (See Note Below) | | $ 0 | | $ |
| (7) | Sum of Cost Breakdown Items Plus Inventories of Materials | | $ 0 | | $ |
| (8) | Less Net Decrease in Cost as a Result of Approved Changes | | $ 596,446 | | $ |
| (9) | Total After Adjusting for Net Decrease to Approved Changes | | $ 0 | | $ |
| (10) | Less Retained 10% | | $ 596,446 | | $ |
| (11) | Bal.: Total Amount Due to Date on Account of Construction Contract | | $ 59,644 | | $ |
| (12) | Less Previous Payments | | $ 536,801 | | $ |
| (13) | Net Amount of This Requisition | | $ 496,301 | | $ |

I certify that the Work covered by this requisition has been completed in accordance with the Contract Documents, and that I have actually received $ 496,301 for Work performed and materials purchased up to the ___19th___ day of ___April___ (date of previous requisition).

Date    June 28, 2004    Contractor

* Percentage derived from subtotal of Breakdown Items (col. B divided by col. A)

** (col. C divided by col. A) Exclusive of Bond Premium    Note: Attached Inventory of materials itemized as to quantities and costs.

For Use of HUD-Federal Housing Commissioner

| Date | Net Amount Approved for Payment | Column C Completed by (Mortgage Credit Examiner) |
|---|---|---|
| Reviewed and Approved by (Chief, Mortgage Credit) | | Director, Housing Development |

Architect's Certificate I certify, based on my on-site observations (or those of my authorized representative) and the data comprising this requisition, that the Work has progressed to the point indicated; that to the best of my knowledge, information and belief the Work is in accordance with the Contract Documents; and that the Contractor is entitled to payment of the amount certified.

Date    6/28/04    Architect

Inspector's Certificate    [ ] Amount Modified    [ ] No Modification
I certify that I have visited the site on this date _____, observed the Work, and monitored the log and reports of the Architect (if an architect is administering the Construction Contract); that to the best of my knowledge, information and belief the amount certified represents acceptable Work; and that I have no personal interest, present or prospective, in the property, applicant or proceeds of the mortgage.

Date    Inspector

Contractor's Prevailing Wage Certificate (For use under all sections of the National Housing Act requiring certification as to payment of prevailing wages. To be completed with each request for insurance of advance of mortgage proceeds which includes a payment on account of construction cost, or at the time the mortgage is presented for insurance pursuant to a commitment to insure upon completion.)

To

| Manager | Date    6/28/04 | Advance No. |
|---|---|---|
| Field Office | Project Name | |
| | Project Number | |

The undersigned, as principal contractor in connection with the construction of the above project, states that he/she is fully familiar with applicable wage determination decision of the Secretary of Labor and certifies that:
a. A copy of the applicable wage determination decision is posted in a conspicuous place at the site of the work and he/she has required each subcontractor as a part of his/her contract, to agree to pay wages at rates not less than those contained in the decision.
b. All laborers and mechanics employed in the construction of the project have been, to the date hereof, paid for such employment at wage rates not less than those contained in the applicable wage determination decision of the Secretary of Labor and no deductions or rebates have been made, either directly or indirectly, from the full weekly wages earned by any person, other than permissible deductions as defined in Regulations of the Secretary of Labor, Part 3 (29 CFR Part 3).
c. He/She has fulfilled his/her obligations, to the date hereof, under The Labor Standards Provisions of the Supplementary Conditions of the Contract for Construction and has included said conditions in all subcontracts.
This certificate is executed by the undersigned for the purpose of inducing the Commissioner to approve for insurance that certain mortgage loan, or an advance thereof, made or to be made by the mortgagee in connection with the construction of the project, and with the intent that the Commissioner rely upon this certification to establish compliance with the provisions of Section 212 of the National Housing Act, which provides in part: The Commissioner shall not insure... unless the principal contractor files a certificate ... certifying that the laborers and mechanics ... have not been paid not less than the wages prevailing ... as determined by the Secretary of Labor..."
I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802).

| Contractor | By | Date: |
|---|---|---|
| Walsh Construction | X | 6/28/04 |

Previous editions are obsolete.

form HUD-92448 (1/91)

# Contractor's Requisition
## Project Mortgages
To be submitted to mortgagee in quadruplicate

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0028 (exp. 12/31/2005)

This information is used to verify program benefits consisting of distribution of insured mortgage proceeds when construction costs are involved. The information regarding completed work items is used by HUD to ensure that payments from mortgage proceeds are made for work actually completed in a satisfactory manner. This information is a requirement under Section 207(b) of the National Housing Act (Public Law 479, 48 Stat. 1246, 12 U.S.C. 1701 et. seq) authorizing the Secretary of HUD to insure mortgages. The information collection does not contain information of a sensitive nature.
Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

| To (owner) | Requisition Number |
|---|---|
| Woodlawn Community Development Corp. | Building Pay App #10 |

| Project | Project Number | Location |
|---|---|---|
| South Park Plaza | FHA #071-35693 | 26th Street & Calumet Ave, |

In accordance with the provision of the Construction Contract dated ___9/22/03___ and Contractor's and/or Mortgagor's Cost Breakdown (Schedule of Values) attached thereto, this requisition is submitted for the amount of $ ___2,193,586___ due for work performed up to the ___18th___ day of ___June___ and as itemized below by the trades listed in the Schedule of Values.

| DIV | Trade Item | Cost as per Cost Breakdown (A) | Amounts Complete (B) | For HUD-FHA Use (C) |
|---|---|---|---|---|
| 3 | Concrete | $ 1,582,897 | $ 1,582,897 | $ |
| 4 | Masonry | 2,308,223 | 1,932,507 | |
| 5 | Metals | 680,249 | 380,607 | |
| 6 | Rough Carpentry | 1,446,638 | 1,442,296 | |
| 6 | Finish Carpentry | 423,682 | 880 | |
| 7 | Waterproofing | 90,135 | 15,142 | |
| 7 | Insulation | 221,005 | | |
| 7 | Roofing | 562,386 | 217,396 | |
| 7 | Sheet Metal | 0. | | |
| 8 | Doors | 280,655 | | |
| 8 | Windows | 629,543 | 97,322 | |
| 8 | Glass | 15,000 | | |
| 8 | Lath and Plaster | 0 | | |
| 9 | Drywall | 1,506,354 | 186,052 | |
| 9 | Tile Work | 0 | | |
| 9 | Acoustical | 0 | | |
| 9 | Wood Flooring | 0 | | |
| 9 | Resilient Flooring | 0 | | |
| 9 | Painting and Decorating | 0 | | |
| 10 | Specialties | 390,630 | 39,956 | |
| 11 | Special Equipment | 82,629 | | |
| 11 | Cabinets | 83,543 | 6,750 | |
| 11 | Appliances | 163,773 | | |
| 12 | Blinds and Shades, Artwork | 186,533 | | |
| 12 | Carpets | 0 | | |
| 13 | Special Construction | 431,389 | | |
| 14 | Elevators | 0 | | |
| 15 | Plumbing and Hot Water | 218,566 | 45,264 | |
| 15 | Heat and Ventilation | 1,819,310 | 1,245,741 | |
| 16 | Air Conditioning | 1,690,589 | 735,675 | |
| 16 | Electrical | 0 | | |
| | Accessory Buildings | 2,472,511 | 696,153 | |
| 2 | Earth Work | 0 | | |
| 2 | Site Utilities | 592,021 | 592,021 | |
| 2 | Roads and Walks | 0 | | |
| 2 | Site Improvement | 307,785 | | |
| 2 | Lawns and Planting | 133,346 | | |
| 2 | Unusual Site Conditions | 475,645 | 281,547 | |
| 1 | General Requirements | 0 | | |
| 1 | Bond Premium ($ 231,042 | 1,127,705 | 496,128 | |

Previous editions are obsolete.

form HUD-92448 (1/91)

| DIV | Trade Item | Cost as per Cost Breakdown (A) | Enter Amounts to Nearest Even Dollar | | For HUD-FHA Use (C) |
|---|---|---|---|---|---|
| 1 | Other Fees ($ | | Amounts Complete (B) | | |
| (1) | Subtotal of Breakdown Items | | | | |
| (2) | Builders Overhead | $ 19,922,786 | * 50 % $ 9,994,394 | ** | $ |
| (3) | Builder's Profit | $ 375,902 | 50 % $ 187,717 | % | $ |
| (4) | Total of Cost Breakdown Items | $ 1,127,705 | 50 % $ 562,900 | % | $ |
| (5) | Inventory of Materials Stored On-site (See Note Below) | 21,426,393 | $ 10,744,951 | | $ |
| (6) | Inventory of Materials Stored Off-Site (See Note Below) | | $ 0 | | $ |
| (7) | Sum of Cost Breakdown Items Plus Inventories of Materials | | $ 0 | | $ |
| (8) | Less Net Decrease in Cost as a Result of Approved Changes | | $ 10,744,951 | | $ |
| (9) | Total After Adjusting for Net Decrease to Approved Changes | | $ 0 | | $ |
| (10) | Less Retained 10% | | $ 10,744,951 | | $ |
| (11) | Bal.: Total Amount Due to Date on Account of Construction Contract | | $ 1,074,495 | | $ |
| (12) | Less Previous Payments | | $ 9,670,456 | | $ |
| (13) | Net Amount of This Requisition | | $ 7,476,870 | | $ |

I certify that the Work covered by this requisition has been completed in accordance with the Contract Documents, and that I have actually received
$ 7,476,870 for Work performed and materials purchased up to the 17th day of May (date of previous requisition).

Date _____   Contractor _____

June 28, 2004

\* Percentage derived from subtotal of Breakdown Items (col. B divided by col. A)
\*\* (col. C divided by col. A) Exclusive of Bond Premium   Note: Attached inventory of materials itemized as to quantities and costs.

For Use of HUD-Federal Housing Commissioner

Date _____

Net Amount Approved for Payment _____

Reviewed and Approved by (Chief, Mortgage Credit) _____

Column C Completed by (Mortgage Credit Examiner) _____

Director, Housing Development _____

Architect's Certificate  I certify, based on my on-site observations (or those of my authorized representative) and the data comprising this requisition, that the Work has progressed to the point indicated; that to the best of my knowledge, information and belief the Work is in accordance with the Contract Documents; and that the Contractor is entitled to payment of the amount certified.

Date   6/28/04   Architect _____

Inspector's Certificate   ☐ Amount Modified   ☐ No Modification
I certify that I have visited the site on this date _____
Architect (if an architect is administering the Construction Contract); that to the best of my knowledge, information and belief the amount certified represents acceptable Work; and that I have no personal interest, present or prospective, in the property, applicant or proceeds of the mortgage.

Date _____   Inspector _____

Contractor's Prevailing Wage Certificate  (For use under all sections of the National Housing Act requiring certification as to payment of prevailing wages. To be completed with each request for insurance of advance of mortgage proceeds which includes a payment on account of construction cost, or at the time the mortgage is presented for insurance pursuant to a commitment to insure upon completion.)

To _____

| Manager | Date 6/28/04 | Advance No. |
|---|---|---|
| Field Office | Project Name | |
| | Project Number | |

The undersigned, as principal contractor in connection with the construction of the above project, states that he/she is fully familiar with applicable wage determination decision of the Secretary of Labor and certifies that:
a. A copy of the applicable wage determination decision is posted in a conspicuous place at the site of the work and he/she has required each subcontractor as a part of his/her contract, to agree to pay wages at rates not less than those contained in the decision.
b. All laborers and mechanics employed in the construction of the project have been, to the date hereof, paid for such employment at wage rates not less than those contained in the applicable wage determination decision of the Secretary of Labor and no deductions or rebates have been made, either directly or indirectly, from the full weekly wages earned by any person, other than permissible deductions as defined in Regulations of the Secretary of Labor, Part 3 (29 CFR Part 3).
c. He/She has fulfilled his/her obligations, to the date hereof, under The Labor Standards Provisions of the Supplementary Conditions of the Contract for Construction and has included said conditions in all subcontracts.
This certificate is executed by the undersigned for the purpose of inducing the Commissioner to approve for insurance that certain mortgage loan, or an advance thereof, made or to be made by the mortgagee in connection with the construction of the project, and with the intent that the Commissioner rely upon this certification to establish compliance with the provisions of Section 212 of the National Housing Act, which provides, in part: The Commissioner shall not insure ... unless the principal contractor files a certificate ... certifying that the laborers and mechanics ... have not been paid not less than the wages prevailing ... as determined by the Secretary of Labor..."
I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.
Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802).

Contractor   By   Date:
Walsh Construction   X   6/28/04

## Construction Progress Schedule

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0039 (Exp. 3/31/2004)

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number. Construction practices and HUD administrative requirements establish the need that HAs maintain certain records or submit certain documents in conjunction with the oversight of the award of construction contracts for the construction of new low-income housing developments or modernization of existing developments. These forms are used by HAs to provide information on the construction progress schedule and schedule of amounts for contract payments. Responses to the collection of information are required to obtain a benefit or to retain a benefit. The information requested does not lend itself to confidentiality.

| 1. Name of Public Housing Agency/Indian Housing Authority (PHA/IHA) | | | | | | |
|---|---|---|---|---|---|---|
| Woodlawn Community Development Corporation | | | | | | |

| 2. City | | 3. State | 5. Project Name | | | |
|---|---|---|---|---|---|---|
| Chicago | | IL | South Park Plaza | | | |

| 4. Location | | | 6. Project Number | | | |
|---|---|---|---|---|---|---|
| 2601 S. Dr. Martin Luther King, Jr. Dr. | | | FHA: FHA #071-35693 | | | |

| 7. Contract For | | | 8. Contract Time (Days) | | | |
|---|---|---|---|---|---|---|
| General Construction | | | 520 | | | |

| 9. From (mm/dd/yyyy) | To (mm/dd/yyyy) | | 10. Contract Price $ | | | |
|---|---|---|---|---|---|---|
| 9/22/03 | 02/24/05 | | | | | $22,501,843 |

| 11. Number of Buildings | | 12. Number of Dwelling Units | | 13. Number of Rooms | | |
|---|---|---|---|---|---|---|
| Six (6) | | One-Hundred Thirty-Four (134) | | Nine Hundred Seventy-One (971) | | |

| (Submit as many pages as necessary to cover the construction period.) | Year (yyyy) | 2003 | 2003 | 2003 | 2003 | 2004 | 2004 | 2004 |
|---|---|---|---|---|---|---|---|---|
| | Month | September | October | November | December | January | February | March |
| Actual Monthly Value, Work in Place | ($) | $134,511 | $696,061 | $1,457,118 | $828,514 | $672,302 | $528,677 | $918,405 |
| Actual Accumulated Progress | (%) | 0.6% | 3.1% | 11% | 13% | 17% | 19% | 23% |
| Anticipated Monthly Value | ($) | $134,511 | $498,458 | $931,319 | $1,471,804 | $2,154,888 | $2,790,998 | $3,089,188 |
| Accumulated Scheduled Progress | (%) | 0.6% | 2.8% | 7.0% | 13.5% | 23.1% | 35.5% | 42.90% |

| Submitted by | Contractor's Name | | | | | |
|---|---|---|---|---|---|---|
| | Walsh Construction Company of Illinois | | | | | |
| | Title | | | | | |
| | Project Manager | | Signature | | | |
| Approved by | PHA/IHA | | | | | Date (mm/dd/yyyy) 6/28/04 |
| | Title | | | | | |
| Approved by | Architect | | | | | Date (mm/dd/yyyy) 6/28/04 |
| | | | | | | Date (mm/dd/yyyy) 6/28/04 |

Previous edition is obsolete

form HUD-5372 (2/93)
ref Handbook 7417.1, 7485.1, 7450.1 & 7460.8

# Construction Progress Schedule

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0039 (Exp. 3/31/2004)

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number. Construction practices and HUD administrative requirements establish the need that HAs maintain certain records or submit certain documents in conjunction with the oversight of the award of construction contracts for the construction of new low-income housing developments or modernization of existing developments. These forms are used by HAs to provide information on the construction progress schedule and schedule of amounts for contract payments. Responses to the collection of information are required to obtain a benefit or to retain a benefit. The information requested does not lend itself to confidentiality.

| 1. Name of Public Housing Agency/Indian Housing Authority (PHA/IHA) |
|---|
| Woodlawn Community Development Corporation |

| 2. City | 3. State | 5. Project Name |
|---|---|---|
| Chicago | IL | South Park Plaza |

| 4. Location | 6. Project Number |
|---|---|
| 2601 S. Dr. Martin Luther King, Jr. Dr. | FHA: FHA #071-35693 |

| 7. Contract For | 8. Contract Time (Days) |
|---|---|
| General Construction | 520 |

| 9. From (mm/dd/yyyy) | To (mm/dd/yyyy) | 10. Contract Price $ |
|---|---|---|
| 9/23/03 | 02/24/05 | $22,501,843.00 |

| 11. Number of Buildings | 12. Number of Dwelling Units | 13. Number of Rooms |
|---|---|---|
| Six (6) | One-Hundred Thirty-Four (134) | Nine Hundred Seventy-One (971) |

| (Submit as many pages as necessary to cover the construction period.) | Year (yyyy) | 2004 | 2004 | 2004 | 2004 | 2004 | 2004 | 2004 |
|---|---|---|---|---|---|---|---|---|
| | Month | April | May | June | July | August | September | October |
| Actual Monthly Value, Work in Place ($) | | $1,467,140 | $1,979,882 | $2,234,086 | $0 | $0 | $0 | $0 |
| Actual Accumulated Progress (%) | | 30% | 40% | 51% | 11% | 11% | 11% | 11% |
| Anticipated Monthly Value ($) | | $2,700,867 | $2,227,301 | $1,660,190 | $1,387,197 | $1,159,276 | $883,747 | $642,894 |
| Accumulated Scheduled Progress (%) | | 61.2% | 71.1% | 78.5% | 84.6% | 89.8% | 93.7% | 96.6% |

| Submitted by | Contractor's Name | | | |
|---|---|---|---|---|
| | Walsh Construction Company of Illinois | | | |
| | Title | | Signature | |
| | Project Manager | | | |
| Approved by | PHA/IHA | | | Date (mm/dd/yyyy) 6/28/04 |
| | Title | | | |
| Approved by | Architect | | | Date (mm/dd/yyyy) 6/28/04 |
| | | | | Date (mm/dd/yyyy) 6/28/04 |

# Application For Payment

Detailed Sheet

**South Park Plaza**
2901 S. Calumet
Chicago, IL 60616

**Contract No:** 071-35693
**To Company:** Woodlawn Community Development Corporation
**From Company:** Walsh Construction Company of Illinois

Walsh Construction Company of Illinois

**Project # 200119**
Tel: (312)326-3957    Fax: (312)326-3952

**Application No:** 012
**Application Date:** 8/31/2004
**Period To:** 8/16/2004
**Architect's Project No:** 200119

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | | Site Security - WCCI | | | | | | | | | |
| 002 | | Cleaning - Angel's | | | | | | | | | |
| 003 | | Surveying - Ways Engineering | 50,000 | 22,609 | 0 | 0 | 0 | 22,609 | 45 | 27,391 | 2,281 |
| 004 | | Earthwork/Site Clearing - (Dynamic Wrecking (Dynamic SCCO #1 ($9,495)) | 73,950 | 0 | 0 | 0 | 0 | 0 | 0 | 73,950 | 0 |
| | | | 35,000 | 29,432 | 0 | 0 | 0 | 29,432 | 84 | 5,558 | 2,943 |
| 005 | | Site Clearing, Dewatering, Protection, Safety & Unsuitable Material Allowance ($10,017) / Dynamic WCCI SCCO #1 $9,495 - | 471,251 | 400,159 | 0 | 0 | 0 | 400,159 | 85 | 71,092 | 40,016 |
| 006 | | Two-rail Townhome Fencing and Tree Grates - S&S Fence | 212,007 | 184,561 | 0 | 0 | 0 | 184,561 | 87 | | |
| 007 | | Site Fencing - WCCI | 237,487 | 237,487 | 0 | 0 | 0 | | 87 | 27,446 | 18,456 |
| 008 | | Asphalt Concrete Paving - Illinois Paving | 31,460 | 7,832 | 0 | 0 | 0 | 7,832 | 25 | 23,628 | 783 |
| 009 | | Site Utilities ($707,000) | 105,000 | 0 | 0 | 0 | 0 | 0 | | 105,000 | 0 |
| | | | 796,983 | 624,465 | | | 693,568 | | | 237,487 | |

Kowett/SouthPark

Printed on: 8/30/2004

Prolog Manager

**Contract No:** 071-35693
**To Company:** Woodlawn Community Development Corporation
**From Company:** Walsh Construction Company of Illinois

**Application For Payment**
Detailed Sheet

**Application No:** 012
**Application Date:** 8/31/2004
**Period To:** 8/16/2004
**Architect's Project No:** 200119

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 010 | | Landscaping - Salt Creek | 230,571 | 0 | | | | | | 230,571 | 0 |
| 011 | | Foundation / Slab Concrete - II in One (PCO 7009 ($14,622)) | 977,230 | 835,778 | 0 | 0 | 0 | 835,778 | 86 | 141,452 | 83,578 |
| 012 | | Concrete Bulkheads, Precast/Concrete Protection, Safety & Equipment Pads - WCCI | (130,356) | 126,770 | 2,416 | 0 | 0 | 129,186 | 99 | 1,170 | 12,919 |
| 013 | | Building Floor Topping - Barker Corp. (PCO 6009 $34,960) | 219,460 | 213,296 | 6,164 | 0 | 0 | 219,460 | 100 | 0 | 21,946 |
| 014 | | Architectural Precast - ATM Dynacore | 513,468 | 502,558 | 4,090 | 0 | 0 | 506,648 | 99 | 6,821 | 50,665 |
| 015 | | Masonry - McNutt | 2,338,000 | 2,134,130 | 190,308 | 0 | 0 | 2,314,438 | 99 | 23,562 | 231,444 |
| 016 | | Masonry Protection, Safety, & Tarping - WCCI | 101,247 | 87,236 | 7,240 | 0 | 0 | 94,476 | 99 | 6,821 | 9,448 |
| 017 | | Structural Steel / Miscellaneous Metals - K&K Ironworks (PCO 6012 $15,454; PCO 6006 $183) | 597,568 | 401,082 | 23,625 | 0 | 0 | 424,707 | 93 | 6,771 | 231,444 |
| 018 | | Structural Steel / Miscellaneous Metals Protection & Safety - WCCI | (11,103) | 8,354 | 0 | 0 | 0 | 94,476 | 71 | 172,961 | 9,448 |
| | | and Unsuitable Materials Allowance ($89,983) (See also Line 54)- Builder's Tracking | | 8,354 | | | | 8,354 | 75 | 2,749 | 835 |

Contract No: 071-35693
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

**Application For Payment**
Detailed Sheet

Application No: 012
Application Date: 8/31/2004
Period To: 8/31/2004
Architect's Project No: 200119

| A | B/C | D | E | F | G | H | I | J | K | L |
|---|-----|---|---|---|---|---|---|---|---|---|
| 019 | Rough Carpentry, Finish Carpentry, Insulation, & Drywall - Saratone & Swift (PCO 6005 - $3,616) | 2,642,351 | 1,606,537 | 309,567 | 0 | 0 | 1,996,104 | 76 | 646,247 | 199,61 |
| 020 | Rough Carpentry, Rough Opening Support & Enclosure - WCCI | 175,695 | 97,217 | 5,376 | 0 | 0 | 102,593 | 58 | 73,102 | 10,259 |
| 021 | Firestopping - WCCI | 25,000 | | | 0 | 0 | 0 | 0 | 25,000 | 0 |
| 022 | Sprayed-On Fireproofing - Chicago Ceilings | 53,200 | 20,500 | | 0 | 0 | 20,500 | 39 | 32,700 | 2,050 |
| 023 | Fireproofing - Chicago Ceilings | | | | | | | | | |
| 024 | Roofing - A-1 Roofing | | 20,500 | 0 | 0 | 0 | 0 | | | 0 |
| 025 | Joint Sealants - Architectural Sealants (PCO 6001 - $30,294) | 542,875 / 86,396 | 343,020 / 33,810 | 57,000 / 16,543 | 0 | 0 | | | | |
| 026 | Roofing and Fireproofing - Coordination - & Safety - WCCI | 33,359 | 10,965 | 0 | 0 | 0 | 400,020 / 50,353 | 74 / 58 | 142,855 / 36,043 | 0 |
| 027 | Steel Frames and Frames, Wood Doors & Finish Hardware - Star Contractors (PCO 6014 - $31,920) | 288,490 | 53,204 | 123,334 | 0 | 0 | 10,066 | 30 | 23,274 | 40,002 / 5,035 |
| 028 | Doors, Hardware, Windows and Glazing Coordination, Protection, Safety - WCCI | 41,122 | 7,150 | 1,320 | 0 | 0 | 176,538 | 66 | 91,862 | 1,007 / 17,654 |
| | Aluminum Entrances, Storefronts & Aluminum | 556,040 | 269,408 | 105,036 | 0 | 0 | 8,470 | 21 | 32,652 | 847 |
| | | 374,444 | | 0 | | | | 67 | 181,596 | 37,444 |

Prolog Manager

Printed on: 8/30/2004                    KowettSouthPark

**Application For Payment**
Detailed Sheet

| Contract No: | 071-35693 |
| To Company: | Woodlawn Community Development Corporation |
| From Company: | Walsh Construction Company of Illinois |

| Application No: | 012 |
| Application Date: | 8/31/2004 |
| Period To: | 8/16/2004 |
| Architect's Project No: | 200119 |

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 010 | | Landscaping - Salt Creek and Unsuitable Materials Allowance ($59,983) (See also Line 54)- Builder's Trucking | 230,571 | 0 | 0 | 0 | 0 | 0 | 0 | 230,571 | 0 |
| 011 | | Foundation / Slab Concrete - It In One (PCO 7069 ($14,621)) | 977,230 | 835,778 | 0 | 0 | 0 | 835,778 | 86 | 141,452 | 83,578 |
| 012 | | Concrete Bulkheads, Precast/Concrete Protection, Safety & Equipment Pads - WCCI | 130,356 | 126,770 | 2,416 | 0 | 0 | 129,186 | 99 | 1,170 | 12,919 |
| 013 | | Building Floor Topping - Baxter Corp. (PCO 6009 $34,959) | 219,460 | 213,296 | 6,164 | 0 | 0 | 219,460 | 100 | 0 | 21,946 |
| 014 | | Architectural Precast - ATMI Dyracore | 513,468 | 502,556 | 4,090 | 0 | 0 | 506,646 | 99 | 6,821 | 50,665 |
| 015 | | Masonry - McNulty | 2,338,000 | 2,134,130 | 180,308 | 0 | 0 | 2,314,438 | 99 | 23,562 | 231,444 |
| 016 | | Masonry Protection, Safety, & Tarping - WCCI | 101,247 | 87,236 | 7,240 | 0 | 0 | 94,476 | 93 | 6,771 | 9,448 |
| 017 | | Structural Steel / Miscellaneous Metals - K&K Ironworks (PCO 6012 $15,484; PCO 6006 $188) | 597,668 | 401,082 | 23,625 | 0 | 0 | 424,707 | 71 | 172,961 | 42,471 |
| 018 | | Structural Steel / Miscellaneous Metals Protection & Safety - WCCI | 11,103 | 8,354 | 0 | 0 | 0 | 8,354 | 75 | 2,749 | 835 |

**Application For Payment**
**Detailed Sheet**

Contract No: 071-35693
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

Application No: 012
Application Date: 8/31/2004
Period To: 8/16/2004
Architect's Project No: 200119

| A Item | B | C Description | D Scheduled Value | E Previous Work and Material In Place | F | G Stored Material Not in Place | H Stored Material Not in Place | I Total Completed and Stored | J % | K Balance to Finish | L Total Retainage |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 019 | | Rough Carpentry, Finish Carpentry, Insulation, & Drywall - Salemone & Swift (PCO 6006 - $5,616) | 2,642,351 | 1,606,537 | 389,567 | 0 | 0 | 1,996,104 | 76 | 646,247 | 199,610 |
| 020 | | Rough Carpentry, Rough Opening Support & Enclosure - WCCI | 175,695 | 97,217 | 5,376 | 0 | 0 | 102,593 | 58 | 73,102 | 10,259 |
| 021 | | Fireproofing - WCCI | 25,000 | 0 | 0 | 0 | 0 | 0 | 0 | 25,000 | 0 |
| 022 | | Sprayed-On Fireproofing - Chicago Ceilings | 53,200 | 20,500 | 0 | 0 | 0 | 20,500 | 39 | 32,700 | 2,050 |
| 023 | | Roofing - A-1 Roofing | 542,875 | 343,020 | 57,000 | 0 | 0 | 400,020 | 74 | 142,855 | 40,002 |
| 024 | | Joint Sealants - Architectural Sealants (PCO 6021 - $30,284) | 86,396 | 33,810 | 16,543 | 0 | 0 | 50,353 | 58 | 36,043 | 5,035 |
| 025 | | Roofing and Fireproofing - Coordination, Protection & Safety - WCCI | (33,339) | 10,065 | 0 | 0 | 0 | 10,065 | 30 | 23,274 | 1,007 |
| 026 | | Steel Doors and Frames, Wood Doors & Finish Hardware - Star Contractors (PCO 6014 $31,920) | 288,490 | 53,204 | 123,334 | 0 | 0 | 176,538 | 66 | 91,862 | 17,654 |
| 027 | | Doors, Hardware, Windows and Glazing Coordination, Protection, Safety - WCCI | (41,122) | 7,150 | 1,320 | 0 | 0 | 8,470 | 21 | 32,652 | 847 |
| 028 | | Aluminum Entrances, Storefronts & Aluminum | 556,040 | 266,408 | 105,036 | 0 | 0 | 374,444 | 67 | 181,596 | 37,444 |

*Prolog Manager*   Printed on: 9/30/2004   KowertSouthPark

Contract No: 071-35693
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

**Application For Payment**
**Detailed Sheet**

Application No: 012
Application Date: 8/31/2004
Period To: 8/16/2004
Architect's Project No: 200119

