IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ex. rel. )
GREG HUDALLA, )
 )
   Plaintiffs, )  No. 05 C 5930
 )
  v. )
 )
WALSH CONSTRUCTION COMPANY, an )
Illinois Corporation, )
 )
   Defendants. )

## WALSH CONSTRUCTION COMPANY'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Defendant, WALSH CONSTRUCTION COMPANY ("Walsh"), by and through its attorneys, Matthew P. Walsh, II and John E. Sebastian and Hinshaw & Culbertson LLP, and for its Amended Answer and Affirmative Defenses to Plaintiff's Amended Complaint, states as follows:

## COUNT I
## (VIOLATION OF 31 U.S.C. § 3729(A)(1))

### JURISDICTION AND VENUE

1. As required under the False Claims Act, 31 U.S.C. § 3730 (b)(2), on October 11, 2005, Greg Hudalla, the relator, has provided the Attorney General of the United States and the United States Attorney for the Northern District of Illinois with a statement of all material evidence and information related to the complaint.

**ANSWER:** Walsh lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 1 and therefore denies same.

2.     This Court has jurisdiction over this matter pursuant to 31 U.S.C. § 3730(b) (in that the claims for relief in this action are brought in the name of the United States Government) and pursuant to 31 U.S.C. § 3730 (e)(4) (in that Hudalla is an "original source" of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this action based on this information).

**ANSWER:**   Walsh denies that this Court has jurisdiction because the Plaintiff's lawsuit is legally and factually baseless.   Walsh lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 2 and therefore denies same.

3.     Venue is proper pursuant to 28 U.S.C. § 1391(b), (c) in that the defendant resides in this district.

**ANSWER:**   Walsh denies that venue is proper because the Plaintiff's lawsuit is legally and factually baseless.

## PARTIES

4.     Defendant, Walsh Construction Company (Walsh) is an Illinois corporation and employs over 500 employees. Walsh's principal place of business is located in Chicago, Illinois. Walsh is engaged in the construction business and provides, among other things, general contracting services to both private and government developers. Walsh is one of the largest construction companies in the City of Chicago.

2

Walsh serves as general contractor for many federally financed construction projects including, but not limited to, Westhaven, Park Boulevard, Park Crescent and Altgeld Gardens. The construction value of these other federally funded construction projects exceeds $150,000,000.

**ANSWER:**   Walsh denies that the statement that "it serves as general contractor for many federally financed construction projects" and that "the construction value of these other federally funded construction projects exceeds $150,000,000" accurately characterizes the nature and scope of its business.   Walsh admits the remaining allegations in paragraph 4.

5.     Plaintiff, Greg Hudalla (Hudalla), the relator, resides in Downers Grove, Illinois. Hudalla has been in the construction industry for over twenty-five (25) years.

**ANSWER:**   Walsh lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 5 and therefore denies same.

### FACTS

6.     Woodlawn Community Development Corporation (WCDC) is an Illinois corporation with its principal place of business located in Chicago, Illinois. WCDC is, and has been, a not-for-profit social services community organization for over 41 years.

**ANSWER:**   Walsh admits that Woodlawn Community Development Corporation is an Illinois corporation.   Walsh lacks knowledge or information sufficient

6558101v1  895084  54316

to form a belief about the truth of the remaining allegations in paragraph 6 and therefore denies same.

7.      In recent years, the City of Chicago (City) has promoted public policies in which it has demolished and re-developed pre-existing public housing structures.

**ANSWER:**    Walsh lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 7 and therefore denies same.

8.      In or around 2000, the City decided to demolish the Prairie Shores public housing project located at or near 26th Street and Calumet Avenue in Chicago, Illinois, and re-locate its tenants. The re-development project was named South Park Plaza (SPP).

**ANSWER:**    Walsh admits the allegations in paragraph 8.

9.      SPP was to be built in two phases: Phase I was comprised of four cluster town homes and two mid-rise buildings containing approximately 134 rental units intended for City residents who qualify for City rent assistance programs. Phase II was comprised of over 90 town homes intended for general sale to the public at fair market value.

