**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA *ex rel.* GREG HUDALLA,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 05 C 5930** |
| **WALSH CONSTRUCTION COMPANY,** | ) ) | |
| **Defendant.** | ) ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY,  District Judge:

Relator Greg Hudalla has brought *qui tam* claims on behalf of the United States against Walsh Construction Company under the False Claims Act (FCA), 31 U.S.C. § 3729(a).  Hudalla claims that Walsh utilized fraudulent billing practices while working as general contractor on eight federally funded affordable housing projects and that it thereby received federal government money to which it was not entitled.  Walsh has moved for summary judgment on Hudalla's claims, and Hudalla has cross-moved for partial summary judgment on liability and Walsh's affirmative defenses.  For the reasons stated below, the Court denies Walsh's motion and grants Hudalla's motion in part.

**Background**

The Court takes the following facts from the parties' memoranda of law and statements of uncontested facts.  On a motion for summary judgment, the Court construes all facts favorably to the nonmoving party and makes reasonable inferences

in that party's favor. *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 552 (7th Cir. 2011).

Although Hudalla and Walsh disagree about the relevant aspects of what constitutes

appropriate billing and accounting practice on a construction project that involves

government funding, they agree on most of the historical facts.

Walsh is a Chicago-based construction management and general contracting

firm that has worked since the mid-1990s on a variety of public housing projects.  In

1999 or 2000, the Woodlawn Community Development Corporation (WCDC) became

the "project sponsor" (also referred to as the "owner" or "developer") for a Chicago

housing project called South Park Plaza.  After securing funding from various private

and government sources, WCDC hired Walsh as its general contractor.  A general

contractor administers a construction project, overseeing logistics and hiring

subcontractors to perform necessary "trade work" such as carpentry or plumbing.  A

developer usually works directly with and pays only the general contractor, which is

then responsible for directing and compensating the subcontractors and paying other

project expenses.

Hudalla served as WCDC's construction-site representative for South Park and

in that capacity had the opportunity to review Walsh's applications for payment from

WCDC during and after the project.  After the project was completed, he concluded that

Walsh had utilized fraudulent billing practices to receive more money than it was

allowed to make for its work on South Park.  He claims in this lawsuit that Walsh also

engaged in the same fraudulent practices in the course of its work on seven other

Chicago affordable-housing construction projects:  Beth-Anne Extended Living, Lake

Park Crescent, Pershing Courts, Roosevelt Tower, St. Sabina Senior Housing, and

2

Westhaven I and II.[1]  Walsh for the most part does not deny that it made estimates and kept billing records on South Park and the other projects in the manner Hudalla claims, but it denies that there was anything wrong with its practices or methodology.

All of the projects received one or more of four types of financial support that originate with the United States Department of Housing and Urban Development (HUD).  First, HUD directly funded two projects through its Capital Advance program.  Second, HUD provided funds to the City of Chicago to finance projects through the HOME program.  Third, HUD provided funds to the Chicago Housing Authority (CHA) to finance projects through the Mixed Finance program.  Several of the projects at issue received funding via the HOME or Mixed Finance programs.  Fourth, on certain projects, HUD guaranteed mortgages against developer default.  Each of the projects at issue that received mortgage guarantees also received funds via one of the other sources just described.

Each project was completed under one of two types of contracts:  "lump sum" contracts for Beth-Anne, Roosevelt, and Pershing, and "cost plus" contracts for the rest.  To be awarded a lump sum contract, a general contractor enters into a competitive bidding process.  The amount of the winning bid is the amount the winning contractor receives for its work on the project, regardless of whether its actual expenses are lower or higher.  In a cost plus contract, the general contractor receives the lower of its expenses on a project or the "guaranteed maximum price" (GMP) for that project, which

---

[1] The Westhaven Park development was the site of two separate construction projects involving Walsh, referred to by the parties as "Westhaven I" and "Westhaven II."

is a total it works out in advance with the developer.