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Windows - Monda / Windows | | | | | | | | | |
| 029 | | Gypsum Drywall, Flooring and Painting Coordination, Protection & Safety - WCCI | 114,806 | 37,300 | 32,777 | 0 | 0 | 70,077 | 61 | 44,729 | 7,008 |
| 056 | | Access Panels | 28,200 | 10,455 | 8,919 | 0 | 0 | 19,374 | 69 | 8,826 | 1,937 |
| 030 | | Tile, Resilient Tile & Carpeting - Office Environments (PCO 6011 - $19,034.80) | 431,551 | 10,109 | 49,772 | 0 | 0 | 59,881 | 14 | 371,670 | 5,988 |
| 031 | | Painting - Continental | 360,225 | 71,185 | 61,792 | 0 | 0 | 132,977 | 37 | 227,248 | 13,298 |
| 032 | | Signage - TBD | 6,700 | 0 | 0 | 0 | 0 | 0 | 0 | 6,700 | 0 |
| 033 | | Postal Specialties - TBD | 10,553 | 0 | 0 | 0 | 0 | 0 | 0 | 10,553 | 0 |
| 034 | | Toilet and Bath Accessories / Closet Specialties - Window Treatments | 142,126 | 0 | 40,548 | 0 | 0 | 40,548 | 29 | 101,578 | 4,055 |
| 035 | | Residential Equipment - TBD | 219,686 | 0 | 13,026 | 0 | 0 | 13,026 | 6 | 206,660 | 1,303 |
| 036 | | Kitchen & Bath Cabinets - Republic | 147,004 | 0 | 65,476 | 0 | 0 | 65,476 | 45 | 81,528 | 6,548 |
| 037 | | Cabinet and Equipment Coordination, Protection, and Safety - WCCI | 16,769 | 0 | 7,072 | 0 | 0 | 7,072 | 42 | 9,697 | 707 |
| 038 | | Window Treatments - TBD | 105,162 | 0 | 0 | 0 | 0 | 0 | 0 | 105,162 | 0 |
| 039 | | Elevators - Thyssen Krupp | 203,600 | 45,264 | 92,324 | 0 | 0 | 137,588 | 68 | 66,012 | 13,759 |
| 040 | | Chutes & Compactors - | 37,154 | 6,750 | 9,472 | 0 | 0 | 16,222 | 44 | 20,932 | 1,622 |

*Prolog Manager*     Printed on: 8/30/2004     KowenSouthPark

**Application For Payment**
Detailed Sheet

| Contract No: | 071-35693 | | Application No: | 012 |
|---|---|---|---|---|
| To Company: | Woodlawn Community Development Corporation | | Application Date: | 8/31/2004 |
| From Company: | Walsh Construction Company of Illinois | | Period To: | 8/16/2004 |
| | | | Architect's Project No: | 200119 |

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Wilkinson | | | | | | | | | |
| 041 | | Plumbing - Maxwell Plumbing (PCO 7009 $11,880) | 1,607,120 | 1,172,280 | 150,105 | 0 | 0 | 1,322,385 | 82 | 284,735 | 132,239 |
| 042 | | HVAC - HVAC Consultants | 1,591,720 | 1,029,073 | 274,421 | 0 | 0 | 1,303,494 | 82 | 288,226 | 130,349 |
| 043 | | Fire Protection - Northstar Fire Protection | 246,800 | 234,800 | 1,000 | 0 | 0 | 235,800 | 96 | 11,000 | 23,580 |
| 044 | | MEP Engineering, Reproduction, Protection and Safety (PCO 6002 ($25,708); PCO 6009 ($34,980); PCO ($5,616); PCO 6010; PCO 60 60; Roof Drains - ($31,140)) - WCCI | 179,613 | 62,061 | 12,964 | 0 | 0 | 75,045 | 42 | 104,568 | 7,505 |
| 045 | | Electrical - Foster (PCO 6002 $25,708; PCO 7009 $2,742) | 2,208,748 | 905,309 | 432,675 | 0 | 0 | 1,337,984 | 61 | 870,764 | 133,798 |
| 046 | | Electrical Consumption - WCCI | 36,500 | 11,401 | 8,643 | 0 | 0 | 20,044 | 56 | 15,456 | 2,004 |
| 047 | | Service Loop Trenching - WCCI | 99,847 | 0 | | 0 | 0 | 0 | 0 | 99,847 | 0 |
| 048 | | Unpurchased Scope - WCCI (PCO 6012 ($15,484); PCO 6011 ($49,956); PCO 6006 ($188); PCO 6021 - ($30,284)) | 136,779 | 0 | 0 | 0 | 0 | 0 | 0 | 136,779 | 0 |
| 049 | | General Conditions - WCCI | 1,037,118 | 622,270 | 114,083 | 0 | 0 | 736,353 | 71 | 300,765 | 73,635 |

**Application For Payment**
Detailed Sheet

Contract No: 071-35693
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

Application No: 012
Application Date: 8/31/2004
Period To: 8/16/2004
Architect's Project No: 290119

| | Description | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|
| 050 | Contract Bond - WCCI | 134,511 | 134,511 | 0 | 0 | 0 | 134,511 | 100 | 0 | 0 |
| 051 | General Liability - WCCI | 281,547 | 281,547 | 0 | 0 | 0 | 281,547 | 100 | 0 | 28,155 |
| 052 | Builder's Overhead - WCCI | 350,716 | 242,244 | 31,257 | 0 | 0 | 273,501 | 70 | 117,215 | 27,350 |
| 053 | Fee - WCCI | 1,171,629 | 726,410 | 93,730 | 0 | 0 | 820,140 | 70 | 351,489 | 82,014 |
| 054 | Unsuitable Soil Removal (PCCO 001, PCO 5004) | 80,022 | 80,022 | 0 | 0 | 0 | 80,022 | 100 | 0 | 0 |
| 055 | Rear-Flush Toilets in Mid-Rises (PCCO 002, PCO 5001) | 16,416 | 15,408 | 0 | 0 | 0 | 15,408 | 94 | 1,008 | 0 |
| 056 | Window Color Customization - Revised (PCCO 002, PCO 5006) | 59,174 | 29,474 | 10,876 | 0 | 0 | 40,350 | 68 | 18,824 | 0 |
| 057 | Masonry Changes on 1st Floor - Rev. 9 & 10 (PCCO 002, PCO 5007) | 19,950 | 19,950 | 0 | 0 | 0 | 19,950 | 100 | 0 | 0 |
| 058 | Revision of Precast Headers To Accommodate Lintel (PCCO 005, Rev.1, PCO 5015) | 18,162 | 18,162 | 0 | 0 | 0 | 18,162 | 100 | 0 | 0 |
| 059 | Steel Lintels at Exterior of Mid-Rises (PCCO 005, Rev.1, PCO 5026) | 14,942 | 0 | 0 | 0 | 0 | 0 | 0 | 14,942 | 0 |
| 060 | Steel Lintel Re-Sizing in Mid-Rise Bldgs. - 1st Floor (PCCO 005, Rev.1, PCO 5032) | 2,232 | 0 | 0 | 0 | 0 | 0 | 0 | 2,232 | 0 |
| 061 | Added Masonry Reinforcement at | 8,086 | 6,086 | 0 | 0 | 0 | 6,086 | 75 | 2,000 | 0 |

*Prolog Manager*     Printed on: 8/30/2004     KuwetSouthPark

Page 6

Application For Payment
Detailed Sheet

Contract No: 071-35693
To Company: Woodlawn Community Development Corporation
From Company: Walsh Construction Company of Illinois

Application No: 012
Application Date: 8/31/2004
Period To: 8/16/2004
Architect's Project No: 200119

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Balcony Wing Walls (PCCO 005, Rev.1, PCO 5003) | | | | | | | | | | |
| 062 | | Sawcutting of Balcony Edges (PCCO 005, Rev.1, PCO 5030) | 8,598 | 0 | 0 | 0 | 0 | 0 | 0 | | 8,598 | 0 |
| 063 | | Obstruction in Elevator Piston Drilling (PCCO 007, PCO 5021) | 1,231 | 0 | 0 | 0 | 0 | 0 | 0 | | 1,231 | 0 |
| 064 | | McNutt Construction Winter Protection (PCCO 008, Rev. 1, PCO 5042) | 30,636 | 30,636 | 0 | 0 | 0 | 30,636 | 100 | | 0 | 0 |
| 065 | | Elevator Machine Room Change (PCCO 009 Rev. 1, PCO 5041) | 903 | 903 | 0 | 0 | 0 | 903 | 100 | | 0 | 0 |

**Exhibit D**

*Foster Electric*
Contract Number: 200119-01

929 W. Adams
Chicago, IL 60607

# Walsh Construction Company of Illinois

A Member of the Walsh Group

## SUBCONTRACT AGREEMENT

| | | | |
|---|---|---|---|
| Subcontractor: | Foster Electric<br>125 W. 75th Street<br>Chicago, IL 60620-1002<br>Phone: 773-651-4400<br>Fax: 773-651-9495 | Date of Agreement:<br>("Project")<br><br>Perform Work at: | Friday, April 11, 2003<br>South Park Plaza<br><br>2601 S. Calumet<br>Chicago, IL 60616 |

Job # 200119

Subject to Retention of: 10.00%

Owner: Woodlawn Community Development Corporation

Architect/Engineer: Loewenberg & Associates, Inc.

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as may be required by law.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

| Subcontractor's Work | Subcontract Amount |
|---|---|
| Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all **Electrical Work** as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor.<br>For the total Subcontract Amount of: | $2,180,298.00 |

The following documents are attached and hereby expressly incorporated into this Agreement:

Exhibit A - Terms and Conditions
Exhibit B - Scope, Clarifications, Alternates and Unit Prices
Exhibit C - Contract Documents
Exhibit D - Insurance Requirements
Exhibit E - Standard Operating Procedure
Exhibit F - Payment Schedule and Procedures
Exhibit G - Safety Requirements
Exhibit H - City of Chicago Construction Contract Rider
Exhibit I - City of Chicago Section 3 Compliance Plan
Exhibit J - Davis/Bacon Wage Requirements
Exhibit K - Project Schedule

FEB 1 8 2004

By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

| Subcontractor : Foster Electric | Walsh Construction Company of Illinois |
|---|---|
| By: | By: |
| Title: PRESIDENT | Title: VP |
| Date: 1-21-04 | Date: 2/14/04 |

**PLEASE SIGN AND RETURN ALL ORIGINALS**
An Equal Opportunity Employer M/F/D/V

*Foster Electric*
Contract Number: 200119-01

929 W. Adams
Chicago, IL 60607

# Walsh Construction Company of Illinois

### A Member of the Walsh Group

## SUBCONTRACT AGREEMENT

| | |
|---|---|
| Subcontractor: Foster Electric<br>125 W. 75th Street<br>Chicago, IL 60620-1002<br>Phone: 773-651-4400<br>Fax: 773-651-9495 | Date of Agreement: Friday, April 11, 2003<br>("Project") South Park Plaza<br><br>Perform Work at: 2601 S. Calumet<br>Chicago, IL 60616 |

Job # 200119

Subject to Retention of: 10.00%

Owner: Woodlawn Community Development Corporation

Architect/Engineer: Loewenberg & Associates, Inc.

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as may be required by law.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

| Subcontractor's Work | Subcontract Amount |
|---|---|
| Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all Electrical Work as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor.<br><br>For the total Subcontract Amount of: | <br><br><br>$2,180,298.00 |

The following documents are attached and hereby expressly incorporated into this Agreement:

Exhibit A - Terms and Conditions
Exhibit B - Scope, Clarifications, Alternates and Unit Prices
Exhibit C - Contract Documents
Exhibit D - Insurance Requirements
Exhibit E - Standard Operating Procedure
Exhibit F - Payment Schedule and Procedures
Exhibit G - Safety Requirements
Exhibit H - City of Chicago Construction Contract Rider
Exhibit I - City of Chicago Section 3 Compliance Plan
Exhibit J - Davis/Bacon Wage Requirements
Exhibit K - Project Schedule

FEB 1 8 2004

By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

| Subcontractor : Foster Electric | Walsh Construction Company of Illinois |
|---|---|
| By: | By: |
| Title: PRESIDENT | Title: VP |
| Date: 1-21-04 | Date: 2/14/04 |

**PLEASE SIGN AND RETURN ALL ORIGINALS**
An Equal Opportunity Employer M/F/D/V

## Exhibit A - Terms and Conditions

### ARTICLE 1 - SCOPE OF WORK CONDITIONS

1.1 **Subcontractor's Work.** Subcontractor shall perform all work and shall furnish all supervision, labor, materials, layout, hoisting, tools, equipment, supplies, shop drawings, samples, insurance and all other things necessary for the construction and completion of the work described above and work incidental thereto (collectively, the "Subcontractor's Work"), in strict accordance and full compliance with the Contract Documents (Unless otherwise specified, "Contract Documents," consist of this agreement, the Contract between the Owner and Contractor, or Prime Contract, and all conditions, specifications, drawings, and addendum thereto), any Modifications to the Contract Documents, and to the satisfaction of Contractor

Subcontractor's Work is not limited by any titles on the drawings or headings in the specifications, it being the intention of the parties that all work customarily performed with Subcontractor's Work and required by the Contract Documents shall be performed by Subcontractor, including any and all items and services consistent with, contemplated by and reasonably inferable from the Contract Documents, whether or not such items and services are specifically mentioned therein.

1.2 **Mutual Obligations.** The Subcontractor assumes toward Contractor all the obligations, risks and responsibilities that Contractor by the Contract Documents, has assumed toward the Owner and the Subcontractor is bound to the Contractor by those obligations in the same manner as the Contractor is bound to the Owner. In addition to the Contractor's rights and remedies in this Agreement, Contractor shall also have the benefit of all rights and remedies against Subcontractor which Owner, under the Contract Documents, has against the Contractor. However, Subcontractor's rights against Contractor (as opposed to Subcontractor's obligations, risks, responsibilities and limitations) shall be limited solely to the rights and remedies provided to Subcontractor under this Agreement without regard to any rights and remedies afforded by the Contract Documents.

Further, Subcontractor is not, and shall not, be deemed to be a third-party beneficiary of any of the Contract Documents or any other agreement relating to the Project. Upon the Subcontractor's written request the Contractor shall furnish a copy of any part of these documents and the Subcontractor agrees to reimburse the Contractor for the cost of reproduction

### ARTICLE 2 - SCHEDULE OF WORK

2.1 **Time is of the Essence.** Subcontractor will proceed with Subcontractor's Work in accordance with Contractor's schedules as amended by Contractor from time to time. Contractor shall have the right to direct the sequence and pace of Subcontractor's Work, without monetary compensation to Subcontractor. Subcontractor shall supply sufficient labor, equipment and material to enable Contractor, Owner and all other subcontractors to complete the construction in the time required by the contract between the Owner and Contractor. The Subcontractor shall furnish to the Contractor in such detail and as often as required, full reports of the progress of the Subcontractor's Work irrespective of the location of such work. TIME OF SUBCONTRACTOR'S PERFORMANCE IS OF THE ESSENCE.

2.2 **Work Schedules.** Subcontractor shall, immediately after the award of the subcontract, prepare and submit for Contractor's information an estimated progress schedule for the Work in a form acceptable to Contractor. The progress schedule shall be related to the entire Project to the extent required by the Contract Documents and shall provide for expeditious and practicable execution of the Work. This Schedule shall indicate the dates for the starting and completion of the various stages of the Work. This schedule shall be revised as required by the conditions of the Work, and shall be subject to Contractor's approval. Any delays in the progress schedule shall be presented at the project meetings and Contractor's receipt, review and/or acceptance of Subcontractor's schedules shall not constitute an amendment to this Agreement nor satisfy any notice requirements of this Agreement or of the Contract Documents.

2.3 **Submittals.** Subcontractor shall be responsible for and will prepare for performance of the Work, including without limitation thereto, the submission of shop drawings, samples, tests, field dimensions, determination of labor requirements, and ordering of materials as required to meet the Project schedule.

2.4 **Owner-furnished items.** Subcontractor agrees to assist the Owner and Contractor in the expediting and tracking of the Owner-furnished items that Subcontractor is to install to insure that their delivery coincides with the project schedule.

### ARTICLE 3 - PAYMENT

3.1 **Schedule of Values.** The Subcontractor shall provide a schedule of values satisfactory to the Contractor and the Owner no more than fifteen (15) days from the date of execution of this Agreement. The format of the schedule of values shall be as provided for in the Contract Documents, or in the absence thereof, as directed by the Contractor.

3.2. **Progress Payment Application.** The Subcontractor's Progress Payment application shall be submitted to the Contractor in a form and with content and documentation acceptable to Contractor and Owner.

3.3 **Retainage.** Contractor may retain from Progress Payments an amount as stated in the Contract Documents, of sums otherwise due Subcontractor until Final Payment. Such retainage shall be in addition to such other sums which Contractor may have a right to withhold pursuant to this Agreement. Retainage is applicable to materials stored on and off-site.

3.4 **Time of Application.** The Subcontractor shall submit Progress Payment applications to the Contractor no later than the second day of each month for work performed up to and including the last day of the previous month or at such other regular dates as may be set forth by the Owner or Contractor.

3.5 **Stored Materials.** Unless otherwise provided in the Contract Documents, and if approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Subcontractor's Work but delivered and suitably stored at the site or at some other location agreed upon in writing. Approval of a payment application for such stored items on or off the site shall be conditioned upon submission by the Subcontractor of bills of sale and applicable insurance or such other procedures satisfactory to the Owner and Contractor and in accordance with the Contract Documents to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Contractor's interests therein, including transportation to the site. The risk of loss shall remain with the Subcontractor until final acceptance of the Project by the Owner.

3.6 **Time of Payment.** If Subcontractor is in compliance with this Subcontract and if, and only if, Owner pays Contractor, which is an express condition precedent to Contractor's duty to pay Subcontractor, Progress Payments shall be due to Subcontractor no later than ten (10) days after receipt of payment from Owner by Contractor provided Subcontractor remains in compliance with the terms of this Agreement. If the Contractor has provided a payment and performance bond for the project, the Subcontractor shall make no claim on this bond for payment due to the Subcontractor for which the Owner has not paid the Contractor and the Contractor's surety is an express third party beneficiary of this promise. No Progress Payment made under this Agreement shall be considered an acceptance of Subcontractor's Work, in whole or in part.

3.7 **Unit Price Work.** Where this Agreement anticipates that the Work shall be paid for at an agreed rate per unit of Work in place, then the Subcontractor agrees that the unit prices stated herein shall represent full payment for the Work covered including Subcontractor's overhead and profit and that the Owner, Engineer or Contractor may make a final and binding determination of the quantity of Work to be paid for.

3.8 **Architect/Engineer Verification.** Upon request, the Contractor shall give the Subcontractor authorization to obtain directly from the Architect/Engineer the percentage of completion certified for the Subcontractor's Work.

3.9 **Payment Use Restriction.** All payments made by Contractor to Subcontractor are made to, and accepted by Subcontractor as trustee for the benefit of Subcontractor's employees, material suppliers and lower tier subcontractors. All payments received by the Subcontractor shall first be used to satisfy or secure any indebtedness owed by the Subcontractor to a person furnishing labor or materials for use in performing or incorporation into the Subcontractor's Work. The Contractor shall have the right at all times to contact the Subcontractor's subcontractors and suppliers to ensure that the same are being paid by the Subcontractor for labor or materials furnished for use in performing the Subcontractor's Work. Subcontractor shall insure that all of its employees, employee benefits, withholding taxes, and other applicable taxes are timely paid.

3.10 **Lien Waivers and Affidavits.** When required by the Contractor, and as a prerequisite for payment, the Subcontractor shall provide, in a form satisfactory to the Owner, Owner's lender, and the Contractor, lien or claim waivers and affidavits from the Subcontractor, and its subcontractors and suppliers for the completed Subcontractor's Work.

Subcontractor shall indemnify, defend and hold Contractor, the Owner, the Project funds, Project site and Contractor's payment bond surety harmless from and against any claim for lien, lien, encumbrance, payment bond claim (collectively "Lien"), any suit to enforce or recover or foreclose upon a Lien, and from any costs, expenses, attorney's fees, consultants' fees and litigation costs incurred by Contractor in connection with any Lien, which arises in connection with Subcontractor's Work or is asserted by any of Subcontractor's subcontractors, suppliers, employees, sureties, creditors, labor unions, or laborers ("Subcontractor's Lien Costs").

Contractor may withhold from Subcontractor's Progress or Final Payment any Subcontractor's Lien Costs incurred or anticipated to be incurred to defend and discharge any Lien and Subcontractor shall reimburseContractor for any Subcontractor's Lien Costs incurred to discharge or defend any Lien if not deducted from a Progress or Final Payment. Subcontractor shall also reimburse Contractor for any Subcontractor's Lien Costs paid under any Contractor's payment bond and all additional amounts paid by Contractor pursuant to any indemnity to Contractor's payment bond surety. This Paragraph is solely for the benefit of Contractor and Subcontractor and is not intended to benefit any persons or entities not parties to this Agreement including Subcontractor's surety, creditors, subcontractors or suppliers of any tier and creates no rights in them.

3.11 **Subcontractor Payment Failure.** In the event the Contractor has reason to believe that labor, material or other obligations incurred in the performance of the Subcontractor's Work are not being paid, the Contractor may take any steps Contractor deems necessary to insure that such obligations are paid including, but not limited to, issuance of checks jointly to Subcontractor and the person to whom Subcontractor owes an obligation, and direct payment of labor, labor unions (and their pension funds) and Subcontractor's subcontractors and suppliers unless Subcontractor: (i) supplies evidence to the satisfaction of the Contractor that such obligations have been satisfied; or (ii) Subcontractor provides a bond indemnifying the Owner, the Contractor, the Contractor's surety, if any, and the project site from such claims arising from such obligations.

3.12 **Right of Set Off.** Contractor may withhold amounts otherwise due under this Subcontract or any other agreement between the parties to cover Contractor's reasonable estimate of any costs or liability Contractor has incurred or may incur for which Subcontractor may be responsible under this Agreement.

3.13 **Final Payment Application.** Upon acceptance of the Subcontractor's Work by the Owner, the Contractor, and if required by the Contract Documents, the Architect/Engineer, and upon the Subcontractor furnishing evidence of fulfillment of the Subcontractor's obligations, the Contractor shall forward the Subcontractor's application for Final Payment to Owner.

3.14 **Final Payment Requirements.** Before the Contractor shall be required to forward the Subcontractor's application for Final Payment to the Owner, the Subcontractor shall submit to the Contractor: (i) an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Subcontractor's Work for which the Owner or his property or the Contractor or the Contractor's surety might in any way be liable, have been paid or otherwise satisfied; (ii) consent of surety to final payment, if required; (iii) satisfaction of required close-out procedures and documentation; and (iv) other data if required by the Contractor or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by the Contractor or Owner.

Final Payment shall constitute a waiver of all claims by the Subcontractor relating to the Subcontractor's Work. All of Subcontractor's obligations pursuant to this Agreement shall be preserved notwithstanding final payment or termination of this Agreement.

ARTICLE 4 - CHANGES, CLAIMS AND DELAYS

4.1 **Changes.** When the Contractor so orders in writing, the Subcontractor, without nullifying this Agreement, shall make any and all changes in the Work which are within the general scope of this Agreement. Adjustments in the Subcontract Amount or Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order pursuant to the Contract Documents. No such adjustment shall be made for any such changes performed by the Subcontractor that have not been so ordered by the Contractor in writing.

An express condition precedent to payment to Subcontractor on account of changes made or directed by Owner shall be that Contractor shall have received such payment from Owner for Subcontractor's changed Work. Each Payment to Subcontractor on account of such change orders shall be equal to Subcontractor's allocable share of Contractor's payment from Owner for the change as determined by Contractor. In no event shall the profit percentage charged by the Subcontractor on a change order exceed the profit awarded to the Contractor by the Owner on the change order.

4.2 **Changed Work at Time and Material.** The Contractor may order changed work to be performed on a time and material basis by written notification to the Subcontractor. Upon receipt of such notice, Subcontractor will perform the work and will accept in full payment thereof an amount equal to the direct cost of labor and materials actually used to perform such changed work, plus mark up for overhead and profit as allowed in the Contract Documents (15% maximum if not specified) to cover all costs including but not limited to indirect, consequential and impact costs. The Subcontractor will keep written records of the labor, materials and equipment used to perform such changed work and will hand-deliver daily records supporting the costs to be paid to the Subcontractor for such work for written verification of work done to the Contractor's superintendent. The Subcontractor waives any right for compensation for work performed on a time and material basis on any day for which said records are not kept and submitted to Contractor's Superintendent for written verification.

4.3 **Claims.** A "Claim" is a Subcontractor's demand or assertion seeking, as a matter of right, an increase in Subcontract Amount, an extension in the time for performance of Subcontractor's Work, or relief with respect to the terms of the Contract. All Claims must be made by written notice to the Contractor at least one (1) week prior to the beginning of the Subcontractor's Work or the date by which Contractor is obligated to give notice to the Owner with respect to such claim, or within one (1) week of the Subcontractor's first knowledge of the event, whichever shall first occur, otherwise, such claims shall be deemed waived. Pending final resolution of a Claim, unless otherwise agreed in writing, the Subcontractor shall proceed diligently with performance of the Subcontractor's Work and the Contractor shall continue to make payments in accordance with this Agreement.

4.4 Delay. If the progress of the Subcontractor's Work is substantially delayed, hindered or interfered with through no fault or responsibility of the Subcontractor, then the Contractor shall either (i) extend the time for the performance of Subcontractor's Work by Change Order, but such extension shall be limited to that amount of time which will enable Contractor to meet its obligation to Owner to complete the Project in accordance with the Contract Documents, or (ii) have the right to order Subcontractor to accelerate its Work with additional manpower and the expediting of materials, but Contractor shall be obligated to pay only for the costs of expediting material.

Except for the costs of expediting materials at the order of Contractor pursuant to the previous paragraph, the Contractor shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delay, hindrance, interference or other similar event, caused by Contractor; by any act, negligence, or default of the Owner or Architect/Engineer; or by reason of fire, casualty, act of God or any other reason beyond the Contractor's control. It is expressly understood and agreed that the Subcontractor's sole and exclusive remedy for any delay, hindrance, interference or other similar event, shall be an extension in the time for performance of the Subcontractor's Work.

4.5 Liquidated Damages. If the Contract Documents provide for liquidated or other damages for delay beyond the Completion Date set forth in the Contract Documents, and are so assessed, then the Contractor may assess the same against the Subcontractor in proportion to the Subcontractor's share of the responsibility for such delay. The amount of liquidated damages assessed shall not exceed the amount assessed against the Contractor. Liquidated damages, as assessed against Contractor for Subcontractor's default, may be but one item of the actual damages that may be incurred by Contractor, and which the Contractor may assess against Subcontractor. The proportionate assessment of liquidated damages shall not limit Contractor's right to collect from Subcontractor the additional actual damages incurred by Contractor as a result of Subcontractor's delay or default.

### ARTICLE 5 - CONTRACTOR'S OBLIGATIONS

5.1 Site Resources. Subcontractor acknowledges that, in order for Contractor to coordinate and manage the work required by the Contract Documents, it will be necessary for Contractor to allocate site access and access to work areas, utilities, storage space, and other characteristics of the Project site and the project work ("Site Resources") and certain trades may be given preference, at the discretion of Contractor, to Site Resources in order to maintain the optimum project schedule as determined by Contractor.

Accordingly, as long as Contractor acts in good faith in allocating Site Resources and, notwithstanding any other provision of this Agreement or the Contract Documents, Subcontractor waives any and all claims for damages, extensions of time or for increase to the Subcontract amount as the result of any delay, disruption, interference, obstruction, hindrance, suspension, acceleration, constructive acceleration, out-of-sequence work, change or other cause arising from Contractor's allocation of Site Resources.

5.2 Authorized Representative. The Contractor shall designate one or more persons who shall be the Contractor's authorized representative(s) on-site and off-site. Such authorized representative(s) shall be the only person(s) the Subcontractor shall look to for instructions, orders and/or directions, except in an emergency.

5.3 Timely Communications. The Contractor shall transmit, with reasonable promptness, all submittals, transmittals, and written approvals relating to the Subcontractor's Work.

### ARTICLE 6 - SUBCONTRACTOR'S OBLIGATIONS

6.1 Temporary Services. The Subcontractor shall furnish all temporary services and/or facilities necessary to perform its work, except as otherwise provided in this Agreement.

6.2 Coordination. Subcontractor will coordinate Subcontractor's Work with the work of Contractor, other subcontractors, and the Owner's separate contractors or employees, if any, so that no delays, obstruction, disruption or interference will occur in completion of any part or all of the Project or Contractor's Work or the work of other of Contractor's subcontractors or Owner's separate contractors or employees. Subcontractor shall determine whether the work of other subcontractors or of Owner is completed and without defect or variance from the Contract Documents in work of other subcontractors or of Owner's separate contractors or employees surrounding, adjacent to or to underlie Subcontractor's Work, Subcontractor shall give prompt notice to Contractor of such defect. Subcontractor shall be liable for the costs to replace, modify or correct, or for the correction, replacement or modification at Subcontractor's own cost, of any of Subcontractor's Work or any other work required as a result of the Subcontractor's failure to give such prompt notice to Contractor.

6.3 Authorized Representative/Meetings. The Subcontractor shall designate one or more persons acceptable to the Contractor who shall be the Subcontractor's Authorized Representative(s) both on-site and off-site. Such authorized representative(s) shall be the only person(s) to whom the Contractor shall issue instructions, orders or directions, except in an emergency. The Authorized Representative shall attend meetings which may be held at such place and on such intervals as the Contractor designates and shall be capable of committing the Subcontractor to actions as agreed in these meetings.

6.4 Clean-up. The Subcontractor shall follow the Contractor's clean-up directions; and, (i) at all times keep the building and site free from debris resulting from the Subcontractor's Work; (ii) store material and equipment in an orderly manner; and (iii) broom clean each floor area prior to discontinuing work in that area. If the Subcontractor fails to commence clean-up duties within 24 hours after receipt from the Contractor of written notice of noncompliance, the Contractor may implement clean-up measures without further notice and deduct the cost thereof from any amounts due or to become due the Subcontractor.

6.5 Permits, Fees and Licenses. The Subcontractor warrants that it possesses all licenses required to perform the Subcontractor's Work. The Subcontractor shall give adequate notices to authorities pertaining to the Subcontractor's Work and secure and pay for all permits, fees, licenses, assessments, inspections, tests and taxes specifically related to the Subcontractor's Work. The Subcontractor shall cooperate with the Contractor in securing building and occupancy permits. The Subcontractor shall immediately notify the Contractor of any deficiency reported by inspection authorities, or denial of applicable permits, licenses, certificates of testing, inspection and occupancy. Upon request of the Contractor, the Subcontractor shall present applicable documentation to the Contractor.