**ANSWER:**    Walsh admits the allegations in paragraph 9.

10.      The SPP project was funded by local, state and federal funds. Specifically, the National Equity Fund guaranteed the SPP equity funding and is an ownership partner with WCDC in SPP with WCDC. The United States Department of Housing and

4

Urban Development (HUD) provided 51% of the SPP funding and guaranteed 100% of the SPP mortgage dollars. The City provided 49% of the SPP funding through its home funds program. Cole Taylor Bank provided an interim bridge loan of $5,600,000.

**ANSWER:** Walsh admits that Cole Taylor Bank provided financing. Walsh denies that the SPP project was funded by local, state and federal funds. Walsh lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 10 and therefore denies same.

11. Beginning in 2000, the City and WCDC contracted to allow WCDC to act as developer for SPP, to manage the forthcoming SPP rental properties and to assist the City in relocating the former Prairie Shores tenants. WCDC was entitled to a fixed developer's fee of $2,250,000 at the time it contracted with the City and HUD.

**ANSWER:** Walsh admits that WCDC entered into a contract with the City of Chicago to act as a developer of the SPP project. Walsh denies any allegation in paragraph 11 inconsistent with the agreement between WCDC and the City.

12. Given the size and scope of the SPP project, WCDC met with and solicited bids from general contractors in an effort to hire a general contractor for the SPP project including, among others, Hunter Alliance Corporation, Walsh, UBM General Contractors and Pepper Construction Co. The City advised WCDC that Walsh was the "right company" for the SPP project and that the City would prefer if it contracted with Walsh for the SPP project

6558101v1 895084 54316

**ANSWER:**    Walsh admits that WCDC solicited a bid from it for the SPP project. Walsh lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 12 and therefore denies same.

13.    In the fall of 2002, WCDC hired Hudalla to, among other things, oversee the SPP construction project.

**ANSWER:**    Walsh admits that Hudalla represented that he worked for WCDC to "oversee" the SPP project.  Walsh lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 13 and therefore denies same.

14.    Hudalla's WCDC responsibilities included serving as WCDC's construction site representative, interfacing with the SPP general contractor throughout the project, reviewing construction change orders requested and/or required on the project.

**ANSWER:**    Walsh lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 and therefore denies same.

15.    WCDC incorporated South Park Plaza, L.L.C. to perform its SSP work. In December, 2002, WCDC selected Walsh as the SSP general contractor. In September 2003, South Park Plaza, L.L.C. and Walsh executed a HUD Construction Contract Cost Plus on HUD form HUD-92442-A (WCDC/Walsh Contract) attached hereto and incorporated herein as Exhibit A.

6

**ANSWER:**   Walsh admits that it entered into an agreement with the South Park Plaza, LP ("SPP").  The agreement between Walsh and SPP is a written document which is the best evidence of its terms.   Walsh denies all allegations in paragraph 15 inconsistent with the agreement.  Walsh denies that Exhibit A is a complete copy of the agreement between it and SPP.   Except as admitted, Walsh lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 15 and therefore denies same.

16.     The *WCDC/Walsh Contract* provided, among other things, that: (1) WCDC would pay the actual SPP construction costs; (2) it would pay Walsh $1,171,692 to serve as general contractor; (3) the total maximum SPP payments were not to exceed $22,501,843; and (4) any excess amounts and/or payments shall be returned to WCDC. See *WCDC/Walsh Contract*, Exhibit A. Cost savings for the project were to be returned to the developer which reduced the mortgage amount on the property reducing WCDC's monthly SPP burden which, in turn, allowed it to offer lower rents to SPP tenants. *Id*.

**ANSWER:**   Walsh admits that it was hired as a general contractor for the SPP project, the owner would pay Walsh its cost of construction plus other costs, and the original contract price was $22,501,843.  Walsh further states that there are other terms of the agreement between it and SPP which determine the total amount to be paid to Walsh not set forth in paragraph 16.    Except as admitted, Walsh denies all allegations in paragraph 16 inconsistent with the agreement.