Walsh was paid periodically during the course of its work on each project to ensure that it would have enough funds to pay for expenses and subcontractors, a practice typical of general contracting arrangements. The projects established interim pay periods, each of which concluded with a meeting that included Walsh, representatives of the architect and developer, and sometimes government agency personnel. The meeting attendees certified that a project was more or less on track. After each of these certifications, Walsh received a fixed percentage of the project's total price (the lump sum or the GMP, depending on the type of contract). These interim percentage payments were structured so that Walsh would receive its entire fee by the conclusion of a project. At the end of a cost plus project, Walsh submitted a statement of its overall costs to be measured against the GMP for the project. In at least one case, these costs exceeded the GMP, and Walsh therefore did not receive reimbursement for all of its expenses.

The lump sum or GMP for a project can be altered during construction with a "change order" form, but the figures tend not to change very much between estimation and final payment. Because the maximum amount a general contractor can receive on a project is basically established before it begins work, the contractor goes through a detailed process of estimating costs before it submits a bid or agrees to a GMP. This estimation process may involve contacting subcontractors for bids or price quotes, as well as considering what other kinds of work will be necessary for a site. The process culminates in the creation of a document called a "schedule of values" (SOV). An SOV lists the total expected costs for a project, broken down into separate line items for

4

various categories of general contractor and subcontractor work. The projects receiving Capital Advance funding and funding administered by the City of Chicago required Walsh to submit its expected costs on HUD form 2328, which asks for the same information that is included in a typical SOV. The Court will refer to Walsh's SOVs and 2328 forms collectively as SOVs.

For all of the projects except Pershing and Westhaven I and II, the parties agree that Walsh's construction contracts were finalized only after HUD approved the SOVs. These contracts all incorporated the SOVs as exhibits, and the GMP or lump sum listed in each contract was the same amount indicated by the SOV for the project. Walsh completed 2328 forms for Pershing and Westhaven I, but it points out that the forms were not signed by anyone from HUD and are not exhibits to the construction contracts. It contends that they therefore did not factor into the approval process in the same way as the other SOVs. Walsh also completed a non-2328 SOV for Westhaven II that it claims HUD approved, although neither the form itself nor the contract to which it is an exhibit indicates that approval. Just as with the other five contracts, however, the lump sum or GMP for each of these projects is the same value that appears on the SOV for the particular project.

Each SOV includes a total expected cost for the project, broken down into itemized lists of costs. These lists are further subdivided into two main sections. The first section is called the "trade lines" or "trade items." These lines include the costs of each particular kind of "hard construction" work that the project requires, such as masonry or carpentry. The second section indicates three separate allotments of money specifically for the general contractor: profit, builder's overhead, and general

5

conditions.  Profit represents a stipend for the general contractor over and above its expenses.  Builder's overhead is a fixed amount that the general contractor receives in consideration of its day-to-day expenses not directly associated with a particular project, such as rent for its home office.  General conditions, also called general requirements, comprise the cost of non-trade-specific work that the general contractor itself performs on a construction project, such as safety, cleanup, and site security, as well as general expenses such as electrical consumption.

The central point of contention in this case is whether certain self-performed work that Walsh listed and billed as part of the trade items on each project's SOV instead should have been listed under "general conditions."  For example, on the Lake Park project, Walsh completed an additional form called a "sworn statement" that listed costs in a more detailed way than the Lake Park 2328 form.  The sworn statement indicated that Walsh's calculation of trade costs included compensation for itself for work including "safety, clean-up, firestopping, unloading and delivery."  Walsh does not dispute that the totals on the 2328 form reflected billing for these activities or that these amounts represented money that was paid to Walsh separately from the amount it received for general conditions.  Walsh maintains, however, that the all relevant project stakeholders knew that it was billing this way, and it denies that it broke any rules or hid anything from HUD.

Hudalla argues that this practice constituted fraudulent billing.  Specifically, he contends that Walsh's inclusion of costs on the trade lines was fraudulent because most of the costs should have been listed under "general conditions" and that certain other costs were not costs for which Walsh was entitled to bill in the first place.  Hudalla

6

alleges that the costs billed as trade items either duplicated work already accounted for under general conditions or that, by separating these costs from the general conditions line item, Walsh billed more for general conditions than it was allowed to.  In support of the latter argument, Hudalla cites the "Cost Control and Safe Harbor Standards for Rental Mixed-Finance Development," which apply to five of the projects at issue, as establishing that HUD prohibits general contractors from receiving more than six percent of the hard construction costs on any given project as general conditions, as well as two percent as builder's overhead and six percent as profit.