6.6 Project Records. The Subcontractor shall prepare and submit to Contractor shop drawings and other submittals as may be necessary to describe the details and construction of the Subcontractor's Work. Approval of these submittals by Contractor will not relieve Subcontractor of its obligation to perform the Work in strict compliance with the plans and/or specifications or the proper matching and fitting of the contiguous work. Subcontractor shall maintain and upon the request of Contractor, produce the manpower count and a brief description of the Subcontractor's Work that was performed on the previous day.

6.7 Labor Conditions. Subcontractor shall not use any class of workmen, materials or methods which may cause strikes or labor disturbances. Subcontractor shall use appropriate union labor. Subcontractor warrants that it has posted bonds with all signatory unions and will notify Contractor of any delinquency in its contributions to the unions.

ARTICLE 7 - SUBCONTRACT PROVISIONS

7.1  Assignment. Subcontractor shall submit a list of proposed sub-subcontractors and material suppliers to the Contractor. The Subcontractor shall not assign this Agreement nor its proceeds nor subcontract the whole nor any part of the Subcontractor's Work without prior approval of the Contractor which shall not be unreasonably withheld.

7.2  Layout Responsibility.  The Subcontractor shall lay out and be strictly responsible for the accuracy of the Subcontractor's Work. The Subcontractor shall exercise prudence so that actual final conditions and details shall result in proper alignment of finished surfaces.

7.3  Workmanship.  All workmanship shall be of the best of its several kinds, and all materials used in the Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the work, and shall be new except such materials as may be expressly provided in the Contract Documents to be otherwise.

7.4  Materials Furnished By Others.  In the event the scope of the Subcontractor's Work includes installation of materials or equipment furnished by others, it shall be the responsibility of the Subcontractor to examine the items so provided and thereupon handle, store and install the items with such skill and care as to ensure a satisfactory and proper installation. Loss or damage due to the acts or omissions of the Subcontractor shall be deducted from any amounts due or to become due to the Subcontractor.

7.5  Deliveries. Subcontractor is to schedule all deliveries of materials and equipment with Contractor's on-site superintendent a minimum of forty-eight (48) hours in advance, and be prepared to receive and unload said deliveries on site. If the foregoing notification requirements are not adhered to, Contractor reserves the right to refuse, warehouse or return to the carrier the shipment in question. In this case, all costs incurred by Contractor for handling, storage, and protection of said materials and equipment shall be reimbursed by Subcontractor. In the event Contractor chooses to accept the delivery on Subcontractor's behalf, the signature of an employee acknowledging the receipt of such material shall not constitute acceptance of the contents, until an actual inspection of the material has been conducted by Subcontractor. In addition, Contractor does not accept any responsibility or liability in regards to verifying quantities, type of materials and safety of said deliveries.

7.6  Substitutions. No substitutions shall be made in the Subcontractor's Work unless permitted in the Contract Documents and only then upon the Subcontractor first receiving all approvals required under the Contract Documents for substitutions. In the event a substitution results in additional cost to the Contractor and/or other subcontractors, Subcontractor shall be responsible for such additional costs.

7.7  Provision for Inspection. The Subcontractor shall notify the Contractor when portions of the Subcontractor's Work are ready for inspection or testing. The Subcontractor shall at all times furnish the Contractor and its representatives adequate facilities for inspecting or testing materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment. Subcontractor shall promptly replace or correct any Subcontractor's Work which Contractor or the Owner shall reject as failing to conform to the requirements of this Agreement.

7.8  Use of Contractor's Equipment. The Subcontractor, its agents, employees, subcontractors or suppliers shall not use the Contractor's equipment without the express written permission of the Contractor's designated representative.

7.9  Privity.  Until final completion of the Project, the Subcontractor agrees not to perform any work directly for the Owner or any tenants thereof, or deal directly with the Owner's representatives in connection with the Project, unless otherwise directed in writing by the Contractor. All work for this Project performed by the Subcontractor shall be processed and handled exclusively by the Contractor.

7.10  Protection of the Work. The Subcontractor shall take necessary precautions to properly protect the Subcontractor's Work and the work, property or materials of the Owner, the Contractor or other subcontractors from damage caused by the Subcontractor's operations. If the Subcontractor causes damage to the work or property of the Owner, the Contractor or other subcontractors, the Subcontractor shall promptly remedy such damage to the satisfaction of the Contractor, or the Contractor may so remedy and deduct the cost thereof from any amounts due or to become due the Subcontractor. The Subcontractor shall have primary responsibility and liability for any damages or losses which may be incurred.

7.11  Warranty Provisions. The Subcontractor warrants its Work against all deficiencies and defects in materials and/or workmanship and as called for in the Contract Documents. The Subcontractor agrees to satisfy such warranty obligations which appear with in the guarantee or warranty period established in the Contract Documents without cost to the Owner or the Contractor. If no guarantee or warranty is required of the Contractor in the Contract Documents, then the Subcontractor shall guarantee or warranty its Work as described above for the period of one year from the date(s) of substantial completion of all or a designated portion of the Subcontractor's Work or acceptance or use by the Contractor or Owner of designated equipment, whichever is sooner. The Subcontractor further agrees to execute any special guarantees or warranties required in the Contract Documents for the Subcontractor's Work.

7.12  Safety. The Subcontractor agrees to comply with the Occupational Safety and Health Act of 1970, as later amended, in the performance of the Subcontractor's Work, and further agrees to abide by and comply with all regulations issued under this Act. In the event the Subcontractor is cited for violations, Subcontractor shall be responsible for all penalties assessed against the Subcontractor. In the event the Contractor is cited or penalized due to the Subcontractor's actions or failure to comply with the Occupational Safety and Health Act, Subcontractor shall hold the Contractor harmless from any costs, expenses, suits, penalties or damages (including legal fees and costs) arising from any such citations or penalties and such sums shall be deducted from amounts due under the Subcontract. Subcontractor shall not be held liable for violations of the Contractor provided the Subcontractor has no liability.
In addition to safety requirements imposed by law, Subcontractor shall comply with all safety requirements imposed by Contractor, Owner or the Architect/Engineer and will conduct operations in a safe manner. Subcontractor shall be liable to Contractor for any additional costs, fines and penalties Contractor incurs as a result of Subcontractor's failure to operate safely. Contractor may conduct safety inspections from time to time. Such inspections shall not relieve Subcontractor from Subcontractor's obligations to adhere to safety requirements nor shall such inspections create any Contractor liability.

If the Subcontractor or any of its subcontractors or any employees thereof fail to comply with a request to work in a safe manner or correct an unsafe condition, the Contractor may withhold payments and/or correct the safety deficiency at the Subcontractor's expense and/or require that unsafe employees be removed from the project site.

7.13  Compliance with Laws. The Subcontractor agrees to be bound by, and at its own cost, comply with all federal, state and local laws, ordinances and regulations (hereinafter collectively referred to as "Laws") applicable to the Subcontractor's Work including, but not limited to, equal employment opportunity, minority business enterprise, women's business enterprise, disadvantaged business enterprise, provisions of Executive Order 11246, as amended, the Vietnam Era Veterans Readjustment Assistance Act of 1974 and the Rehabilitation Act of 1973, such implementing rules and regulations as may be established by the Secretary of Labor, safety and all other Laws with which the Contractor must comply according to the Contract Documents.

ARTICLE 8 - RECOURSE BY CONTRACTOR

8.1 Failure of Performance. If the Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or it fails to make prompt payment for its workers, subcontractors or suppliers, disregards Laws or orders of any public authority having jurisdiction, or otherwise is guilty of a material breach of a provision of this Agreement, and fails within seventy-two (72) hours after receipt of written notice (confirmed facsimile transmission shall constitute sufficient notice) to commence and continue satisfactory correction of such default with diligence and promptness, the Contractor, without prejudice to any rights or remedies, shall have the right to any or all of the following remedies:

(i) supply such number of workers and quantity of materials, equipment and other facilities as the Contractor deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of same including reasonable overhead, profit and attorney's fees; (ii) contract with one or more additional contractors to perform such part of the Subcontractor's Work as the Contractor shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor; and/or (iii) withhold payment of any moneys due the Subcontractor pending corrective action to the extent required by and to the satisfaction of the Contractor and the Architect/Engineer. In the event of an emergency affecting the safety of persons or property, the Contractor may proceed as outlined above without notice.

8.2 Failure of Performance-Termination. If the Subcontractor fails to commence and satisfactorily continue correction of a default within seventy-two (72) hours after the notice is issued under Paragraph 8.1, then the Contractor may, in lieu of or in addition to the remedies provided therein, terminate this Agreement and use any materials, implements, equipment, appliances or tools furnished by or belonging to the Subcontractor to complete the Subcontractor's Work. The Contractor may furnish those materials, equipment and/or employ such workers or subcontractors as the Contractor deems necessary to maintain the orderly progress of the work.

All of the costs incurred by the Contractor in so performing the Subcontractor's Work, including reasonable overhead, profit, liquidated or consequential damages, and attorney's fees, shall be deducted from any moneys due or to become due the Subcontractor. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Amount.

8.3 Bankruptcy-Termination Absent Cure. Upon the appointment of a receiver for the Subcontractor or upon the Subcontractor making an assignment for the benefit of creditors, the Contractor may terminate this Agreement after seventy-two (72) hours written notice to the Subcontractor.

If an order for relief is entered under the bankruptcy code with respect to the Subcontractor, the Contractor may terminate this Agreement by giving seventy-two (72) hours written notice to the Subcontractor, its trustee, or its surety. If any, unless the Subcontractor, the surety, or the trustee: (i) promptly cures all defaults; (ii) provides adequate assurances of future performance; (iii) compensates the Contractor for actual pecuniary loss resulting from such defaults; AND (iv) assumes the obligations of the Subcontractor within the statutory time limits. Contractor need not consent to assumption or assignment of this Agreement because of the liquidated damages and other liabilities to which Contractor may be exposed.

8.4 Bankruptcy-Interim Remedies. If the Subcontractor is not performing in accordance with the Schedule of Work at the time of entering an order for relief, or at any subsequent time, the Contractor, while awaiting the decision of the trustee to reject or to accept this Agreement and provide adequate assurance of its ability to perform hereunder, may avail itself of such remedies under this Article as are reasonably necessary to maintain the Contractor's Schedule.

The Contractor may offset against any sums due or to become due the Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorney's fees. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Amount.

8.5 Suspension/Termination by Owner. Should the Owner suspend or terminate the Contractor's Work or any part of the Contractor's Work which includes the Subcontractor's Work, the Contractor shall so notify the Subcontractor in writing and upon receipt of said notice, this Agreement shall also be suspended or terminated respectively and the Subcontractor shall immediately stop the Subcontractor's Work. In the event of such Owner suspension or termination, the Contractor's liability to the Subcontractor is limited to the extent of the Contractor's recovery on the Subcontractor's behalf.

8.6 Termination for Convenience. Contractor shall have the right to terminate for convenience Subcontractor's performance of all or a part of the Subcontractor's Work by providing Subcontractor with a written notice of termination of convenience which shall be effective upon receipt by Subcontractor. If Contractor's contract with Owner has not been terminated and the Subcontractor is not in default on any provision of this Agreement, Subcontractor shall be paid the reasonable value of Subcontractor's Work performed prior to termination plus reasonable direct close-out costs if and when payment therefor is received by Contractor from Owner but in no event shall Subcontractor be entitled to unabsorbed overhead, lost profits, or damages of any kind.

8.7 Wrongful Exercise of Termination. If Contractor wrongfully exercises Contractor's remedy options under this Article, that action shall be treated as a deductive change. If Contractor wrongfully exercises Contractor's termination options under this Article, that termination for default shall be considered a termination for Contractor's convenience and Subcontractor shall be entitled to the applicable compensation provided in Paragraph 8.6 of this Agreement. Subcontractor's remedies under this Paragraph shall be exclusive.

8.8 Conditional Assignment. Subcontractor, by execution of this Agreement, contingently assigns to Contractor all Subcontractor's subcontracts and purchase orders relating to the Project. The assignment of each of Subcontractor's subcontracts and purchase orders shall take effect only upon Subcontractor's termination for default under this Article and Contractor's affirmative acceptance of the assignment of the specific subcontract or purchase order by written notice to Subcontractor and Subcontractor's subcontractor or material supplier.

Contractor shall have no liability to any of Subcontractor's subcontractors or material suppliers unless and until Contractor affirmatively accepts the assignment as provided above and then such liability shall relate to work performed and material or supplies ordered only from the date of Contractor's acceptance of the assignment after Subcontractor's termination.

8.9 Contractor's Rights Survive Termination. Termination of this Agreement by Contractor or abandonment by Subcontractor shall not relieve Subcontractor from Subcontractor's obligations in connection with Subcontractor's Work performed prior to termination or abandonment nor will such termination or abandonment abrogate any obligations of Subcontractor under, or rights or remedies afforded to Contractor by this Agreement or the Contract Documents including without limitation, Subcontractor's indemnity obligations.

ARTICLE 9 - INDEMNIFICATION

9.1 Indemnification. To the fullest extent permitted by law, Subcontractor shall indemnify, defend and hold harmless the Contractor, Owner, Architect/Engineer, their parents, members, subsidiaries, related corporations and any other entity as provided in the Contract Documents (hereinafter "Indemnified Parties") and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, but only to the extent caused or alleged to be caused in whole or in any part by the negligent acts or omissions of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this paragraph.

9.2 No Limitation upon Liability. In any and all claims against the Indemnified Parties, by any employees of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the indemnification obligation under Paragraph 9.1 shall not be limited in any way by a limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under worker's compensation acts, disability benefit acts or other employee benefit acts.

9.3 Additional Indemnification. Subcontractor shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all claims, demands, suits, actions, expenses, judgments, losses and liabilities, including fines and penalties, costs and attorneys', consultants', and experts' fees as a result of Subcontractor's actual or alleged failure to perform this Subcontract in accordance with the terms of this Agreement and the Contract Documents. The foregoing obligations of Subcontractor shall include, but are not limited to, indemnifying, defending and holding harmless from claims made by third parties against any Indemnified Party. Subcontractor's liability includes, but is not limited to, (i) damages and other delay costs payable by Contractor; (ii) Contractor's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor caused delays or omitted or defective Subcontractor's Work; (iii) warranty, rework and repair costs;

(iv) liability to third parties, including, but not limited to, other subcontractors of Contractor and Owner's contractors; (v) excess reprocurement costs; (vi) costs to obtain a substitute subcontractor or costs incurred to demand and ensure performance of Subcontractor's surety in the event of Subcontractor default; (vii) consultants' and experts' fees; and (viii) attorneys' fees and related costs. Subcontractor's actual or alleged failure to perform shall include the actual or alleged failure of Subcontractor's lower-tier subcontractors or suppliers to perform. The foregoing indemnity shall also be an obligation of Subcontractor's performance bond surety provided, however, the existence or non-existence of a performance or payment bond shall in no way limit or condition Contractor's right of indemnity or remedies against Subcontractor nor shall it limit Subcontractor's responsibilities hereunder.

9.4 Indemnity for Equipment Utilized. In the event that Subcontractor or any of Subcontractor's agents, employees, suppliers, or lower-tier subcontractors utilize any machinery, equipment, tools, ladders, scaffolding, hoists, lifts or similar items belonging to or under the control of any of the Indemnified Parties, Subcontractor agrees to indemnify, defend and save harmless the Indemnified Parties from and against any and all claims, demands, suits, actions, expenses, judgments, losses and liabilities, including fines and penalties, costs and attorneys', consultants' and experts' fees, arising out of such use, except to the extent such loss or damage shall be caused by the negligence of any of the Indemnified Parties' employees operating any of the Indemnified Party-owned or Indemnified Party-leased equipment.

9.5 Patents. Except as otherwise provided by the Contract Documents, the Subcontractor shall pay all royalties and license fees which may be due on the inclusion of any patented materials in the Subcontractor's Work. The Subcontractor shall defend all suits for claims for infringement of any patent rights arising out of the Subcontractor's Work, which may be brought against the Contractor or Owner, and shall be liable to the Contractor and Owner for all loss, including all costs, expenses, and attorney's fees.

9.6 Work. Subcontractor hereby assumes the entire responsibility and liability for all work, supervision, labor and materials provided hereunder, whether or not erected in place, and for all plant, scaffolding, tools, equipment, supplies and other things provided by Subcontractor until final acceptance of Subcontractor's Work by the Owner as defined by the Contract Documents. In the event of any loss, damage or destruction thereof from any cause, Subcontractor shall be liable therefor, and shall repair, rebuild and make good said loss, damage or destruction at Subcontractor's sole cost.

9.7 Duty to Defend. Subcontractor shall: (i) at Subcontractor's own cost, expense and risk, defend all claims defined in this Article that may be brought or instituted by third persons, including, but not limited to, governmental, state, or local agencies, or employees of the Subcontractor against the Contractor or the Owner or their agents or employees or any of them; (ii) pay and satisfy any judgment or decree that may be rendered against the Contractor or the Owner or their agents or employees, or any of them arising out of any such claim; and, (iii) reimburse the Contractor or the Owner or their agents or employees for any and all legal expense incurred by any of them in connection herewith or in enforcing the indemnity granted in this Article.

9.8 Indemnification Independent from Insurance. Subcontractor's indemnification obligations are independent from, and not limited in any manner by the Subcontractor's insurance coverage required by Article 10.

ARTICLE 10 - INSURANCE

10.1 Subcontractor's Insurance. Prior to start of the Subcontractor's Work, the Subcontractor shall procure for the Subcontractor's Work and maintain in force Worker's Compensation and Employer's Liability Insurance, Automobile Liability Insurance, Commercial General Liability Insurance and all insurance required of the Subcontractor under the Contract Documents. Evidence of required insurance shall be furnished to the Contractor prior to the commencement of the Work.

The Contractor (its parents, subsidiaries, and related corporations), Owner and Architect/Engineer, and others as provided in the Contract Documents, shall be named as Additional Insured on each of these policies except for Worker's Compensation. Failure by the Contractor to request Subcontractor to fulfill this requirement is not a waiver of this requirement. Subcontractor's insurance policies shall state that they are primary and not additional to, or contributing with, any other insurance carried by, or for the benefit of the Additional Insured. Any such insurance maintained by an Additional Insured shall be excess of that maintained by Subcontractor. Each liability policy of Subcontractor shall contain a "separation of insureds" provision stating that, except for limits of liability, the policies shall operate as though separate policies had been issued to each insured.

Subcontractor may provide the coverage required herein through the use of a primary liability policy or through a combination of primary liability and umbrella liability policies. However, the total limit of liability shall not be less than the limits set forth in the Contract Documents or greater if required by law.

Commercial General Liability insurance shall include as minimum coverage: (i) Premises - Operations Liability; (ii) Products and Completed Operations Liability; (iii) Broad Form Property Damage Liability; (iv) Blanket Contractual covering indemnity obligations herein; (v) Personal Injury Liability, with Employment Exclusion deleted; (vi) Property Damage Liability insurance shall provide "X, C, and U" (explosion, collapse, and underground hazard) coverage as applicable; (vii) Products and Completed Operations; (viii) Cross-Liability Extension endorsement; and, (ix) Incidental Professional Design Liability coverage.

10.2 Cancellation, Renewal or Modification. The Subcontractor shall maintain in effect all insurance coverage required under this Agreement at the Subcontractor's sole expense and with insurance companies acceptable to the Contractor. Coverage shall be maintained without interruption until date of Final Payment, except for Products and Completed Operations coverage which shall be maintained for three years after Final Payment.

All insurance policies shall contain a provision that the coverage afforded thereunder shall not be canceled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to the Contractor unless otherwise specifically required in the Contract Documents.

Certificates of Insurance, or certified copies of policies acceptable to the Contractor shall be filed with the Contractor prior to the commencement of the Subcontractor's Work. Contractor's failure to request a Certificate of Insurance shall not be a waiver of Subcontractor's duty to procure insurance.

In the event the Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, the Contractor may purchase such coverage and charge the expense thereof to the Subcontractor, or terminate this Agreement.

10.3 Property Insurance. The Contractor and Subcontractor waive all rights against each other and the Owner, the Architect/Engineer, separate contractors, and all Other Subcontractors for loss or damage to the extent covered by Builder's Risk or any other property or equipment insurance, except such rights as they may have to the proceeds of such insurance.

Loss or damage which is not covered by builder's risk or other property or equipment insurance and deductibles or self insured retention amounts shall be borne by the Subcontractor in proportion the extent of Subcontractor's loss or damage in comparison to the total loss or damage of the underlying occurrence.

10.4 Carrier Qualifications. All insurance policies purchased shall be maintained with insurance companies licensed to do business in the state where the Project is located and shall have a policyholder rating of "A" or better in the most current Best's Key Rating Guide. ✓

ARTICLE 11 - DISPUTE RESOLUTION

11.1 Law and Effect. This Agreement shall be governed by the law of the state in which the Project is situated. The Subcontractor hereby agrees to accept jurisdiction of and service of process in the state in which the Project is situated and any action or proceeding under or in connection with this Subcontract shall be brought in the county in which the Project is situated. In the event of any dispute involving this Agreement or the Subcontractor's Work performed or to be performed, or any claims of Subcontractor, Subcontractor shall continue to perform the Subcontractor's Work without interruption, deficiency or delay in a diligent manner. Further, Subcontractor hereby waives its right to a trial by jury in any and all disputes or claims arising out of or in relation to this Agreement. Subcontractor agrees to make these conditions a part of each contract for materials, supplies, labor or equipment entered into by Subcontractor in regard to the Work.

11.2 Arbitration. Any controversy or claim of Contractor against Subcontractor or Subcontractor against Contractor shall, at the option of Contractor, be resolved by arbitration pursuant to the Construction Industry Arbitration Rules of the American Arbitration Association in effect on the date on which the demand for arbitration is made. Subcontractor hereby irrevocably submits to the jurisdiction of the federal and state courts located in the state of the Project for the purpose of proceedings with respect to the arbitration. Subcontractor hereby waives to the fullest extent permitted by law any objection that they may now or may hereafter have to having arbitration proceedings conducted in the state in which the Project is located, including any claim that it is an inconvenient forum for such arbitration or court proceedings.

The award rendered by the arbitrator(s) shall be conclusive and binding upon the parties and shall be enforceable in any court of competent jurisdiction of any Contracting State pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (330 UNTS 3; 9 U.S.C. 201, et seq.).

11.3 Owner Related Disputes. In case of any dispute between Contractor and Subcontractor in any way relating to or arising from any act or omission of the Owner or Architect/Engineer or involving the Contract Documents, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner, by the terms of the Contract Documents, and by any and all preliminary and final decisions, determinations or agreements made by or between Contractor, Architect/Engineer or Owner or so authorized in the Contract Documents or by the court or arbitrator designated in the Contract Documents whether or not Subcontractor is a party to such agreement or proceeding. Contractor shall not be liable to Subcontractor in excess of any sum actually received from Owner on behalf of Subcontractor.

Contractor may, at Contractor's option, (i) present to the Architect/Engineer, the Owner, or any court or arbitrator, in Contractor's name, or (ii) authorize Subcontractor to present to Architect/Engineer, the Owner, or any court or arbitrator in Contractor's name, all of Subcontractor's claims, and to answer the claims of Architect/Engineer or the Owner involving Subcontractor or Subcontractor's Work. If such dispute is prosecuted or defended by Contractor, the Subcontractor, at Subcontractor's own expense, agrees to furnish all documents, statements, witnesses, and other information required by Contractor and to pay or reimburse Contractor for all costs incurred by Contractor in connection with the dispute including, without limitation, attorneys', experts' and consultants' fees.

ARTICLE 12 - MISCELLANEOUS PROVISIONS

12.1 Inconsistencies and Omissions. The drawings, specifications, and other Contract Documents shall be construed as supplementing one another. Any of the Subcontractor's work shown in the specifications and not on the drawings, or shown on the drawings and not in the specifications shall be performed by the Subcontractor as part of this Agreement. Dimensions given on the drawings and the specifications are approximations only, and the Subcontractor shall take such measures at the project site as will insure the proper matching and fitting of the work covered by this Agreement with contiguous work.

Subcontractor has reviewed the Contract Documents in advance of the execution of this Agreement. Any error, ambiguity, inconsistency or omission therein, of which Subcontractor had, or should have had knowledge may not be a basis for an increase in the Subcontract Amount or time to perform the Subcontractor's Work. If inconsistencies or omissions exist in the Contract Documents, of which Subcontractor did not have, and should not have had knowledge before execution of this Agreement, it shall be the duty of the Subcontractor to notify Contractor in writing thereof within seventy-two (72) hours of the discovery of such inconsistencies or omissions. Upon receipt of said notice, Contractor shall instruct Subcontractor as to the actions to be taken.

12.2 Severability and Waiver. The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

12.3 Interpretation. In the event of a conflict between or among modifications to any of the body of this Agreement, any exhibit thereto or a Contract Document, the later in date shall prevail; in the event of a conflict between or among the terms of this Agreement, the higher standard, shorter notice period, or greater requirement for Subcontractor shall prevail; and in the event of a conflict between or among the terms of the Contract Documents, the higher standard, shorter notice period, or greater requirement for Subcontractor shall prevail.

12.4 Titles. The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

12.5 Entire Agreement. This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or oral.

*Foster Electric*
Subcontract Agreement No. 200119-01

# EXHIBIT B
## SCOPE, CLARIFICATIONS, ALTERNATES
## and UNIT PRICES

Walsh Construction Company of Illinois
General Contractors For:
**South Park Plaza**
**222 S. Morgan**
Chicago, IL 60607
Woodlawn Community Development Corporation Project # 071-35693
Walsh Construction Company of Illinois Project # 200119

## 1. SPECIFICATION SECTIONS:

The scope of the Electrical Work to be performed by Foster Electric is defined in the documents listed in Exhibit "C", including but not limited to, the following specification sections:

Specification Division 1
Specification Division 2
Specification Division 3
Specification Division 7
Specification Division 15
Specification Section # 16010 General Provisions - Electrical
Specification Section # 16050 Raceways & Boxes
Specification Section # 16123 Wires, Cables, Splices & Terminations
Specification Section # 16141 Wiring Devices
Specification Section # 16470 Panel Boards
Specification Section # 16620 Packaged Engine Generator Systems

## 2. SCOPE CLARIFICATIONS:

The following clarifications are intended to further define the scope of this subcontract but do not alter the above requirements unless specifically noted.

1.   The subcontractor will provide a fully functional and code compliant power and communication systems as required.
2.   The subcontractor will provide temporary power and lighting as required for all buildings and general contractor trailers, including the connecting of welding & scaffolding equipment.

3. The subcontractor is to provide field mockups, in the size and quantities outlined in the contract document. The filed mockups shall denote all the conditions and variations that are shown in the contract documents.

4. Provide pipe and equipment ID and tagging per the project documents.

5. All testing & inspections required for completion and sign-off of work is included.

6. The subcontractor will furnish and install all carbon monoxide detectors, smoke detectors (including in the RTU), emergency lighting, interior lighting, exterior lighting (including light pole bases) and connection of electrical appliances as required.

7. The subcontractor will furnish and install the primary service loop including trenching, concrete and piping.

8. The subcontractor will install all exit & emergency signs in accordance with City code.

9. The subcontractor will furnish and install fire stopping at the subcontractors penetrations through horizontal and vertical fire rated assemblies.

10. Furnish and install all alarm systems in accordance with ADA and ADA adaptable units as required.

11. Furnish and install all motors, starters, disconnects, controls and wiring as required for the electrical, mechanical and fire alarm systems; including but not limited to pumps, dampers, alarm bells, fans, and heaters (units provided by others).

12. The subcontractor's installation must conform to wall and ceiling design. Any wall relocations, additional walls, horizontal soffits, or vertical chases required to incorporating the subcontractor's work will be at the subcontractors expense.

13. The subcontractors included layout for their own work.

14. The subcontractor will clean all shop and field markings from all exposed finish work.

15. All warranties commence upon the date of final completion.

16. Provide installation, maintenance, operating manuals and instruction for all equipment at substantial completion to building maintenance personnel as required by the project documents.

17. The subcontractor will supply a self-contained power supply for their tools and equipment in order to properly install the subcontractor's work.

18. The subcontractor will perform work simultaneously at all buildings. The manpower and overtime to complete the work to maintain the schedule is included in the contract.

19. The subcontractor is responsible for all applications and permits required to complete their work.

20. Lack of material availability will not be allowed as a reason for schedule delay. Materials are expected to be on site in accordance with the construction schedule.

21. The subcontractor shall be responsible to check all existing conditions on site prior to commencing work.

22. All subcontractors are responsible to provide and maintain, safety railings, construction barricades, enclosures, and traffic controls for their own work. The subcontractor shall also provide a safe working environment to other trades, when working in these areas.

23. The subcontractor is responsible for cleaning work site of its trades materials on a daily basis and placing it in dumpster provided at grade level by Walsh Construction Company of Illinois. The debris must be broken down into the smallest size possible prior to being placed in the dumpster.

24. The subcontractor shall utilize (2) Two Section 3 (Resident Hire), Youth Build or Skill Builders Pre-Apprentice ('s) for the life to its contract. The subcontractor shall provide a current list of existing employees. See Contract Exhibit "I" for details.

Contact:
Ms. Lawanna Sumler-Anderson
CHA Human Resources
626 W. Jackson Street
Chicago, IL 60661
Telephone: 312-742-8620

25. The subcontractor is required to provide work place task lighting for its own work.

26. The subcontractor shall assure that its excavation, trenching, auguring, drilling or other operations do not damage underground utilities. The subcontractor shall contact the appropriate utility or utility locator service to inspect its work area to locate and mark underground utilities, and shall preserve markings or have locations marked again, so that equipment operators know where utilities are located. Utilities shall be exposed by hand-digging and also the subcontractor shall train its operators, foremen and superintendent in proper procedures to avoid damaging underground utilities. Subcontractor shall protect all utilities that remain on site.

27. The subcontractor is responsible for providing power and phone services to their own construction trailers.

28. The subcontractor is responsible for all shoring for its own work.

29. The subcontractor is responsible for providing opening sizes that are true, plumb and square for all new work as required by the contract documents.

30. Provide Coordination drawings that will provide location and size of openings required in the floor and roof trusses to properly coordinate with other trades. This information must be provided one week after notice to proceed and/or contract date.

31. The Contractor is not providing any hoisting, rigging or a crane service for the subcontractor's use. Therefore the subcontractor is responsible providing labor, material and equipment for their own hoisting, rigging of their materials, supplies, equipment, including temporary and permanent supports.

32. The subcontractor is to provide its own on-site storage for all of its materials. Walsh will designate storage locations on site for each subcontractor on an as needed basis.