17.     In its capacity as general contractor, Walsh was required to, among other things, negotiate with and select subcontractors for the SPP project. Walsh executed subcontractor contracts with each subcontractor performing work on the SPP project. Each subcontract contains an exhibit outlining the scope of work and responsibilities for that particular subcontract.

**ANSWER:**    Walsh admits the allegations in paragraph 17.

18.     Pursuant to the *WCDC/Walsh Contract*, once Walsh began the SPP construction project, Walsh would collect its contract fee, and the value of construction work completed and materials utilized, on a monthly basis by submitting monthly applications for payment and draw requests on HUD form HUD-92448. On this form, Walsh was required to itemize, and account for the costs and fees constituting each draw request. A Walsh representative is further required to attest to the accuracy of the application for payment.

**ANSWER:**    Walsh admits that for each payment request, Walsh submitted for the owners and architect's review and approval, among other documents, a form HUD-92448, a payment application, and a sworn affidavit. Walsh further states that because of restrictions on the HUD form, the monthly payment applications reflect the actual detailed cost values updated only for actual progress of work completed on the original scope of work of construction by line item and that the HUD form represents only the original schedule of costs.

19.     Pursuant to the *WCDC/Walsh Contract* and the HUD, Illinois Housing Department Authority and the City Department of Housing regulations, Walsh's general contractor fee cannot exceed six percent (6%) of the total construction costs, its overhead cannot exceed two percent (2%) of the total construction costs and the general conditions for the project cannot exceed six percent (6%) of the total construction costs of the project. See Walsh/WCDC Contract, Exhibit A.

**ANSWER:**     Walsh denies that the allegations contained in paragraph 19 accurately reflect the obligations and rights under the *WCDC/Walsh Contract* when taken as a whole.  Further answering the allegations contained in this paragraph, Walsh states that the term "total construction costs" is not defined by the Contract, and the term "general conditions" does not appear in the Contract, which terms speak for itself. Walsh further incorporates its response to paragraph 20 as if fully restated herein.

20.     The "general conditions" of a construction project refers to the general costs incurred in the day-to-day operation of the construction site including salary for a project manager and site superintendent, certain safety issues and other miscellaneous labor. Walsh utilizes an internal list of expenses which constitute its general conditions. *See Walsh SPF General Conditions List*, attached hereto and incorporated herein as Exhibit B. "Builder's overhead" refers to expenses such as upper management salary and fees and insurance.

9

**ANSWER:**    Walsh denies that the allegations in paragraph 20 completely reflects what are general conditions and builder's overhead.   Walsh admits that it submitted a budget for Supervision and General Conditions anticipated for the SPP project as identified on Exhibit B to the Plaintiff's Complaint. Walsh further states that the agreement between Walsh and SPP governs what Walsh was entitled to seek reimbursement for and is a written document which is the best evidence of its terms. Walsh further incorporates its response to paragraph 19 as if fully restated herein.

21.    The SPP project is now completed and awaiting final audit and review by HUD. During course of the project, Walsh presented 21 total applications for payment and draw requests. In each and every one of the applications for payment and draw requests, Walsh manipulated the line items on those applications for payment and draw requests to allow it collect funds as profit which it either was already paid pursuant to its general conditions/contractors' fee and overhead budget or which were already paid to subcontractors as a legitimate payments pursuant to their subcontracts. As a result, Walsh collected amounts to which it was not entitled under federal law or pursuant to the *WCDC/Walsh Contract* and thus caused the federal government to make to Walsh fraudulent and unlawful payments on the SPP project.

**ANSWER:**    Walsh admits that it completed the SPP project and that the owner and architect accepted the SPP project as complete.   Except as admitted, Walsh denies the remaining allegations in paragraph 21.