Hudalla contends that the six percent limitation represents a hard cap for general conditions costs.  Therefore, he argues, any general contractor that manages to take home a higher percentage based on work like safety and clean-up – which Hudalla says should be categorized, by definition, under "general conditions" – is cheating the system and deceiving the government.  Thus, according to Hudalla, Walsh illegally supplemented its income in two ways.  First, Walsh received the wrongfully added amounts themselves over and above the six percent allocated on the general contractor lines, thereby receiving compensation for general conditions work that exceeded six percent of the project's hard construction costs.  Second, because Walsh counted these amounts along with subcontractor-performed work when calculating the total construction costs, the total fourteen percent cut that it received was higher than it otherwise would have been.  Walsh denies all of these allegations.

Although Hudalla worked only on the South Park project, his complaint identified four other projects and alleged that, due to the way in which Walsh billed as a matter of practice, it had, "on information and belief, knowingly and recklessly damaged the

7

United States Government" on other projects, "including, but not limited to" several that Hudalla named. Am. Compl. ¶ 33. Walsh moved to dismiss in part, arguing that the non-South Park projects were not properly part of the lawsuit because they were not referenced with sufficient specificity in the complaint. On June 23, 2009, the Court denied the motion, noting that Hudalla did not have access to the records for other projects and that his allegations were sufficiently specific to meet the requirements of Federal Rule of Civil Procedure 9(b). During discovery, Walsh objected to producing materials regarding projects not named in the complaint. The Court granted Hudalla's motion to compel discovery of these materials.

## Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, a court may grant summary judgment "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.    Non-South Park projects

As a threshold matter, Walsh contends that some or all of the projects other than South Park should not be considered in this case because of deficiencies in Hudalla's complaint or other alleged missteps.

### 1.    Adequacy of the complaint

In his original complaint, filed in October 2005, Hudalla alleged in detail how he

contended Walsh had committed fraud in connection with South Park.  He then alleged

that he was told by Walsh supervisory personnel "that this is how Walsh regularly does

business and accounts for its expenses."  Compl. ¶ 26.  Walsh went on to allege that

the damage to the government on South Park exceeded $1,300,000 and that

> given the sheer number of other government financed construction
> projects for which Walsh serves as general contractor, including, but not
> limited to, the federally financed construction projects known as
> Westhaven, Park Boulevard, Park Crescent, and Altgeld Gardens, and
> the manner in which Walsh "accounts" for its costs, expenses and fees,
> Walsh has, on information and belief, knowingly or recklessly damaged
> the United States Government in an as yet undetermined amount but, in
> any event, in excess of $5,000,000.

*Id*. ¶ 32.  In his amended complaint, Hudalla beefed up his allegation regarding Walsh's

general billing practices, alleging that he was told by various Walsh supervisory

personnel that

> Walsh regularly "does business" this way and routinely collects additional
> funds in this manner on construction projects which are governed by
> maximum cost contracts such as SPP and other federally funded
> construction projects on which it is, or has, been hired.

Am. Compl. ¶ 28.  He also supplemented his separate allegation regarding Walsh's use

of fraudulent practices on projects beyond South Park.  *See id.* ¶ 33.

Walsh argues that Hudalla's complaint did not adequately reference the non-

South Park projects because it referred by name only to Westhaven and Lake Park

Crescent – not Beth-Anne, Pershing Courts, Roosevelt Tower, or St. Sabina – and did

not describe Westhaven or Lake Park Crescent in any detail.  Walsh contends that this

ran afoul of Federal Rule of Civil Procedure 9(b), which requires allegations of fraud to

be alleged with particularity.