33. The subcontractor is responsible for, cutting, coring, setting of sleeves, coordination of box-outs, incorrect installation, patching for incorrect installations, and fire safing required for its work. The subcontractor is responsible for providing all testing, layout and coordination with structural systems prior to starting the cutting and coring.

34. Provide as-built CAD drawings at final completion as required by project documents.

## 3. EXCLUSIONS:

The following work is not a part of this subcontract or will be performed by others as noted.

1. Building Permit fees.
3. Bonding.
4. Equipment pads
5. Dumpsters

## 4. ALTERNATES:

The following alternates, as defined in the contract documents, or as noted below, shall be in effect for the term of this contract unless noted otherwise.

1. NONE

## 5. CHANGES TO THE WORK AND UNIT PRICES:

The following unit prices shall be in effect for the term of this agreement, unless otherwise noted, and shall apply to changes to the work in accordance with the contract documents. Labor rates listed are all-inclusive and include the subcontractor's overhead and profit.

### 1. LABOR

| Trade | Classification | Straight Time | Premium Time | Double Time |
|-------|---------------|---------------|--------------|-------------|
| Electrical | Electrician | $ 76.15 /hr | $111.60 /hr | $ 147.09 /hr |
| Electrical | Foreman | $ 81.40 /hr | $119.54 /hr | $ 157.60 /hr |
| Electrical | General Foreman | $ 85.81 /hr | $ 127.56 /hr | $ 168.39 /hr |

### 2. MATERIAL (The below unit costs are for material and labor.)

  i. Switches:
  1. Single pole switch < 15' of existing opening using existing circuit. $144.00 ea.
  2. 3 way switch <' of existing opening using existing circuit $208.00 ea.

  ii. Receptacles:
  1. 15 or 20 AMP Duplex receptacle < 15' of existing opening using existing circuit $143.00 ea.
  2. Duplex receptacle switched to new switch off existing circuit in same room $189.00 ea.
  3. 15 or 20 AMP Duplex GFI receptacle < 15' of existing opening using existing circuit $158.00 ea.
  4. Dedicated outlet circuit for microwave $228.00 ea.
  5. Dedicated outlet circuit for dishwasher $200.00 ea.
  6. Exterior weatherproof GFI outlet $169.00 ea.
  7. Existing receptacle to dedicated circuit receptacle $145.00 ea.

  iii. Light fixtures:
  1. Junction box opening, conduit, and wire, and installation of fixture for ceiling light (light fixture material not included) $150.00 ea.

  iv. Detection:
  1. 110 V smoke detector fixture, conduit, wire, and installation complete $ $156.00 ea.
  2. 110 V carbon monoxide detector fixture, conduit, wire, and installation complete $ 177.00 ea.

  v. Empty raceways:
  1. ½" Thin wall conduit $7.60 / lf.
  2. ¾" Thin wall conduit $8.60 / lf.
  3. 1" Thin wall conduit $10.10/ lf.

### 3. LABOR/EQUIPMENT

  a. 30' gas scissor lift $150.00/ day.

    b. 30' gas scissor lift $601.25/ week.
    c. 40' articulating boom lift $232.00/ day.
    d. 40' articulating boom lift $927.50/ week.

All unit prices will remain in effect for the life of the contract and are inclusive of overhead and profit.

## 4. ACCOUNTING BREAKDOWN OF CONTRACT AMOUNT:

| Bid Item | Description | Budget Code | Amount |
|---|---|---|---|
| 1 | Electrical Subcontract work | 16-16000-09 | $2,080,145.00 |
| 2 | ComEd Electrical Site Work | 16-16005-09 | $100,153.00 |

The contents of these Walsh Construction Company of Illinois SCOPE, CLARIFICATIONS, ALTERNATES & UNIT PRICES have been read, understood and agreed to by the undersigned. Any and all field personnel will be informed of our compliance with these procedures.

**Foster Electric**

MICHAEL WHEELER
Typed or Printed name of representative

X _Michael Wheeler_ President 1-21-04
Signature and Title      Date

*Foster Electric Exhibit B page 1 of 5*
*Foster Electric Exhibit B page 2 of 5*
*Foster Electric Exhibit B page 3 of 5*
*Foster Electric Exhibit B page 4 of 5*
*Foster Electric Exhibit B page 5 of 5*

**Exhibit E**

McNutt Construction Compan
Contract Number: 200119-0

929 W. Adams
Chicago, IL 60607

# Walsh Construction Company of Illinois

A Member of the Walsh Group

## SUBCONTRACT AGREEMENT

| | |
|---|---|
| Subcontractor: | McNutt Construction Company |
| | 5072 W. Monroe Street |
| | Chicago, IL 60644 |
| | Phone: (773)378-6755 |
| | Fax: (773)924-2098 |

Date of Agreement:
("Project")     South Park Plaza

Perform Work at:     222 S. Morgan
Chicago, IL 60607

Job # 200119

Owner:     Woodlawn Community Development Corporation

Subject to Retention of:     10.00%

Architect/Engineer:     Loewenberg & Associates, Inc.

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as
may be required by law.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

| Subcontractor's Work | Subcontract Amount |
|---|---|
| Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all Masonry Work as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor. | |
| For the total Subcontract Amount of: | $2,338,000.00 |

The following documents are attached and he

Exhibit A - Terms and Conditions
Exhibit B - Scope, Clarifications, Alternates
Exhibit C - Contract Documents
Exhibit D - Insurance Requirements
Exhibit E - Standard Operating Procedure
Exhibit F - Payment Schedule and Procedures
Exhibit G - Safety Requirements
Exhibit H - City of Chicago Construction Contract Rider
Exhibit I - City of Chicago Section 3 Compliance Plan
Exhibit J - Davis/Bacon Wage Requirements
Exhibit K - Project Schedule
Exhibit L - McNutt Construction Subcontract Rider

By executing this Agreement, the Subcontractor certifies that it is fully familiar wi... ...ct Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontra... ...rmed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opi... ...ations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

| Subcontractor: McNutt Construction Company | Walsh Construction Company of Illinois |
|---|---|
| By: | By: |
| Title: OWNER | Title: VP |
| Date: 11-20-03 | Date: 11/20/03 |

### PLEASE SIGN AND RETURN ALL ORIGINALS
An Equal Opportunity Employer M/F/D/V

*McNutt Construction Company*
Subcontract Agreement No. 200119-08

# EXHIBIT B
## SCOPE, CLARIFICATIONS, ALTERNATES
## and UNIT PRICES

Walsh Construction Company of Illinois
General Contractors For:
**South Park Plaza**
**222 S. Morgan**
**Chicago, IL 60607**
Woodlawn Community Development Corporation Project # 071-35693
Walsh Construction Company of Illinois Project # 200119

## 1. SPECIFICATION SECTIONS:

The scope of the Masonry Work to be performed by McNutt Construction Company is defined in the documents listed in Exhibit "C", including but not limited to, the following specification sections:

> Specification Division 1
> Specification Section # 04000 Masonry
> Specification Division 5
> Specification Division 7
> Specification Division 8

## 2. SCOPE CLARIFICATIONS:

The following clarifications are intended to further define the scope of this subcontract but do not alter the above requirements unless specifically noted.

1. The subcontractor will furnish and install all stone, Harvard Brick, Utility Brick and CMU Block and full brick as required to complete project as shown on the contract documents.
2. The subcontractor will furnish and install mortar nets as required by the documents.
3. The subcontractor shall allow access in a timely manner to allow other subcontractors and contractor to set sleeves, and/or provide openings through walls for others as directed.
4. The subcontractor will design, furnish and install stone and masonry anchors to provide a complete installation as to satisfy the design load requirements; excludes welding.
5. The subcontractor will furnish and install bond beams as contained in the contract documents.
6. The subcontractor shall include all washing of masonry, weeps, and flashings, as required.
7. Surrounding areas, stored materials, equipment and work in place are to be protected by the subcontractor during the brick cleaning operation.
8. Patching for other trades are included in this subcontract up to the amount of $4,000.
9. The subcontractor will provide labor and equipment required for mortar test samples required by the testing agency hired by the owner.

10. The subcontractor will protect against and treat efflorescence as it may occur on the finish product. Antifreeze added for cold weather work will increase the possibility of efflorescence and is not recommended by the Subcontractor.

11. Scaffolding provided by Mason may be shared and used by other subcontractors, provided this does not unduly impede the Mason's production and insurance waivers are provided to Mason.

12. Subcontractor will place all embeds, inserts and wall penetration components required at the new work as shown and/or required. Layout and embed materials to be supplied by others in advance.

13. Hoisting, temporary supports, permanent supports, equipment and labor to install work as shown is the subcontractor's responsibility. The Contractor is not providing any hoisting or crane for the subcontractors use.

14. Subcontractor to provide horizontal reinforcing, joint preparation and filler required for expansion and construction joints including sealants as specified by the drawings and/or specifications.

15. The subcontractor will furnish and install all flashing as shown, specified, and per IMI standards, whichever is most stringent.

16. The subcontractor will furnish and install drip edge on all flashing per the specifications.

17. The subcontractor will furnish and install "J" bolts, nuts and washers for the wood blocking installation at the parapets.

18. The subcontractor will provide window returns as shown. The contractor will not allow exposed air gaps at the windows.

19. The subcontractor is responsible to coordinate the work with all subcontractors on the project. Shop drawings to be provided (3) weeks after notice to proceed. Fabrication to be complete and delivered to the jobsite (3) three weeks after shop drawing approval.

20. Subcontractor shall provide doorframe grouting only for frames installed in new masonry with frames having been pre-set with separation blocks by others in advance of work.

21. Subcontractor to include both support and weather protection for newly erected sections of masonry.

㉒ The subcontractor has included a winter conditions enclosure allowance that is set at $35,000 and is included in the base bid.

23. The subcontractor will provide labor and equipment to unload, store, handle and install contractor supplied loose lintels, plates, embeds and any other miscellaneous metals required to complete the installation of the masonry work.

24. The subcontractor is to provide field mockups, in the size and quantities outlined in the contract document. The filed mockups shall denote all the conditions and variations that are shown in the contract documents.

25. The subcontractor's installation must conform to wall and ceiling design.

26. The subcontractor will clean all shop and field markings from all exposed finish work.

27. All warranties commence upon the date of final completion.

28. The subcontractors shall include layout for their own work, benchmarks will be provided by the Contractor.

㉙ Temporary power will be provided by the Contractor. In the event of power outages the subcontractor will supply a self-contained power supply for their tools and equipment in order to properly install the subcontractor's work at no cost to the General Contractor.

30. The subcontractor will perform work in accordance with the schedule. Overtime due to lack of manpower, materials or production to maintain the schedule will be at the Subcontractor's expense.

31. The subcontractor is responsible for all applications and permits required to complete their work.

32. Lack of material availability will not be allowed as a reason for schedule delay. Materials are expected to be on site in accordance with the construction schedule.

33. The subcontractor shall be responsible to check all existing conditions on site prior to commencing work.

㉞ All subcontractors are responsible to provide and maintain, construction barricades, safety railings, enclosures, and traffic controls during their own work. The subcontractor shall also provide a safe working environment to other trades, when working in these areas.

㉟ The subcontractor is responsible for cleaning work site of its trades materials on a daily basis and placing it in dumpster provided at grade level by Walsh Construction Company of Illinois. The debris must be broken down into the smallest size possible prior to being placed in the dumpster.

36.   The subcontractor shall utilize (2) Two Section 3 (Resident Hire), Youth Build or Skill Builders Pre-Apprentice ('s) for the life to its contract. The subcontractor shall provide a current list of existing employees.  See Contract Exhibit "I" for details.

Contact:
Ms. Lawanna Sumler-Anderson
CHA Human Resources
626 W. Jackson Street
Chicago, IL  60661
Telephone: 312-742-8620

37.   The subcontractor is required to provide work place task lighting for its own work.
38.   The subcontractor is responsible for providing power and phone services to their own construction trailers.
39.   The subcontractor is responsible for all shoring for its own work.
40.   The subcontractor is responsible for providing opening sizes that are true, plumb and square for all new work as required by the contract documents.
41.   The subcontractor is to provide its own on-site storage for all of its materials.  Walsh will designate storage locations on site for each subcontractor on an as needed basis.
42.   The subcontractor is responsible for, cutting, coring, setting of sleeves, coordination of box-outs, incorrect installation, patching for incorrect installations, and fire safing required for its work. The subcontractor is responsible for providing all testing, layout and coordination with structural systems prior to starting the cutting and coring.  The subcontractor is not responsible for errors and omissions by others.

## 3.  EXCLUSIONS:

The following work is not a part of this subcontract or will be performed by others as noted.

1.   Building Permit fees.
2.   Equipment Pads
3.   Dumpsters
4.   Vapor Barriers

## 4. ALTERNATES:

The following alternates, as defined in the contract documents, or as noted below, shall be in effect for the term of this contract unless noted otherwise.

NONE

## 5. CHANGES TO THE WORK AND UNIT PRICES:

The following unit prices shall be in effect for the term of this agreement, unless otherwise noted, and shall apply to changes to the work in accordance with the contract documents. Labor rates listed are all-inclusive and include the subcontractor's overhead and profit.

1.   LABOR

| Trade | Classification | Straight Time | Premium Time | Double Time |
|---|---|---|---|---|
| Bricklayer | Journeyman | $64.47/Hr | $96.71/Hr | $128.94/Hr |
| Laborer | Journeyman | $55.08/Hr | $82.62/Hr | $110.16/Hr |
| Tuckpointer | Journeyman | $63.57/Hr | $95.36/Hr | $127.14/Hr |
| Operator Arthur | Journeyman | $67.92/Hr | $101.88/Hr | $135.84/Hr |
| Operator Derek | Journeyman | $64.10/Hr | $96.15/Hr | $128.20/Hr |

2.   MATERIAL (The below unit costs are for material and labor.)

| | | |
|---|---|---|
| i. | Split Face Stone | $15.00/SF |
| ii | Harvard Brick | $18.00/SF |
| iii. | Block 8" | $11.00/SF |
| iv. | Lintels | $125.00/LF |
| v. | Sills 3' | $85.00/Ea |
| vi. | Sills 4' | $110.00/Ea |
| vii. | Sills 6' | $200.00/Ea |
| viii. | 4" Face Brick w/ 4" D2, 2hr CMU Backup | $25.00/SF |

3.   LABOR/EQUIPMENT

| | | |
|---|---|---|
| i. | Fork Lift: | $148.00/Hr |
| ii. | Bobcat: | $120.00/Hr |
| iii. | Mortar Mixers (2-3) | $110.00/Hr |
| iv. | Washers | $105.00/Hr |
| v. | Chipping Hammers | $85.00/Hr |
| vi. | Wet/Dry Saws | $90.00/Hr |

All unit prices will remain in effect for the life of the contract and are inclusive of overhead and profit.

# 6. ACCOUNTING BREAKDOWN OF CONTRACT AMOUNT:

| Bid Item | Description | Budget Code | Amount |
|----------|-------------|-------------|--------|
| 13 | Winter Protection | | $35,000.00 |
| 14 | Masonry | | $2,303,000.00 |

The contents of these Walsh Construction Company of Illinois SCOPE, CLARIFICATIONS, ALTERNATES & UNIT PRICES have been read, understood and agreed to by the undersigned. Any and all field personnel will be informed of our compliance with these procedures.

McNutt Construction Company

_FRANK MCNUTT_

Typed or Printed name of representative

X _Frank Mc Nutt_     11-20-03

Signature and Title          Date

*McNutt Construction Company Exhibit B page 1 of 5*
*McNutt Construction Company Exhibit B page 2 of 5*
*McNutt Construction Company Exhibit B page 3 of 5*
*McNutt Construction Company Exhibit B page 4 of 5*
*McNutt Construction Company Exhibit B page 5 of 5*

# EXHIBIT L

## McNutt Construction Company Subcontract Rider
### Walsh Construction Company of Illinois

This exhibit shall modify WCCI's Exhibits; A – Terms and Conditions, E – Standard Operating Procedures, D – Insurance Requirements. In the event of conflict with other articles, terms, conditions, or contract documents, (other than those specifically referenced in Exhibit L) the Subcontract Agreement shall govern.

### Exhibit 'A'
Article 4 – CHANGES, CLAIMS AND DELAYS

Paragraph 4.4  Delay.  If the progress of the Subcontractor's Work is substantially delayed, hindered, or interfered with through no fault or responsibility of the Subcontractor, then the Contractor shall either (i) extend the time for the performance of Subcontractor's Work by Change Order, but shall be limited to that amount of time which will enable Contractor to meet its obligation to Owner to compete the Project in accordance with the Contract Documents, or (ii) have the right to order Subcontractor to accelerate its Work with additional manpower and the expediting of materials, but Contractor shall be obligated to pay only for the costs of expediting material and the premium portion of the overtime the Subcontractor works.

Except for the costs of expediting materials at the order of Contractor pursuant to the previous paragraph, the Contractor shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delay, hindrance, interference or other similar event, caused by Contractor; by any act, negligence, or default of the Owner or Architect/Engineer; or by the reason of fire, casualty, act of God or any other reason beyond the Contractor's control.  It is expressly understood and agreed that the Subcontractor's sole and exclusive remedy for any delay, hindrance, interference or other similar event, shall be an extension in the time for performance of the Subcontractor's Work.

Exhibit F

08/06/2003　09:38　312421　51.　　　WALSH CONSTRUCTION　　　PAGE　02/03

## Contractor's and/or Mortgagor's Cost Breakdown
Schedules of Values

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 8/31/2003)

Public reporting burden for this collection of information is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewin

| Date: July 25, 2003 | Sponsor: The Woodlawn Community Development Corporation |
|---|---|
| Project No: 071-35693 | Building Identification: Mixed Income Mid-Rise & Low-Rise |
| Name of Project: South Park Plaza | Location: 26th Street & Calumet Ave., Chicago IL |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div. | Trade Item | Cost | Trade Description |
|---|---|---|---|---|
| 1 | 3 | Concrete  * | $ 1,582,897 | w/Rebar, Precast Planks and Topping |
| 2 | 4 | Masonry  * | $ 2,308,223 | w/Rebar and Flashing |
| 3 | 5 | Metals | $ 680,249 | Strucural, Lintels, Stairs, Railings, and Misc. Metals |
| 4 | 6 | Rough Carpentry  * | $ 1,446,638 | Blocking, Caulking, Townhome Framing |
| 5 | 6 | Finish Carpentry  * | $ 423,682 | Window Sills, Misc. Trim |
| 6 | 7 | Waterproofing | $ 90,135 | Waterproofing and sealants |
| 7 | 7 | Insulation  * | $ 221,005 | Foundation, Spray and Attic Insulation |
| 8 | 7 | Roofing | $ 562,386 | Roofing, Sheet Metal and Water proofing |
| 9 | 7 | Sheet Metal | $ - | Included in Line 8 |
| 10 | 8 | Doors | $ 280,699 | HM Doors and Frames, Wood Doors, Finish Hardware |
| 11 | 8 | Windows | $ 629,543 | Windows, Storefront |
| 12 | 8 | Glass | $ 15,000 | Misc. Glazing |
| 13 | 9 | Lath and Plaster | $ - | N/A |
| 14 | 9 | Drywall | $ 1,506,354 | Studs, Gyp Board, Finishing, Acoustical Ceilings |
| 15 | 9 | Tile Work | $ - | In Line 25 |
| 16 | 9 | Acoustical | $ - | In Drywall |
| 17 | 9 | Wood Flooring | $ - | N/A |
| 18 | 9 | Resilient Flooring | $ - | In Line 25 |
| 19 | 9 | Painting and Decorating | $ 390,630 | Painting |
| 20 | 10 | Specialties | $ 82,629 | Toilet Access, Louvers, Signage, Postal Specialties, Closet Shelves |
| 21 | 11 | Special Equipment | $ 83,543 | Trash Chute and Compactor |
| 22 | 11 | Cabinets  * | $ 163,773 | Kitchen and Bath Cabinets |
| 23 | 11 | Appliances  * | $ 186,533 | Range, Hood, Refrigerator, Microwave |
| 24 | 12 | Blinds and Shades, Artwork | $ - | None |
| 25 | 12 | Carpets | $ 431,389 | Vinyl Tile, Carpet, Base and Ceramic Tile |
| 26 | 13 | Special Construction | $ - | N/A |
| 27 | 14 | Elevators | $ 218,566 | Four (4) Hydraulic |
| 28 | 15 | Plumbing and Hot Water | $ 1,819,310 | Plumbing and Fire Protection |
| 29 | 15 | Heat and Ventilation | $ 1,690,589 | Heating, Air Conditioning, Ventilation, Temperature Control |
| 30 | 15 | Air Conditioning | $ - | Included in Line 29 |
| 31 | 16 | Electrical | $ 2,472,511 | Power, Light, Phone |
| 32 |  | Subtotal (Structures) | $ 17,286,284 |  |
| 33 |  | Accessory Structures | $ - | N/A |
| 34 |  | Total (Lines 32 and 33) | $ 17,286,284 |  |
| 35 | 2 | Earth Work  * | $ 592,021 | Excavation, Grading, Site Paving |
| 36 | 2 | Site Utilities  * | $ 692,400 | Site Plumbing |
| 37 | 2 | Roads and Walks  * | $ 328,885 | Site Pavements |
| 38 | 2 | Site Improvements  * | $ 152,963 | Demolition |
| 39 | 2 | Lawns and Planting  * | $ 475,645 | Landscaping, Fencing, Clearing and Grubbing |

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

| Line | Div. | Trade Item | Cost | | Trade Description | | | |
|------|------|-----------|------|---|---|---|---|---|
| | | | | | Nonresidential and Special Exterior Land Improvement (costs included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | |
| | | | | | Description | Est. Cost | Description | Est. Cost |
| 40 | 2 | Unusual Site Condition | $ | - | | $ | | $ |
| 41 | | Total Land Improvements | $ | 2,241,914 | | $ | | $ |
| 42 | | Total Struct. & Land Imprvts. | $ | 19,528,198 | | $ | | $ |
| 43 | 1 | General Requirements (6%) | $ | 1,171,692 | | $ | | $ |
| 44 | | Subtotal (Lines 42 thru 43) | $ | 20,699,890 | | $ | | $ |
| 45 | | Builder's Overhead (2%) | $ | 390,564 | | $ | | $ |
| 46 | | Builder's Profit  (6%) | $ | 1,171,692 | Total $ | | Total $ | |
| 47 | | Subtotal (Lines 44 thru 46) | $ | 22,262,146 | Other Fees | | | |
| 48 | | | | | | $ | Demolition (costs not included in trade item breakdown) | |
| 49 | | Other Fees (Preconstruction) | | | | $ | Description | Est. Cost |
| 50 | | Bond Premium | $ | 239,697 | | $ | | |
| 51 | | Total for All Improvements | $ | 22,501,843 | | $ | | |
| 52 | | Builder's Profit Paid by Means Other Than Cash | | | | $ | | |
| 53 | | Total for All Improvements Less Line 52 | $ | 22,501,843 | Total $ | | Total $ | |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment therewith, is true and accurate. *Warning* : HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penal

| Mortgagor: | | By: | | Date: |
|---|---|---|---|---|
| Contractor: Walsh Construction Company of Illinois | | By: *[signature]* Pressley | | Date: 8·05·03 |
| FHA: (Processing Analyst) | Date: | FHA: (Chief, Cost Branch or Cost Analyst) | | Date: |
| FHA: (Chief Underwriter) | | | | Date: |

**Instructions for Completing Form HUD-2328**

This form is prepared by the contractor and/or mortgagor as a requirement for the issuance of a firm commitment The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed breakdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each *structure type* . A summation of these structure costs are entered on line 32 of a master form. Land Improvements, General Requirements and Fees are completed through line 53 on the master form only.

Date—Date form was prepared.

Sponsor—Name of sponsor or sponsoring organization.

Project No.—Eight digit assigned project number.

Building Identification—Number(s) or Letter(s) of each building as designated on plans.

Name of Project—Sponsors designated name of project.

Location—Street address, city and state.

Division—Division numbers and trade items have been developed from the cost accounting section of the uniform system.

Accessory Structures—This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings.

When the amount shown on line 33 is $20,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

Unusual Site Conditions—This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on - site conditions considered unusual.

Cost—Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

Trade Description—Enter a brief description of the work included in each trade item.

Other Fees—Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

Total For All Improvements—This is the sum of lines 1 through 50 and is to include the total builder's profit (line 46).

Line 52—When applicable, enter that portion of the builder's profit (line 46) to be paid by means other than cash and/or any part of the builder's profit to be waived during construction.

Non-Residential and Special Exterior Land Improvement Costs—Describe and enter the cost of each improvement, i.e. on-site parking facilities including individual garages and carports, commercial facilities, swimming pools with related facilities and on-site features provided to enhance the environment and livability of the project and the neighborhood. The Design Representative and Cost Analyst shall collaborate with the mortgagor or his representative in designating the items to be included.

Off-Site Costs—Enter description and dollar amount including fees and bond premium for off-site improvements.

Demolition—Enter description and dollar amount of demolition work necessary to condition site for building improvements including the removal of existing structures, foundations, utilities, etc.

Other Fees—Enter a brief description of item involved and cost estimate for each item.

Signatures—Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the form was completed.

form HUD-2328 (3/95)
ref. Handbook 4450.1 &4460.1

**Exhibit G**

# FILE COPY

Maxwell Plumbing Company, LTD.
Contract Number: 200119-26

929 W. Adams
Chicago, IL 60607

# Walsh Construction Company of Illinois

A Member of the Walsh Group

## SUBCONTRACT AGREEMENT

| | | | |
|---|---|---|---|
| Subcontractor: | Maxwell Plumbing Company, LTD. <br> P.O. Box 875 <br> Tinley Park, IL 60477 <br> Phone: (708)633-1020 <br> Fax: (708)633-8230 | Date of Agreement: <br> ("Project") <br><br> Perform Work at: | South Park Plaza <br><br> 222 S. Morgan <br> Chicago, IL 60607 |

| | | |
|---|---|---|
| Job # 200119 | Owner: | Woodlawn Community Development Corporation |
| Subject to Retention of: 10.00% | Architect/Engineer: | Loewenberg & Associates, Inc. |

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as may be required by law.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

| Subcontractor's Work | Subcontract Amount |
|---|---|
| Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all Plumbing Work as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor. | |
| For the total Subcontract Amount of: | $1,562,100.00 |

The following documents are attached and hereby expressly incorporated into this Agreement:

Exhibit A - Terms and Conditions
Exhibit B - Scope, Clarifications, Alternates and Unit Prices
Exhibit C - Contract Documents
Exhibit D - Insurance Requirements
Exhibit E - Standard Operating Procedure
Exhibit F - Payment Schedule and Procedures
Exhibit G - Safety Requirements
Exhibit H - City of Chicago Construction Contract Rider
Exhibit I - City of Chicago Section 3 Compliance Plan
Exhibit J - Davis/Bacon Wage Requirements
Exhibit K - Project Schedule

By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

| | |
|---|---|
| Subcontractor: Maxwell Plumbing Company, LTD. | Walsh Construction Company of Illinois |
| By: _Roger Maxwell_ | By: _Douglas Olwin_ |
| Title: PRESIDENT | Title: _VP_ |
| Date: 11-04-03 | Date: 11/18/03 |

**PLEASE SIGN AND RETURN ALL ORIGINALS**
An Equal Opportunity Employer M/F/D/V

*Maxwell Plumbing Company, LTD.*
Subcontract Agreement No. 200119-26

# EXHIBIT B
## SCOPE, CLARIFICATIONS, ALTERNATES
## and UNIT PRICES

Walsh Construction Company of Illinois
General Contractors For:
**South Park Plaza**
**222 S. Morgan**
**Chicago, IL 60607**
Woodlawn Community Development Corporation Project # 071-35693
Walsh Construction Company of Illinois Project # 200119

## 1. SPECIFICATION SECTIONS:

The scope of the Building Plumbing Work to be performed by Maxwell Plumbing Company, LTD. is defined in the documents listed in Exhibit "C", including but not limited to, the following specification sections:

Specification Division 1   General Requirements
Specification Division 2   Site Work
Specification Division 7   Thermal and Moisture Protection
Specification Division 15 General Provisions

## 2. SCOPE CLARIFICATIONS:

The following clarifications are intended to further define the scope of this subcontract but do not alter the above requirements unless specifically noted.

1.  Furnish and install Grey boxes for washing machines.
2.  Furnish and install dishwasher connections, provide final hookup.
3.  The subcontractor will provide excavation, removal of spoil, backfill and concrete encasement and thrust blocks for all underground work as required.
4.  Subcontractor is responsible for providing a City of Chicago code compliant and fully operable system. Costs associated with engineering beyond the contract documents are the subcontractor's responsibility.
5.  Once a system is complete and functional, the system cannot be disabled or made non-functional without written approval by the Contractor.
6.  Upon complete installation and prior to substantial completion, the Contractor will use the equipment and/or systems as deemed necessary by the Contractor without notification. The use of these systems will not void any warranties written or implied, nor constitute the start of the warranty period.
7.  Provide pipe and equipment ID and painting per the project documents.
8.  Provide floor-by-floor coordination CAD drawings and printouts incorporating horizontal and vertical piping.
9.  Furnish, layout and install plumbing sleeves and tees in concrete floors and walls.

10. Subcontractor is responsible for all labor and equipment to load and unload its materials and jobsite deliveries. Subcontractor is responsible for hoisting of all equipment, materials and personnel as required.

11. The subcontractor will furnish and deliver to jobsite access panels for this subcontractors work.

12. The subcontractor will furnish and install fire stopping at the subcontractors penetrations through horizontal and vertical fire rated assemblies.

13. The subcontractor will furnish and install roof curbs as required to provide a complete installation.

14. The subcontractor will furnish and install all building plumbing and sewer work with stubs 5'-0" outside building property line.

15. Subcontractor will clean all shop and field markings from all exposed finish work.

16. The subcontractor is to provide field mockups, in the size and quantities outlined in the contract documents. The filed mockups shall denote all the conditions and variations that are shown in the contract documents.

17. The subcontractor's installation must conform to wall and ceiling design. Any wall relocations, additional walls, horizontal soffits, or vertical chases required to incorporating the subcontractor's work will be at the subcontractor's expense.

18. All warranties commence upon the date of final completion per building.

19. Provide installation, maintenance, operating manuals and instruction for all equipment at completion to building maintenance personnel.

20. The subcontractors shall include layout for their own work.

21. The subcontractor will supply a self-contained power supply for their tools and equipment in order to properly install the subcontractor's work.

22. The subcontractor will perform work simultaneously at all buildings. Overtime due to lack of manpower or production to maintain the schedule will be at the Subcontractor's expense.