10

22. For example, on or about June 24, 2004, Walsh presented an application for payment which constituted draw request no. 10. See Walsh June 24, 2004 *Application for Payment and Draw Request*, attached hereto and incorporated herein as Exhibit C. In that draw request:

a. Walsh sought payment of approximately $35,500 for "electrical consumption." Electrical consumption, however, is a "general condition" as indicated on Walsh's own internal documents. *See Walsh June 24, 2004 Application for Payment and Draw Request*, Exhibit C and *Walsh SPP General Conditions List*, Exhibit B

b. Walsh sought payment of approximately $99,847 for "trenching." "Trenching" is an expense otherwise accounted for in the electrical subcontractor contract scope of work. *See Walsh June 24, 2004 Application for Payment and Draw Request*, Exhibit C and *SPP Electrical Subcontract*, attached hereto and incorporated herein as Exhibit D.

c. Walsh sought payment of approximately $101,247 for masonry protection safety and taping which is already accounted for in the masonry subcontract scope of work and/or otherwise accounted for as WCDC's responsibility. *See Walsh June 24, 2004Applicatio22 lbr Payment and Draw Request, Exhibit C and SPP Masonry Subcontract*, attached hereto and incorporated herein as Exhibit E.

d. Walsh sought payment of approximately $11,103 for structural steel/miscellaneous metals protection and safety which is already accounted for in the structural steel subcontract scope of work and/or otherwise accounted for as WCDC's responsibility. *See Walsh June 24, 2004 Application for Payment and Draw Request*, Exhibit C and *SPP Structural Steel Subcontract*, attached hereto and incorporated herein as Exhibit L.

e. Walsh sought payment of approximately $33.339 for roofing and fireproofing coordination protection and safety which is already accounted for in the roofing subcontract scope of work, otherwise accounted for as WCDC's responsibility (site protection) and/or already accounted for in Walsh's contractor's fee (subcontractor coordination). *See WCDC/Walsh Contract*, Exhibit A; Walsh June 24, 2004 *Application for Payment and Draw Request*, Exhibit C and *SPP Roofing Subcontract*, attached hereto and incorporated herein as Exhibit H.

11

**ANSWER:**

a.     Walsh admits that it requested payment, and subsequently received payment, in the amount of $35,500 for line item number 046 titled "Electrical Consumption – WCCI".  Walsh denies that line item number 046 is included within Walsh's general condition costs.  Walsh's budget for Supervision and General Conditions specifically excludes, as "Not Included", from Walsh's general condition costs "Utility Bills".  See Walsh's General Conditions Budget, Category 3 "Temporary Construction & Utilities", Exhibit B to Complaint.  Except as admitted, Walsh denies the allegations in paragraph 22(a).

b.     Walsh admits that it requested payment, and subsequently received payment, in the amount of $98,847 for line item number 047 titled "Service Loop Trenching – WCCI".  Walsh denies that "Service Loop Trenching" is a line item within the electrical subcontractor's, Foster Electric ("Foster"), subcontract agreement's scope of work.  Foster requested a change order to Walsh for the Service Loop Trenching costs because additional conduit was required to be installed beyond what was specified by the plans and specifications.  The Service Loop Trenching additional work is identified within Walsh Change Order Number 011.  The Service Loop Trenching claim for additional compensation was

12

reviewed and eventually approved by the owner. Except as admitted, Walsh denies the allegations in paragraph 22(b).

c.      Walsh admits that it requested payment, and subsequently received payment, in the amount of $101,247 for line item number 016 titled "Masonry Protection, Safety, & Tarping – WCCI". Walsh denies that "Masonry Protection, Safety, & Tarping" is work to performed by the masonry subcontractor, McNutt Construction ("McNutt"), agreement's scope of work. As such, Masonry Protection, Safety, & Tarping costs incurred by Walsh were not charged back against McNutt's subcontract price. Additionally, Walsh's general conditions include only safety costs for the entire project and this line item does not include safety costs related to each subcontractor trade as stated on Walsh's General Conditions. See, General Conditions Budget, Category 5 "Job Maintenance", Complaint Exhibit B. Rather, as part of its general contractor responsibilities, if needed depending on the circumstances, Walsh was required to provide certain safety protections to its subcontractor trades. In order to meet its obligations as the general contractor for the SPP project, Walsh was required to provide safety protection and material protection to the work area and work installed by

McNutt.  Except as admitted, Walsh denies the allegations in paragraph 22(c).