The adequacy of pleading in Hudalla's complaint, however, is no longer an issue

at this advanced stage of the litigation. In any event, the Court rejected Walsh's Rule 9(b) argument over two years ago when it denied Walsh's motion to dismiss:

> Walsh contends that Hudalla's allegation concerning construction projects other than South Park Plaza fail to allege fraud with the requisite particularity. Generally, an FCA relator must allege specific examples of false claims submitted for payment in order to comply with the heightened pleading requirements of Rule 9(b). This requirement is relaxed, however, when the relator lacks access to the facts necessary to detail his claim. . . . It is undisputed that Hudalla did not have access to records pertaining to Walsh projects other than South Park Plaza. And he has alleged that his superiors at Walsh informed him that the allegedly unauthorized billing of certain expenses to the government was standard operating procedure for Walsh. These allegations are sufficient to meet the requirement the requirements of Rule 9(b).

*United States ex rel. Hudalla v. Walsh Constr. Co.*, No. 05 C 5930 (N.D. Ill. June 23, 2009) (order denying motion to dismiss) (internal citations omitted).

Walsh has been on notice since it was first served with Hudalla's complaint that he was challenging its practices concerning projects beyond South Park, and indeed beyond the other projects Hudalla named in the complaint. That was readily apparent from Hudalla's detailed allegations regarding the nature of the alleged fraud; his contention that he had been told that Walsh billed in the same way on other projects; his identification of several of those projects; and his statement that his claim "includ[es], but [is] not limited to," the named projects. Hudalla's counsel also made it clear at numerous status hearings, all attended by Walsh's counsel, that his claim went beyond South Park: a significant number of discovery-related issues that were brought to the Court's attention concerned Hudalla's requests for documents and information relating to non-South Park projects. Finally, the report of Hudalla's expert, served at the beginning of July 2001, as well as his summary judgment materials, made it abundantly clear that his claims were not confined to South Park.

10

For these reasons, the Court rejects Walsh's argument that, based on the complaint, Hudalla's claims in this case should be limited to South Park.

## 2. FCA presentment requirement

Walsh also argues that, with respect to the non-South Park projects, Hudalla has failed to comply with 31 U.S.C. § 3730(b)(2). This provision requires a relator in a *qui tam* case under the FCA to serve on the government a "copy of the complaint and written disclosure of substantially all material evidence and information the person possesses." According to Walsh, Hudalla's inadequate disclosures relating to the non-South Park projects deprived the government of an adequate opportunity to decide whether to intervene in the case.

There is no question that Hudalla complied with section 3730(b)(2)'s requirement as of the date he filed suit. Walsh does not suggest that Hudalla had information that he held back at the time. In addition, as the Court noted above, the complaint made it clear that Hudalla was alleging that Walsh had used on other projects the same fraudulent practices that his complaint described in detail with regard to South Park. It is also undisputed that the government has been provided with copies of all motions, briefs, and other filings in this case. These included Hudalla's briefs and materials in support of his motion for summary judgment and in opposition to Walsh's motion, including the aforementioned expert report. The summary judgment materials contain, or at least summarize in detail, the vast majority of the material evidence in the case. Again, Walsh does not argue otherwise.

The requirement that a relator disclose his evidence to the government serves a twofold purpose: protecting the government's interests, and protecting the defendant

11

from having to prepare a defense without knowing whether its opposing litigant is the relator or the government. *See United States ex rel. King v. F.E. Moran, Inc.*, No. 00 C 3877, 2002 WL 2003219, at *13 (N.D. Ill. Aug. 29, 2002) (citing *United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995,998-99 (2d Cir. 1995)). Both of these purposes have been satisfied in this case. The government has been apprised of the scope of Hudalla's claims throughout the litigation and unquestionably has had an adequate opportunity to determine whether to intervene. And Walsh likewise has had a full and adequate opportunity to address in discovery and on summary judgment Walsh's claims concerning the non-South Park projects, knowing full well that it is litigating against Hudalla, not the government.

Because Hudalla complied with the statute's literal requirements, and because the purposes behind the statute have been met, the Court denies Walsh's request to strike Hudalla's claims regarding the non-South Park projects. The Court also denies Walsh's request to submit a supplemental memorandum in support of summary judgment regarding those projects, because Walsh has already addressed them in its briefs.