23. The subcontractor is responsible for all applications and permits required to complete their work.

24. Lack of material availability will not be allowed as a reason for schedule delay. Materials are expected to be on site in accordance with the construction schedule.

25. The subcontractor shall be responsible to check all existing conditions on site prior to commencing work.

26. All subcontractors are responsible to provide and maintain, construction barricades, safety rails, enclosures, and traffic controls for their own work. The subcontractor shall also provide a safe working environment to other trades when working in these areas.

27. The subcontractor is responsible for cleaning work area of its trades materials on a daily basis and placing it in dumpster provided at grade level by Walsh Construction Company of Illinois. The debris must be broken down into the smallest size possible prior to being placed in the dumpster.

28. The subcontractor shall utilize (3) Three Section 3 (Resident Hire), Youth Build or Skill Builders Pre-Apprentice ('s) for the life of this contract. The subcontractor shall provide a current list of existing employees. See Contract Exhibit 'I' for details.

Contact:
Ms. Lawanna Sumler-Anderson
CHAA Human Resources
626 W. Jackson Street
Chicago, IL 60661
Telephone: 312-742-8620

29. The subcontractor is required to provide work place task lighting for its own work.

30. The subcontractor shall assure that its excavation, trenching, auguring, drilling or other operations do not damage underground utilities. The subcontractor shall contact the appropriate utility or utility locator service to inspect its work area to locate and mark underground utilities, and shall preserve markings or have locations marked again, so that equipment operators know where utilities are located. Utilities shall be exposed by hand- digging and also the subcontractor shall train its operators, foremen and superintendent in proper procedures to avoid damaging underground utilities. Subcontractor shall protect all utilities that remain on site.

31. The subcontractor is responsible for providing power and phone services to their own construction trailers.

32. The subcontractor is responsible for all shoring for its own work.
33. The subcontractor is responsible for providing opening sizes that are true, plumb and square for all new work as required by the contract documents.
34. Provide Coordination drawings that will provide location and size of mechanical openings requirements in the floor and roof trusses to properly coordinate with other trades. This information must be provided one week after Notice of Intent to Award.
35. The Contractor is not providing any hoisting, rigging or a crane service for the subcontractor's use. Therefore the subcontractor is responsible providing labor, material and equipment for their own hoisting, rigging of their materials, supplies, equipment, including temporary and permanent supports.
36. The subcontractor is to provide its own on-site storage for all of its materials. Walsh will designate storage locations on site for each subcontractor on an as needed basis.
37. The subcontractor is responsible for, cutting, coring, coordination of box-outs and fire safing required for its work. The subcontractor is responsible for providing all testing, layout and coordination with structural systems prior to starting the cutting and coring.
38. Provide as-built CAD drawings at final completion.

## 3. EXCLUSIONS:

The following work is not a part of this subcontract or will be performed by others as noted.

1. Building Permit fees.
2. Equipment pads (By WCCI)
3. Dumpsters (By WCCI)
4. Backing (Salomone & Swift)
5. Toilet Accessories (By Window Treatment, Inc.)

## 4. ALTERNATES:

The following alternates, as defined in the contract documents, or as noted below, shall be in effect for the term of this contract unless noted otherwise.

1. Furnish and install all floor drains in laundry closets of the townhomes: $11,500

## 5. CHANGES TO THE WORK AND UNIT PRICES:

The following unit prices shall be in effect for the term of this agreement, unless otherwise noted, and shall apply to changes to the work in accordance with the contract documents. Labor rates listed are all-inclusive and include the subcontractor's overhead and profit.

1. **LABOR**

| Trade | Classification | Straight Time | Premium Time | Double Time |
|---|---|---|---|---|
| Plumber | Journeyman | $80.00 /hr | $98.00 /hr | $116.00 /hr |
| Plumber | Foremen | $81.50 /hr | $101.25 /hr | $119.00 /hr |
| Plumber | Superintendent | $83.00 /hr | $102.50 /hr | $122.00 /hr |

2. **MATERIAL (The below unit costs are for material and labor.)**

| PIPES | DIMENSIONS | PRICE W/OUT INSULATION | | PRICE W/ INSULATION | |
|---|---|---|---|---|---|
| SVCI | 3" | $22.00 | /ft. | $26.00 | /ft. |
| | 4" | $26.00 | /ft. | $30.00 | /ft. |
| | 6" | $28.00 | /ft. | $32.00 | /ft. |
| copper | <3/4" | $10.00 | /ft. | $12.00 | /ft. |
| | 3/4" | $12.00 | /ft. | $14.00 | /ft. |
| | 1" | $15.00 | /ft. | $17.00 | /ft. |
| | 1 1/2" | $18.00 | /ft. | $21.00 | /ft. |
| | 2" | $20.00 | /ft. | $23.00 | /ft. |
| | 3" | $28.00 | /ft. | $31.00 | /ft. |

**Above Ground Waste & Vent**

| | | |
|---|---|---|
| 1 ½" PVC | $5.00 | /lf. |
| 2" PVC | $7.00 | /lf. |
| 3" PVC | $10.00 | /lf. |
| 4" PVC | $12.00 | /lf. |
| 1 ½" Copper | $18.00 | /lf. |
| 2" Copper | $20.00 | /lf. |
| 3" Cast Iron | $29.00 | /lf. |
| 4" Cast Iron | $32.00 | /lf. |

**Underground Waste & Vent**

| | | |
|---|---|---|
| 2" Cast Iron | $12.00 | /lf. |
| 3" Cast Iron | $16.00 | /lf. |
| 4" Cast Iron | $18.00 | /lf. |

**Fixtures (Including Misc. Trim No Rough In Piping Included In Below Pricing)**

| | | |
|---|---|---|
| Water Closet | $275.00 | ea. |
| Lavatory sink and Faucet – | $315.00 | ea. |
| Bathtub, Surround and Faucet – | $450.00 | ea. |
| Shower Surround and Faucet – | $435.00 | ea. |

| | | |
|---|---|---|
| Kitchen Sink and Faucet – | $385.00 | ea. |
| Washing Machine Wall Box (Guy Grey Box) | $175.00 | ea. |
| Mop Basin | $400.00 | ea. |
| Floor Drain or Clean Out | $150.00 | ea. |
| Exterior Wall Hydrant (Sill Cock) | $175.00 | ea. |
| Water Heater | $475.00 | ea. |
| Water Booster Pump Package | N/A | ea. |

3.    LABOR/EQUIPMENT

CAT 416C    $140.00 /hr men and machine

All unit prices will remain in effect for the life of the contract and are inclusive of overhead and profit.

## 6. ACCOUNTING BREAKDOWN OF CONTRACT AMOUNT:

| Bid Item | Description | Budget Code | Amount |
|---|---|---|---|
| 56 | Bonding | 15-15105-09 | $38,100.00 |
| 39 | Plumbing | 15-15105-09 | $1,524,000.00 |

The contents of these Walsh Construction Company of Illinois SCOPE, CLARIFICATIONS, ALTERNATES & UNIT PRICES have been read, understood and agreed to by the undersigned. Any and all field personnel will be informed of our compliance with these procedures.

Maxwell Plumbing Company, LTD.

_ROGER MAXWELL_
Typed or Printed name of representative

X _Roger Maxwell-Pres._    11-4-03
Signature and Title.                Date

*Maxwell Plumbing Company, LTD. Exhibit B page 1 of 5*
*Maxwell Plumbing Company, LTD. Exhibit B page 2 of 5*
*Maxwell Plumbing Company, LTD. Exhibit B page 3 of 5*
*Maxwell Plumbing Company, LTD. Exhibit B page 4 of 5*
*Maxwell Plumbing Company, LTD. Exhibit B page 5 of 5*

Exhibit H



**Walsh Construction Company of Illinois**

*A Member of the Walsh Group*

Walsh Construction

929 W. Adams
Chicago, IL 60607

## SUBCONTRACT AGREEMENT

| | | | |
|---|---|---|---|
| Subcontractor: | A-1 Roofing Company<br>1001 Fargo Avenue<br>Elk Grove Village, IL 60007<br>Phone: (847)952-3600<br>Fax: (847)952-3606 | Date of Agreement:<br>("Project") | South Park Plaza |
| | | Perform Work at: | 2601 S. Calumet<br>Chicago, IL 60616 |

Job # 200119

Subject to Retention of: 10.00%

Owner: Woodlawn Community Development Corporation

Architect/Engineer: Loewenberg & Associates, Inc.

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as may be required by law.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

| Subcontractor's Work | Subcontract Amount |
|---|---|
| Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all **Roofing Work** as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor. | |
| For the total Subcontract Amount of: | $542,875.00 |

The following documents are attached and hereby expressly incorporated into this Agreement:

Exhibit A - Terms and Conditions
Exhibit B - Scope, Clarifications, Alternates and Unit Prices
Exhibit C - Contract Documents
Exhibit D - Insurance Requirements
Exhibit E - Standard Operating Procedure
Exhibit F - Payment Schedule and Procedures
Exhibit G - Safety Requirements
Exhibit H - City of Chicago Construction Contract Rider
Exhibit I - City of Chicago Section 3 Compliance Plan
Exhibit J - Davis/Bacon Wage Requirements
Exhibit K - Project Schedule

JUN 0 9 2004

By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

| | |
|---|---|
| Subcontractor: A-1 Roofing Company | Walsh Construction Company of Illinois |
| By: | By: |
| Title: UP | Title: VP |
| Date: 6/1/04 | Date: 6/6/04 |
| | TOP 6/4/04 |

PLEASE SIGN AND RETURN ALL ORIGINALS
An Equal Opportunity Employer M/F/D/V

# EXHIBIT B
## SCOPE, CLARIFICATIONS, ALTERNATES
## And UNIT PRICES

Walsh Construction Company of Illinois
General Contractors For:
**South Park Plaza**
**2601 S. Calumet**
**Chicago, IL 60616**
Woodlawn Community Development Corporation Project # 071-35693
Walsh Construction Company of Illinois Project # 200119

## 1. SPECIFICATION SECTIONS:

The scope of the Roofing Work to be performed by A-1 Roofing Company is defined in the documents listed in Exhibit "C", including but not limited to, the following specification sections:

Specification Division 1 General Requirements
Specification Section # 03410 Structural Precast Contrete - Plant Cast
Specification Section # 04200 Masonry
Specification Section # 04220 Concrete Unit Masonry
Specification Section # 05300 Metal Decking
Specification Section # 06100 Rough Carpentry
Specification Section # 07530 EPDM Roofing
Specification Section # 07610 Sheet Metal
Specification Section # 07620 Sheet Metal Flashing And Trim
Specification Section # 07721 Prefabricated Curbs and Penetration Assemblies
Specification Section # 07722 Roof Hatches
Specification Section # 07920 Sealants

## 2. SCOPE CLARIFICATIONS:

The following clarifications are intended to further define the scope of this subcontract but do not alter the above requirements unless specifically noted.

1.  The subcontractor is to provide field mockups, in the size and quantities outlined in the contract document. The filed mockups shall denote all the conditions and variations that are shown in the contract documents.
2.  The subcontractor is responsible for all blocking for it's work as required to provide a complete installation.

3. The subcontractor's installation must conform to wall and ceiling design. Any wall relocations, additional walls, horizontal soffits, or vertical chases required to incorporate the subcontractor's work will be at the subcontractor's expense.

4. The subcontractor will clean all shop and field markings from all exposed finish work.

5. The subcontractor is to furnish and install all roofing as shown in the plans and specifications, including but not limited to EPDM roofing, standing seam roofing, pavers, reglets, gutters, sheetmetal, roof hatches, curbs, flashings, counterflashings and sealants.

6. All warranties commence upon the date of final completion.

7. Provide installation, maintenance, operating manuals and instruction for all equipment at substantial completion to building maintenance personnel as required by the project documents.

8. The subcontractors shall include layout for their own work.

9. The subcontractor will supply a self-contained power supply for their tools and equipment in order to properly install the subcontractor's work.

10. The subcontractor will perform work simultaneously at all buildings. Overtime due to lack of manpower or production to maintain the schedule will be at the Subcontractor's expense.

11. The subcontractor is responsible for all applications and permits required to complete their work.

12. Lack of material availability will not be allowed as a reason for schedule delay. Materials are expected to be on site in accordance with the construction schedule.

13. The subcontractor shall be responsible to check all existing conditions on site prior to commencing work.

14. All subcontractors are responsible to provide and maintain, construction barricades, safety railings, enclosures, and traffic controls for their own work. . The subcontractor shall also provide a safe working environment to other trades, when working in these areas.

15. The subcontractor is responsible for cleaning work site of its trades materials on a daily basis and placing it in dumpster provided at grade level by Walsh Construction Company of Illinois. The debris must be broken down into the smallest size possible prior to being placed in the dumpster.

16. The subcontractor shall utilize (1) One Section 3 (Resident Hire), Youth Build or Skill Builders Pre-Apprentice ('s) for the life to its contract. The subcontractor shall provide a current list of existing employees. See Contract Exhibit "I" for details.

> Contact:
> Ms. Lawanna Sumler-Anderson
> CHA Human Resources
> 626 W. Jackson Street
> Chicago, IL 60661
> Telephone: 312-742-8620

17. The subcontractor is required to provide work place task lighting for its own work.

18. The subcontractor is responsible for providing power and phone services to their own construction trailers.

19. The subcontractor is responsible for all shoring for its own work.

20. The subcontractor is responsible for providing opening sizes that are true, plumb and square for all new work as required by the contract documents.

21. The Contractor is not providing any hoisting, rigging or a crane service for the subcontractor's use. Therefore the subcontractor is responsible providing labor, material and equipment for their own hoisting, rigging of their materials, supplies, equipment, including temporary and permanent supports.

22. The subcontractor is to provide its own on-site storage for all of its materials. Walsh will designate storage locations on site for each subcontractor on an as needed basis.

23. The subcontractor is responsible for, cutting, coring, setting of sleeves, coordination of box-outs, incorrect installation, patching for incorrect installations, and fire safing.



required for its work. The subcontractor is responsible for providing <u>all</u> testing, layout and coordination with structural systems prior to starting the cutting and coring.

## 3. EXCLUSIONS:

The following work is not a part of this subcontract or will be performed by others as noted.

1. Building Permit fees.
3. Bonding.
4. Equipment pads
5. Dumpsters

## 4. ALTERNATES:

The following alternates, as defined in the contract documents, or as noted below, shall be in effect for the term of this contract unless noted otherwise.

1. Mid-rises # 1 & 2 deductive alternate for $9,405/Midrise = $18,810 Total Deduct.

    a. Loose lay 5/8" dens deck
    b. Mechanically fasten 2" min. thickness 1/8" per ft. tapered polyisocyanurate rigid insulation with an approved fastener, per FM-190 assembly requirements.
    c. Construct Firestone fully adhered 60 mil. EPDM membrane roof system per manufacturer details.
    d. Fabricate from field verified dimensions and install .040 aluminum gravel stop, counterflashing, gutter and downspout.
    e. Install 24 ga. Pre-finished standing seam metal roofing at canopies with 30 lb. Roofing underlayment.
    f. Issue 15-year manufacturer NDL warranty upon completion.

2. Townhouses A, B, C & D deductive alternate of $23,010:

    a. Mechanically fasten 4" min. thickness 1/8" per ft. tapered polyisocyanurate rigid insulation with an approved fastener, per FM-190 assembly requirements (exclude the mechanical fastening of Type II fiberglass base sheet/vapor barrier with approved fastener).
    b. Construct Firestone fully adhered 60 mil. standard membrane roof system.
    c. Fabricate from field verified dimensions and install .040 aluminum gravel stop, counterflashing, gutter and downspout.
    d. Install 24 ga. Pre-finished standing seam metal roofing at canopies with 30 lb. Roofing underlayment.
    e. Issue 15-year manufacturer NDL warranty upon completion.

## 5. CHANGES TO THE WORK AND UNIT PRICES:

The following unit prices shall be in effect for the term of this agreement, unless otherwise noted, and shall apply to changes to the work in accordance with the contract documents. Labor rates listed are all-inclusive and include the subcontractor's overhead and profit.

1.     LABOR

| Trade | Classification | Straight Time | Premium Time | Double Time |
|-------|----------------|---------------|--------------|-------------|
| Roofer | Journeyman | $78.00/Hr | $97.00/Hr | $119.00/Hr |
| Roofer | Foreman | $80.50/Hr | $99.50/Hr | $121.50/Hr |
| Sheet Metal Worker | Journeyman | $81.00/Hr | $97.00/Hr | $119.00/Hr |
| Sheet Metal Worker | Foreman | $83.00/Hr | $99.50/Hr | $121.50/Hr |

2.     MATERIAL (The below unit costs are for material and labor.)

|      |                          |            |
|------|--------------------------|------------|
| i.   | EPDM Roofing             | $2.50/SF   |
| ii.  | Tapered Insulation       | $3.00/SF   |
| iii. | Concrete Masonry Pavers  | $5.00/SF   |
| iv.  | Sheet Metal Copings      | $14.00/LF  |
| v.   | Counter Flashing         | $12.00/LF  |
| vi.  | Metal Flashing           | $12.00/LF  |
| vii. | Metal Gravel Stops       | $13.00/LF  |
| viii.| Reglets                  | $5.00/LF   |

3.     LABOR/EQUIPMENT

       None

All unit prices will remain in effect for the life of the contract and are inclusive of overhead and profit.

## 6. ACCOUNTING BREAKDOWN OF CONTRACT AMOUNT:

| Bid Item | Description | Budget Code | Amount |
|----------|-------------|-------------|--------|
| 45 | Mid-Rise #2 Roofing | | $128,730.00 |
| 46 | Townhouse A Roofing | | $61,000.00 |
| 47 | Townhouse B Roofing | | $81,025.00 |
| 48 | Townhouse C Roofing | | $84,360.00 |
| 49 | Townhouse D Roofing | | $59,030.00 |
| 19 | Mid-Rise #1 Roofing | | $128,730.00 |

The contents of these Walsh Construction Company of Illinois SCOPE, CLARIFICATIONS, ALTERNATES & UNIT PRICES have been read, understood and agreed to by the undersigned. Any and all field personnel will be informed of our compliance with these procedures.

A-1 Roofing Company

Davud Rabin
_____
Typed or Printed name of representative

X _____  UP  6/11/04
Signature and Title                    Date

*A-1 Roofing Company Exhibit B page 1 of 5*
*A-1 Roofing Company Exhibit B page 2 of 5*
*A-1 Roofing Company Exhibit B page 3 of 5*
*A-1 Roofing Company Exhibit B page 4 of 5*
*A-1 Roofing Company Exhibit B page 5 of 5*

Exhibit I

929 W. Adams
Chicago, IL 60607

# Walsh Construction Company of Illinois

### A Member of the Walsh Group

## SUBCONTRACT AGREEMENT

| | | | |
|---|---|---|---|
| Subcontractor: | ThyssenKrupp Elevator<br>2305 Enterprise Drive<br>Westchester, IL 60154 | Date of Agreement:<br>("Project") | Friday, January 9, 2004<br>South Park Plaza |
| | Phone: 708-236-7500<br>Fax: 708-236-7540 | Perform Work at: | 2601 S. Calumet<br>Chicago, IL 60616 |

Job # 200119

Owner: Woodlawn Community Development Corporation

Subject to Retention of: 10.00%

Architect/Engineer: Loewenberg & Associates, Inc.

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as may be required by law.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

| Subcontractor's Work | Subcontract Amount |
|---|---|
| Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all **Hydraulic Elevator Work** as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor. | |
| For the total Subcontract Amount of: | $203,600.00 |

The following documents are attached and hereby expressly incorporated into this Agreement:

Exhibit A - Terms and Conditions
Exhibit B - Scope, Clarifications, Alternates and Unit Prices
Exhibit C - Contract Documents
Exhibit D - Insurance Requirements
Exhibit E - Standard Operating Procedure
Exhibit F - Payment Schedule and Procedures
Exhibit G - Safety Requirements
Exhibit H - City of Chicago Construction Contract Rider
Exhibit I - City of Chicago Section 3 Compliance Plan
Exhibit J - Davis/Bacon Wage Requirements
Exhibit K - Project Schedule
Exhibit L - Thyssen Krupp Subcontract Rider

MAR 3 1 2004

By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

| | |
|---|---|
| Subcontractor: **ThyssenKrupp Elevator** | Walsh Construction Company of Illinois |
| By: | By: |
| Title: Brian Scott Contract Analyst | Title: VP |
| Date: 3/26/04 | Date: 4/13/04 |

PLEASE SIGN AND RETURN ALL ORIGINALS
An Equal Opportunity Employer M/F/D/V

4/2/04

# EXHIBIT B
## SCOPE, CLARIFICATIONS, ALTERNATES
## and UNIT PRICES

**Walsh Construction Company of Illinois**
General Contractors For:
**South Park Plaza**
**222 S. Morgan**
**Chicago, IL 60607**
Woodlawn Community Development Corporation Project # 071-35693
**Walsh Construction Company of Illinois Project # 200119**

## 1. SPECIFICATION SECTIONS:

The scope of the Hydraulic Elevator Work to be performed by ThyssenKrupp Elevator is defined in the documents listed in Exhibit "C", including but not limited to, the following specification sections:

Specification Division 1 General Requirements
Specification Section 02200 Earthwork
Specification Section 03300 Cast-In-Place Concrete
Specification Section 04200 Masonry
Specification Section 05500 Metal Fabrications
Specification Section 14215 Hydraulic Elevators
Specification Section 15500 Heating, Ventilating, and Air Conditioning
Specification Section 16100 Electrical
Specification Section 16610 Standby Power Supply Systems
Specification Section 16720 Fire Alarm Systems
Specification Section 16740 Telephone Systems

## 2. SCOPE CLARIFICATIONS:

The following clarifications are intended to further define the scope of this subcontract but do not alter the above requirements unless specifically noted.

1.   Contractor will provide a dry and secure area adjacent to the hoistway at ground level for storage of the elevator equipment at the time of delivery. Relocation of the equipment as directed by the Contractor will be at the Contractor's expense.
2.   The Subcontractor shall furnish and install Hydraulic elevators and equipment as shown.
3.   Furnish freight pads and hooks for each car.
4.   Furnish and install elevator rails, including all required concrete anchors.

5.      Subcontractor shall coordinate and provide drawings and layout of the elevator machine room with Contractor and other subcontractors.

6.      Subcontractor is responsible to provide protection for the top of cylinder as well as an encasement to protect against the high water table as required.

7.      Costs associated with engineering beyond the contract documents are the subcontractor's responsibility.

8.      Once a system is complete and functional, the system cannot be disabled or made non-functional without written approval by the Contractor.

9.      The subcontractor will furnish and install fire stopping at the subcontractors penetrations through horizontal and vertical fire rated assemblies.

10.      The subcontractor's installation must conform to wall and ceiling design. Any wall relocations, additional walls, horizontal soffits, or vertical chases required to incorporate the subcontractor's work will be at the subcontractor's expense.

11.      The subcontractor will clean all shop and field markings from all exposed finish work.

12.      Twelve-month warranty and maintenance period for each elevator commences upon the date of <u>final</u> completion or final acceptance (whichever comes first).

13.      Provide installation, maintenance, operating manuals and instruction for all equipment at substantial completion to building maintenance personnel as required by the project documents.

14.      The subcontractors shall include layout for their own work.

15.      The subcontractor will perform work simultaneously at all buildings. Overtime due to lack of manpower or production to maintain the schedule will be at the subcontractor's expense.

16.      The subcontractor is responsible for all applications, permits and inspections required to complete their work.

17.      Lack of material availability will not be allowed as a reason for schedule delay. Materials are expected to be on site in accordance with the construction schedule.

18.      The subcontractor shall be responsible to check all existing conditions on site prior to commencing work.

19.      The subcontractor is responsible for cleaning work site of its trades materials on a daily basis and placing it in dumpster provided at grade level by Walsh Construction Company of Illinois. The debris must be broken down into the smallest size possible prior to being placed in the dumpster.

20.      The subcontractor shall utilize Section 3 (Resident Hire), Youth Build or Skill Builders Pre-Apprentice ('s) for the life to its contract as required. The subcontractor shall provide a current list of existing employees. See Contract Exhibit "I" for details.

> Contact:
> Ms. Lawanna Sumler-Anderson
> CHA Human Resources
> 626 W. Jackson Street
> Chicago, IL 60661
> Telephone: 312-742-8620

21.      The subcontractor is required to provide work place task lighting for its own work.

22.      The subcontractor shall assure that its excavation, trenching, auguring, drilling or other operations do not damage underground utilities. The subcontractor shall contact the appropriate utility or utility locator service to inspect its work area, to locate and mark underground utilities, and shall preserve markings or have locations marked again, so that equipment operators know where utilities are located. Utilities shall be exposed by <u>hand-digging</u> and also the subcontractor shall train its operators, foremen and superintendent in proper procedures to avoid damaging underground utilities. Subcontractor shall protect all utilities that remain on site.

23.      The subcontractor is responsible for providing power and phone services to their own construction trailers.

24.      The subcontractor is responsible for all shoring for its own work.

25. The subcontractor is responsible for providing opening sizes that are true, plumb and or square for all new work as required by the contract documents.
26. Provide Coordination drawings that will provide location and size of mechanical openings requirements in the floor and roof trusses to properly coordinate with other trades. This information must be provided one week after notice to proceed and/or contract date.
27. The Contractor is not providing any hoisting, rigging or a crane service for the subcontractor's use. Therefore the subcontractor is responsible providing labor, material and equipment for their own hoisting, rigging of their materials, supplies, equipment, including temporary and permanent supports.
28. The subcontractor is to provide its own on-site storage for all of its materials. Walsh will designate storage locations on site for each subcontractor on an as needed basis.
29. The subcontractor is responsible for, cutting, coring, setting of sleeves, coordination of box-outs, incorrect installation, patching for incorrect installations, and fire safing required for its work. The subcontractor is responsible for providing all testing, layout and coordination with structural systems prior to starting the cutting and coring.
30. Provide as-built CAD drawings at final completion as required by project documents.

## 3. EXCLUSIONS:

The following work is not a part of this subcontract or will be performed by others as noted.

1. Building Permit fees.
3. Bonding.
4. Equipment pads
5. Dumpsters

## 4. ALTERNATES:

The following alternates, as defined in the contract documents, or as noted below, shall be in effect for the term of this contract unless noted otherwise.

1. NONE

## 5. CHANGES TO THE WORK AND UNIT PRICES:

The following unit prices shall be in effect for the term of this agreement, unless otherwise noted, and shall apply to changes to the work in accordance with the contract documents. Labor rates listed are all-inclusive and include the subcontractor's overhead and profit.

1. LABOR

| Trade | Classification | Straight Time | Premium Time | Double Time |
|---|---|---|---|---|
| Elev. Constructor | Mechanic | $85/Hr. | $127.50/Hr. | $170/Hr. |
| Elev. Constructor | Helper | $60/Hr. | $90/Hr. | $120/Hr. |
| Elev. Constructor | Crew Rate | $145/Hr. | $187.50/Hr. | $290/Hr. |

2.     MATERIAL (The below unit costs are for material and labor.)

        <u>Unit Prices:</u>

| | <u>Add</u> |
|---|---|
| Excavation for Cylinder | $150.00/Vertical Ft. |
| Interior Elevator Panel Damaged | $700.00/Panel |

3.     EQUIPMENT

       None

All unit prices will remain in effect for the life of the contract and are inclusive of overhead and profit.

## 6. ACCOUNTING BREAKDOWN OF CONTRACT AMOUNT:

| Bid Item | Description | Budget Code | Amount |
|---|---|---|---|
| 36 | Hydraulic Elevator | 14-14000-09 | $203,600.00 |

The contents of these Walsh Construction Company of Illinois SCOPE, CLARIFICATIONS, ALTERNATES & UNIT PRICES have been read, understood and agreed to by the undersigned. Any and all field personnel will be informed of our compliance with these procedures.

<u>ThyssenKrupp Elevator</u>

Brian Scott
_____
Typed or Printed name of representative

X _____ Contract Analyst   3/26/04
_____
Signature and Title            Date

*ThyssenKrupp Elevator Exhibit B page 1 of 4*
*ThyssenKrupp Elevator Exhibit B page 2 of 4*
*ThyssenKrupp Elevator Exhibit B page 3 of 4*
*ThyssenKrupp Elevator Exhibit B page 4 of 4*

# EXHIBIT L
## Thyssen Krupp Subcontract Exhibit

### Walsh Construction Company of Illinois

This exhibit shall modify WCCI's Exhibits; A – Terms and Conditions, E – Standard Operating Procedures, D – Insurance Requirements. In the event of conflict with other articles, terms, conditions, or contract documents, (other than those specifically referenced in Exhibit L) the Subcontract Agreement shall govern.

**Article 2** Amend so both parties shall agree to a schedule in writing before becoming effective. As a condition precedent to fabrication of equipment Subcontractor must have received and executed contract and approved shop drawings.

Subcontractor shall not be responsible for timely completion of preparatory work by others and shall receive an extension of time commensurate with any such delay.

**Article 3** Amend so Contractor agrees to increase progress payments to ninety percent (90%) of contract value on or before Contractor's acceptance of Subcontractor's work. Contractor shall include in progress payments for materials stored at jobsite or at other agreed location. Final payment shall be made within sixty (60) days from Contractor's final acceptance of subcontractor's work. All shall be subject to the Owner's terms and approval.

**Paragraph 3.12** Contractor will notify Subcontractor prior to the institution of any back-charge or set-off hereunder; and such determination shall not be final and binding upon the parties until expressly agreed to in writing. Contractor will continue to pay all invoices of Subcontractor not in dispute. Delete "or any other agreement".

**Paragraph 4.5** Subcontractor shall be responsible for liquidated damages only to the extent said damages were caused by Subcontractor.

**Paragraph 6.3** Amend so that Subcontractor shall only attend job meeting while manning jobsite, or as required to schedule and coordinate this Subcontractor's work.

**Paragraph 6.7** Subcontractor shall not be liable for any loss, damage, or delay caused by acts of government, labor troubles, strikes, lockouts, fire, explosion, theft, riot, civil commotion, war, malicious mischief, acts of God or any other caused beyond its control.

**Paragraph 7.12** Amend so Contractor shall furnish OSHA approved removable barricades and kickboards and subcontractor shall maintain same while manning the jobsite.

**Paragraph 8.5 & 8.6** Amend so in the event of termination for any reason, Contractor agrees to pay Subcontractor the proportional contract value of work performed including contract value of materials in process of fabrication when delivered to jobsite, in transit, stored at jobsite or at other agreed location, provided notice and values of all such items are given to the Contractor prior to fabrication. Contractor agrees to limit possession to work and materials previously paid for by Contractor.