(d)  Walsh admits that it requested payment, and subsequently received payment, in the amount of $11,103 for line item number 018 titled "Structural Steel/Miscellaneous Metals – K&K Ironworks (PCO 60125 $15,484, PCO 6006 $188)".  Walsh denies that "Structural Steel/Miscellaneous Metals" is work to performed by the structural steel subcontractor, K&K Ironworks ("K&K"), agreement's scope of work.  As such, Structural Steel/Miscellaneous Metals costs incurred by Walsh were not charged back against K&K's subcontract price.  Additionally, Walsh's general conditions include only safety costs for the entire project and this line item does not include safety costs related to each subcontractor trade as stated on Walsh's General Conditions.  See, General Conditions Budget, Category 5 "Job Maintenance", Complaint Exhibit B.  Rather, as part of its general contractor responsibilities, if needed depending on the circumstances, Walsh was required to provide certain safety protections to its subcontractor trades.  In order to meet its obligations as the general contractor for the SPP project, Walsh was required to provide safety protection and material protection to the work area and work installed by

14

K&K. Except as admitted, Walsh denies the allegations in paragraph 22(d).

e.      Walsh admits that it requested payment, and subsequently received payment, in the amount of $33,339 for line item number 025 titled "Roofing and Fireproofing – Coordination, Protection & Safety – WCCI". Walsh denies that "Roofing and Fireproofing – Coordination, Protection & Safety" is work to performed by the structural roofing subcontractor, A-1 Roofing ("A1"), agreement's scope of work.   As such, Roofing and Fireproofing – Coordination, Protection & Safety costs incurred by Walsh were not charged back against A1's subcontract price.   Additionally, Walsh's general conditions include only safety costs for the entire project and this line item does not include safety costs related to each subcontractor trade as stated on Walsh's General Conditions. See, General Conditions Budget, Category 5 "Job Maintenance", Complaint Exhibit B. Rather, as part of its general contractor responsibilities, if needed depending on the circumstances, Walsh was required to provide certain safety protections to its subcontractor trades.   In order to meet its obligations as the general contractor for the SPP project, Walsh was required to provide safety protection and material protection to the work

15

area and work installed by A1. Except as admitted, Walsh denies the allegations in paragraph 22(e).

23.    Walsh attempted to hide these fraudulent payments in the manner in which it executed and reported the values of the SPP subcontractor contracts.

**ANSWER:**    Walsh denies the allegations in paragraph 23.

24.    For example, Walsh was required by HUD to report on HUD form HUD2328 the contractor's cost breakdown and schedule of values. *See Walsh Cost Breakdown and Schedule of Values* attached hereto as Exhibit F. On HUD form HUD2328, Walsh falsely inflated the value of the SPP subcontractor contracts. For example:

a.    Walsh advised HUD that the plumbing subcontract contract was valued at $1,819,310 when, in fact, Hudalla and WCDC later learned that the actual plumbing subcontract was valued at $1,562,100. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false line items on draw requests. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Plumbing Subcontract*, attached hereto and incorporated herein as Exhibit G.

b.    Walsh advised HUD that the roofing subcontract contract was valued at $562,386 when, in fact, Hudalla and WCDC later learned that the actual roofing subcontract was valued at $542,875. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false line items on draw requests. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Roofing Subcontract*, attached hereto and incorporated herein as Exhibit H.

c.    Walsh advised HUD that the hydraulic elevator subcontract contract was valued at $218,566 when, in fact, Hudalla and WCDC later learned that the actual hydraulic elevator subcontract was valued at $203,600. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false line items on draw requests. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Hydraulic Elevator Subcontract*, attached hereto and incorporated herein as Exhibit I.