### 3.    Affirmative defenses

Walsh asserted two affirmative defenses along with its answer. The first defense was that the Court lacks jurisdiction over some of Hudalla's claims because he was not the "original source" of the information as required by the FCA. Hudalla rebuts this defense at length in his brief supporting summary judgment, and Walsh provides no contrary argument either in its own brief or its response to Hudalla's. Walsh has

12

forfeited the point.  Hudalla is entitled to summary judgment on this defense.

Walsh's second affirmative defense is based on the FCA statute of limitations, which establishes that a claim may not be brought

> (1) more than 6 years after the date on which the violation . . . is committed; or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

31 U.S.C. § 3731(b).  In a case in which the government has not intervened, the statute of limitations is measured from the date the *qui tam* relator became aware of the facts giving rise to the allegations.  *See King*, 2002 WL 2003219, at *13.

There is no viable statute of limitations defense in this case.  Hudalla filed suit in October 2005.  It is undisputed that this was within three years after he became aware of Walsh's billing practices that he challenges in this case.  It was also within ten years of the alleged FCA violations upon which he sues.

In support of its limitations argument (which concerns only the non-South Park projects), Walsh cites the proposition that a party may not amend its complaint through arguments in a summary judgment brief, noting a case in which a complaint was deemed barred by the statute of limitations although the summary judgment motions discussed a claim.  *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002).  That has no bearing on this case.  As the Court has already indicated, the additional projects have been a part of Hudalla's claims since the beginning of this case, despite Walsh's contention that his allegations were insufficiently detailed.

For these reasons, the Court grants Hudalla's motion for summary judgment on

Walsh's limitations defense.

## B. Hudalla's claims

Hudalla contends that Walsh's practice of billing for general contracting activities under trade items rather than general conditions amounted to a violation of two provisions of the FCA, 31 U.S.C. § 3729(a)(1) and (2). Count one of his complaint concerns section 3729(a)(1), which imposes liability for "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Count two concerns section 3729(a)(2), which imposes liability on "any person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

### 1. Count 1

Walsh argues that Hudalla cannot prove either that its challenged billing practices constituted actual claims to the government, or, if they were claims, that they were knowingly false when made.

#### a. Claims

Hudalla must show that Walsh has presented a "false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). The FCA, at the time of the alleged fraudulent claims at issue here, defined a "claim" as

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

Former 31 U.S.C. § 3729(c). Case law indicates that under this statutory definition of a

14

"claim," there is no FCA liability if the defendant made a claim for payment by an entity that had previously received federal funds over which it thereafter exercised complete control. *See, e.g,. United States Dep't of Transp. ex rel. Arnold v. CMC Eng'g*, 564 F.3d 673, 678 (3d Cir. 2009); *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492-93 (D.C. Cir. 2004).

Hudalla has provided evidence from which a reasonable jury could find that the federal government disbursed funds for construction costs on each of the projects at issue only after HUD had reviewed and approved a budget that included the amount to be paid to Walsh, an amount that, in turn was based on the allegedly false submissions that Walsh had made regarding its costs. From this, a reasonable jury could find that Walsh submitted false claims or caused false claims to be submitted.

Walsh created SOVs for each of the eight projects before the formation of the final construction contracts and incorporated them into at least six of the contracts. The total value listed on each SOV was equal to the initial GMP or lump sum for the project for which the SOV was created. A reasonable jury could conclude from this evidence that the approved GMP and lump sum values for each project were derived from the HUD-approved SOVs. It is undisputed that the interim and total payments Walsh requested and received on each project were based on a percentage of these values. A reasonable jury could therefore conclude that Walsh would not have had access to the money absent HUD approval of the SOVs, and thus that the SOVs themselves constituted requests for payment and therefore claims.[2] And if the total amounts in

---

[2]Walsh points out that there is no undisputed evidence of HUD approval of the SOVs or construction contracts for Pershing and Westhaven I. For both projects,

these SOVs were fraudulently tabulated, as Hudalla alleges, a reasonable jury could find that the SOVs, as the documents that secured HUD's approval for the amount that Walsh was later to request, constituted claims within the meaning of the FCA.