**Exhibit L**
**Thyssen Krupp Subcontract Exhibit**
**Walsh Construction Company of Illinois**
**Page 2**

2

**Article 10 & Exhibit D** Amend so that the named additional Insured are defended and Indemnified for actions arising from Subcontractor's acts, actions, omissions or neglects; but are not defended or Indemnified for their own acts, actions, omissions, neglects, or bare allegations.

Limit waiver of subrogation only to acts and actions of Subcontractor. Delete per project aggregate.

**Exhibit E 12.** Amend so that If schedule modifications, not solely caused by Subcontractor, shall result In overtime work, Contractor agrees to pay In accordance with Subcontractor's standard charges for premium time.

Exhibit J

HVAC Consultants, Inc.
Contract Number: 200119-25



## Walsh Construction Company of Illinois

A Member of the Walsh Group

929 W. Adams
Chicago, IL 60607

### SUBCONTRACT AGREEMENT

| | |
|---|---|
| Subcontractor: | HVAC Consultants, Inc.<br>1900 S. Highland Avenue<br>Suite 206<br>Lombard, IL 60148<br>Phone: (630) 599-0168<br>Fax: (630) 599-0180 | 
| Date of Agreement<br>("Project") | South Park Plaza |
| Perform Work at: | 222 S. Morgan<br>Chicago, IL 60607 |

Job # 200119

Owner: Woodlawn Community Development Corporation

Subject to Retention of: 10.00%

Architect/Engineer: Loewenberg & Associates, Inc.

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as may be required by law.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

| Subcontractor's Work | Subcontract Amount |
|---|---|
| Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all HVAC Work as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor.<br>For the total Subcontract Amount of: | $1,591,720.00 |

The following documents are attached and hereby expressly incorporated into this Agreement:

- Exhibit A - Terms and Conditions
- Exhibit B - Scope, Clarifications, Alternates and Unit Prices
- Exhibit C - Contract Documents
- Exhibit D - Insurance Requirements
- Exhibit E - Standard Operating Procedure
- Exhibit F - Payment Schedule and Procedures
- Exhibit G - Safety Requirements
- Exhibit H - City of Chicago Construction Contract Rider
- Exhibit I - City of Chicago Section 3 Compliance Plan
- Exhibit J - Davis/Bacon Wage Requirements
- Exhibit K - Project Schedule



APR 2 8 2004

WALSH CONSTRUCTION

By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

| Subcontractor : HVAC Consultants, Inc. | Walsh Construction Company of Illinois |
|---|---|
| By: _____ | By: _____ |
| Title: VICE PRESIDENT | Title: VP |
| Date: 4/14/04 | Date: 4/23/04 |

PLEASE SIGN AND RETURN ALL ORIGINALS
An Equal Opportunity Employer M/F/D/V

4/21/04

*HVAC Consultants, Inc.*
Subcontract Agreement No. 200119-25

# EXHIBIT B
## SCOPE, CLARIFICATIONS, ALTERNATES
## and UNIT PRICES

**Walsh Construction Company of Illinois**
General Contractors For:
**South Park Plaza**
**222 S. Morgan**
**Chicago, IL 60607**
Woodlawn Community Development Corporation Project # 071-35693
Walsh Construction Company of Illinois Project # 200119

## 1. SPECIFICATION SECTIONS:

The scope of the HVAC Work to be performed by HVAC Consultants, Inc. is defined in the documents listed in Exhibit "C", including but not limited to, the following specification sections:

Specification Division 1 General Requirements
Specification Division 5 Metals
Specification Division 7 Thermal and Moisture Protection
Specification Division 15 Mechanical: General Provisions
Specification Division 16 Electrical: General Provisions

## 2. SCOPE CLARIFICATIONS:

The following clarifications are intended to further define the scope of this subcontract but do not alter the above requirements unless specifically noted.

1. The subcontractors shall furnish and install all louvers as required.
2. The subcontractors shall provide a complete, fully operational and code compliant HVAC system.
3. Provide as-built CAD drawings at final completion as required by project documents.
4. Subcontractor to provide pipe, duct and equipment tagging per the project documents.
5. Provide local temperature controls on all HVAC equipment as identified in the specifications and as shown on the drawings.
6. Install duct smoke detectors as furnished and wired by the electrical contractor.
7. Furnish and install equipment supports and/or curbs for all outdoor HVAC equipment.
8. Provide independent testing and balancing of air and water systems.
9. Costs associated with engineering beyond the contract documents are the subcontractor's responsibility.
10. Provide a construction set of filters during the work, one set of replacement filters at substantial completion, and one set of attic stock filters at final completion.
11. Provide final hookup of appliances located in apartment units during subcontractors work in unit.
12. Furnish and install flexible connector and test connection.

12. The Subcontractor will furnish and install roof curbs as required to provide a complete installation of all equipment/systems.
13. The Subcontractor will furnish and install all unit heaters as indicated on contract documents.
14. Subcontractor is responsible for setting any inserts for hanging its pipes, ducts, and equipment. Subcontractor will provide lighting of dwelling unit gas range/oven resulting from installation and gas shut-down as required.
15. The subcontractor is to provide field mockups, in the size and quantities outlined in the contract document. The filed mockups shall denote all the conditions and variations that are shown in the contract documents.
16. The subcontractor will furnish and install fire stopping at the subcontractors penetrations through horizontal and vertical fire rated assemblies.
17. The subcontractor's installation must conform to wall and ceiling design. Any wall relocations, additional walls, horizontal soffits, or vertical chases required to incorporating the subcontractor's work will be at the subcontractor's expense. The soffits, for ductwork in dwelling units shown on HVAC Drawings dated 2/19/03, are acknowledged and are at the expense of the Contractor.
18. The subcontractor will clean all shop and field markings from all exposed finish work.
19. All warranties commence upon the date of final completion/acceptance.
20. Provide installation, maintenance, operating manuals and instruction for all equipment at substantial completion to building maintenance personnel as required by the project documents.
21. The subcontractors shall include layout for their own work.
22. The subcontractor will supply a self-contained power supply for their tools and equipment in order to properly install the subcontractor's work.
23. The subcontractor will perform work simultaneously at all buildings. Overtime due to lack of manpower or production to maintain the schedule will be at the Subcontractor's expense.
24. The subcontractor is responsible for all applications and permits for on-site activities required to complete their work.
25. Lack of material availability will not be allowed as a reason for schedule delay. Materials are expected to be on site in accordance with the construction schedule.
26. The subcontractor shall be responsible to check all existing conditions on site prior to commencing work.
27. All subcontractors are responsible to provide and maintain, construction barricades, enclosures, and traffic controls for their own work. . The subcontractor shall also provide a safe working environment to other trades, when working in these areas.
28. The subcontractor is responsible for cleaning work site of its trades materials on a daily basis and placing it in dumpster provided at grade level by Walsh Construction Company of Illinois. The debris must be broken down into the smallest size possible prior to being placed in the dumpster.
29. The subcontractor shall utilize (1) One Section 3 (Resident Hire), Youth Build or Skill Builders Pre-Apprentice ('s) for the life to its contract. The subcontractor shall provide a current list of existing employees. See Contract Exhibit "I" for details.

Contact:
Ms. Lawanna Sumler-Anderson
CHA Human Resources
626 W. Jackson Street
Chicago, IL 60661
Telephone: 312-742-8620

30. The subcontractor is required to provide work place task lighting for its own work.
31. The subcontractor shall assure that its excavation, trenching, auguring, drilling or other operations do not damage underground utilities. The subcontractor shall contact the appropriate utility or utility locator service to inspect its work area, to locate and mark underground utilities, and shall preserve markings or have locations marked again, so that equipment operators know where utilities are located. Utilities shall be exposed by hand-digging; also the subcontractor shall train its operators, foremen and superintendent in proper procedures to avoid damaging underground utilities. Subcontractor shall protect all utilities that remain on site.

32. The subcontractor is responsible for providing power and phone services to their own construction trailers.
33. The subcontractor is responsible for all shoring for its own work.
34. The subcontractor is responsible for providing opening sizes that are true, plumb and square for all new work as required by the contract documents.
35. Provide Coordination drawings that will provide location and size of mechanical openings requirements in the floor and roof trusses to properly coordinate with other trades. This information must be provided one week after notice to proceed and/or contract date.
36. The Contractor is not providing any hoisting, rigging or a crane service for the subcontractor's use. Therefore the subcontractor is responsible providing labor, material and equipment for their own hoisting, rigging of their materials, supplies, equipment, including temporary and permanent supports.
37. The subcontractor is to provide its own on-site storage for all of its materials. Walsh will designate storage locations on site for each subcontractor on an as needed basis.
38. The subcontractor is responsible for, cutting, coring, setting of sleeves, coordination of box-outs, incorrect installation, patching for incorrect installations, and fire safing required for its work. The subcontractor is responsible for providing all testing, layout and coordination with structural systems prior to starting the cutting and coring.
39. Provide as-built CAD drawings at final completion as required by project documents.

## 3. EXCLUSIONS:

The following work is not a part of this subcontract or will be performed by others as noted.

1.    Building Permit fees.
3.    Bonding.
4.    Equipment pads
5.    Dumpsters

## 4. ALTERNATES:

The following alternates, as defined in the contract documents, or as noted below, shall be in effect for the term of this contract unless noted otherwise.

1.    The subcontractor will provide extended Warranties, Duct Cleaning, Equipment Service on equipment used during construction at all buildings for the lumpsum of Thirty Five Thousand Four Hundred Fifty Dollars:                    $35,450.00

2.    The subcontractor will provide an equivalent Carrier Reciprocating Chiller Unit in lieu of the 70 Ton Trane screw chiller for the deductive sum of Eleven Thousand Two Hundred Fifty Dollars: ($11,250.00)

## 5. CHANGES TO THE WORK AND UNIT PRICES:

The following unit prices shall be in effect for the term of this agreement, unless otherwise noted, and shall apply to changes to the work in accordance with the contract documents. Labor rates listed are all-inclusive and include the subcontractor's overhead and profit.

A. LABOR:

| Trade | Classification | Straight Time | Premium Time | Double Time |
|-------|---------------|---------------|--------------|-------------|
| Pipefitter | Journeyman | $74.00/Hr | $96.00/Hr | $117.00/Hr |
| Pipefitter | Foreman | $77.60/Hr | $100.00/Hr | $124.00/Hr |
| Pipefitter | General Foreman | $84.00/Hr | $109.00/Hr | $134.00/Hr |
| Sheetmetal | Journeyman | $73.00/Hr | $94.00/Hr | $115.00/Hr |
| Sheetmetal | Foreman | $76.00/Hr | $98.00/Hr | $119.00/Hr |

B. MATERIAL:

| | | |
|---|---|---|
| i. | Furnish and install 24/12 galvanized duct: | $27.41/LF |
| ii. | Furnish 1" Sch. 40 Blk. Stl. Pipe B W T&C: | $1.02/LF |
| iii. | Furnish 3" Sch. 40 Blk. Stl. Pipe ERW P.E.: | $3.60/LF |
| iv. | Furnish 1" Sch. 40 Blk. Stl. A106 P.E.: | $1.12/LF |
| v. | Furnish 1" Type L Hard Copper Tube: | $1.28/LF |
| vi. | Furnish 1" TOL: | $3.92/LF |
| vii. | Furnish 3" Std. Weld 90 Ells | $6.16/EA |
| viii. | Furnish 3" Std. Weld Tees | $13.45/EA |
| ix. | Furnish 3" Std. Weld Red. Tees | $16.30/EA |
| x. | Furnish 3" Std. Weld Caps | $3.75/EA |
| xi. | Furnish 3" Std. Weld Conc. Red. | $10.48/EA |
| xii. | Furnish 3" Std. Weld Ecc. Red. | $7.95/EA |
| xiii. | Furnish 3" 150# S.O. Flg. | $7.13/EA |
| xiv. | Furnish 1" 150# BMI 90 Ells | $1.05/EA |
| xv. | Furnish 1" 150# BMI Tees | $1.75/EA |
| xvi. | Furnish 1" 150# BMI Red. Tees | $1.95/EA |
| xvii. | Furnish 1" 150# BMI Conc. Red. | $1.45/EA |
| xviii. | Furnish 1" 150# BMI Caps | $.95/EA |
| xix. | Furnish 1" 150# BMI Unions | $3.85/EA |
| xx. | Furnish 1" 250# BMI Unions | $5.25/EA |
| xxi. | Furnish 1" XH Blk. Stl. Cplgs. | $3.75/EA |
| xxii. | Furnish 1" Sq. Hd. Plugs | $.48/EA |
| xxiii. | Furnish 1" Copper Swt. 90 Ells | $1.46/EA |
| xxiv. | Furnish 1" Copper Swt. Tees | $3.20/EA |
| xxv. | Furnish 1" Copper Red. Tees | $3.45/EA |
| xxvi. | Furnish 1" Copper Swt. Cplgs. | $.98/EA |
| xxvii. | Furnish 1" Copper Swt. Caps | $.92/EA |
| xxviii. | Furnish 1" Copper Swt. Reducers | $1.33/EA |
| xxix. | Furnish 1" Copper Swt. MPT Adapters | $2.78/EA |
| xxx. | Furnish 1" Copper Swt. FPT Adapters | $3.20/EA |
| xxxi. | Furnish 1" Copper Swt. Unions | $6.98/EA |
| xxxii. | Furnish 1" Dielectric Unions | $7.50/EA |
| xxxiii. | Furnish 3" Lug BFV Nibco LD2000 | $67.00/EA |
| xxxiv. | Furnish 3" Flg'd. Lube Cock Homestd 612 | $172.15/EA |
| xxxv. | Furnish 3/4" Lev. Hdl. Gas Cock | $7.55/EA |
| xxxvi. | Furnish 4" Round pipe 26 ga. | $1.10/LF |

| | | |
|---|---|---|
| xxxvii. | Furnish 5" Round pipe 26 ga. | $1.10/LF |
| xxxviii. | Furnish 6" Round pipe 26 ga. | $1.14/LF |
| xxxix. | Furnish 7" Round pipe 26 ga. | $1.30/LF |
| xl. | Furnish 8" Round pipe 26 ga. | $1.45/LF |
| xli. | Furnish 9" Round pipe 26 ga. | $1.55/EA |
| xlii. | Furnish 10" Round pipe 26 ga. | $1.60/EA |
| xliii. | Furnish 4" 90 degree elbow | $1.80/EA |
| xliv. | Furnish 5" 90 degree elbow | $1.85/EA |
| xlv. | Furnish 6" 90 degree elbow | $2.00/EA |
| xlvi. | Furnish 7" 90 degree elbow | $2.35/EA |
| xlvii. | Furnish 8" 90 degree elbow | $2.55/EA |
| xlviii. | Furnish 9" 90 degree elbow | $3.25/EA |
| xlix. | Furnish 10" 90 degree elbow | $3.40/EA |
| l. | Furnish 4x10 Sidewall residential register | $15.00/EA |
| li. | Furnish 4x12 Sidewall residential register | $17.00/EA |
| lii. | Furnish 6x10 Sidewall residential register | $16.00/EA |
| liii. | Furnish 8x12 Sidewall residential register | $18.00/EA |
| liv. | Furnish 1/2" Schedule 40 | $ .58/LF |
| lv. | Furnish 3/4" Schedule 40 | $ .72/LF |
| lvi. | Furnish 1" Schedule 40 | $ .92/LF |
| lvii. | Furnish 1 1/4" Schedule 40 | $1.17/LF |
| lviii. | Furnish 1 1/2" Schedule 40 | $1.37/LF |
| lix. | Furnish 2" Schedule 40 | $1.75/LF |
| lx. | Furnish 2 1/2" Schedule 40 | $2.45/LF |
| lxi. | Furnish 3" Schedule 40 | $3.25/LF |
| lxii. | Furnish 4" Schedule 40 | $3.85/LF |
| lxiii. | Furnish 5" Schedule 40 | $4.95/LF |
| lxiv. | Furnish 6" Schedule 40 | $6.55/LF |
| lxv. | Furnish 3" Welded Schedule 40 Elbow | $5.40/EA |
| lxvi. | Furnish 4" Welded Schedule 40 Elbow | $9.47/EA |
| lxvii. | Furnish 5" Welded Schedule 40 Elbow | $17.30/EA |
| lxviii. | Furnish 6" Welded Schedule 40 Elbow | $41.30/EA |
| lxix. | Furnish 1/2" Black pipe Schedule 40 elbow | $ .62/EA |
| lxx. | Furnish 3/4" Black pipe Schedule 40 elbow | $1.46/EA |
| lxxi. | Furnish 1 1/4" Black pipe Schedule 40 elbow | $4.18/EA |
| lxxii. | Furnish 1 1/2" Black pipe Schedule 40 elbow | $5.50/EA |
| lxxiii. | Furnish 2" Black pipe Schedule 40 elbow | $9.49/EA |

C.  LABOR / EQUIPMENT:

| | | |
|---|---|---|
| 30' gas scissor lift: | $210.00/Day | $430.00/Wk |
| 40' articulating boom lift | $300.00/Day | $740.00/Wk |

All unit prices will remain in effect for the life of the contract and are inclusive of overhead and profit.

## 6. ACCOUNTING BREAKDOWN OF CONTRACT AMOUNT:

| Bid Item | Description | Budget Code | Amount |
|---|---|---|---|
| 60 | HVAC | 15-15110-09 | $1,567,520.00 |
| 61 | Duct & Equipment Cleaning | 15-15115-09 | $35,450.00 |
| 62 | Carrier Unit Substitution | 15-15110-09 | ($11,250.00) |

The contents of these Walsh Construction Company of Illinois SCOPE, CLARIFICATIONS, ALTERNATES & UNIT PRICES have been read, understood and agreed to by the undersigned. Any and all field personnel will be informed of our compliance with these procedures.

HVAC Consultants, Inc.


JEFFREY A. GLINSKI
Typed or Printed name of representative


X _____     4/14/04
Signature and Title                    Date


*HVAC Consultants, Inc. Exhibit B page 1 of 6*
*HVAC Consultants, Inc. Exhibit B page 2 of 6*
*HVAC Consultants, Inc. Exhibit B page 3 of 6*
*HVAC Consultants, Inc. Exhibit B page 4 of 6*
*HVAC Consultants, Inc. Exhibit B page 5 of 6*
*HVAC Consultants, Inc. Exhibit B page 6 of 6*

Exhibit K

929 W. Adams
Chicago, IL 60607

# Walsh Construction Company of Illinois

### A Member of the Walsh Group

## SUBCONTRACT AGREEMENT

| | | |
|---|---|---|
| Subcontractor: | Dynamic Wrecking & Excavation, Inc. | Date of Agreement |
| | 16658 Woodlawn Court | ("Project") South Park Plaza |
| | South Holland, IL 60473 | |
| | Phone: (708) 339-7633 | Perform Work at: 222 S. Morgan |
| | Fax: (708) 333-2973 | Chicago, IL 60607 |

Job # 200119

Owner: Woodlawn Community Development Corporation

Subject to Retention of: 10.00%

Architect/Engineer: Loewenberg & Associates, Inc.

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as may be required by law.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

| Subcontractor's Work | Subcontract Amount |
|---|---|
| Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all Earth Excavation Work as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor. | |
| For the total Subcontract Amount of: | $480,746.00 |

The following documents are attached and hereby expressly incorporated into this Agreement:

Exhibit A - Terms and Conditions
Exhibit B - Scope, Clarifications, Alternates and Unit Prices
Exhibit C - Contract Documents
Exhibit D - Insurance Requirements
Exhibit E - Standard Operating Procedure
Exhibit F - Payment Schedule and Procedures
Exhibit G - Safety Requirements
Exhibit H - City of Chicago Construction Contract Rider
Exhibit I - City of Chicago Section 3 Compliance Plan
Exhibit J - Davis/Bacon Wage Requirements
Exhibit K - Project Schedule

By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

| | |
|---|---|
| Subcontractor : Dynamic Wrecking & Excavation, Inc. | Walsh Construction Company of Illinois |
| By: | By: |
| Title: *President* | Title: *VP* |
| Date: *10/14/03* | Date: *10/15/03* |

### PLEASE SIGN AND RETURN ALL ORIGINALS
An Equal Opportunity Employer M/F/D/V

*Dynamic Wrecking & Excavation, Inc.*
Subcontract Agreement No. 200119-03

# EXHIBIT B
## SCOPE, CLARIFICATIONS, ALTERNATES
## and UNIT PRICES

**Walsh Construction Company of Illinois**
General Contractors For:
**South Park Plaza**
**222 S. Morgan**
**Chicago, IL 60607**
Woodlawn Community Development Corporation Project # 071-35693
Walsh Construction Company of Illinois Project # 200119

## 1. SPECIFICATION SECTIONS:

The scope of the Demolition & Earth Excavation Work to be performed by Dynamic Wrecking & Excavation, Inc. is defined in the documents listed in Exhibit "C", including but not limited to, the following specification sections:

> Specification Division 1 General Requirements
> Specification Section # 02000 Site Demolition
> Specification Section # 02100 Clearing and Site Preparation
> Specification Section # 02200 Earthwork
> Specification Section # 02205 Aggregate Base Course
> Specification Section # 02206 Geotechnical Fabric
> Specification Section # 02207 Bituminous Concrete Surface Course &
>             Bituminous Concrete Binder Course
> Specification Section # 02220 Excavation, Backfilling, and Compacting
>             For Pavements and Structures

## 2. SCOPE CLARIFICATIONS:

The following clarifications are intended to further define the scope of this subcontract but do not alter the above requirements unless specifically noted.

1. Subcontractor will furnish, operate and maintain all equipment required to excavate, stockpile, backfill, load and haul spoil & materials.
2. Subcontractor will provide hauling company that will haul spoil material off site as required.
3. Excavate and maintain open cut excavation at a slope back of 1.5:1.
4. Labor and equipment to backfill and compact at foundation walls with stockpiled material from the excavation; coordinate backfill operation with installation of foundation waterproofing.
5. Labor and equipment to perform excavation, grading, backfill and spoils hauling/removal for foundations, site concrete excavation and compacted stone fill, parking lot area excavations and compacted stone fill.

6.     Demolition of existing site paving, concrete, trees, playground area and playground equipment.

7.     Subcontractor operations will include all movement of excavated spoils material, on the site and off the site, in order to comply with the project schedule.

8.     In the event Hazardous Soil is encountered subcontractor will provide a 40 Hour OSHA HazMat trained superintendent and equipment operator for the duration of the work involving the Hazardous Soil.

9.     The subcontractors shall include layout for their own work.

10.     The subcontractor will supply a self-contained power supply for their tools and equipment in order to properly install the subcontractor's work.

11.     The subcontractor will perform work simultaneously at all buildings. Overtime due to lack of manpower or production is at the expense of the Subcontractor.

12.     The subcontractor is responsible for all applications and permits required to complete their work.

13.     Lack of material availability will not be allowed as a reason for schedule delay. Materials are expected to be on site in accordance with the construction schedule.

14.     The subcontractor shall be responsible to check all existing conditions on site prior to commencing work.

15.     All subcontractors are responsible to provide and maintain, construction barricades, enclosures, and traffic controls for their own work. . The subcontractor shall also provide a safe working environment to other trades, when working in these areas.

16.     The subcontractor is responsible for cleaning work site of its trades materials on a daily basis and placing it in dumpster provided at grade level by Walsh Construction Company of Illinois. The debris must be broken down into the smallest size possible prior to being placed in the dumpster.

17.     The subcontractor shall utilize (1) One Section 3 (Resident Hire), Youth Build or Skill Builders Pre-Apprentice ('s) for the life to its contract. The subcontractor shall provide a current list of existing employees. See Contract Exhibit "I" for details.

> Contact:
> Ms. Lawanna Sumler-Anderson
> CHA Human Resources
> 626 W. Jackson Street
> Chicago, IL 60661
> Telephone: 312-742-8620

18.     The subcontractor is required to provide work place task lighting for its own work.

19.     The subcontractor shall assure that its excavation, trenching, auguring, drilling or other operations do not damage underground utilities. The subcontractor shall contact the appropriate utility or utility locator service to inspect its work area, to locate and mark underground utilities, and shall preserve markings or have locations marked again, so that equipment operators know where utilities are located. Utilities shall be exposed by hand-digging. Also, the subcontractor shall train its operators, foremen and superintendent in proper procedures to avoid damaging underground utilities. Subcontractor shall protect all utilities that remain on site.

20.     The subcontractor is responsible for providing power and phone services to their own construction trailers.

21.     The subcontractor is responsible for all shoring for its own work.

22.     The subcontractor is responsible for providing opening sizes that are true, plumb and square for all new work as required by the contract documents.

23.     The Contractor is not providing any hoisting, rigging or a crane service for the subcontractor's use. Therefore the subcontractor is responsible providing labor, material and equipment for their own hoisting, rigging of their materials, supplies, equipment, including temporary and permanent supports.

24.     The subcontractor is to provide its own on-site storage for all of its materials. Walsh will designate storage locations on site for each subcontractor on an as needed basis.

## 3. EXCLUSIONS:

The following work is not a part of this subcontract or will be performed by others as noted.

1.    Building Permit fees.
3.    Bonding.
4..   Dumpsters

## 4. ALTERNATES:

The following alternates, as defined in the contract documents, or as noted below, shall be in effect for the term of this contract unless noted otherwise.

1.    NONE

## 5. CHANGES TO THE WORK AND UNIT PRICES:

The following unit prices shall be in effect for the term of this agreement, unless otherwise noted, and shall apply to changes to the work in accordance with the contract documents. Labor rates listed are all-inclusive and include the subcontractor's overhead and profit.

1.    LABOR

| Trade | Classification | Straight Time | Premium Time | Double Time |
|-------|----------------|---------------|--------------|-------------|
| Laborer | Journeyman | $41.44/Hr | $64.67/Hr | $93.67/Hr |
| Flagman | Journeyman | $41.44/Hr | $64.67/Hr | $93.67/Hr |
| Operator | Journeyman | $47.63/Hr | N/A | $71.44/Hr |
| Operator | Hazmat Levl A | $50.63/Hr | N/A | $77.44/Hr |
| Operator | Hazmat Levl B | $49.63/Hr | N/A | $75.44/Hr |
| Operator | Hazmat Levl C | $48.63/Hr | N/A | $73.44/Hr |

2.    MATERIAL (The below unit costs are for material and labor.)

| | | |
|-----|-----------------------------------------|---------------|
| i. | Excavate, Haul & Dump Special Waste: | $29.00/Hr |
| ii. | Excavate, Haul & Dump Typical Soil: | $10.75/Ton |
| iii. | Furnish & Install CA-6: | $33.00/Ton |
| iv. | Furnish & Install CA-7: | $31.00/Ton |
| v. | Hauling & Stockpile Soil: | $8.50/Ton |
| vi. | Backfill & Compact: | $6.50/Ton |
| vii. | Tree Removal | $50.00/Each |

3.   LABOR/EQUIPMENT

| | | |
|---|---|---|
| i. | Backhoe Excavator Straight Time: | $135.00/Hr |
| ii. | Backhoe Excavator Overtime: | $158.81/Hr |
| iii. | Trucks Straight Time: | $70.50/Hr |
| iv. | Trucks Overtime: | $82.50/Hr |
| v. | Bobcat Straight Time: | $63.00/Hr |
| vi. | Bobcat Overtime: | $77.50/Hr |
| vii. | D-3 Dozer Straight Time: | $80.00/Hr |
| viii. | D-3 Dover Overtime: | $103.81/Hr |
| ix. | 973 Caterpillar Straight Time: | $135.00/Hr |
| x. | 973 Caterpillar Overtime: | $158.81/Hr |

All unit prices will remain in effect for the life of the contract and are inclusive of overhead and profit.

# 6. ACCOUNTING BREAKDOWN OF CONTRACT AMOUNT:

| Bid Item | Description | Budget Code | Amount |
|---|---|---|---|
| 6 | Earth Excavation | 02-02105-09 | $431,000.00 |
| 40 | Demolition & removal of site paving & concrete | 02-02000-09 | $37,746.00 |
| 41 | Tree Removal | 02-02005-09 | $12,000.00 |

The contents of these Walsh Construction Company of Illinois SCOPE, CLARIFICATIONS, ALTERNATES & UNIT PRICES have been read, understood and agreed to by the undersigned. Any and all field personnel will be informed of our compliance with these procedures.

Dynamic Wrecking & Excavation, Inc.

Rasheed H. Bonds
Typed or Printed name of representative

X Rasheed H. Bonds          10/14/03
Signature and Title                    Date

*Dynamic Wrecking & Excavation, Inc. Exhibit B page 1 of 4*
*Dynamic Wrecking & Excavation, Inc. Exhibit B page 2 of 4*
*Dynamic Wrecking & Excavation, Inc. Exhibit B page 3 of 4*
*Dynamic Wrecking & Excavation, Inc. Exhibit B page 4 of 4*

Exhibit L

K&K Iron Works
Contract Number: 2001

# Walsh Construction Company of Illinois

A Member of the Walsh Group

929 W. Ad:
Chicago, IL 60(

## SUBCONTRACT AGREEMENT

Subcontractor: K&K Iron Works, Inc.
5100 S. Lawndale
McCook, IL 60525
Phone: (708)924-0000
Fax: (708)924-1240

Job # 200119

Subject to Retention of: 10.00%

Date of Agreement: Tuesday, January 27, 2004
("Project") South Park Plaza

Perform Work at: 2601 S. Calumet
Chicago, IL 60616

Owner: Woodlawn Community Development Corporation

Architect/Engineer: Loewenberg & Associates, Inc.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as may be required by law.

### Subcontractor's Work

Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all Structural & Miscellaneous Metals Work as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor.

The following documents are attached and hereby expressly incorporated into this Agreement.

For the total Subcontract Amount of:

| | Subcontract Amount |
|---|---|
| Exhibit A - Terms and Conditions | |
| Exhibit B - Scope, Clarifications, Alternates and Unit Prices | |
| Exhibit C - Contract Documents | $581,996.00 |
| Exhibit D - Insurance Requirements | |
| Exhibit E - Standard Operating Procedure | |
| Exhibit F - Payment Schedule and Procedures | |
| Exhibit G - Safety Requirements | |
| Exhibit H - City of Chicago Construction Contract Rider | |
| Exhibit I - City of Chicago Section 3 Compliance Plan | |
| Exhibit J - Davis/Bacon Wage Requirements | |
| Exhibit K - Project Schedule | |

RECEIVED
MAY 3 2004
WALSH CONSTRUCTION

By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

Subcontractor: K&K Iron Works, Inc.