16

d.      Walsh advised HUD that the electrical subcontractor contract was valued at $2,472,511 when, in fact, Hudalla and WCDC later learned that the actual electrical subcontract was valued at $2,180,298. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false electrical related line items on draw requests such as "consumption" and "trenching." *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Electrical Subcontract*, Exhibit D.

e.      Walsh advised HUD that the heating and ventilation subcontractor contract was valued at $1,690,589 when, in fact, Hudalla and WCDC later learned that the actual heating and ventilation subcontract was valued at $1,591,220. This allowed Walsh to collect the difference fraudulently as profit by creating false heating and ventilation related line items. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Heating and Ventilation Subcontract*, attached hereto and incorporated herein as Exhibit J.

f.      Walsh advised HUD that the earth excavation subcontract contract was valued at $ 592,021 when, in fact, Hudalla and WCDC later learned that the actual earth excavation subcontract was valued at $480,746. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false line items on draw requests. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Earth Excavation Subcontract*, attached hereto and incorporated herein as Exhibit K.

g.      Walsh advised HUD that the structural metals subcontract contract was valued at $680,249 when, in fact, Hudalla and WCDC later learned that the actual structural metals subcontract was valued at $581,996. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false line items on draw requests. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Structural Metals Subcontract*, attached hereto and incorporated herein as Exhibit L.

h.      Walsh advised HUD that the windows subcontract contract was valued at $629,543 when, in fact, Hudalla and WCDC later learned that the actual windows subcontract was valued at $556,040. This discrepancy allowed Walsh to collect the difference fraudulently as profit by creating false line items on draw requests. *See Walsh Cost Breakdown and Schedule of Values*, Exhibit F and *SPP Windows Subcontract*, attached hereto and incorporated herein as Exhibit M.

**ANSWER:** Walsh denies the allegations in paragraph 24 and subparagraphs a through h. Walsh admits that the form HUD 2328 (5/95) statement (the "HUD Statement") represents the estimated schedule of values for the SPP project. The HUD Statement does not reflect each line item's actual total cost (and corresponding subcontract cost) for construction of the SPP project upon completion. The HUD Statement differs from each of Walsh's detailed payment applications (which applications represent the actual cost of completion of the SPP project) for, among other reasons, the following: it combines certain areas of work into one line item, it does not reflect each respective actual and adjusted subcontract amount, it does not reflect changes to the scope of work which increased certain line items and subcontractor costs. Furthermore, the Plaintiff lists certain subcontract amounts which are the amount of the respective subcontract amounts at execution of the subcontract and each number listed in paragraph 24 does not reflect the final subcontract amount agreed to upon completion of the SPP project as adjusted for change orders. Except as admitted, Walsh denies the allegations in paragraph 24 and subparagraphs a through h.

25. WCDC, Walsh, and others, including Hudalla, attended monthly meetings where each of Walsh's applications for payment and draw requests were discussed. Hudalla, on numerous occasions, advised both Walsh and WCDC that it appeared from his review of certain line items on Walsh's application for payment including, among others, those set forth in detail in ¶22-24 above (the "suspicious line items") that Walsh

18

was seeking payments for expenses which were either not permitted pursuant to federal law or the contract, or otherwise were already accounted for under the "general conditions" portion of the draw request.

**ANSWER:** Walsh admits that Hudalla attended monthly meetings wherein payment applications were reviewed. Walsh denies the remaining allegations in paragraph 25.

26. In response to Hudalla's inquiries during these meetings, as well as at other times, Hudalla was advised by, among others, Craig Kane (Kane), Walsh's SPP project manager, and Todd Pressley (Pressley), Mr. Kane's supervisor, that the suspicious line items were Walsh's own "internal change orders" for work Walsh allegedly had to perform directly on the project.