### b. Knowingly false

Central to each of Hudalla's claims is his allegation that Walsh's billing practices were knowingly false or fraudulent. Walsh argues that Hudalla must show that the alleged rules requiring general contracting costs to be billed all in one place and not to surpass fourteen percent were actually requirements, rather than guidelines or expectations.

As Walsh points out, Hudalla provides no evidence that a HUD statute, regulation, or specific written policy mandated that general contractors bill in the way Hudalla contends is required. For his argument that "general conditions" is an exclusive and all-encompassing definition and that five of the projects had a hard cap of six percent for general conditions, Hudalla relies principally on the wording on the SOVs, guidance documents such as Walsh's internal construction manual and a form from the American Institute of Architects, and the declarations of several HUD, CHA, and Chicago employees. In response, Walsh has supplied testimony from various personnel stating that its billing practices were acceptable, including the general counsel of WCDC, who had direct knowledge of the practice. Both sides have

---

however, Walsh completed a 2328 form with the same total value as the lump sum or GMP for the project, and the construction contracts each referred specifically to a schedule of values. A reasonable jury could conclude from this evidence that Pershing and Westhaven I were presented to and approved by HUD in the same manner and based on the same information as the other projects.

16

submitted expert reports and testimony about standard practice in the industry. Based on this evidence, a reasonable jury could go either way on the question of whether Walsh was "allowed" to bill in the manner that it used.

The question of liability in this case, however, depends not on whether Walsh's actions were contrary to a rule but rather on whether they were "knowingly fraudulent." The FCA penalizes "only those statements made with knowledge of their falsity. Innocent mistakes or negligence are not actionable" under the FCA. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 832 (7th Cir. 2011) (internal quotation marks and citation omitted). To establish that Walsh's statements of costs were knowingly fraudulent, Hudalla must show that Walsh's billing methods were calculated to deceive the government. Specifically, he must show that HUD expected Walsh's SOVs and other forms to conform to the rules as Hudalla reads them; Walsh knew of and knowingly thwarted that expectation; and it walked away from the projects with more money than HUD would have allowed. Because the evidence would allow a reasonable jury to determine that the requirements were as either party describes them, it would also allow a reasonable jury to find for either party on the question of HUD's expectations.

In particular, from the evidence described above, a reasonable jury could conclude that the HUD officials who approved the construction contracts did so with the expectation that the costs Hudalla describes as "general conditions" would be billed as such and that they would not exceed six percent of the total construction costs of the projects, and that Walsh knew this. A reasonable jury could also conclude that the HUD officials expected that the total cost for hard construction would not include any

17

money going to the general contractor for "general conditions" expenses – even for those projects not subject to the six percent cap, and that Walsh likewise knew this.

Walsh argues that all the work for which it was paid was self-performed, implying that it was work that HUD would have had to pay for anyway. This misses the point. A reasonable jury could find that HUD expected a general contractor to fit all of its costs for safety, clean-up, and the like into the general conditions line item; that if the general contractor needed to do additional work, it would have to lower its rates or obtain specific written approval; and that Walsh knew this.

Walsh contends that it received such approval, as indicated by the fact its budgets were all approved by various officials of HUD and WCDC. It offers no written example, however, of an SOV or other billing statement that clearly indicated that it was billing for costs included in the trade lines and that HUD officials approved. *Cf. United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999) (noting that the fact that the government was "fully apprised of [the substance of the claims] and never complained about them in the least" was evidence there was no fraud). Although the non-2328 SOV for Westhaven II does indicate that Walsh itself performed work accounted for in the trade items, the form does not include a signature or other indication of approval by a HUD official.

It is certainly true that a jury could find from the evidence that HUD inspectors did not expect Walsh to conform to Hudalla's version of the rules or industry standards and/or that Walsh did not believe that it was doing anything deceptive in order to get paid. Walsh has not shown, however, that a reasonable jury would have no choice but to find that HUD officials knew not just what the total amounts of Walsh's bids were but

18

that it was allocating its costs in the particular manner it used. Indeed, a reasonable jury could find that Walsh's billing methods thwarted the expectations of the HUD officials who approved the contracts for each project and that Walsh's SOVs and subsequent payment requests thus constituted false claims.