By:

Title: PRESIDENT

Date: 4-28-2004

Walsh Construction Company of Illinois

By:

Title: VP

Date: 5/8/04

PLEASE SIGN AND RETURN ALL ORIGINALS
An Equal Opportunity Employer M/F/D/V

5/4/04

ited on: 2/9/2004

# EXHIBIT B
## SCOPE, CLARIFICATIONS, ALTERNATES
## and UNIT PRICES

Walsh Construction Company of Illinois
General Contractors For:
**South Park Plaza**
2601 S. Calumet
Chicago, IL 60616
Woodlawn Community Development Corporation Project # 071-35693
Walsh Construction Company of Illinois Project # 200119

## 1. SPECIFICATION SECTIONS:

The scope of the Structural Steel & Miscellaneous Metal Work to be performed by K&K Iron Works, Inc. is defined in the documents listed in Exhibit "C", including but not limited to, the following specification sections:

Specification Division 1 General Requirements
Specification Section # 05120 Structural Steel
Specification Section # 05210 Steel Joists
Specification Section # 05300 Metal Decking
Specification Section # 05400 Cold Formed Metal Framing
Specification Section # 05500 Metal Fabrications
Specification Section # 05810 Expansion Joint Cover Assemblies

## 2. SCOPE CLARIFICATIONS:

The following clarifications are intended to further define the scope of this subcontract but do not alter the above requirements unless specifically noted.

1. The subcontractor will furnish and deliver miscellaneous loose lintels as required.
2. The subcontractor will furnish and install; ladders, canopies, structural steel, hoist beams (including removal), metal roof and decking, bar joists, steel stairs, handrails, railings, landings, handicap ramps, divider panels, brick angles, connections, accessories and embed plates.
3. The subcontractor will coordinate with other trades and provide penetrations for other trades materials.
4. The subcontractor is to provide field mockups, in the size and quantities outlined in the contract document. The filed mockups shall denote all the conditions and variations that are shown in the contract documents.

5. The subcontractor's installation must conform to wall and ceiling design. Any wall relocations, additional walls, horizontal soffits, or vertical chases required to incorporating the subcontractor's work will be at the subcontractors expense.

6. The subcontractor will clean all shop and field markings from all exposed finish work.

7. All warranties commence upon the date of final completion.

8. The subcontractors shall include layout for their own work.

9. The subcontractor will supply a self-contained power supply for their tools and equipment in order to properly install the subcontractor's work.

10. The subcontractor will perform work simultaneously at all buildings. The manpower and overtime to complete the work to maintain the schedule is included in the contract.

11. The subcontractor is responsible for all applications and permits required to complete their work.

12. Lack of material availability will not be allowed as a reason for schedule delay. Materials are expected to be on site in accordance with the construction schedule.

13. The subcontractor shall be responsible to check all existing conditions on site prior to commencing work.

14. All subcontractors are responsible to provide and maintain, construction barricades, safety rails, enclosures, and traffic controls for their own work. . The subcontractor shall also provide a safe working environment to other trades, when working in these areas.

15. The subcontractor is responsible for cleaning work site of its trades materials on a daily basis and placing it in dumpster provided at grade level by Walsh Construction Company of Illinois. The debris must be broken down into the smallest size possible prior to being placed in the dumpster.

16. The subcontractor shall utilize Section 3 (Resident Hire), Youth Build or Skill Builders Pre-Apprentice ('s) for the life to its contract as required. The subcontractor shall provide a current list of existing employees. See Contract Exhibit "I" for details.

> Contact:
> Ms. Lawanna Sumler-Anderson
> CHA Human Resources
> 626 W. Jackson Street
> Chicago, IL 60661
> Telephone: 312-742-8620

17. The subcontractor is required to provide work place task lighting for its own work.

18. The subcontractor shall assure that its excavation, trenching, auguring, drilling or other operations do not damage underground utilities. The subcontractor shall contact the appropriate utility or utility locator service to inspect its work area ,to locate and mark underground utilities, and shall preserve markings or have locations marked again, so that equipment operators know where utilities are located. Utilities shall be exposed by hand-digging and also the subcontractor shall train its operators, foremen and superintendent in proper procedures to avoid damaging underground utilities. Subcontractor shall protect all utilities that remain on site.

19. The subcontractor is responsible for providing power and phone services to their own construction trailers.

20. The subcontractor is responsible for all shoring for its own work.

21. The subcontractor is responsible for providing opening sizes that are true, plumb and square for all new work as required by the contract documents.

22. The Contractor is not providing any hoisting, rigging or a crane service for the subcontractor's use. Therefore the subcontractor is responsible providing labor, material and equipment for their own hoisting, rigging of their materials, supplies, equipment, including temporary and permanent supports.

23. The subcontractor is to provide its own on-site storage for all of its materials. Walsh will designate storage locations on site for each subcontractor on an as needed basis.

*K & K Iron Works, Inc.: Exhibit B Page 2 of 4*

## 3. EXCLUSIONS:

The following work is not a part of this subcontract or will be performed by others as noted.

1. Building Permit fees.
3. Bonding.
4. Roof hatches, gates, aluminum or stainless steel angles for sliding doors, metal panels note 8 on MRA-301, brackets for wood handrails, wood stairs, landings at floor levels, townhouse stair railings, intumescent coating, field welding of lintels & bearing plates per approved shop drawings, railing returns per 3/MR.A-201 (per architects approval), perimeter safety railings, installation of steel lintels, testing of welds and bolted connections, interior light gauge framing, slip resistant finish on stairs, surveys, grouting, touch-up paint damaged by other trades, intermediate and final coats of paint, cutting of masonry pockets, installation of bearing plates, installation of setting plates.
5. Dumpsters

## 4. ALTERNATES:

The following alternates, as defined in the contract documents, or as noted below, shall be in effect for the term of this contract unless noted otherwise.

1. NONE

## 5. CHANGES TO THE WORK AND UNIT PRICES:

The following unit prices shall be in effect for the term of this agreement, unless otherwise noted, and shall apply to changes to the work in accordance with the contract documents. Labor rates listed are all-inclusive and include the subcontractor's overhead and profit.

1. LABOR

| Trade | Classification | Straight Time | Premium Time | Double Time |
|---|---|---|---|---|
| Ironworker | Ornamental | $90.82/hr | NA | $131.00/hr |
| Ironworker | Structural (over 2 flrs) | $103.05/hr | NA | $141.00/hr |
| Ironworker | Structural (under 2 flr) | $111.62/hr | NA | $148.00/hr |

2. MATERIAL (The below unit costs are for material and labor.)

| | | |
|---|---|---|
| i. | Lintels (Primed) | $0.85/lb. |
| ii. | Juliet Railings | $95.00/LF |
| iii. | Balcony Railings | $72.00/LF |
| iv. | Structural Steel (delivered) | $0.75/lb. |

All unit prices will remain in effect for the life of the contract and are inclusive of overhead and profit.



**Exhibit L**

**Rider Between**
**Walsh Construction Company of Illinois'**
**Standard Subcontract Agreement and**
**K&K Iron Works, Inc.**
**As of 7/24/03**

This Rider contains changes to the standard Subcontract Agreement between Walsh Construction Company of Illinois and K&K Iron Works, Inc., to the extent that the terms and conditions of this Rider conflict with the terms and conditions of the Subcontract Agreement, this Rider shall control.

1. Referring to Article 1, Paragraph 1.2, line 4, the words "However, Subcontractors rights against Contractor (as opposed to Subcontractor's obligations, risks, responsibilities and limitations) shall be limited solely to the rights and remedies provided to Subcontractor under this agreement without regard to any rights and remedies afforded by the Contract Documents shall be deleted.
2. Referring to Article 1, Paragraph 1.2, line 7 shall be deleted.
3. Referring to Article 3, Paragraph 3.6, line 3, the words "If the Contractor has provided a payment and performance bond for the project, the Subcontractor shall make no claim on this bond for payment due to the Subcontractor for which the Owner has not paid the Contractor and the Contractor's surety is an express third party beneficiary of this promise," Shall be deleted.
4. Referring to Article 3, Paragraph 3.12 shall be deleted.
5. Referring to Article 4, Paragraph 4.1, line 5, the sentence "An express condition.... by Contractor." shall be deleted.
6. Referring to Article 4, Paragraph 4.3, line 2, the words "by written notice to the Contractor at least one (1) week prior to the beginning of the Subcontractor's work of" and "whichever shall first occur" shall be deleted.
7. Referring to Article 4, Paragraph 4.4, line 4, the words "but Contractor shall be obligated to pay only for the costs of expediting material." shall be changed to "at the contractor's expense."
8. Referring to Article 4, Paragraph 4.4, line 6, the word "material" shall be changed to "the work"
9. Referring to Article 7, Paragraph 7.10, line 4, the words "The subcontractor shall have....may be incurred." shall be deleted.
10. Referring to Article 11, Paragraph 11.3, line 4, the words "whether or not Subcontractor..... behalf of Subcontractor." shall be deleted.
11. Referring to Article 11, Paragraph 11.3 shall be deleted.

K&K Iron Works, Inc.

Signed: _____

Title: V PRESIDENT

Date: 4-23-2004

Walsh Construction of Illinois

Signed: _____

Title: _____

Date: 5/8/04

1

## 6. ACCOUNTING BREAKDOWN OF CONTRACT AMOUNT:

| Bid Item | Description | Budget Code | Amount |
|----------|-------------|-------------|--------|
| 14 | Structural/ Misc Metals | 05-05000-09 | $556,670.00 |
| 14 | 27 ea. ADA Ramps | 05-05005-09 | $25,326.00 |

The contents of these Walsh Construction Company of Illinois SCOPE, CLARIFICATIONS, ALTERNATES & UNIT PRICES have been read, understood and agreed to by the undersigned. Any and all field personnel will be informed of our compliance with these procedures.

K&K Iron Works, Inc.

*KARL · KULHANEK*
Typed or Printed name of representative

X _____ PRESIDENT.  4-23-200X
Signature and Title                                    Date

*K&K Iron Works, Inc. Exhibit B page 1 of 4*
*K&K Iron Works, Inc. Exhibit B page 2 of 4*
*K&K Iron Works, Inc. Exhibit B page 3 of 4*
*K&K Iron Works, Inc. Exhibit B page 4 of 4*

Exhibit M



**Walsh Construction Company of Illinois**

A Member of the Walsh Group

**Walsh Construction**

929 W. Adams
Chicago, IL 60607

## SUBCONTRACT AGREEMENT

Subcontractor: Monda Windows and Doors Mfg.    Date of Agreement:

| | |
|---|---|
| 3801 West 44th Street<br>Chicago, IL 60632<br>Phone: 773-890-3888<br>Fax: 773-890-3680 | ("Project")  South Park Plaza<br><br>Perform Work at:  2601 S. Calumet<br>Chicago, IL 60616 |

Job # 200119                Owner: Woodlawn Community Development Corporation

Subject to Retention of:        10.00%        Architect/Engineer: Loewenberg & Associates, Inc.

Subcontract Amount includes all Federal, State, Local and Municipal Taxes, as may be required by law.

Walsh Construction Company of Illinois ("Contractor") and Subcontractor hereby agree as follows:

| Subcontractor's Work | Subcontract Amount |
|---|---|
| Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and Install all Windows & Sliding Glass Doors Work as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor.<br>For the total Subcontract Amount of: | $556,040.00 |

The following documents are attached and hereby expressly incorporated into this Agreement:

Exhibit A - Terms and Conditions
Exhibit B - Scope, Clarifications, Alternates and Unit Prices
Exhibit C - Contract Documents
Exhibit D - Insurance Requirements
Exhibit E - Standard Operating Procedure
Exhibit F - Payment Schedule and Procedures
Exhibit G - Safety Requirements
Exhibit H - City of Chicago Construction Contract Rider
Exhibit I - City of Chicago Section 3 Compliance Plan
Exhibit J - Davis/Bacon Wage Requirements
Exhibit K - Project Schedule

RECEIVED
MAY 2 7 2004
WALSH CONSTRUCTION

RECEIVED
JUN 0 4 2004

By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract Amount.

| Subcontractor: Monda Windows and Doors Mfg. | Walsh Construction Company of Illinois |
|---|---|
| By: | By: |
| Title: President | Title: VP |
| Date: 05/20/04 | Date: 6/3/04 |

**PLEASE SIGN AND RETURN ALL ORIGINALS**
An Equal Opportunity Employer M/F/D/V

# EXHIBIT B
## SCOPE, CLARIFICATIONS, ALTERNATES
## and UNIT PRICES

**Walsh Construction Company of Illinois**
General Contractors For:
**South Park Plaza**
**222 S. Morgan**
**Chicago, IL 60607**
Woodlawn Community Development Corporation Project # 071-35693
Walsh Construction Company of Illinois Project # 200119

## 1. SPECIFICATION SECTIONS:

The scope of the Windows, Storefronts & Residential Appliance Work to be performed by Monda Windows and Doors Mfg. is defined in the documents listed in Exhibit "C", including but not limited to, the following specification sections:

Specification Division 1 General Requirements
Specification Section # 06100 Rough Carpentry
Specification Section # 07920 Sealants
Specification Section # 08163 Sliding Aluminum-Framed Glass Doors
Specification Section # 08410 Aluminum Doors and Frames
Specification Section # 08520 Aluminum Windows
Specification Section # 08554 Vinyl Clad Tilt-Wash Wood Dbl-Hung Windows
Specification Section # 08710 Finished Hardware
Specification Section # 08810 Glass and Glazing

## 2. SCOPE CLARIFICATIONS:

The following clarifications are intended to further define the scope of this subcontract but do not alter the above requirements unless specifically noted.

1.  The subcontractor is to provide field mockups, in the size and quantities outlined in the contract document. The filed mockups shall denote all the conditions and variations that are shown in the contract documents.
2.  Subcontractor's scope includes the cost of multiple deliveries per building.
3.  The subcontractor is to furnish and install all aluminum door hardware, including weatherstripping and thresholds per the project documents.
4.  All aluminum window and door assemblies to meet City of Chicago Energy Code.
5.  Furnish and install sealants at all aluminum doors and windows as required.
6.  Subcontractor is to provide all glass, glazing, muntins, transoms, break metal, accessories, finishes, and hardware as shown on project documents.
7.  The subcontractor's installation must conform to wall and ceiling design.

8.  The subcontractor will clean all shop and field markings from all exposed finish work.
9.  All warranties commence upon the date of <u>final completion</u>.
10. Provide installation, maintenance, operating manuals and instruction for all equipment at substantial completion to building maintenance personnel as required by the project documents.
11. The subcontractors shall include layout for their own work.
12. The subcontractor will supply a self-contained power supply for their tools and equipment in order to properly install the subcontractor's work.
13. The subcontractor will perform work simultaneously at all buildings. Overtime required to complete work due to lack of materials, production or manpower will be at the cost of the subcontractor.
14. The subcontractor is responsible for all applications and permits required to complete their work.
15. Lack of material availability will not be allowed as a reason for schedule delay. Materials are expected to be on site in accordance with the construction schedule.
16. The subcontractor shall be responsible to check all existing conditions on site prior to commencing work.
17. All subcontractors are responsible to provide and maintain, construction barricades, safety railings, enclosures, and traffic controls for their own work. . The subcontractor shall also provide a safe working environment to other trades, when working in these areas.
18. The subcontractor is responsible for cleaning work site of its trade's materials on a daily basis and placing it in dumpster provided at grade level by Walsh Construction Company of Illinois. The debris must be broken down into the smallest size possible prior to being placed in the dumpster.
19. The subcontractor shall utilize (1) One Section 3 (Resident Hire), Youth Build or Skill Builders Pre-Apprentice ('s) for the life to its contract. The subcontractor shall provide a current list of existing employees. See Contract Exhibit "I" for details.

> Contact:
> Ms. Lawanna Sumler-Anderson
> CHA Human Resources
> 626 W. Jackson Street
> Chicago, IL 60661
> Telephone: 312-742-8620

20. The subcontractor is required to provide work place task lighting for its own work.
21. The subcontractor is responsible for providing power and phone services to their own construction trailers.
22. The subcontractor is responsible for installing work that is true, plumb and square as required by the contract documents.
23. The Contractor is not providing any hoisting, rigging or a crane service for the subcontractor's use. Therefore the subcontractor is responsible providing labor, material and equipment for their own hoisting, rigging of their manpower, materials, supplies, equipment, including temporary and permanent supports.
24. The subcontractor is to provide its own on-site storage for all of its materials. Walsh will designate storage locations on site for each subcontractor on an as needed basis.

## 3. EXCLUSIONS:

The following work is not a part of this subcontract or will be performed by others as noted.

1.    Building Permit fees.
3.    Bonding.
4.    Equipment pads
5.    Dumpsters

## 4. ALTERNATES:

The following alternates, as defined in the contract documents, or as noted below, shall be in effect for the term of this contract unless noted otherwise.

1.    NONE

## 5. CHANGES TO THE WORK AND UNIT PRICES:

The following unit prices shall be in effect for the term of this agreement, unless otherwise noted, and shall apply to changes to the work in accordance with the contract documents. Labor rates listed are all-inclusive and include the subcontractor's overhead and profit.

1.    LABOR

| Trade | Classification | Straight Time | Premium Time | Double Time |
|---|---|---|---|---|
| Carpentry | Apprentice | $70.00/hr | $92.50/hr | $118.50/hr |
| Carpentry | Journeyman | $70.00/hr | $92.50/hr | $118.50/hr |
| Carpentry | Foreman | $75.00/hr | $100.00/hr | $122.00/hr |
| Ironworker | Journeyman | $72.44/hr | N/A | $128.12/hr |
| Ironworker | Foreman | $72.44/hr | N/A | $128.12/hr |
| Glazer | Journeyman | $70.00/hr | $92.50/hr | $118.50/hr |
| Glazer | Foreman | $75.00/hr | $100.00/hr | $122.00/hr |
| Laborer | Journeyman | $56.24/hr | $75.00/hr | $95.00/hr |
| Laborer | Foreman | $58/hr | $78.00/hr | $97.00/hr |

2.    MATERIAL (The below unit costs are for shipping, material and labor.)

|   |   |   |
|---|---|---|
| i. | Window | $429.00/ea |
| ii. | Sliding Doors | $1,335.00/ea |
| iii. | Custom Size Sliding Door | $1,835.00/ea |

3.    LABOR/EQUIPMENT

All unit prices will remain in effect for the life of the contract and are inclusive of overhead and profit.

## 6. ACCOUNTING BREAKDOWN OF CONTRACT AMOUNT:

| Bid Item | Description | Budget Code | Amount |
|----------|-------------|-------------|--------|
| 63 | Storefronts | 08-08100 | $61,324.00 |
| 64 | Safety Glazing for Doors | 08-08100 | $16,320.00 |
| 61 | Aluminum upgrade on all buildings | 08-08100 | $36,520.00 |
| 22 | Mid-rise Windows | 08-08100 | $259,526.00 |
| 62 | Low-rise Vinyl Windows | 08-08100 | $182,350.00 |

The contents of these Walsh Construction Company of Illinois SCOPE, CLARIFICATIONS, ALTERNATES & UNIT PRICES have been read, understood and agreed to by the undersigned. Any and all field personnel will be informed of our compliance with these procedures.

Monda Windows and Doors Mfg.

ElIAS ABuBeKeR
_____
Typed or Printed name of representative

X _____   05/20/05
Signature and Title                    Date

*Monda Windows and Doors Mfg. Exhibit B page 1 of 4*
*Monda Windows and Doors Mfg. Exhibit B page 2 of 4*
*Monda Windows and Doors Mfg. Exhibit B page 3 of 4*
*Monda Windows and Doors Mfg. Exhibit B page 4 of 4*

Monda Windows and Doors Mfg.

Exhibit N

312 247-8110

Walsh Construction
Company of Illinois

Contractor's Certificate of Actual Cost

South Park Plaza
Project #071-35693

Wolf & Company *LLP*
Certified Public Accountants

## CONTENTS

| | PAGE |
|---|---|
| Report of Independent Certified Public Accountant | 1 |
| Contractor's Certificate of Actual Cost | 2-5 |
| Notes to the Contractor's Certificate of Actual Cost | 6 |

WALSH CONSTRUCTION COMPANY OF ILLINOIS
NOTES TO CONTRACTOR'S CERTIFICATE OF ACTUAL COST

1.   Summary of Significant Accounting Policies

The Contractor's Certificate of Actual Cost has been prepared in conformity with the accounting
and reporting standards prescribed by the U.S. Department of Housing and Urban Development
(HUD) in the Audit Guide for Auditing Development Costs of HUD-Insured Multifamily Projects.
These standards differ in some respects from generally accepted accounting principles, and Form
HUD-92330-A reflects the following additional HUD accounting and reporting principle:

*   Costs are to be exclusive of kickbacks, rebates or trade discounts.

## Contractor's Certificate Of Actual Cost

U.S. Department of Housing and

Urban Development
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (Exp. 11/30/2008)

Public reporting burden for this collection of information is average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This information is required to obtain benefits. HUD may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB Control Number. Section 227 of the National Housing Act (Section 126 of the Housing Act of 1954, Public Law 560, 12 U.S.C. 1715b), authorizes the collection of this information. The information is required for a general contractor when an identity of interest exists between the general contract and the mortgagor or when the mortgagor is a non-profit entity and a cost plus contract has been used. The information is required from the contractor to convey its actual construction cost in a standardized format for cost certification. Privacy Act Notice. The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information request.

| Project Number FHA #071-35693 | Building Number | Mortgagor South Park Plaza L.P. |
|---|---|---|
| Contractor Walsh Construction Company | Name of Project South Park Plaza | Location 2800 S. Dr. Martin Luther King Jr. Drive, Chicago, IL. |

Gentlemen:

This Certificate is made pursuant to the provisions of the Construction Contract entered into by and between us under date of _____ and it is understood and agreed by the undersigned that this Certificate is to be submitted by you to the Federal Housing Commissioner in order to induce the Commissioner to finally endorse the mortgage for insurance.

The actual cost incurred in the completion of construction under the above Construction Contract and accepted construction changes exclusive of all kick-backs, rebates and discounts received in connection with the construction of the project is itemized below:

| Div. | Trade Item | Paid in Cash | To Be Paid In Cash | Total | Name of Subcontractor or Payee | Line |
|---|---|---|---|---|---|---|
| 3 | Concrete | 1,473,394 | 222,340 | 1,695,734 | See Attached Worksheet | 1 |
| 4 | Masonry | 2,477,769 | 103,893 | 2,581,662 | See Attached Worksheet | 2 |
| 5 | Metals | 592,450 | 90,722 | 683,172 | See Attached Worksheet | 3 |
| 6 | Rough Carpentry | 945,914 | 149,910 | 1,095,824 | See Attached Worksheet | 4 |
| 6 | Finish Carpentry | 290,986 | 0 | 290,986 | See Attached Worksheet | 5 |
| 7 | Waterproofing | 100,831 | 13,436 | 114,267 | See Attached Worksheet | 6 |
| 7 | Insulation | 225,488 | 10,330 | 235,818 | See Attached Worksheet | 7 |
| 7 | Roofing | 547,142 | 43,303 | 590,445 | See Attached Worksheet | 8 |
| 7 | Sheet Metal | | | | See Attached Worksheet | 9 |
| 8 | Doors | 344,108 | 28,440 | 372,548 | See Attached Worksheet | 10 |
| 8 | Windows | 573,859 | 51,009 | 624,868 | See Attached Worksheet | 11 |
| 8 | Glass | | | | See Attached Worksheet | 12 |
| 9 | Lath and Plaster | | | | See Attached Worksheet | 13 |
| 9 | Drywall | 1,439,363 | 0 | 1,439,363 | See Attached Worksheet | 14 |
| 9 | Tile Work | 176,270 | 24,375 | 200,645 | See Attached Worksheet | 15 |
| 9 | Acoustical | | | | See Attached Worksheet | 16 |
| 9 | Wood Flooring | | | | See Attached Worksheet | 17 |
| 9 | Resilient Flooring | 134,517 | 0 | 134,517 | See Attached Worksheet | 18 |
| 9 | Painting and Decorating | 391,912 | 30,756 | 422,668 | See Attached Worksheet | 19 |
| 10 | Specialties | 152,164 | 10,701 | 162,865 | See Attached Worksheet | 20 |
| 11 | Special Equipment | 44,011 | 5,925 | 49,936 | See Attached Worksheet | 21 |
| 11 | Cabinets | 141,603 | 7,350 | 148,953 | See Attached Worksheet | 22 |
| 11 | Appliances | 172,197 | 19,982 | 192,179 | See Attached Worksheet | 23 |
| 12 | Blinds and Shades, Artwork | 31,500 | 0 | 31,500 | See Attached Worksheet | 24 |
| 12 | Carpets | 214,789 | 0 | 214,789 | See Attached Worksheet | 25 |
| 13 | Special Construction | | | | See Attached Worksheet | 26 |
| 14 | Elevators | 223,598 | 18,050 | 241,648 | See Attached Worksheet | 27 |
| 15 | Plumbing and Hot Water | 1,840,500 | 125,566 | 1,966,066 | See Attached Worksheet | 28 |
| 15 | Heat and Ventilation | 1,579,197 | 81,828 | 1,661,025 | See Attached Worksheet | 29 |
| 15 | Air Conditioning | | | | See Attached Worksheet | 30 |
| 16 | Electrical | 2,379,760 | 150,646 | 2,530,406 | See Attached Worksheet | 31 |
| | Subtotal (Structures) | 16,493,322 | 1,188,564 | 17,681,886 | | 32 |
| | Accessory Structures | 0 | 0 | 0 | | 33 |
| | Total (Structures) | 16,493,322 | 1,188,564 | 17,681,886 | | |

Replaces FHA-2330-A, which is obsolete.

form HUD-92330-A (3/94)
ref. Handbook 4470.1 & 4470.2

2

| Div. | Trade Item | Paid in Cash | To be Paid Cash | Total | Name of Subcontractor or Payee | Line |
|---|---|---|---|---|---|---|
| 2 | Earth Work | 750,193 | 100,000 | 850,193 | See Attached Worksheet | 35 |
| 2 | Site Utilities | 987,072 | 77,713 | 1,064,785 | See Attached Worksheet | 36 |
| 2 | Roads and Walks | 305,263 | 10,237 | 315,500 | See Attached Worksheet | 37 |
| 2 | Site Improvements | 294,259 | 53,101 | 347,360 | See Attached Worksheet | 38 |
| 2 | Lawns and Planting | 110,003 | 212,600 | 322,603 | See Attached Worksheet | 39 |
| 2 | Unusual Site Conditions | 208,342 | 4,499 | 212,841 | | 40 |
| | Total (Land Improvements) | 2,655,132 | 458,150 | 3,113,282 | | 41 |
| | Total (Structure and Land Improvements) | 19,148,454 | 1,646,714 | 20,795,168 | | 42 |
| 1 | General Requirements | 321,451 | 35,717 | 357,168 | | 43 |
| | General Overhead | 983,136 | 107,015 | 1,070,151 | | 44 |
| | Miscellaneous (Labor and Materials)⁻ | 44,081 | 4,898 | 48,979 | | 45 |
| | Bond Premium | 134,511 | 105,186 | 239,697 | | 46 |
| | Other Fees—Paid by Contractor | | | | | 47 |
| | | | | | | 48 |
| | Total Costs | 20,611,633 | 1,899,530 | 22,511,163 | | 49 |

⁻ Total purchases of materials and cost of labor amounting to less than $1,000 may be included as a lump sum under miscellaneous materials and labor. Costs exceeding this amount for materials and labor must be allocated to the trade item under which they were expended on HUD-92330-A worksheets 3 and 4.

Note: If additional space is required for these or other items, append Rider thereto, with references and initial. When more than one subcontractor is performing a trade item, the attached work sheet must be completed giving the information indicated.

**Itemized Breakdown**

| General Requirements (Job Overhead) | | Other Fees—Paid by Contractor | |
|---|---|---|---|
| Item | Total | Item | Total |
| Supervision | $  862,589 | | $ |
| Field Engineering | 69,420 | | |
| Field Office Expense | 51,921 | | |
| Temporary Facilities | 34,421 | | |
| Temporary Utilities | 31,800 | | |
| Cleaning and Rubbish Removal | 48,979 | | |
| Bond | 239,697 | | |
| Watchmen Wages | | | |
| Insurance | 357,168 | | |
| | | | |
| | | | |
| Total for General Requirements | $  1,715,995 | Total | $ |

The undersigned hereby certifies that: (Check One)

a  There has not been and is not now any identity of interest between mortgagor and/or general contractor on the one hand and any subcontractor, material supplier or equipment lessor on the other.

≡  The accompaniment contains a statement fully describing any identities of interest. Identity of interest is defined as follows: When there is any financial interest of the party of the first part in the party of the second part; when one or more of the officers, directors or stockholders or the part of the first part is also an officer, director or stockholder of the party of the second part; when any officer, director or stockholder of the party of the first part has any financial interest whatsoever in the party of the second part; when the part of the second part advances any funds to the party of the first part; when the party of the second part provides and pays on behalf of the party of the first part the cost of any architectural services or engineering services other than those of a surveyor, general superintendent, or engineer employed by a general contract in connection with its obligations under the construction contract; when the party of the second part takes stock or any interest in the party of the first part as part of the consideration to be paid them; when there exist or come into being any side deals, agreements, contracts or undertakings entered into or contemplated, thereby altering, amending or cancelling any of the required closing documents except as approved by the Commissioner.

All amounts shown have been reduced to give effect to the amount(s) of any kickbacks, rebates, adjustments, discounts, or any other devices which have had the effect of reducing the actual cost, and all amounts shown above as "to be paid in cash" will be so paid within forty-five (45) days after final endorsement.

Note: This certificate must be supported by a certification as to actual cost by an independent Certified Public Accountant or by an independent public accountant as required for Forms HUD-3305 or 3306. I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate. Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

Signature:
X _Larry J. Miller_                                     Date: 10/5/05

Replaces FHA-2330-A, which is obsolete.

form HUD-92330-A (3/94) ref. Handbook 4470.1 & 4470.2

Worksheet

3

989-F  800/900.9  250-T  3127618490  From-MINER BARNHILL GALLAND  08:40am  10-07-05

# Wolf Company LLP



A Wolf Financial Group Member

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

To the Shareholders
Walsh Construction Company of Illinois
Chicago, Illinois

We have audited the WALSH CONSTRUCTION COMPANY OF ILLINOIS' Contractor's Certificate of Actual Cost (Form HUD-92330-A), through June 7, 2005, related to the construction of South Park Plaza – Project No. 071-35693. Form HUD-92330-A is the responsibility of the Company's management. Our responsibility is to express an opinion on Form HUD-92330-A based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether Form HUD-92330-A is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures of Form HUD-92330-A. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation. We believe that our audit provides a reasonable basis for our opinion.