**ANSWER:** Walsh admits that Hudalla attended monthly meetings wherein payment applications were reviewed. Walsh further admits that Crain Kane was Walsh's SPP Project Manager and that Todd Pressley was Mr. Kane's supervisor. Walsh denies the remaining allegations in paragraph 26.

27. Upon further review of Walsh's applications for payment and the SPP subcontractor contracts, Hudalla learned that Walsh was not entitled to any payments from the suspicious line items because: (a) the work performed fell under the "general conditions" portion of the draw request for which Walsh was already compensated and thus it was not entitled to any additional payments for such work; (b) it was work for

which subcontractors were paid and already obligated to perform pursuant to the express terms of the SPP subcontractor contracts; and (c) regardless of 27(a) or (b) above, Walsh did not perform any of the work reflected on the "internal change orders" for which Walsh sought such payments.

**ANSWER:**    Walsh denies the allegations in paragraph 28, specifically denying each of its subparts.

28.    As a result, Hudalla again raised during the monthly SPP meeting the suspicious line items referenced in ¶22-24 above.   Kane, Pressley and others told Hudalla that Walsh regularly "does business" this way and routinely collects additional funds in this manner on construction projects which are governed by maximum cost contracts such as SPP and other federally funded construction projects on which it is, or has, been hired.   Hudalla was further told generally during these meetings that, given both the City's preference that Walsh act as the SPP general contractor and the timing of the project itself, WCDC should accept Walsh's applications for payment and other accounting documents as they were presented.

**ANSWER:**    Walsh admits that Hudalla attended monthly meetings.   Walsh denies the remaining allegations in paragraph 28.

29.    On October 5, 2005, Walsh submitted to WCDC an executed Contractor's Certificate of Actual Cost on HUD form HUD-92330-A. *See Walsh SPP Contractor's Certificate of Actual Cost* attached hereto and incorporated herein as Exhibit N. On the

*Contractor's Certificate of Actual Cost*, Walsh under reported by approximately $1,300,000 the amounts of funds it received for the SPP construction costs. *Compare Walsh SPP Contractor's Certificate of Actual Cost*, Exhibit N with *WCDC Draw 21 Draft Sworn Statement*, attached hereto and incorporated herein as Exhibit O.

**ANSWER:**   Walsh admits that it submitted a completed audit of its costs and expenses for the SPP project on form HUD 92330-A.   Walsh denies the allegations remaining allegations in paragraph 29.

30.   Walsh under reported the SPP construction costs on the *SPP Contractor's Certificate of Actual Cost* to ensure it would receive amounts it was currently owed while not exceeding the maximum SPP construction costs pursuant to *the WCDC/Walsh Contract*. In reality, Walsh collected fraudulently in excess of $1,300,000 in profit from the SPP project in the manner outlined above.

**ANSWER:**   Walsh denies the allegations in paragraph 30.

31.   As a result of the conduct detailed in Paragraphs 1 through 30 of this Count I, Walsh caused to be filed with the United States Government claims for construction payments with knowledge of their falsity or with grossly negligent or reckless disregard to facts and conditions that would indicate that said claims were inaccurate or inappropriate and false and caused payments for said claims to be made by the United States Government.

**ANSWER:**   Walsh denies the allegations in paragraph 31.

32.     By reason of the violation of 31 U.S.C. 3729(0(1), Walsh has knowingly or recklessly damaged the United States Government on the SPP project in an as yet undetermined amount, but in any event, in excess of $1,300,000.

**ANSWER:**     Walsh denies the allegations in paragraph 32.

33.     By reason of the violation of 31 U.S.C. 3729(a)(1), and given the sheer number of other government financed construction projects for which Walsh serves as general contractor, including, but not limited to, the federally financed construction projects known as Westhaven, Park Boulevard, Park Crescent and Altgeld Gardens, and the manner in which Walsh "accounts" for its costs, expenses and fees, Walsh has, on information and belief, knowingly or recklessly damaged the United States Government in an as yet undetermined amount but, in any event, in excess of $5,000,000.