In his cross-motion for partial summary judgment, Hudalla contends that a reasonable jury would have no choice but to find that Walsh acted fraudulently. For example, he argues throughout his briefs that the statement on the standard 2328 form that "[t]his form represents the Contractors and/or Mortgagors [sic] firm costs and services as a basis for disbursing dollar amounts" necessarily implied that the representations on the form were in conformity with the rules as Hudalla describes them. He appears to argue that the statements of costs are supposed to be "firm," meaning actual and certain, and that Walsh's knowingly inflated cost estimates deliberately flouted the requirement of firmness by virtue of their dishonesty. A reasonable jury, however, could find that Walsh believed itself to be in compliance with the rules as it understood them, or that "firm" meant its final, best-guess figures for purposes of the form, even if they were to change later.

Hudalla submits the "Cost Control and Safe Harbor Standards for Rental Mixed-Finance Development," which apply to five of the projects, as well as an affidavit from a HUD official, both of which reiterate the six percent, two percent, and six percent caps on profit, builder's overhead, and general conditions. He also points to the definitions of "general conditions" in Walsh's internal construction manual and an American Institute of Architects form, asserting that any activities listed under these definitions can appropriately be billed only on the general conditions line item. In response, Walsh

19

offers expert reports and testimony from several persons with knowledge of its practices

that "general conditions" is not meant to be an exclusive definition.  A reasonable jury

could find from this evidence that Walsh's practice of billing for some of these activities

on the trade lines was not a violation of a hard cap on general conditions

compensation.  Because the words Hudalla cites as establishing definitive rules

arguably are subject to differing interpretations, especially given the fact that they

appear on forms and in guidance documents rather than in statutes or regulations,

nowhere is the evidence indicating fraudulent intent so undisputedly clear as he alleges.

For these reasons, the Court denies both parties' motions for summary judgment

on count 1.

### 2.      Count 2

#### a.      Retroactivity of 2009 FCA amendments

Count 2 of Hudalla's complaint alleges that Walsh violated 31 U.S.C. §

3729(a)(1)(b).  The parties disagree on which version of the statute, which was

amended in 2009, applies in this case.  The previous version, codified at 31 U.S.C. §

3729(a)(2), imposed liability on "any person who knowingly makes, uses, or causes to

be made or used, a false record or statement to get a false or fraudulent claim paid or

approved by the Government."  As amended, the statute imposes liability on "any

person who knowingly makes, uses, or causes to be made or used, a false record or

statement material to a false or fraudulent claim."

The 2009 law amending the FCA, known as the Fraud Enforcement and

Recovery Act (FERA), provided that the amendment to this particular provision "shall

20

take effect as if enacted on June 7, 2008, and apply to all claims under the False

Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date."  Pub. L. No.

111-21, § 4(f).  Hudalla argues that the meaning of "claims" in FERA section 4(f)

encompasses lawsuits, such as this one, and that the amended version of the statute

therefore applies in this case, which has been pending since before June 2008.  He

contends that the Seventh Circuit has already ruled on this issue, citing the following

footnote from *Yannacopoulos*:

> In 2009, Congress amended the False Claims Act, Pub. L. 111–21, § 4(a)(1),
> making those amendments generally applicable only to conduct occurring on or
> after May 20, 2009, Pub. L. 111–21, § 4(f). The one exception is the amendment
> to section 3729(a)(1)(B), which applies to cases, such as this, that were pending
> on or after June 7, 2008. *Id.*

*Yannacopoulos*, 652 F.3d at 818 n.2.

Walsh responds that the meaning of "claims" is established by the FCA itself,

which defines the term as "any request or demand . . . for money or property."  31

U.S.C. § 3729(b)(2)(A).  It contends that the previous version of the statute should

therefore apply because none of the claims at issue were pending in 2008.  Walsh

argues that the *Yannacopoulos* footnote is "less than dicta; the issue of whether the

new FERA language applied . . . was never raised in the briefs or argument in the case

and was not otherwise addressed in the opinion, and none of the court's holdings even

remotely depended on the question."  Def.'s Resp. at 30.