As described in Note 1, the Certificate of Actual Cost has been prepared on the basis of accounting and reporting practices prescribed by the Department of Housing and Urban Development (HUD). These prescribed practices are a comprehensive basis of accounting other than generally accepted accounting principles. This report is intended solely for filing with HUD and is not intended for any other purpose.

In our opinion, the Contractor's Certificate of Actual Cost referred to above presents fairly the actual costs of South Park Plaza through June 7, 2005 on the basis of accounting described in Note 1.

We certify that we have no financial interest in the contractor or the mortgagor other than in the practice of our profession.

*Wolf & Company LLP*

Oak Brook, Illinois
September 7, 2005

2100 Clearwater Drive    Oak Brook, Illinois 60523-1927
630.545.4500 main    630.574.7818 fax    www.wolfcpa.com

| Div. | Trade Item | Paid in Cash | To be Paid Cash | Total | Name of Subcontractor or Payee |
|---|---|---|---|---|---|
| 3 | Concrete - Foundations | 709,449 | 84,937 | 794,386 | Il in One Contractors |
|  | 2" Structural Topping | 208,487 | 11,730 | 220,217 | Barrier |
|  | Pre-cast Concrete Planks | 487,785 | 25,673 | 513,458 | ATMI Dynacore |
|  | Miscellaneous Bulkheads, Equipment Pads, pelts | 87,863 | 100,000 | 187,863 | Walsh Construction |
| 4 | Masonry · | 2,283,737 | 103,893 | 2,387,630 | Frank McNutt Construction |
|  | Safety & Cleanup | 122,532 | 0 | 122,532 | Walsh Construction |
|  | Masonry Sealcoat | 71,500 | 0 | 71,500 | Szabo's Masonry Cleaning |
| 5 | Metals | 555,707 | 90,722 | 646,429 | K&K Ironworks |
|  | Safety & Cleanup | 36,743 | 0 | 36,743 | Walsh Construction |
| 6 | Rough Carpentry & Townhouse Bays | 826,365 | 149,910 | 976,275 | Salamone Builder's |
|  | Safety Cleanup & townhouse Bays | 119,549 | 0 | 119,549 | Walsh Construction |
| 6 | Finish Carpentry | 214,965 | 0 | 214,965 | Salamone Builder's |
|  | Install Microwaves & extinguishers | 30,750 | 0 | 30,750 | Window Treatments Inc |
|  | Window Sills, Safety Cleanup | 45,271 | 0 | 45,271 | Walsh Construction |
| 7 | Waterproofing | 71,360 | 13,436 | 84,796 | Architectural Sealants |
|  | Miscellaneous Sealants, Firestop, Cleanup & Safety | 29,471 | 0 | 29,471 | Walsh Construction |
| 7 | Insulation – Buildings | 153,077 | 0 | 153,077 | Salamone Builder's |
|  | Fire Proofing | 42,940 | 10,330 | 53,270 | Chicago Ceilings & Partition |
|  | Miscellaneous Sealants, Firestop, Cleanup & Safety | 29,471 | 0 | 29,471 | Walsh Construction |
| 7 | Roofing | 517,671 | 43,303 | 560,974 | A-1 Roofing Company |
|  | Miscellaneous Sealants, Firestop, Cleanup & Safety | 29,471 | 0 | 29,471 | Walsh Construction |
| 7 | Sheet Metal |  |  |  | Included in Roofing |
| 8 | Doors | 268,941 | 28,440 | 297,381 | Star Contractor's Supply |
|  | Custom Sliding Doors | 32,260 | 0 | 32,260 | Monda Windows |
|  | Miscellaneous Safety & Swing Balcony Doors | 42,907 | 0 | 42,907 | Walsh Construction |
| 8 | Windows & Storefronts | 546,870 | 51,009 | 597,879 | Monda Windows |
|  | Miscellaneous Safety & Swing Balcony Doors | 27,189 | 0 | 27,189 | Walsh Construction |
| 8 | Glass |  |  |  | Included in Windows |
| 9 | Lath and Plaster |  |  |  | N/A |
| 9 | Drywall | 1,361,773 | 0 | 1,361,773 | Salamone Builder's |
|  | Miscellaneous Access pencls, Finish Protection & Safety Cleanup | 77,590 | 0 | 77,590 | Walsh Construction |
| 9 | Tile Work  Ceramic | 140,811 | 24,375 | 165,186 | Office Environment |
|  | Miscellaneous Access panels, Finish Protection & Safety Cleanup | 35,459 | 0 | 35,459 | Walsh Construction |
| 9 | Acoustical |  |  |  | Included in Drywall |
| 9 | Wood Flooring |  |  |  | N/A |
| 9 | Resilient Flooring | 99,059 | 0 | 99,059 | Office Environment |
|  | Miscellaneous Access panels, Finish Protection & Safety Cleanup | 35,458 | 0 | 35,458 | Walsh Construction |

F-968   P.007/009   T-250   08167151213   From-MINER BARNHILL GALLAND   09:40am   10-07-05

| Div. | Trade Item | Paid in Cash | To be Paid Cash | Total | Name of Subcontractor or Payee |
|------|-----------|-------------|----------------|-------|-------------------------------|
| 9 | Painting and Decorating | 356,453 | 30,756 | 387,209 | Continental Painting |
| | Miscellaneous Access panels, Finish Protection & Safety Cleanup | 35,489 | 0 | 35,489 | Walsh Construction |
| 10 | Specialties Shelving & Toilet Accessories | 120,167 | 10,701 | 130,868 | Window Treatments Inc. |
| | Signage, Postal & Safety Cleanup | 31,997 | 0 | 31,997 | Walsh Construction |
| 11 | Special Equipment | | | | |
| | Trash Chutes & Compactors | 33,049 | 5,925 | 38,974 | Wilkinson Hi-Rise |
| | Safety Cleanup | 10,962 | 0 | 10,962 | Walsh Construction |
| 11 | Cabinets | 135,014 | 7,350 | 143,364 | Republic Industries |
| | Safety Cleanup | 5,589 | 0 | 5,589 | Walsh Construction |
| 11 | Appliances | 152,212 | 19,982 | 172,194 | Angel's Cleaning |
| | Safety Cleanup | 19,985 | 0 | 19,985 | Walsh Construction |
| 12 | Blinds and Shades, Artwork | 31,500 | 0 | 31,500 | Window Treatments Inc. |
| 12 | Carpets | 214,789 | 0 | 214,789 | Office Environment |
| 13 | Special Construction | | | | N/A |
| 14 | Elevators | 194,910 | 18,050 | 212,960 | Thyssenkrupp Elevators |
| | Safety Cleanup | 28,688 | 0 | 28,688 | Walsh Construction |
| 15 | Plumbing and Hot Water | 1,530,516 | 105,164 | 1,635,681 | Maxwell Plumbing |
| | Fire Sprinklers | 255,571 | 20,405 | 275,976 | Northstar Fireprotection |
| | Safety Cleanup | 54,411 | 0 | 54,411 | Walsh Construction |
| 15 | Heat and Ventilation | 1,518,939 | 81,828 | 1,600,767 | HVAC Consultants |
| 15 | Air Conditioning | | | | Included in Heat & Ventilation |
| | Safety Cleanup | 60,258 | 0 | 60,258 | Walsh Construction |
| 16 | Electrical | 2,310,897 | 160,646 | 2,461,543 | Foster Electric |
| | Trenching, Safety Cleanup | 68,863 | 0 | 68,863 | Walsh Construction |
| 2 | Earth Work | 360,143 | 0 | 360,143 | Dynamic Wrecking |
| | | 390,050 | 100,000 | 490,050 | Walsh Construction |
| 2 | Site Utilities | 811,518 | 35,351 | 846,869 | Builder's Trucking |
| | | 100,153 | 0 | 100,153 | Foster Electric |
| | | 75,401 | 42,362 | 117,763 | Walsh Construction |
| 2 | Roads and Walks | 94,763 | 10,237 | 105,000 | Illinois Paving |
| | | 210,500 | 0 | 210,500 | II In One Contractors |
| 2 | Site Improvements – New Fencing | 108,398 | 45,839 | 154,237 | S&S Industries |
| | Cleaning | 39,312 | 5,790 | 45,302 | Top-to-Bottom |
| | | 27,960 | 1,472 | 29,432 | Wayles Engineering |
| | Site Security, Cleanup, Remaining Earthwork | 118,389 | 0 | 118,389 | Walsh Construction |
| 2 | Lawns and Planting | 81,971 | 212,600 | 294,571 | Salt Creek Desing |
| | Safety Cleanup | 26,032 | 0 | 26,032 | Walsh Construction |
| 2 | Unusual Site Conditions | 52,563 | 0 | 52,563 | Walsh Construction |
| | | 155,679 | 4,499 | 160,178 | Builder's Trucking |

Replaces FHA-2330-A, which is obsolete.

form HUD-92330-A (2/94)
Handbook 4470.1 & 4470.2

Exhibit O

| OWNER'S SWORN STATEMENT | | | | | | 2005 | |
|---|---|---|---|---|---|---|---|
| PROJECT NAME: South Park Plaza | | | | | | Draw # 21 wcci | |
| STATE OF ILLINOIS | | | Revised | | | Hud's # 30 | |
| COUNTY OF COOK | | | | | | | |

The affiant Carole Millison being duly sworn on oath deposes and says that she is the
owner of the following described premises in Cook County, Illinois to wit:

1. That she is thoroughly familiar with all the facts and circumstances concerning the premises described above;
2. That during the six months last past the only work done or materials furnished in connection with the mentioned premises are listed below;
3. That the only contracts let for the furnishing of future work or materials relative to the contemplated improvements are as listed below;
4. That this statement is a true and complete statement of all such contracts, previous payments, and balances due, if any.

| | NAME/ ADDRESS | KIND OF WORK | ORIGINAL TOTAL | ADJUST- MENTS | ADJUSTED TOTAL | PREVIOUSLY PAID | NET AMT. DUE | BALANCE TO BECOME DUE |
|---|---|---|---|---|---|---|---|---|
| 1 | Loewenberg + Assoc. | Arch.-Design | $360,000 | $0 | $360,000 | $360,000 | $0 | $0 |
| 2 | Loewenberg + Assoc. | Architect-Supr. | $90,000 | $0 | $90,000 | $89,200 | $800 | $0 |
| 3 | EDI | Environmental | $10,325 | ($3,314) | $7,011 | $7,011 | $0 | $0 |
| 4 | Carnow, Conibear | Environmental | $1,600 | $0 | $1,600 | $1,600 | $0 | $0 |
| 5 | Carlson | Environmental | $8,991 | ($4,172) | $4,819 | $4,819 | $0 | $0 |
| 6 | Carlson | UST Removal | $207,611 | ($30,000) | $177,611 | $177,611 | $0 | $0 |
| 7 | IEC | Civil Engr. | $78,300 | $25,157 | $103,457 | $103,457 | $0 | $0 |
| 8 | IEC | Survey | $33,000 | ($5,724) | $27,276 | $27,276 | $0 | $0 |
| 9 | AMS | Market Study | $12,000 | $860 | $12,860 | $12,860 | $0 | $0 |
| 10 | STS | Soils Report | $15,543 | ($5,418) | $10,125 | $10,125 | $0 | $0 |
| 10a | Flood Testing | Testing Services | $0 | $4,600 | $4,600 | $4,600 | $0 | $0 |
| 11 | ECS | Concrete/Radon | $55,000 | ($41,614) | $13,386 | $13,386 | $0 | $0 |
| 12 | Walsh Construction | Construction | $22,501,843 | $1,309,339 | $23,811,182 | $22,207,465 | $490,547 | $1,113,170 |
| 13 | Walsh Construction | Design/Supr. | $581,220 | $0 | $581,220 | $581,220 | $0 | $0 |
| 14 | South Park Plaza LP | Constr. Ctgcy | $630,000 | ($630,000) | | $0 | $0 | $0 |
| 15 | South Park Plaza LP | Furnishings | $14,200 | $0 | $14,200 | $0 | $0 | $14,200 |
| 16 | Walsh/Boyd Elec. | MEP Design | $25,600 | $0 | $25,600 | $25,600 | $0 | $0 |
| 17 | NEF | Legal/Oversite | $45,000 | ($10,000) | $35,000 | $35,000 | $0 | $0 |
| 18 | South Park Plaza, L.P. | Organization | $2,000 | $0 | $2,000 | $0 | $0 | $2,000 |
| 19 | Commonwealth Edison | Electirc Transfr | $153,126 | $0 | $153,126 | $153,126 | $0 | $0 |
| 20 | DOH | Pre-Dev Interest | $1,350 | $0 | $1,350 | | $0 | $1,350 |
| 21 | City of Chicago | Permits | $28,656 | $0 | $28,656 | $28,656 | $0 | $0 |
| 22 | D. L. DuBois & Assoc. | Appraisal | $12,000 | $0 | $12,000 | $12,000 | $0 | $0 |
| 23 | G. A Kennedy & Assoc. | Arch. Review | $5,800 | $0 | $5,800 | $5,800 | $0 | $0 |
| 24 | HUD | Exam. Fee | $26,400 | $0 | $26,400 | $26,400 | $0 | $0 |
| 25 | Midland | MIP | $88,000 | $0 | $88,000 | $44,000 | $0 | $44,000 |
| 26 | Midland | IOD & W/C | $446,676 | ($8,016) | $438,660 | $438,660 | $0 | $0 |
| 27 | Midland | Inspections | $44,000 | $0 | $44,000 | $44,000 | $0 | $0 |
| 28 | Midland | TIF Def. Escrow | $142,000 | $0 | $142,000 | $142,000 | $0 | $0 |
| 29 | Northern Trust/Seaway | Bridge Interest | $613,511 | ($174,844) | $438,667 | $246,673 | $14,667 | $177,327 |
| | Seaway Nat. Bank | | $0 | $9,000 | $9,000 | $9,000 | $0 | $0 |
| 30 | Bond Trustee | Neg. Arb. Res. | $706,516 | ($46,516) | $660,000 | $660,000 | $0 | $0 |
| 31 | Midland | Constr. Interest | $392,223 | $0 | $392,223 | $0 | $0 | $392,223 |
| 32 | NEF/SPP, LP | Operating Res. | $398,000 | $0 | $398,000 | $0 | $0 | $398,000 |
| 33 | Midland | Ins. Escrow | $30,000 | $0 | $30,000 | $0 | $0 | $30,000 |
| 34 | Midland | Legal | $10,000 | $0 | $10,000 | $10,000 | $0 | $0 |
| 35 | Duane Morris Hecksher | Legal | $230,000 | $0 | $230,000 | $230,000 | $0 | $0 |
| 36 | Charity & Associates | Legal | $25,000 | $0 | $25,000 | $25,000 | $0 | $0 |
| 37 | Sanchez & Daniels | Legal | $50,000 | $0 | $50,000 | $50,000 | $0 | $0 |
| 38 | Schiff, Hardin | Legal | $75,000 | $0 | $75,000 | $75,000 | $0 | $0 |
| 39 | Whitehead & Assoc. | Legal | $10,000 | $10,000 | $20,000 | $20,000 | $0 | $0 |
| 40 | Miner, Barnhill | Legal | $80,000 | $6,572 | $86,572 | $86,572 | $0 | $0 |
| 41 | Thomas & Thomas | Mtge. Banking | $150,000 | $0 | $150,000 | $150,000 | $0 | $0 |
| 42 | Loop Capital | Underwriter | $252,500 | ($2,000) | $250,500 | $250,500 | $0 | $0 |
| 43 | Developers Mtge. Corp. | Mtge. Banker | $176,000 | $0 | $176,000 | $176,000 | $0 | $0 |
| 44 | Title Services | Tittle/Recording | $35,000 | $0 | $35,000 | $35,000 | $0 | $0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 45 | WCDC | Developer | $2,250,000 | ($533,763) | $1,716,237 | ?288 | $0 | $1,413,549 |
| 46 | Thomas & Thomas | Fncl Consulting | $100,000 | $0 | $100,000 | ?,000 | $0 | $0 |
| 47 | WCDC | Marketing | $52,000 | $0 | $52,000 | $0 | $0 | $52,000 |
| 48 | Friduss, Lukee, Schiff | Accounting | $32,020 | $0 | $32,020 | $17,915 | $0 | $14,105 |
| 49 | Mesirow Financial | Constr. Ins. | $70,000 | ($1,530) | $68,470 | $68,470 | $0 | $0 |
| 50 | Louik, Schneider | TIF Consultant | $29,006 | ($1,166) | $27,840 | $27,840 | $0 | $122,291 |
| 51 | Cole Taylor/Seaway | LOC Fee | $70,000 | $122,423 | $192,423 | $70,132 | $0 | $0 |
| 52 | Burnham | Expeditor | $51,482 | ($4,874) | $46,608 | $46,608 | $0 | $0 |
| 53 | Chicago Housing Auth. | Land Lease | $99 | $0 | $99 | $99 | $0 | $0 |
| 54 | Sidley, Austin | Legal | $2,683 | $0 | $2,683 | $2,683 | $0 | $0 |
| 55 | Dearborn Assoc. | Nef Inspector | $0 | $15,000 | $15,000 | $12,488 | $2,512 | $0 |
| | TOTALS | | $31,511,281 | $0 | $31,511,281 | $27,228,140 | $508,526 | $3,774,615 |

Signed this _____ 8th day of _AUGUST_____ , 2005  SIGNED_____

BY _By Ms. Carole Millison, President, WCDC

Subscribed and sworn to before me this_____ 8th_____ day of ____AUGUST_____ , 2005

Notary Public _____

Commission Expires_____ 8/11/06 _____

SEE SOURCES and USES on the attached sheets

| | | | | | Draw # 20 | | Draw # 21 |
|---|---|---|---|---|---|---|---|
| SEE SOURCES and USES | | | | | | | |
| DRAWS | | | | | Draw # 20 | | Draw # 21 |
| Sources of funds as listed below | | | | | | | |
| Title Co. | | | | | | | |
| $8,800,000 | | | | | 131522 | | 46303 |
| to Seaway Bank | | | | | | | |
| $8,714,000 | | | | | | | |
| Title Co. NEF equity | | | | | | | |
| $10,183,166 | From contingency portion of these dollars | | | | 38976 | | 400255 |
| to Seaway $5,600,000 | | | | | | | |
| to Seaway-cost of issuance funds | | | | | | | |
| $591,000 | | | | | 14000 | | 14667 |
| Bridge Int $ 438,667 | | | | | | | |
| Loc fund $ 126,332 | leftovers | | | | | | |
| Seaway fee $ 8,000 | | | | | | | |
| Leftovers $ 18,001 | | | | | | | |
| Leftovers $ 69,027 | | | | | | | |
| $7,992,100 | | | | | 124989 | | 44003 |
| fhlb-ahp $ 500,000 | | | | | | | |
| from CHA-GRANT | | | | | | | |
| bond at close 8655 | | | | | 3855 | | 3298 |
| site work $835,753 | | | | | | | |
| Boa-TC $1,805,000 | | | | | 313342 | | |
| Sponsor cont. $100 | | | | | | | 508,526 |
| Funded for project | | | | Current funds requirede for draw # 21 | | | |
| $31,511,281 | | | | | | | $3,168,741 |
| $31,511,281 | $26,247,741 | ######## | ######## | ######### | $3,990,609 | $3,677,267 | |
| -5263540 | ($676,298) | ######## | ($763,822) | ($621,306) | ($313,342) | ($508,526) | |

Comments: The open items need to be resolved between the Owner, Architect, and the General Contractor.
However, Sealer burden was undertaken by Todd. He removed the owner from this issue and I feel the subcontractor
should be removed as well for several reasons. The window sill burdens ( added material, labor and delays) are Jim's.
Any and all costs associated with delays & tax credit losses should be discussed from a lack of coordination on the
part of Walsh perspective. Having said that, I would discuss reductions to Walsh's build-up change order fees.
Using this approach my return the depleted developer fess and or go toward the deminishment of the winter conditions
The total winter conditions values are currently contained in this whole number also.

**OWNER'S SWORN STATEMENT**     ...2005

PROJECT NAME: South Park Plaza     Draw # 20 wcci

STATE OF ILLINOIS     REVISED     Hud's # 29

COUNTY OF COOK

The affiant Carole Millison being duly sworn on oath deposes and says that she is the owner of the following described premises in Cook County, Illinois to wit:

1. That she is thoroughly familiar with all the facts and circumstances concerning the premises described above;
2. That during the six months last past the only work done or materials furnished in connection with the mentioned premises are listed below;
3. That the only contracts let for the furnishing of future work or materials relative to the contemplated improvements are as listed below;
4. That this statement is a true and complete statement of all such contracts, previous payments, and balances due, if any.

| | NAME/ ADDRESS | KIND OF WORK | ORIGINAL TOTAL | ADJUST-MENTS | ADJUSTED TOTAL | PREVIOUSLY PAID | NET AMT. DUE | BALANCE TO BECOME DUE |
|---|---|---|---|---|---|---|---|---|
| 1 | Loewenberg + Assoc. | Arch.-Design | $360,000 | $0 | $360,000 | $360,000 | $0 | $0 |
| 2 | Loewenberg + Assoc. | Architect-Supr. | $90,000 | $0 | $90,000 | $89,200 | $0 | $800 |
| 3 | EDI | Environmental | $10,325 | ($3,314) | $7,011 | $7,011 | $0 | $0 |
| 4 | Carnow, Conibear | Environmental | $1,600 | $0 | $1,600 | $1,600 | $0 | $0 |
| 5 | Carlson | Environmental | $8,991 | ($4,172) | $4,819 | $4,819 | $0 | $0 |
| 6 | Carlson | UST Removal | $207,611 | ($30,000) | $177,611 | $177,611 | $0 | $0 |
| 7 | IEC | Civil Engr. | $78,300 | $25,157 | $103,457 | $103,457 | $0 | $0 |
| 8 | IEC | Survey | $33,000 | ($5,724) | $27,276 | $27,276 | $0 | $0 |
| 9 | AMS | Market Study | $12,000 | $860 | $12,860 | $12,860 | $0 | $0 |
| 10 | STS | Soils Report | $15,543 | ($5,418) | $10,125 | $10,125 | $0 | $0 |
| 10a | Flood Testing | Testing Services | $0 | $4,600 | $4,600 | $3,085 | $1,515 | $0 |
| 11 | ECS | Concrete/Radon | $55,000 | ($41,614) | $13,386 | $13,386 | $0 | $0 |
| 12 | Walsh Construction | Construction | $22,501,843 | $1,035,290 | $23,537,133 | $21,911,652 | $295,813 | $1,329,668 |
| 13 | Walsh Construction | Design/Supr. | $581,220 | $0 | $581,220 | $581,220 | $0 | $0 |
| 14 | South Park Plaza LP | Constr. Ctgcy | $630,000 | ($630,000) | $0 | $0 | $0 | $0 |
| 15 | South Park Plaza LP | Furnishings | $14,200 | $0 | $14,200 | $0 | $0 | $14,200 |
| 16 | Walsh/Boyd Elec. | MEP Design | $25,600 | $0 | $25,600 | $25,600 | $0 | $0 |
| 17 | NEF | Legal/Oversite | $45,000 | ($10,000) | $35,000 | $35,000 | $0 | $0 |
| 18 | South Park Plaza, L.P. | Organization | $2,000 | $0 | $2,000 | $0 | $0 | $2,000 |
| 19 | Commonwealth Edison | Electirc Transfr | $153,126 | $0 | $153,126 | $153,126 | $0 | $0 |
| 20 | DOH | Pre-Dev Interest | $1,350 | $0 | $1,350 | $0 | $0 | $1,350 |
| 21 | City of Chicago | Permits | $28,656 | $0 | $28,656 | $28,656 | $0 | $0 |
| 22 | D. L. DuBois & Assoc. | Appraisal | $12,000 | $0 | $12,000 | $12,000 | $0 | $0 |
| 23 | G. A Kennedy & Assoc. | Arch. Review | $5,800 | $0 | $5,800 | $5,800 | $0 | $0 |
| 24 | HUD | Exam. Fee | $26,400 | $0 | $26,400 | $26,400 | $0 | $0 |
| 25 | Midland | MIP | $88,000 | $0 | $88,000 | $44,000 | $0 | $44,000 |
| 26 | Midland | IOD & W/C | $446,676 | ($8,016) | $438,660 | $438,660 | $0 | $0 |
| 27 | Midland | Inspections | $44,000 | $0 | $44,000 | $44,000 | $0 | $0 |
| 28 | Midland | TIF Def. Escrow | $142,000 | $0 | $142,000 | $142,000 | $0 | $0 |
| 29 | Northern Trust/Seaway | Bridge Interest | $613,511 | ($174,844) | $438,667 | $232,673 | $14,000 | $191,994 |
| | Seaway Nat. Bank | | $0 | $9,000 | $9,000 | $9,000 | $0 | $0 |
| 30 | Bond Trustee | Neg. Arb. Res. | $706,516 | ($46,516) | $660,000 | $660,000 | $0 | $0 |
| 31 | | Constr. Interest | $392,223 | $0 | $392,223 | $0 | $0 | $392,223 |
| 32 | NEF/SPP, LP | Operating Res. | $398,000 | $0 | $398,000 | $0 | $0 | $398,000 |
| 33 | Midland | Ins. Escrow | $30,000 | $0 | $30,000 | $0 | $0 | $30,000 |
| 34 | Midland | Legal | $10,000 | $0 | $10,000 | $10,000 | $0 | $0 |
| 35 | Duane Morris Hecksher | Legal | $230,000 | $0 | $230,000 | $230,000 | $0 | $0 |
| 36 | Charity & Associates | Legal | $25,000 | $0 | $25,000 | $25,000 | $0 | $0 |
| 37 | Sanchez & Daniels | Legal | $50,000 | $0 | $50,000 | $50,000 | $0 | $0 |
| 38 | Schiff, Hardin | Legal | $75,000 | $0 | $75,000 | $75,000 | $0 | $0 |
| 39 | Whitehead & Assoc. | Legal | $10,000 | $10,000 | $20,000 | $20,000 | $0 | $0 |
| 40 | Miner, Barnhill | Legal | $80,000 | $6,572 | $86,572 | $86,572 | $0 | $0 |
| 41 | Thomas & Thomas | Mtge. Banking | $150,000 | $0 | $150,000 | $150,000 | $0 | $0 |
| 42 | Loop Capital | Underwriter | $252,500 | ($2,000) | $250,500 | $250,500 | $0 | $0 |
| 43 | Developers Mtge. Corp. | Mtge. Banker | $176,000 | $0 | $176,000 | $176,000 | $0 | $0 |
| 44 | Title Services | Tittle/Recording | $35,000 | $0 | $35,000 | $35,000 | $0 | $0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 45 | WCDC | Developer | $2,250,000 | ($259,714) | $1,990,286 | ...288 | $0 | | $1,687,998 |
| 46 | Thomas & Thomas | Fncl.Consulting | $100,000 | $0 | $100,000 | $100,000 | $0 | | $0 |
| 47 | WCDC | Marketing | $52,000 | $0 | $52,000 | $0 | $0 | | $52,000 |
| 48 | Friduss, Lukee, Schiff | Accounting | $32,020 | $0 | $32,020 | $17,915 | $0 | | $14,105 |
| 49 | Mesirow Financial | Constr. Ins. | $70,000 | ($1,530) | $68,470 | $68,470 | $0 | | $0 |
| 50 | Louik, Schneider | TIF Consultant | $29,006 | ($1,166) | $27,840 | $27,840 | $0 | | $0 |
| 51 | Cole Taylor/Seaway | LOC Fee | $70,000 | $122,423 | $192,423 | $70,132 | $0 | | $122,291 |
| 52 | Burnham | Expeditor | $51,482 | ($4,874) | $46,608 | $46,608 | $0 | | $0 |
| 53 | Chicago Housing Auth. | Land Lease | $99 | $0 | $99 | $99 | $0 | | $0 |
| 54 | Sidley, Austin | Legal | $2,683 | $0 | $2,683 | $2,683 | $0 | | $0 |
| 55 | Dearborn Assoc. | Nef inspector | $0 | $15,000 | $15,000 | $11,774 | $714 | | $2,512 |
| | TOTALS | | $31,511,281 | $0 | $31,511,281 | $26,916,098 | $312,042 | | $4,283,141 |

Signed this ____9th  day of _AUGUST_____ , 2005  SIGNED _____

BY_ By Ms. Carole Millison, President, WCDC

Subscribed and sworn to before me this____ 9th t _____ day of ____AUGUST_____ , 2005

Notary Public _____

Commission Expires _____ 8/11/06 ___

SEE SOURCES and USES on the attached sheets

SEE SOURCES and USES

| | | | | | Draw # 19 | | | Draw # 20 |
|---|---|---|---|---|---|---|---|---|
| DRAWS | | | | | | | | |
| Sources of funds as listed below | | | | | | | | |
| Title Co. | | | | | | | | |
| $8,800,000 | | | | | | | | |
| to Seaway Bank | | | | | 163,386 | | | 131061 |
| $8,714,000 | | | | | | | | |
| Title Co. NEF equity | | | | | 291,850 | | | 38576 |
| $10,183,166 | From contingency portion of these dollars | | | | | | | |
| to Seaway $5,600,000 | | | | | | | | |
| to Seaway-cost of issuance funds | | | | | | | | |
| $591,000 | | | | | 14667 | | | 14000 |
| Bridge Int $ 438,667 | | | | | | | | |
| | leftovers | | | | | | | |
| Loc fund $ 126,332 | | | | | | | | |
| Leftovers $18,001 | | | | | | | | |
| Leftovers $69,027 | | | | | 156,987 | | | |
| $7,992,100 | | | | | | | | 124550 |
| fhlb-ahp $ 500,000 | | | | | | | | |
| from CHA-GRANT | | | | | | | | |
| bond at close 8655 | | | | | | | | |
| site work $835,753 | | | | | | | | |
| Boa-TC $1,805,000 | | | | | | | | 3855 |
| Sponsor cont. $100 | | | | | | | | |
| Funded for project | | | | Current funds requirede for draw # 20 | | | | 312,042 |
| $31,511,281 | | | | | | | | |
| $31,511,281 | $26,247,741 | ######## | ######## | ######### | $4,617,499 | $3,990,609 | | $3,678,567 |
| -5263540 | ($676,298) | ######## | ($763,822) | ($621,306) | ($626,890) | ($312,042) | | |