**ANSWER:**     Walsh denies the allegations in paragraph 33.

## COUNT II
### (VIOLATION OF 31 U.S.C. § 3729(A)(2)

1-33.   The Plaintiffs repeat and re-allege the allegations of Paragraphs 1 through 33 of Count I as paragraphs 1 through 33 of this Count IL.

**ANSWER:**     Walsh restates its answers to paragraphs 1 through 33 of Count I as its answer to paragraphs 1 to 33 of Count II.

34.     As a result of the conduct detailed in Paragraphs 1 through 29 of this Count II, Walsh caused to be filed with the United States Government claims for construction payments with knowledge of their falsity or with grossly negligent or

22

reckless disregard to facts and conditions that would indicate that said claims were inaccurate or inappropriate and false and caused payments for said claims to be made by the United States Government.

**ANSWER:**    Walsh denies the allegations in paragraph 34.

35.    By reason of the violation of 31 U.S.C. § 3729(a)(2), Walsh has knowingly or recklessly damaged the United States Government in an as yet undetermined amount but, in any event, in excess of $6,300,000.

**ANSWER:**    Walsh denies the allegations in paragraph 35.

## COUNT III
## (VIOLATION OF 31 U.S.C. § 3729(0(7)

1-35.    The Plaintiffs repeat and re-allege the allegations of Paragraphs 1 through 34 of Counts I and II as paragraphs 1 through 35 of this Count III.

**ANSWER:**    Walsh restates its answers to paragraphs 1 to 35 of Counts I and II as its answers to paragraphs 1 to 35 of Count III.

36.    As a result of the conduct detailed in Paragraphs 1 through 29 of this Count III, Walsh knowingly used or caused to be used a false statement to conceal, avoid and decrease its obligation to pay or transmit money to the Government funds which were not utilized for construction costs on the SPP project and, on information and belief, other federally funded construction projects.

**ANSWER:**    Walsh denies the allegations of paragraph 36.

23

37.     By reason of the violation of 31 U.S.C. § 3729(a)(7), Walsh has knowingly or recklessly damaged the United States Government in an as yet undetermined amount but, in any event, in excess of $6,300,000.

**ANSWER:**     Walsh denies the allegations of paragraph 37.

## AFFIRMATIVE DEFENSES

### *First Affirmative Defense – Statute of Limitations*

For its First Affirmative Defense, Walsh states that some of Hudalla's claims are barred by the statute of limitations applicable to claims arising under the False Claims Act, 31 U.S.C. §3729 *et seq.*

### *Second Affirmative Defense – Lack of Jurisdiction*

For its Second Affirmative Defense, Walsh states that some of Hudalla's claims are barred because he was not the original source of the information as required by the

6558101v1 895084 54316

False Claims Act, 31 U.S.C. §3729 *et seq.*, and this Court therefore does not have jurisdiction to allow those claims to proceed in the United States District Court.

Respectfully submitted,

By: _/s/ Justin M. Penn_____
One of the Attorneys for Defendant

Matthew P. Walsh, II (ARDC # 6210360)
John E. Sebastian (ARDC # 6230240)
Justin M. Penn (ARDC # 6283726)
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, IL 60601-1081
(312) 704-3000

6558101v1 895084 54316

## CERTIFICATE OF SERVICE

I hereby certify that on **April 26, 2010**, I electronically filed **Defendant Walsh Construction Company's Amended Answer and Affirmative Defenses to Plaintiff's Amended Complaint,** with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

**Jeffrey R. Kulwin**
**Shelly Byron Kulwin**
Kulwin, Masciopinto & Kulwin, LLP
161 North Clark Street
Suite 2500
Chicago , IL 60601

**Eric S Pruitt**
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago , IL 60604

Respectfully submitted,
Walsh Construction Company, Inc.
By:  /s/ Justin M. Penn
HINSHAW & CULBERTSON LLP
222 North LaSalle Street, Suite 300
Chicago, IL 60601

6558101v1 895084 54316