The Court agrees with Walsh that the reference to "cases" in *Yannacopoulos* is

dicta that does not establish binding precedent on this question.  The question of

whether the FERA amendments applied was not at issue in that case.  The Court also

agrees that the word "claims" in FERA is not a reference to lawsuits.  First, the FCA

itself clearly defines "claim" in a manner that does not include "legal claim," and

"[s]tatutory definitions control the meaning of statutory words." *Mason v. Medline*

*Indus., Inc.*, 731 F. Supp. 2d 730, 734 (N.D. Ill. 2010) (citing *Lawson v. Suwannee Fruit*

*& S.S. Co.*, 336 U.S. 198, 201 (1949)). Second,

> In § 4(f)(2), the provision immediately following the section at issue here, Congress provided that "section 3731(b) of title 31, as amended . . . shall apply to cases pending on the date of enactment." Pub. L. No. 111-21, 123 Stat. 1625. If Congress intended the retroactivity of § 4(f)(1) be measured by "cases," it would have said so just as it did in § 4(f)(2).

*Id*. at 735.

Several other district judges, as well as at least one court of appeals, have

similarly found that FERA did not retroactively apply to cases like Hudalla's. *See, e.g.*,

*Hopper v. Sovay Pharm., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009); *United States v.*

*Hawley*, __ F. Supp. 2d __, No. 06 C 4087, 2011 WL 3295419, at *8-9 (N.D. Iowa Aug.

1, 2011) (collecting cases). The Court finds the logic of these decisions persuasive. It

therefore concludes that the amended version of 31 U.S.C. § 3729(a)(1)(b) does not

apply in this case.

### b. False statement

The Court's conclusion that a reasonable jury could find for either party on count

one applies equally to Hudalla's claim under former section 3729(a)(2). This claim

requires "three essential elements: (1) the defendant made a statement in order to

receive money from the government, (2) the statement was false, and (3) the defendant

knew it was false." *Yannacopoulos*, 652 F.3d at 822 (citing *United States ex rel. Gross*

*v. AIDS Research Alliance – Chicago*, 415 F.3d 601, 604 (7th Cir. 2005)). The statute

provision requires "a causal rather than a temporal connection between fraud and payment," meaning that a statement must be "integral to a causal chain leading to payment."  *Main*, 426 F.3d at 916.

A reasonable jury could find that Walsh created numerous "records" and "statements" to get its claims for payment approved, particularly the SOVs and the interim payment requests that were based on a percentage of the allegedly inflated total project prices.  If Walsh's claims for interim and total payment were based on items for which he was not allowed to bill, all of these statements were false.  Because they were submitted to HUD, the other government agencies, and the developer to obtain approval for and receive payments, a reasonable jury could find that these statements – some of which arguably were false claims in and of themselves – had a sufficient causal connection to the claims to provide a basis for liability.  A reasonable jury also could find that Walsh made the false statements knowing that they would cause the payment of federal funds.

A reasonable jury could also find, however, that Walsh did not commit fraud because HUD's expectation of how Walsh would bill or Walsh's understanding of that expectation were not what Hudalla claims they were.  In that case, neither Walsh's overall claims nor the specific statements it made in an effort to get them paid by the government were false.

For these reasons, the Court denies both parties' motions for summary judgment on count 2.

### Conclusion

For the reasons stated above, the Court grants relator's motion for partial

23

summary judgment [docket nos. 158 & 159] with regard to certain of defendant's affirmative defenses but otherwise denies the motion.  The Court denies defendant's motion for summary judgment [docket no. 152].  The case is set for a status hearing on December 6, 2011 at 9:30 a.m.  Lead trial counsel are directed to appear.  If lead trial counsel are unavailable, those attending the status hearing must have complete knowledge of the trial schedules of lead counsel, because it is likely that the Court will have to reset the currently scheduled trial date.

_____
s/ Matthew F. Kennelly
MATTHEW F. KENNELLY
United States District Judge

Date:  December 3, 2011